UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
                                                    )
KAREN READ,                                         )
            Petitioner                              )
                                                    )
v.                                                  )            No. 25-CV-10399
                                                    )
NORFOLK COUNTY SUPERIOR                             )
COURT, MASSACHUSETTS                                )
ATTORNEY GENERAL,                                   )
            Respondents                             )
                                                    )
_____ )

## MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

Now comes the petitioner Karen Read, by and through undersigned counsel, and hereby respectfully submits this Memorandum in Support of her Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241.

Ms. Read is currently facing an April 1, 2025 retrial in Norfolk County Superior Court, after a prior mistrial in July 2024. This Petition contends that such retrial will violate Ms. Read's Fifth and Fourteenth Amendment protections against Double Jeopardy. The Petition relies upon post-trial statements of five jurors (four directly and one indirectly) that the jury in Ms. Read's first trial reached a final, unanimous decision to acquit her of second-degree murder. Despite massive media publicity regarding these declarations, none of the other seven jurors disputed the accuracy of these post-trial statements. In the usual course, the jury's verdict would have been announced in open court, and re-prosecution for that charge would indisputably be constitutionally prohibited. Here, however, the trial court, assuming but not verifying that juror

1

notes indicating an impasse referred to all rather than just several of the outstanding charges, failed to inquire, pursuant to Mass. R. Crim. P. 27(b), regarding the existence of any partial verdicts (as well as failing to poll the jury) and, for that reason, the jury acquittals were not announced and a mistrial was declared without the defendant's consent.  Contrary to longstanding federal as well as state caselaw, the trial court gave no consideration to any of the existing viable alternatives to a mistrial, nor was defense counsel consulted or given any opportunity to be heard prior to and in relation to the court's declaration of a mistrial.  At no time prior to the trial court's final *sua sponte* decision to respond to a jury note by declaring a mistrial had the trial court even mentioned the word "mistrial."  In these circumstances, the Commonwealth did not satisfy its heavy well-established burden of establishing manifest necessity as a condition precedent for the mistrial which was declared in violation of petitioner's Double Jeopardy rights.

The defense independently maintains that a jury's final, unanimous agreement that Ms. Read is not guilty constitutes an acquittal for Double Jeopardy purposes, and that the trustworthy and uncontradicted post-trial affidavits entitled her at minimum to a judicial inquiry on this issue. The prosecution wants this Court to in essence ignore the declarations of the jurors, ignore the possibility if not probability that the jury unconditionally, finally, and without any ambiguity unanimously found Ms. Read innocent, and avoid any post-trial inquiry that could demonstrate that all 12 jurors unanimously rejected the sufficiency of the prosecution as to two of the three indictments.  The defense has more than met is burden of production regarding the jury's decision to acquit Ms. Read.  Neither the trial court nor the SJC held otherwise.  Instead, the state courts erected an impenetrable procedural barrier to prevent Ms. Read from proving what is

2

clearly true – that the jurors finally and unanimously agreed that Ms. Read did not commit the murder (nor a second charge of leaving the scene) for which she stands charged. This ruling is irreconcilable with the constitutional interest in having decisions by jurors respected and honored. Public respect for the judiciary requires that agreements reached by a jury of the defendant's peers in a matter so consequential not be rendered irrelevant. For these reasons, federal courts favor post-trial *voir dires*, and the denial of such inquiry here violated Ms. Read's Fifth, Sixth, and Fourteenth Amendment federal constitutional rights.

## I.    Procedural Background

On June 9, 2022, Ms. Read was charged in three separate indictments with second-degree murder in violation of Mass. Gen. Laws c. 265, § 1 (Count 1); manslaughter while operating under the influence of alcohol in violation of Mass. Gen. Laws c. 265, § 13½ (Count 2); and leaving the scene of a collision resulting in death in violation of Mass. Gen. Laws c. 90, § 24(2)(a½)(2) (Count 3). (R. 139-44).[1] A jury trial began in Norfolk County Superior Court on April 16, 2024. The trial court declared a mistrial on July 1, 2024.

After the mistrial, Ms. Read moved to dismiss Counts 1 and 3 on Double Jeopardy grounds, contending (1) that the jury reached a final, unanimous decision to acquit her on those charges; and (2) that there was no manifest necessity supporting the mistrial. As set forth in more detail *infra*, the motion was predicated, in part, upon affidavits by counsel reflecting statements of four deliberating jurors that the jury had agreed Ms. Read is not guilty of the

---

[1] The Record Appendix for Ms. Read's appeal to the Supreme Judicial Court is attached as Exhibit A to this Memorandum. The citations to that Record Appendix ("R. _____") correspond to the page numbers in the lower lefthand corner of each page.

relevant counts (and a second-hand statement attributed to a fifth juror stating that the jury had agreed Ms. Read is not guilty of murder).  On August 22, 2024, after hearing oral argument, the Superior Court issued an order denying Ms. Read's motion to dismiss.

On September 11, 2024, Ms. Read filed a petition for relief to the Supreme Judicial Court ("SJC") pursuant to Mass. Gen. Laws c. 211, § 3.  (R. 5).  On September 19, 2024, a single justice of the SJC (Dewar, J.) reserved and reported the case, without decision, to the full Court. (R. 423).

On February 11, 2025, the SJC issued an opinion (hereinafter "Opinion"), attached as Exhibit B to this Memorandum,[2] affirming the denial of Ms. Read's motion to dismiss.  The SJC held that (1) the trial court acted within its discretion in deciding that the jury was at an impasse and that a mistrial was therefore supported by manifest necessity, notwithstanding that the jury never clearly stated that the impasse extended to **all** counts (and the post-trial affidavits make clear that it did not); (2) the trial court adequately considered alternatives to a mistrial, notwithstanding that the court's intention of declaring a mistrial was not so much as mentioned until the trial court *sua sponte* declared one; (3) the trial court was not required to consult with counsel or give counsel an opportunity to be heard regarding the prospect of a mistrial because it had previously solicited counsel's views on whether to give a *Tuey-Rodriguez* charge designed to prevent a mistrial in response to prior jury notes (albeit without mentioning the possibility of a mistrial); (4) the lack of a formal verdict announced in open court precluded any later claim that the jury in fact had unanimously and finally decided to acquit Ms. Read of two of the three

_____

[2] The parties' briefs filed with the SJC are attached as Exhibits C, D, and E.

charges against her; and (5) the defense was not entitled to a post-verdict inquiry to substantiate
its claim of acquittal because the availability of such inquiry is limited to claims of extraneous
influence or juror bias.

## II.    Ms. Read Is Entitled to Federal Review of Her Double Jeopardy Claim Prior to Retrial

Because Ms. Read is currently released on bail, she is in the Commonwealth's custody,
as required to file a 28 U.S.C. § 2241 petition. *See Allen v. Att'y Gen. of Me.*, 80 F.3d 569, 572
(1st Cir. 1996).

The First Circuit has made clear that "[a] petition for habeas relief that raises a colorable
claim of former jeopardy need not invariably await trial and conviction in the state court. Such
claims are distinctive because the Constitution insists that 'courts may not impose more than one
punishment for the same offense and prosecutors ordinarily may not attempt to secure that
punishment in more than one trial.'" *Id.* (quoting *Witte v. United States*, 515 U.S. 389, 397
(1995)). As the Supreme Court has observed, "the rights conferred on a criminal accused by the
Double Jeopardy Clause would be significantly undermined if appellate review of double
jeopardy claims were postponed until after conviction and sentence. To be sure, the Double
Jeopardy Clause protects an individual against being twice convicted for the same crime, and
that aspect of the right can be fully vindicated on an appeal following final judgment . . . .
However, this Court has long recognized that the Double Jeopardy Clause protects an individual
against more than being subjected to double punishments. It is a guarantee against being twice
put to trial for the same offense." *Abney v. United States*, 431 U.S. 651, 660 (1977).
"Obviously, these aspects of the guarantee's protections would be lost if the accused were forced
to 'run the gauntlet' a second time before an appeal could be taken; even if the accused is

acquitted, or, if convicted, has h[er] conviction ultimately reversed on double jeopardy grounds, [s]he has still been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit." *Id.* at 662.

"To realize the solemn promise of this constitutional guaranty, federal habeas courts will in appropriate circumstances entertain a claim that permitting a nascent (but as yet incomplete) state court prosecution to go forward would violate the Double Jeopardy Clause." *Allen*, 80 F.3d at 572. For reasons set forth *infra* Section IV, the defense contends that Ms. Read's retrial on Counts 1 and 3 would violate her federal constitutional protection against Double Jeopardy. Accordingly, Ms. Read "may seek federal habeas corpus relief without first undergoing trial on the challenged indictment[s]." *Id.*; *see also, e.g.*, *Justices of Bos. Mun. Court v. Lydon*, 466 U.S. 294, 303 (1984) ("Because the [Double Jeopardy] Clause protects interests wholly unrelated to the propriety of any subsequent conviction, a requirement that a defendant run the entire gamut of state procedures, including retrial, prior to consideration of h[er] claim in federal court, would require h[er] to sacrifice one of the protections of the Double Jeopardy Clause." (citation omitted)).

## III.    Facts

On June 25, 2024, the jury in Ms. Read's first trial began deliberations after receiving instructions from the trial court. The court instructed the jurors, "You should continue deliberating until you have reached a final verdict on each charge." June 25, 2024 Tr. at 46 (R. 190). It also noted that Count 2 contained "lesser include[d] charge[s]" of involuntary manslaughter and motor vehicle homicide, which the jury should consider "even if [the

Commonwealth] fail[ed] to prove the greater charge of manslaughter while operating a motor vehicle under the influence of liquor." *Id.* at 35, 38 (R. 179, 182).

The following day, on June 26, 2024, outside the presence of the jury, counsel for Ms. Read raised an issue regarding the verdict form. With respect to Count 2, the original verdict slip provided only one option to find Ms. Read not guilty before going on to ask whether Ms. Read was guilty of the offense charged, or guilty of one of the two lesser included offenses. *See* Exhibit B to Affidavit in Support of Motion to Amend Jury Verdict Slip (R. 239). Counsel asked that the form be amended to provide "not guilty options for the subordinate charges under Count 2." June 26, 2024 Tr. at 5 (R. 212). The trial court initially indicated its disagreement with counsel's request. *See id.* at 8 (R. 215). However, after considering the matter further, the court agreed to provide supplemental instructions and an amended verdict slip. *See id.* at 9-14 (R. 216-21). Later that day, the court provided the supplemental instructions, telling jurors that "Count 2 encompasses three separate charges, the most serious of which is manslaughter while operating a vehicle under the influence of liquor." *Id.* at 16 (R. 223). The jury should first focus on that "lead charge" and, "if the Commonwealth . . . failed to prove that crime beyond a reasonable doubt, then . . . consider the remaining lesser included offenses in descending order." *Id.* (R. 223).

On June 28, 2024, the jury sent the following note to the court: "I am writing to inform you on behalf of the jury that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict." June 28, 2024 Tr. at 4 (R. 250). The court asked counsel for their views "on whether there ha[d] been due and thorough deliberations" sufficient to support the giving of a so-called *Tuey-Rodriguez*

charge.  *Id.* at 5 (R. 251); *see also* Mass. Gen. Laws c. 234A, § 68C.[3]  The Commonwealth

responded that the charge should not be given because there "simply ha[d]n't been sufficient

time yet."  June 28, 2024 Tr. at 5 (R. 251).  Counsel for Ms. Read disagreed, requesting that the

court "read the *Tuey-Rodriguez* model instruction and go from there."  *Id.* at 6 (R. 252).  The trial

court sided with the Commonwealth ruling, "I am not prepared to find that there have been due

and thorough deliberations at this point.  So I am going to send them back out."  *Id.* at 7 (R. 253).

On July 1, 2024, the jury presented another note, stating:

> despite our commitment to the duty entrusted to us, we find
> ourselves deeply divided by fundamental differences in our
> opinions and state of mind.  The divergence in our views are not
> rooted in a lack of understanding or effort but deeply held
> convictions that each of us carry, ultimately leading to a point
> where consensus is unattainable.  We recognize the weight of this
> admission and the implications it holds.

July 1, 2024 Tr. at 7 (R. 264).  Upon being asked by the court, the parties reiterated their same

previously expressed views, with the Commonwealth taking the position that due and thorough

deliberations had not yet occurred and Ms. Read's counsel arguing that the court should give a

*Tuey-Rodriguez* instruction.  *See id.* at 4-6 (R. 261-63).  This time, the trial court decided to give

the requested instruction.

Later that day, the jury sent yet another note.  Thereafter, without reading the note to

counsel, and without providing counsel with either an opportunity to be heard or an opportunity

to consult with their client about the implication of a potential mistrial on one or more charges,

---

[3] In the SJC's words, "[t]he *Tuey-Rodriguez* charge is a model instruction given when jurors
report a deadlock after due and thorough deliberation that is designed to urge the jury to reach a
verdict by giving more serious consideration to opposing points of view."  Opinion at 5 n.4
(citation omitted).

the trial court simply stated, "The jury is at an impasse" and immediately called in the jurors. *Id.*

at 10 (R. 267). It then read the note on the record:

> despite our rigorous efforts, we continue to find ourselves at an
> impasse. Our perspectives on the evidence are starkly divided.
> Some members of the jury firmly believe that the evidence
> surpasses the burden of proof, establishing the elements of the
> charges beyond a reasonable doubt. Conversely, others find the
> evidence fails to meet this standard and does not sufficiently
> establish the necessary elements of the charges. The deep division
> is not due to a lack of effort or diligence but, rather, a sincere
> adherence to our individual principles and moral convictions. To
> continue to deliberate would be futile and only serve to force us to
> compromise these deeply held beliefs.

*Id.* at 11 (R. 268).

After reading the note, and without soliciting the views of counsel in any respect, the trial

court stated, "I am not going to do that to you, folks. Your service is complete. I am declaring a

mistrial in this case." *Id.* (R. 268). The jury was then excused and ordered to leave the

courtroom. Counsel was not invited to speak during this entire interaction. *See id.* (R. 268).

The following day, on July 2, 2024, unsolicited by any party, one of the jurors ("Juror

A") contacted one of the attorneys for Ms. Read, Alan Jackson. Juror A stated that s/he

"wish[ed] to inform [Attorney Jackson] of the true *results*" of the jury's deliberations. Affidavit

of Alan J. Jackson ¶ 4 (R. 286).[4] According to Juror A, "the jury unanimously agreed that Karen

Read is NOT GUILTY of Count 1 (second degree murder). Juror A was emphatic that Count 1

(second degree murder) was 'off the table,' and that all 12 of the jurors were in agreement that

she was NOT GUILTY of such crime." *Id.* ¶ 5 (R. 287). "[T]he jury also unanimously agreed

---

[4] For purposes of adjudicating Ms. Read's Double Jeopardy claim, both the trial court and the
SJC "accepted" the juror statements reflected in the post-trial affidavits "as true and accurate."
Opinion at 26 n.14.

that Karen Read is NOT GUILTY of Count 3 (leaving the scene with injury/death)." *Id.* ¶ 6 (R. 287).

One day later, on July 3, 2024, another attorney for Ms. Read, David Yannetti, was contacted by "two different individuals (hereinafter, 'Informant B' and 'Informant C') who had received information from two distinct jurors (hereinafter 'Juror B' and 'Juror C') both of whom were part of the deliberating jury in this case." Affidavit of David R. Yannetti ¶ 2 (R. 283).

Informant B sent Attorney Yannetti "a screenshot he/she had received from someone (hereinafter, 'Intermediary B') of text messages that Intermediary B had received from Juror B. In that screenshot, Juror B texted the following to Intermediary B:  'It was not guilty on second degree.  And split in half for the second charge. . . .  I thought the prosecution didn't prove the case.  No one thought she hit him on purpose or even thought she hit him on purpose [sic].'" *Id.* ¶ 4 (R. 283).  Juror B later placed an unsolicited phone call to Attorney Yannetti, confirming that the information contained in the publicly filed Affidavit was accurate.  *See* Supplemental Affidavit of David R. Yannetti ¶ 4 (R. 330).  "Juror B clarified, however, that he/she meant to write, 'No one thought she hit him on purpose or even knew that she had hit him.'" *Id.* (R. 330-31).  Juror B further told Attorney Yannetti s/he "believe[d] that every member of the jury, if asked, w[ould] confirm that the jury reached Not-Guilty verdicts on indictments (1) and (3)." *Id.* ¶ 5 (R. 331).

Informant C had been in contact with another individual ("Intermediary C") who is a co-worker and friend of Juror C and joined a Zoom meeting during which Juror C discussed the trial.  Informant C sent Attorney Yannetti the below screenshots of his/her text messages with Intermediary C regarding what Juror C revealed in the Zoom meeting:

| Intermediary C: | "no consideration for murder 2. manslaughter started polling at 6/6 then ended deadlock @ 4no8yes." |
|---|---|

. . . .

| Informant C: | "interesting.  if it was no consideration for murder two, shouldn't she have been acquitted on that count.   and hung on the remaining chargers [sic] goes back to the jury verdict slip that was all confusing" |
|---|---|

| Intermediary C: | "she should've been acquitted I agree.  Yes, the remaining charges were what they were hung on.  and that instruction paper was very confusing." |
|---|---|

Affidavit of David R. Yannetti ¶ 10 (R. 284-85).

After the filing of Ms. Read's initial motion to dismiss, but before the Superior Court hearing on that motion, Attorney Jackson was contacted by two other deliberating jurors.  The first, "Juror D," stated "that the jury reached NOT GUILTY verdicts on Count 1 and Count 3, and that the disagreement was solely as to Count 2 and its lesser offenses."  Supplemental Affidavit of Alan J. Jackson ¶ 5 (R. 293).  S/he recounted that, "after the jury was excused and aboard the bus, many of the jurors appeared uncomfortable with how things ended, wondering, *Is anyone going to know that we acquitted [Karen Read] on Count 1 and 3?*"  *Id.* ¶ 8 (R. 293).  Juror D unequivocally told counsel, "*Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3.  Because that's what happened.*"  *Id.* ¶ 10 (R. 293).  "Juror E" similarly stated "that the jury was 'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges."  Second Supplemental Affidavit of Alan J. Jackson ¶ 4 (R. 323).

The Commonwealth filed a post-trial notice of disclosure informing the court that, "[o]n Sunday July 21, 2024, Assistant District Attorney Adam Lally received an unsolicited voicemail on his office's phoneline from an individual, who identified their self as a juror by full name and seat number."  Commonwealth Notice at 1 (R. 325).  The message stated, "it is true what has come out recently about the jury being unanimous on charges 1 and 3."  *Id.* (R. 325).  ADA Lally received a subsequent message from the same individual stating he could "confirm unanimous on charges one and three, as not guilty and as of last vote 9-3 guilty on the manslaughter charges . . . ."  *Id.* (R. 325).  The Commonwealth additionally "received emails from three individuals who identified themselves as jurors" and "indicated they wished to speak anonymously."  *Id.* (R. 325).  The Commonwealth declined to substantively respond to the voice messages or emails, instead claiming in responsive emails that it was ethically prohibited from discussing such matters.  *See id.* (R. 325).

## IV.    Re-Prosecution on Counts 1 and 3 Will Violate Ms. Read's Double Jeopardy Rights

### A.    Standard of Review

Because Ms. Read is "awaiting trial on state criminal charges," she "is not in custody pursuant to the SJC's judgment."  *Gonzalez v. Justices of Mun. Court of Bos.*, 382 F.3d 1, 6 (1st Cir. 2004), *vacated on other grounds and subsequently reinstated*, 420 F.3d 5.  Accordingly, this Petition is brought under 28 U.S.C. § 2241, not § 2254.  *See id.*  Section 2254's restrictions on the scope of habeas review, therefore, do not apply.  *See id.* at 7.  Instead, the Court "must defer to the SJC's findings of fact, but must undertake plenary review of that court's resolution of issues of law."  *Id.* (citation omitted); *see also Christian v. Wellington*, 739 F.3d 294, 298 (6th Cir. 2014) ("[H]abeas petitions governed by § 2241 are not subject to the heightened standards

contained in § 2254(d)." (citation omitted)). "Ordinarily, a motion to dismiss on double jeopardy grounds rests on a pure question of law that [the Court] review[s] de novo." *United States v. Candelario-Santana*, 977 F.3d 146, 154 (1st Cir. 2020).

      B.    <u>The Constitutional Protection Against Double Jeopardy</u>

      The ancient right to a jury trial is no mere "procedural formalit[y] but [rather a] fundamental reservation[] of power to the American people." *Erlinger v. United States*, 602 U.S. 821, 832 (2024) (citation omitted). "By requiring the Executive Branch to prove its charges to a unanimous jury beyond a reasonable doubt, the Fifth and Sixth Amendments seek to mitigate the risk of prosecutorial overreach and misconduct, including the pursuit of 'pretended offenses' and 'arbitrary convictions.'" *Id.* (citation omitted). "Prominent among the reasons colonists cited in the Declaration of Independence for their break with Great Britain was the fact Parliament and the Crown had 'depriv[ed] [them] in many cases, of the benefits of Trial by Jury.'" *Id.* at 829 (citation omitted). "After securing their independence, the founding generation sought to ensure what happened before would not happen again. As John Adams put it, the founders saw representative government and trial by jury as 'the heart and lungs' of liberty." *Id.* (citation omitted). It follows that a jury acquittal is entitled to the utmost respect in our criminal justice system. *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) ("Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that [a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution." (citation omitted)).

      "The Double Jeopardy Clause provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Blueford v. Arkansas*, 566 U.S. 599, 605

(2012) (quoting U.S. Const., Amdt. 5). "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense." *Green v. United States*, 355 U.S. 185, 187 (1957). "Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which [s]he is stigmatized by an unresolved accusation of wrongdoing, and ***may even enhance the risk that an innocent defendant may be convicted***." *Arizona v. Washington*, 434 U.S. 497, 503-04 (1978) (internal footnotes omitted) (emphasis added); *see also Martin Linen*, 430 U.S. at 569 ("At the heart of this policy is the concern that permitting the sovereign freely to subject the citizen to a second trial for the same offense would arm Government with a potent instrument of oppression."); *Blueford*, 566 U.S. at 605 ("The Clause guarantees that the State shall not be permitted to make repeated attempts to convict the accused, thereby subjecting h[er] to embarrassment, expense and ordeal and compelling h[er] to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent [s]he may be found guilty." (citation omitted)).

    C.    <u>Re-Prosecution Is Barred Because There Was No Manifest Necessity to Declare a Mistrial on Counts on which the Jury Was Not Deadlocked</u>

"[A]s a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Washington*, 434 U.S. at 505. This rule is rooted in "the importance to the defendant of being able, once and for all, to conclude h[er] confrontation with society through the verdict of a tribunal [s]he might believe to be favorably disposed to h[er] fate." *United States v. Jorn*, 400 U.S. 470, 486 (1971) (plurality opinion); *see also Oregon v. Kennedy*, 456 U.S. 667, 671-72 (1982) ("[T]he Double Jeopardy Clause affords a criminal defendant a

valued right to have h[er] trial completed by a particular tribunal." (citation omitted)).  Thus,

"after a mistrial has been declared without the defendant's request or consent,"[5] the

permissibility of retrial "depends on whether there [wa]s a manifest necessity for the [mistrial]."

*United States v. Dinitz*, 424 U.S. 600, 606-07 (1976) (citation omitted).  The "power" to

discharge a jury without a verdict "ought to be used with the greatest caution, under urgent

circumstances, and for very plain and obvious cases."  *United States v. Ramirez*, 884 F.2d 1524,

1528 (1st Cir. 1989) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)).

> ***Importantly, the "heavy" burden of establishing "manifest necessity" to justify a
> mistrial is exclusively on the Commonwealth***, *Washington*, 434 U.S. at 505 (emphasis added), a

burden that the state courts erroneously placed on the defendant.  In assessing whether the

prosecution satisfied its burden on this point, the First Circuit has stated it is "useful to consider"

the following three factors: "(1) whether the [trial] court consulted with counsel; (2) whether the

court considered alternatives to a mistrial; and (3) whether the court adequately reflected on the

circumstances before making a decision."  *United States v. Garske*, 939 F.3d 321, 334 (1st Cir.

2019) (citation omitted).  "Embracing both . . . consideration of alternatives and consultation

with counsel[] is the amount of time devoted by the judge to the mistrial decision.  A precipitate

decision, reflected by a rapid sequence of events culminating in a declaration of mistrial . . .

tend[s] to indicate insufficient concern for the defendant's constitutional protection."  *Brady v.*

---

[5] The SJC did not find that Ms. Read or her counsel consented to the mistrial here.  *See* Opinion at 25 n.13.  And for good reason.  Neither Ms. Read nor her counsel requested or expressly consented to a mistrial.  While consent may, in some circumstances, be implied "from a failure to object," any such finding requires, "at a bare minimum, that the defendant . . . had an adequate opportunity to register an effective objection."  *United States v. Toribio-Lugo*, 376 F.3d 33, 40 (1st Cir. 2004).  For reasons discussed *infra* pages 16-18, no such opportunity was provided here.

*Samaha*, 667 F.2d 224, 229 (1st Cir. 1981).

Although, in other circumstances, "a reviewing court may defer to the trial court's discretion to make a mistrial decision, '[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to h[er], the reason for such deference . . . disappears." *Id.* (quoting *Washington*, 434 U.S. at 510 n.28); *see also Commonwealth v. Steward*, 396 Mass. 76, 79 (1985) (stating that deferential review of a trial court's exercise of discretion as to when to declare a mistrial is appropriate "only if it is clear from the record that the judge has given careful consideration to the available alternatives and to the defendant's interest in having the trial concluded in a single proceeding." (citation omitted)).  Here, the SJC, at the outset, committed legal error by relying heavily upon the trial court's discretion, notwithstanding that the record reflected no consideration of any alternatives to a mistrial, *i.e.*, no exercise of such discretion.  *See* Opinion at 13-15, 21-22, 24-25.

Turning to the relevant factors, "[t]he first thing to be noted is that the [trial] judge did not give counsel an opportunity to object or discuss with them the advisability of a mistrial." *Ramirez*, 884 F.2d at 1529.  Upon receiving the final jury note, the court declared a mistrial and excused the jury without consulting counsel.

Video footage[6] reinforces the suddenness of the court's action and corresponding lack of any meaningful opportunity to be heard.  At the approximately 5:47:25 mark of the video, the court took the bench and stated, "[t]he jury is at an impasse."  In contrast to the procedure followed as to prior notes, this note was not read to counsel.  Instead, the court immediately

---

[6]https://www.youtube.com/watch?v=0An5qcRINe8&list=PLGE3I9evF9H_XqVRt8WzVmdIClu MirtCg&t=7s

called for the jury to be brought in.  The sound of a door opening or closing can be heard and

then, at approximately 5:47:55, a mere 30 seconds later, the jury arrived in the courtroom.  The

court then read the note, which had not previously been provided or read to counsel, on the

record.  At 5:49:23, the court stated it was declaring a mistrial and immediately discharged the

jury at 5:49:30, a mere seven seconds later.  These circumstances did not provide Ms. Read's

counsel with a meaningful opportunity to be heard.  *See Ramirez*, 884 F.2d at 1527 (finding lack

of sufficient opportunity where, after hearing testimony regarding potential defect in jury venire,

district court stated its intent to declare mistrial, then called for the jury to be brought in and

discharged them); *Candelario-Santana*, 977 F.3d at 162 (finding lack of sufficient opportunity to

object where "[t]he district court only addressed counsel after reading and confirming the verdict

in open court to ask if there was '[a]nything else' before discharging the jury").

Legal and factual context renders the trial court's action even more unexpected.  Legally,

trial counsel was entitled to rely on decades of caselaw expressly requiring a "full opportunity to

be heard" before the declaration of a mistrial.  *Steward*, 396 Mass. at 79.[7]  Factually, in response

to multiple prior jury notes in this case, the trial court had advised counsel of the contents and

afforded them time first to consider and then be heard regarding any issues raised.  (R.250-51,

261-62).  The trial court's deviation from that well-known and accepted practice with respect to

the final note was a "precipitate decision, reflected by a rapid sequence of events culminating in

a declaration of mistrial."  *Brady*, 667 F.2d at 229.  It also deprived defense counsel of any

opportunity to raise issues or even discuss potential remedies with their client.

---

[7] *See also Commonwealth v Taylor*, 486 Mass. 469, 484 (2020); *Commonwealth v. Nicoll*, 452
Mass. 816, 818 (2008); *Picard v. Commonwealth*, 400 Mass. 115, 118 (1987); *Commonwealth v. Horrigan*, 41 Mass. App. Ct. 337, 340 (1996).

Moreover, the defense respectfully submits that, given the importance of Double Jeopardy protections and the profound implications of a retrial for a criminal defendant, an opportunity to be heard must, in order to be meaningful, occur after a reasonable opportunity for counsel to consult with their client. *See United States v. Pierce*, 593 F.2d 415, 417 n.1 (1st Cir. 1979) (noting in finding lack of manifest necessity that counsel had no opportunity to discuss the prospect of a mistrial with his client). Counsel for Ms. Read clearly had no such opportunity here.

The SJC erred in multiple respects in ruling that the trial court's prior consultation with counsel was sufficient to excuse the absence of such consultation at the pivotal moment prior to any declaration of a mistrial. First, the SJC erred in relying upon the trial court's solicitation of counsel's views in response to the first two jury notes. Those discussions related solely to the propriety of giving a *Tuey-Rodriguez* charge, which again "is designed to urge the jury to reach a verdict," Opinion at 5 n.4 (citation omitted), and presents a distinct legal issue from the declaration of a mistrial. Defense counsel's request for a *Tuey-Rodriguez* charge implies that their desire was not to have a mistrial but instead to have the trial court urge this jury to reach a verdict. Second, the SJC was wrong in simply assuming that consultation regarding the third note would not "have produced any fruitful alternatives." Opinion at 23 (citation omitted). This reading of the silent record against the defense is contrary to the clear Supreme Court caselaw placing the burden of establishing manifest necessity on the prosecution. *See supra* page 15. Indeed, the SJC's Opinion does not so much as mention the appropriate allocation of the burden to the Commonwealth. Moreover, as set forth *infra* pages 19-22, there were alternatives to the declaration of a mistrial here, so it is far from clear that consultation would not have proved

18

fruitful.

      The record is independently lacking on the second prong, as it reflects no judicial consideration of alternatives to a mistrial.  Here, there was one obvious alternative: to simply ask the jury to specify the charge(s) on which it was deadlocked and/or to ask the jury whether or not its final note related to all or less than all of the charges.  This option is apparent from the face of Mass. R. Crim. P. 27(b) which states that "[t]he judge may declare a mistrial as to any charges upon which the jury cannot agree upon a verdict; **_provided_**, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded."  (Emphasis added).  In fact, the reporter's notes expressly indicate that such reception of partial verdicts is **_required_** before a mistrial may be declared for manifest necessity.  *See* Mass. R. Crim. P. 27, reporter's notes ("This rule also provides that the court may declare a mistrial in cases where the jury is unable to reach a verdict. However, it **_must_** first receive and record the verdicts which the jury can agree upon." (emphasis added)).  Had the court inquired as to the existence of any partial verdicts, and the jury articulated its verdict consistent with the statements of Juror A, Juror B, Juror C, Juror D, and Juror E, the Double Jeopardy implications would have been clear and decisive.  "[I]ndeed, with virtual unanimity, the cases have applied collateral estoppel to bar the Government from relitigating a question of fact that was determined in defendant's favor by a partial verdict." *United States v. Mespoulede*, 597 F.2d 329, 336 (2d Cir. 1979); *see also Wallace v. Havener*, 552 F.2d 721, 724 (6th Cir. 1977) ("When the jury hands down a partial verdict, a final judgment is rendered on the counts upon which the jury has reached agreement.").

The First Circuit's decision in *United States v. Toribio-Lugo*, 376 F.3d 33 (1st Cir. 2004), provides a helpful analogue. There, in the midst of trial, upon noticing "that only eleven jurors were present," the district judge "consulted with both the prosecutor and the [defendant's] lawyers," outlining "two options: either postpone the trial until the twelfth juror could be located or proceed with a jury of eleven." *Id.* at 36. Defense counsel "conferred with her client and informed the judge that the [defendant] did not wish to proceed at that moment with eleven jurors, but, rather, would like to wait for . . . a twelve-member jury." *Id.* (internal quotation marks omitted). Shortly thereafter, the judge learned for the first time "that the missing juror had been absent during some or all of the earlier portions of the trial. The judge then announced that he was going to declare a mistrial because only eleven jurors had heard the evidence and he did not believe that there was any way to cure that defect." *Id.* The trial judge denied a subsequent motion to dismiss on the grounds "that a mistrial was required by manifest necessity because only eleven jurors remained and the [defendant] had refused to proceed with fewer than twelve." *Id.*

The First Circuit reversed, finding that "there was a clear alternative to a mistrial: proceeding with eleven jurors." *Id.* at 39. While the district court had "tentatively explored" that alternative, it "never exhausted" it. *Id.* "The court never offered the [defendant] a choice between proceeding with eleven jurors or accepting a mistrial." *Id.* In fact, "during the pertinent time frame," the court "made no effort to ascertain the [defendant's] attitude or wishes with regard to the possibility of a mistrial. In view of these omissions, the record compel[led] a conclusion that the 'jury of eleven' alternative was not adequately explored." *Id.* This

conclusion was "dispositive" because, "[w]here there is a viable alternative to a mistrial and the [trial] court fails adequately to explore it, a finding of manifest necessity cannot stand." *Id.*

The present case reflects even less consideration of alternatives to a mistrial. While the trial court discussed the two prior jury notes reporting an impasse with counsel, it did so only in the context of deciding whether to give a *Tuey-Rodriguez* charge, and the court did not even mention the prospect of a mistrial. The SJC, therefore, legally erred in finding that the trial court's response to the first two jury notes reflected adequate consideration of alternatives to a mistrial. *See* Opinion at 16. "[T]here is nothing in the record to indicate that the judge was considering a mistrial at that time." *Brady*, 667 F.2d at 230. While the notes stated that the jury had reached an impasse on some "charges," "[t]he test is not whether the judge considered that [s]he had a potential problem on h[er] hands but rather whether [s]he 'accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding.'" *Id.* (quoting *Washington*, 434 U.S. at 516). "With the record barren of any hint whatsoever that the judge was aware of the double jeopardy implications of h[er] decision," the defense respectfully submits that this Court cannot find "that h[er] discretion was sound." *Id.* at 230-31.

The statutory prohibition on ordering the jury to continue deliberations without consent, *see* Mass. Gen. Laws c. 234A, § 68C, was one among many factors that the trial court should have considered in consultation with the parties. The statute would not have prohibited the trial court from simply asking whether the jury had reached a verdict on any count(s) or asking the jury whether its impasse related to all or less than all charges. Contrary to the SJC's suggestion, *see* Opinion at 19-20, there is simply nothing coercive about asking a jury whether it has reached a verdict on some but not all separately charged counts. *See, e.g.*, *United States v. Armstead*, 116

F.4th 519, 526 (D.C. 2024) (affirming instruction that "simply asked the jury to report any partial verdict it had already reached" as non-coercive); *United States v. Kechego*, 91 F.4th 845, 852 (6th Cir. 2024) ("[A] court does not err if it asks about a partial verdict [even] when it is clear that the jury is at an impasse and further deliberations would prove fruitless.").[8]  Moreover, the trial court could have alternatively (a) informed the jury that it could not be required to continue deliberations without its consent and still (b) asked it to retire to consider whether it was prepared to return any partial verdict.  *See Commonwealth v. Jenkins*, 416 Mass. 736, 739-40 (1994).  This Massachusetts statute, on its face, by permitting the jury to be sent back to continue deliberating with its consent, contemplates that courts may non-coercively make a post *Tuey-Rodriguez* inquiry to the jury as to whether it consents to continuing deliberations on all or less than all charges.  Whether the trial court would have ultimately adopted any of these alternatives is beside the point.  The dispositive fact for present purposes is that the record provides no indication that the trial court even considered available alternatives.[9]

---

[8] *Blueford* held that, before declaring a mistrial, the trial court was not required to permit the jury to return a partial verdict on lesser-included offenses within a single charge.  The Supreme Court explained that, "under Arkansas law, the jury's options . . . were limited to two: either convict on one of the offenses, or acquit on all."  566 U.S. at 610.  *Commonwealth v. Roth*, 437 Mass. 777 (2002), a case relied upon by the SJC, also involved lesser-included offenses within a single count.  By contrast, where, as here, "a complaint or indictment, in multiple counts, charges multiple crimes," a partial verdict is an available alternative under Massachusetts law.  *A Juvenile v. Commonwealth*, 392 Mass. 52, 55 n.1 (1984); *see also Roth*, 437 Mass. at 793 n.13 (distinguishing situation "where a defendant has been charged in separate indictments or complaints, each with a separate verdict slip").

[9] As stated *supra* page 15, the federal constitutional burden to justify a mistrial is clearly on the Commonwealth, yet the state court not only failed to identify that burden but improperly placed the burden on the defendant on subjects such as the consideration of alternatives.

While the law is clear that a jury deadlock may constitute manifest necessity, "[t]he key to this principle, of course, is that the jury must be *genuinely* deadlocked." *Candelario-Santana*, 977 F.3d at 158. Here, it is "possible" to read the jury notes, in the context of the trial court's instructions, as reflecting an impasse on one count but not others. *Id.* at 159. The jury's reference to "charges" is easily reconciled with the post-trial affidavits affirming that the only deadlock related to the lesser-included offenses of Count 2. Indeed, the trial court repeatedly referred to those lesser-included offenses as distinct and multiple "charge[s]," both in its initial and supplemental instructions to the jury. *See* June 25, 2024 Tr. at 35, 38 (R. 179, 182); June 26, 2024 Tr. at 16 (R. 223). In this context, the jury's final note was facially susceptible to two alternative interpretations: (1) that the jury had reached an impasse as to all charges, or (2) that the deadlock applied to only some of those charges (*e.g.*, multiple lesser-included allegations within a single count such as Count 2). It was not an unambiguous note affirmatively declaring an impasse on all charges as assumed by the SJC. The information received from jurors post-trial proves the latter interpretation was correct. The jury's failure to expressly mention its agreement on Counts 1 and 3 is understandable in light of the court's instruction that it "should continue deliberating until" it had "reached a final verdict on *each* charge." June 25, 2024 Tr. 46 (R. 190) (emphasis added). For these reasons, the SJC was wrong to characterize the juror affidavits underlying the defense motion as "inconsistent" with the jury notes. Opinion at 3. The jury simply never stated that it was unable to "reach[] a unanimous verdict on *any* of the charges." Opinion at 3 (emphasis added). The SJC did not mention, much less analyze, the reading of the notes set forth by the defense above.

The trial court "took no steps to clarify the jury's" notes.  *Candelario-Santana*, 977 F.3d at 160.  In the Double Jeopardy context, where the Commonwealth alone bears the burden of establishing manifest necessity, this ambiguity must be read in the defendant's favor.  *See id.* at 161 ("[A]mbiguous verdicts . . . must be construed in favor of the defendant."); *Downum v. United States*, 372 U.S. 734, 738 (1963) ("We resolve any doubt in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion." (citation omitted)).  The SJC therefore erred in construing the jury notes as an unambiguous declaration of an impasse on all counts.[10]

"In sum, a decision . . . made so precipitately could not have been the product of any careful consideration of the valued right of the defendant[] to have [her] guilt or innocence determined" in a single trial.  *Brady*, 667 F.2d at 230.  This, in itself, precludes the Commonwealth from retrying Ms. Read on Counts 1 and 3.

D.    The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution

"[W]hat constitutes an 'acquittal' is not to be controlled by the form" of the action in question.  *Martinez v. Illinois*, 572 U.S. 833, 841-42 (2014) (citation omitted).  "Rather, [the Court] must determine whether" the action "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged."  *Martin Linen*, 430 U.S. at 571. "[L]abels—including those provided by state law—do not control [the] analysis . . . ."  *McElrath*

---

[10] In *Commonwealth v. Daniels*, 441 Mass. 1017, 1017 (2004), the jury responded by a *Tuey-Rodriguez* charge by saying it had not reached a unanimous decision on ***any*** of the charges.  The trial judge then asked counsel for his position, and counsel said he did not object to a mistrial. *Daniels* does not, therefore, support the SJC's finding that the trial court appropriately exercised its discretion here.  In any event, *Daniels* does not bind this Court in its analysis of the federal constitutional issue.

*v. Georgia*, 601 U.S. 87, 96 (2024) (citation omitted).  This is because "***whether an acquittal has occurred for purposes of the Double Jeopardy Clause is a question of federal, not state, law***." *Id.* (emphasis added).

Here, the affidavits by Attorneys Jackson and Yannetti reflect statements by four deliberating jurors that the jury had reached a final, unanimous conclusion that Ms. Read is not guilty of Counts 1 and 3 (and an indirect statement by a fifth juror that they had agreed with respect to Count 1).  Both the trial court and the SJC, for purposes of ruling on the Double Jeopardy issue, "proceed[ed] from the assumption that the affidavits [we]re accurate."  Opinion at 26 n.14.  There was nothing tentative about the jurors' statements.  To the contrary, they were definitive in describing the result of the jury's deliberations.  *See* Affidavit of Alan J. Jackson ¶ 5 (R. 287) ("Juror A was emphatic that Count 1 (second degree murder) was 'off the table,' and that all 12 of the jurors were in agreement that she was NOT GUILTY of such crime."); Affidavit of David R. Yannetti ¶ 4 (R. 283) (reflecting text message from Juror B, "It was not guilty on second degree. . . .  No one thought she hit him on purpose or even [knew that she had hit him]"); *Id.* ¶ 10 (R. 284-85) (reflecting Juror C's statement, relayed by Intermediary C, that there was "no consideration for murder 2" and Ms. Read "should've been acquitted" on that count); Supplemental Affidavit of Alan J. Jackson ¶ 10 (R. 293) ("Juror D, without hesitation, said in substance, *Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3.  Because that's what happened.*"); Second Supplemental Affidavit of Alan J. Jackson ¶ 4 (R. 323) ("Juror E explained that the jury was 'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges.").  Despite significant publicity that accompanied the filing of the defense motion relying on jury declarations, none of the remaining

25

jurors ever communicated to the court, the court's staff, the District Attorney's office, defense counsel, or the media that they disputed the accuracy of the five jurors' representations.

In rejecting Ms. Read's claim of acquittal, the SJC relied solely upon the lack of a formal verdict "returned, received, and recorded in open court." Opinion at 29. This reasoning is rooted in a formalism that has been consistently rejected by the Supreme Court in a string of precedents spanning more than one hundred years. *See supra* page 24 (citing cases); *Ball v. United States*, 163 U.S. 662, 671 (1896) ("However it may be in England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense."); *Hudson v. Louisiana*, 450 U.S. 40, 41 & n.1 (1981) (holding that judicial grant of new trial prohibited retrial on Double Jeopardy grounds, notwithstanding that the state "Code of Criminal Procedure d[id] not authorize trial judges to enter judgments of acquittal in jury trials"). "[T]he Double Jeopardy clause . . . prohibits reexamination of a court-decreed acquittal to the same extent it prohibits reexamination of an acquittal by jury verdict." *Smith v. Massachusetts*, 543 U.S. 462, 467 (2005). The Supreme Court has, for example, "consistently refused to rule that jeopardy for an offense continues after an acquittal, ***whether that acquittal is express or implied*** by a conviction on a lesser included offense . . . ." *Price v. Georgia*, 398 U.S. 323, 329 (1970) (emphasis added); *see also Green*, 355 U.S. at 190 (similar).[11]

_____

[11] The SJC's reliance upon an almost 90-year-old Supreme Court of Tennessee opinion, which has never been cited in any published federal court decision, is unpersuasive in light of the foregoing authorities. *See* Opinion at 29 (citing *Clark v. State*, 170 Tenn. 494, 502 (1936)). Additionally, *Clark* did not foreclose the success of the Double Jeopardy claim at issue. In fact, it expressly "reserved" such claim observing, "should the petitioner be again arraigned, the learned trial judge, if convinced that in truth and in fact all twelve of the jurors on this trial did agree, and continued to the end of their deliberations to agree, that petitioner was innocent, and that they failed to so report only because of a mistaken conception of their authority in the matter, may well conceive it his duty to exercise the right vested in him, of advising the entry of

Under the SJC's reasoning, affidavits executed by all 12 jurors attesting to a final, unanimous decision to acquit would not be sufficient to mount a successful Double Jeopardy challenge. Surely, that cannot be the law. Indeed, it ***must*** not be the law. And, in the context of this highly publicized case, it strains credulity to suggest that, if the unequivocal statements of five jurors quoted above did not, in fact, represent the unanimous view of all 12, the remaining jurors would allow the inaccuracy to go uncorrected. Instead, they would predictably have notified the Commonwealth or the trial court of their own recollection. Here, to the contrary, the Commonwealth has received the exact same information as the defense regarding the jury's unanimous agreement to acquit Ms. Read on Counts 1 and 3.

The Supreme Court's decision in *Blueford* is not to the contrary, as it is factually distinguishable from the instant case. There, the foreperson had reported during deliberations that the jury "was unanimous against" the charges of capital murder and first-degree murder but split on manslaughter. 566 U.S. at 603-04. The court sent the jury back to continue deliberations and, when the jury remained unable to reach a verdict, declared a mistrial. *See id.* at 604. The Supreme Court rejected the defendant's argument that the Double Jeopardy Clause prohibited re-prosecution for capital and first-degree murder. In doing so, the Court relied heavily upon the lack of finality of the juror's report. "[T]he jury's deliberations had not yet concluded," and it "went back to the jury room to deliberate further." *Id.* at 606. "The foreperson's report was not a final resolution of anything," and there was no indication at the conclusion of deliberations that "it was still the case that all 12 jurors believed [the defendant]

---

a nolle prosequi." *Clark*, 170 Tenn. at 648.

was not guilty of capital or first-degree murder." *Id.* Here, by contrast, the jurors' statements reflect a final and indelible determination that persisted through the end of deliberations and following.

The defense respectfully submits that this Court should hold that Ms. Read may not be forced to stand trial a second time for an offense a previous jury found her not guilty of simply because such final, unanimous agreement was not announced in open court. Any lack of formality does not supersede the defendant's fundamental constitutional protections. *See United States v. Dotson*, 817 F.2d 1127, 1129 (5th Cir. 1987) (affirming correction of verdict on one count after "receiv[ing] a telephone call from two of the jurors . . . stat[ing] that, contrary to the verdict read in court, the jury had unanimously voted to acquit"), *vacated in part on other grounds*; *United States v. Stauffer*, 922 F.2d 508, 511 (9th Cir. 1990) (affirming changing verdict on count where "[p]ost-verdict interviews of several jurors . . . determined that the jury had . . . intended to acquit"). This issue is one of existential importance—not merely to Ms. Read, but to the very foundation of the constitutional safeguards that protect her.

> E.    <u>Alternatively, the Defense Is Entitled to a Post-Verdict Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Ms. Read</u>

The SJC narrowly construed the right to a post-trial judicial inquiry to substantiate a constitutional violation as limited to claims "that jurors were exposed to extraneous information or demonstrated racial or ethnic bias." Opinion at 31-32. Under this logic, no defendant claiming that the jury acquitted her but failed to announce that verdict would be entitled to further inquiry, no matter how clear and well-supported her claim. In other words, even if all 12 jurors submitted affidavits saying they unanimously and finally agreed to acquit the defendant,

their failure to announce that verdict (and the trial court's failure to inquire) would take precedence over the defendant's fundamental constitutional protection against Double Jeopardy. The defense respectfully submits that this ruling violates Ms. Read's constitutional rights.

In the analogous context of juror bias, the law is clear that the defendant's Sixth Amendment right to an impartial jury also guarantees "the opportunity to prove" a claim of bias. *Dennis v. United States*, 339 U.S. 162, 171-72 (1950); *see also Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.").  Thus, "a nonfrivolous claim of jury taint" triggers the trial court's "unflagging duty to adequately probe" the allegation. *United States v. Zimny*, 846 F.3d 458, 464 (1st Cir. 2017) (citation omitted).  Crucially, the trial court "does not have discretion to refuse to conduct any inquiry at all" when "confronted with a colorable claim of juror misconduct." *Id.* at 465 (citation omitted).  The required inquiry may include the taking of jury testimony because a categorical bar of such testimony on the issue of bias would "violat[e] the plainest principles of justice."  *United States v. Villar*, 586 F.3d 76, 84 (1st Cir. 2009) (quoting *McDonald v. Pless*, 238 U.S. 264, 268-69 (1915)).

Recently, in *United States v. Tsarnaev*, 96 F.4th 441, 449 (1st Cir. 2024), the First Circuit remanded the matter for further proceedings in the Boston Marathon bombing case due to two jurors' postings on social media "regarding the bombings and the district court proceedings," which came to light after the jurors had been provisionally selected to serve.  The comments did not reflect racial bias in any way, but rather possible bias specific to the defendant.  *See id.* at 454, 461.  The comments were also inconsistent with the jurors' assurances that they had not discussed the case online.  *See id.* at 455, 461.  The First Circuit held that the district court erred

29

by failing to inquire about these issues with the jurors.  *See id.* at 458, 462.  Given that "[t]he

right to an impartial jury is a constitutional bedrock[,] . . . when there is a plausible claim that a

prospective juror lied in a manner that may reveal bias, a court need conduct some inquiry

reasonably calculated to determine whether the prospective juror did lie and, if so, why."  *Id.* at

458 (citation omitted).  Although the district court has broad discretion to determine the type of

investigation into juror bias warranted by particular facts, "[n]otwithstanding this broad

discretion, . . . a district judge does not have discretion to refuse to conduct any inquiry at all

regarding the magnitude of the taint-producing event and the extent of the resulting prejudice if

confronted with a colorable claim of juror misconduct."  *Id.* at 457 (citation omitted).

      Crucially for present purposes, the First Circuit ordered the district court to *voir dire* the

jurors, ***nine years after the trial***.  In doing so, the court acknowledged, "[n]o doubt any juror

would have strong incentives to avoid admitting having committed perjury during voir dire.  We

also expect that most jurors, having taken time out of their daily lives to receive evidence at trial,

deliberate with other jurors, and reach a verdict that they believe is just, would prefer not to have

that verdict disturbed – especially as a result of their own actions. . . .  [W]e have no doubt that

the able district court judge can do what judges regularly do – form a considered opinion about

the sufficiency of the jurors' explanations once those explanations are given and explored."  *Id.*

at 464.

      Post-verdict inquiry is similarly required to investigate claims of external influence.  In

*Remmer v. United States*, 347 U.S. 227, 228 (1954), "[a]fter the jury had returned its verdict, the

petitioner learned for the first time that during the trial a person unnamed had communicated

with a certain juror, who afterwards became the jury foreman, and remarked to him that he could

profit by bringing in a verdict favorable to the petitioner." The court, without the defense's knowledge, then enlisted the FBI to investigate. The Supreme Court held that the defendant was entitled to post-verdict inquiry regarding the FBI's unauthorized contact with jurors.

The defense respectfully submits that, no less than a conviction rendered by a biased jury or impermissibly tainted by external influence, requiring a defendant to stand trial for murder after a unanimous jury found her not guilty of that same offense would violate "the plainest principles of justice." *Villar*, 586 F.3d at 84 (citation omitted).[12] Indeed, the SJC did not suggest otherwise. Instead, it erected an artificial dividing line between the Fifth Amendment protection against Double Jeopardy and the Sixth Amendment right to an impartial jury. The defense respectfully submits that this result is not supported by precedent or logic. While the foregoing authorities arose in different contexts, they stand for the proposition that a defendant who comes forward with credible evidence of a serious constitutional violation post-trial must be entitled to an opportunity to prove those claims. There is no apparent reason to artificially limit the availability of such constitutional inquiry, as the SJC did, to racial bias and extraneous influence. The defense acknowledges that there is little precedent involving situations factually similar to that at issue here. This case is unique. It is not often the case that, after trial, four jurors directly contact defense counsel stating in no uncertain terms that the jury had acquitted the defendant. But the unique strength of the evidence underlying the defense motion to dismiss supports rather than undermines the claim for relief.

---

[12] The decades-old Florida and Pennsylvania state court opinions cited by the SJC involved post-trial rendering of guilty verdicts (not acquittals), and are therefore inapposite. *See Brown v. State*, 661 So. 2d 309, 311 (Fla. Dist. Ct. App. 1995); *Commonwealth v. Johnson*, 359 Pa. 287, 290-91 (1948).

Contrary to the SJC's characterization, the defense request did not seek to "prob[e] the content of juror deliberations."  Opinion at 33.  To the contrary, the requested inquiry was directed solely to the *result* of such deliberations, namely a unanimous decision that Ms. Read is not guilty of murder in the second degree.  Juror testimony on that subject is not prohibited.  *See United States v. Barragan-Cepeda*, 29 F.3d 1378, 1380 (9th Cir. 1994) ("Rule 606(b) bars the admission of juror testimony only upon an inquiry into 'the validity of a verdict.'  It does not limit the admissibility of juror affidavits to determine what issues were decided in a prior proceeding.").  In any event, evidentiary rules cannot extinguish a criminal defendant's fundamental constitutional rights.  *See Villar*, 586 F.3d at 87.  The inquiry requested by the defense here could be accomplished by a single "yes" or "no" question posed to jurors: *did you unanimously acquit Karen Read of the charges in Counts 1 and 3*?, or similar questions that do not intrude into the heart of jury deliberations.

Of course, the results of a jury's deliberations are not secret.  They are, in fact, routinely announced in open court.  Here, the defense learned post-trial that the jury reached a verdict that was not so announced.  It was at least entitled to the opportunity to substantiate that fact in order to ensure Ms. Read is not unconstitutionally forced to stand trial for criminal offenses of which she has already been acquitted.  Such inquiry in no way intrudes on the deliberative process of the jury.  Such an inquiry instead honors the jury service which the trial court described as "extraordinary" rather than disregarding the efforts of five jurors to disclose that there was not an "impasse" on all three as contrasted to only one count.

The trial court rejected the defense's repeated requests to order a post-trial *voir dire* of the jury where the court could make inquiries that matched what would have occurred if the jury

was polled, count-by-count, which Mass. R. Crim. P. 27 permits if not prescribes – a *voir dire* that could be structured by this Court or the experienced trial court to steer clear of overstepping the boundaries set by Mass. Guide Evid. 606(b), that could ask about the results of a jury's deliberations without asking about how the jury internally and secretly reached that result. The First Circuit has entrusted post-trial jury inquiries to the skill and experience of the trial court in matters ranging from extraneous influence to the intrusion of racial or ethnic bias during deliberations. The defense submits that the values at the core of the Double Jeopardy Clause – the primacy of a jury's decision-making as a protection for accused citizens against the perils of being prosecuted twice for the same offense for which a prior jury acquitted – is as central to the values of our criminal justice system as is the right to a trial before an impartial and unbiased jury. The defendant has met her burden of production. Far lesser showings – statements by one juror for instance, have resulted in repeated holdings that jury inquiries are mandated. *See, e.g.*, *United States v. Tejeda*, 481 F.3d 44, 48 (1st Cir. 2007).

To create an impenetrable procedural wall to this new evidence just because a jury failed to volunteer to the court that its impasse was not as to all counts, just because it was never asked, is no more principled than to create a similar wall against new evidence of untruthfulness by a juror as in *Tsarnaev*, of racial bias as in *Villar*, of contact with an outsider as in *Remmer*: in each case the jury could have been polled about outside influence or violating the court's rules by accessing the internet, but that clearly does not result in an absolute prohibition against further fact finding on a showing far less compelling than that at issue here. As in *Tsarnaev*, the law trusts trial courts to determine whether any of the jurors' answers to *voir dire* have been affected

by media exposure.  There cannot be one set of rules for trials with publicity and another for trials without it.

The defense respectfully submits that confidence in the courts is eroded by the creation of such an impenetrable wall preventing jurors from informing the judge whether they voted, as a final matter, to acquit a defendant of murder.  At a time that public confidence in the judiciary is pivotal, not allowing the jurors to be heard on a matter of such significance, and allowing the trial court to decide (without taking any action to ascertain the truth of the matter) if there was in fact a final, unanimous, un-reconsidered decision to acquit, is inconsistent with the elevated role that jurors have long held in our democracy.

## V.     Conclusion

For all the foregoing reasons, the defense respectfully requests that this Court issue a writ of habeas corpus and hold that Ms. Read's retrial on Counts 1 and 3 would violate her Double Jeopardy rights.

Respectfully Submitted,
KAREN READ
By Her Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Michael Pabian**
Michael Pabian, Esq.
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116

34

(617) 227-3700
pabianlaw38@gmail.com

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq.
*Pro Hac Vice* application forthcoming
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com

**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

Dated: February 18, 2025

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, February 18, 2025, a copy of the foregoing document, the Petition, and all exhibits, has been served via hand-delivery on the Massachusetts Office of the Attorney General and via email on Assistant District Attorney Caleb Schillinger.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.