NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13663

KAREN READ <u>vs</u>.  COMMONWEALTH.


Suffolk.     November 6, 2024. - February 11, 2025.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges,
Dewar, & Wolohojian, JJ.


<u>Supreme Judicial Court</u>, Superintendence of inferior courts.
<u>Homicide</u>.  <u>Motor Vehicle</u>, Homicide, Operating under the
influence, Leaving scene of accident.  <u>Practice, Criminal</u>,
Mistrial, Double jeopardy, Deliberation of jury,
Investigation of jurors, Verdict, Affidavit.
<u>Constitutional Law</u>, Double jeopardy.  <u>Jury and Jurors</u>.


<u>Civil action</u> commenced in the Supreme Judicial Court for
the county of Suffolk on September 11, 2024.

The case was reported by <u>Dewar</u>, J.


<u>Martin G. Weinberg</u> (<u>Alan J. Jackson</u>, of California, <u>Michael
Pabian</u> & <u>David R. Yannetti</u> also present) for the petitioner.
<u>Caleb J. Schillinger</u>, Assistant District Attorney (<u>Laura A.
McLaughlin</u>, Assistant District Attorney, also present) for the
Commonwealth.
<u>Jessie Rossman</u>, <u>Daniel McFadden</u>, & <u>Michael T. Packard</u>, for
American Civil Liberties Union of Massachusetts, Inc., amicus
curiae, submitted a brief.

GEORGES, J.  The defendant challenges the denial of her motion to dismiss after her first trial ended in a mistrial.[1] That trial was lengthy, spanning eight weeks of evidence, involving seventy-four witnesses and 657 exhibits.  The defendant does not contend that this evidence was legally insufficient to support a conviction on any of the charges, which would preclude retrial.[2]  Instead, her argument focuses on whether the trial judge properly declared a mistrial and the relevance, if any, of posttrial accounts of jury deliberations.

The jury deliberated for five days, sending progressively insistent notes to the judge about their inability to reach a unanimous verdict.  In their third and final note, the jury stated that "[s]ome members . . . firmly believe[d] that the evidence surpasses the burden of proof establishing the elements of the charges," while others did not.  They described their views as rooted in "sincere adherence to [their] individual principles and moral convictions," and stated that further deliberation would be "futile" and would "force [them] to

---

[1] Although Karen Read commenced this action by filing a petition in the county court, for convenience, we refer to her as the defendant.

[2] The record submitted to the single justice, and now before this court, does not contain transcripts of the testimony or the exhibits from the defendant's first trial.

compromise these deeply held beliefs."  Based on this final note, the judge declared a mistrial.

The defendant's motion to dismiss and this petition rely on posttrial accounts from several jurors.  These accounts suggest that, during deliberations, the jury unanimously agreed the defendant was not guilty on two of the three charges and were deadlocked only on the remaining charge.  The defendant argues that a mistrial was thus not manifestly necessary because the judge could have requested a partial verdict from the jury before discharging them.  The defendant further asserts that these posttrial accounts show she was, in effect, acquitted of two charges, and that double jeopardy bars retrial on those counts.

This petition thus raises the question:  Can posttrial accounts of jurors' private deliberations that are inconsistent with their public communications in court render the declaration of a mistrial improper, or constitute an acquittal, where the jury did not announce or record a verdict in open court?  We conclude that they cannot.  The jury clearly stated during deliberations that they had not reached a unanimous verdict on any of the charges and could not do so.  Only after being discharged did some individual jurors communicate a different supposed outcome, contradicting their prior notes.  Such posttrial disclosures cannot retroactively alter the trial's

outcome -- either to acquit or to convict.  Accordingly, we affirm the trial judge's denial of the motion to dismiss and the defendant's request for a posttrial juror inquiry.[3]

Background.  1.  Trial and deliberations.  In 2022, a grand jury returned three indictments against the defendant:  murder in the second degree, G. L. c. 265, § 1 (count one); manslaughter while operating a motor vehicle under the influence of alcohol, G. L. c. 265, § 13 1/2 (count two); and leaving the scene of personal injury resulting in death, G. L. c. 90, § 24 (2) (a 1/2) (2) (count three).  Trial began in April 2024 and lasted over two months.  On the thirty-seventh day, the jury received instructions regarding the three indictments, and two lesser included offenses for count two:  involuntary manslaughter and motor vehicle homicide.

Before deliberations began, the judge indicated that the foreperson of the jury would be given separate verdict slips for each of the three indictments.  The judge then explained the procedure for delivering the verdicts:

> "After the final vote of the jury, the foreperson should check the appropriate boxes as to each charge, then sign and date the verdict slips and notify the court officer that you have reached a unanimous verdict.  You will then be brought back into the courtroom, where the foreperson will deliver the verdicts to the Court."

---

[3] The motion filed by the American Civil Liberties Union of Massachusetts, Inc., seeking leave to file an amicus curiae brief, is hereby allowed.

The judge also instructed the jury to "continue deliberating until you have reached a final verdict on each charge," and to not disclose their numerical standing or progress to anyone, including the judge, "before such time as you have reached a unanimous verdict."  The jury then began deliberations.

Three days later, after approximately nineteen hours of deliberations, the foreperson submitted a note to the judge (first note) that stated:

> "I am writing to inform you, on behalf of the jury, that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict."

After reading the note into the record, the judge requested argument from the parties on whether the jury had conducted "due and thorough" deliberations, warranting a so-called Tuey-Rodriquez charge.[4]  The Commonwealth argued that the jury had not deliberated long enough, while the defense disagreed, requesting the instruction and asserting that the foreperson's use of the word "exhaustive" suggested "an impasse."  The judge determined

---

[4] See Commonwealth v. Rodriquez, 364 Mass. 87, 101-102 (1973) (Appendix A); Commonwealth v. Tuey, 8 Cush. 1, 2-3 (1851).  The Tuey-Rodriquez charge is a model instruction "given when jurors report deadlock after 'due and thorough deliberation'" that is "designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view."  Commonwealth v. Carnes, 457 Mass. 812, 827 (2010).  Once a deadlocked jury receives the Tuey-Rodriquez charge and resumes their deliberations, "they shall not be sent out again without their own consent."  G. L. c. 234A, § 68C.

that further deliberation was appropriate and instructed the jury to continue.

Deliberations extended through the afternoon and resumed the following Monday morning.  At 10:45 A.M., the jury foreperson submitted another note to the judge (second note), which stated:

> "Despite our commitment to the duty entrusted to us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind.
>
> "The divergence in our views are [sic] not rooted in a lack of understanding or effort, but deeply held convictions that each of us carry ultimately leading to a point where consensus is unattainable.
>
> "We recognize the weight of this admission and the implications it holds."

Upon receiving this note, the judge again invited argument from both parties.  The Commonwealth acknowledged that the jury had already deliberated "in the vicinity of 22 or 23 hours,"[5] but nonetheless argued it was premature to conclude their deliberations had been due and thorough.  Defense counsel, however, maintained that the jury were "hopelessly deadlocked," and again requested the Tuey-Rodriquez instruction.  The judge agreed with defense counsel, noting that the jury had been "extraordinary" and that she had "never seen a note like this

---

[5] Although the transcript does not state the precise time that deliberations resumed on Monday morning, based on prior proceedings it appears the jury had deliberated closer to twenty-four or twenty-five hours by this point.

reporting to be at an impasse."  The judge then delivered the Tuey-Rodriquez instruction to the jury and sent them back to deliberate further.

At approximately 2:30 P.M., the foreperson submitted yet another note to the judge (third note), which stated:

> "Despite our rigorous efforts, we continue to find ourselves at an impasse.
>
> "Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyound [sic] a reasonable doubt. Convers[e]ly, others find the evidence fails to meet this standard, and does not sufficiently establish the necessary elements of the charges[.]
>
> "The deep division is not due to a lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions.
>
> "To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs."

After receiving the third note, the judge informed counsel that "[t]he jury is at an impasse."  The jury were called back into the court room, and the third note was read aloud into the record.  Upon reaching the final line -- stating that further deliberation would "force [the jury] to compromise these deeply held beliefs" -- the judge addressed the jury, saying, "I am not going to do that to you . . . folks," and declared a mistrial.

The judge then discharged the jury back to the deliberation room, explaining that she would meet them there privately to thank them for their service.  The judge and the parties

remained in the court room to discuss their availability for scheduling a status conference on the matter.  At no point during this discussion did defense counsel object to the judge's declaration of a mistrial or express disagreement with that outcome.

2.  <u>Posttrial events</u>.  According to affidavits submitted by defense counsel, a member of the deliberating jury (juror A) contacted defense counsel on July 2, 2024, after noticing "inaccurate reports" about the jury's alleged "split" that caused the mistrial the day before.  Juror A stated that the jury had unanimously agreed that the defendant was not guilty of count one (murder in the second degree) and count three (leaving the scene of personal injury resulting in death).

Two days after the mistrial, defense counsel also received screenshots[6] of text message exchanges with jurors or their acquaintances describing the deliberations.  In one exchange, another member of the jury (juror B) wrote, "It was not guilty on second degree.  And split in half for the second charge."[7]  In another exchange, an individual (referred to as an "[i]nformant"

_____

[6] "A screenshot is a copy of the image displayed by a computer screen" (quotation and citation omitted).  <u>Commonwealth</u> v. <u>Cronin</u>, 495 Mass. 170, 171 n.2 (2025).

[7] One month later, juror B contacted defense counsel to confirm the content of this exchange, and further asserted that the jury had unanimously agreed the defendant was not guilty of count three as well.

by defense counsel) was advised that another juror (juror C) had told friends there was "no consideration" of murder in the second degree and that the jury deadlocked on "the remaining charges."  The exchange contained no mention of count three, but it stated that "manslaughter started polling at 6/6 then ended deadlock [sic] @ 4no8yes."  Juror C had also reportedly stated that the jurors had "a group text going."  Upon receiving this information, the informant commented, "[I]f they all agreed on no for murder two[,] they should make that clear to the DA[] and the court.  [I]t's basically a case of double jeopardy if she is retried on that charge."

On July 8, 2024, one week after the mistrial, the defendant filed a motion to dismiss based on these posttrial accounts. The defendant argued that the accounts showed the jury had effectively acquitted her of counts one (murder in the second degree) and three (leaving the scene of personal injury resulting in death).  She further contended that the judge's mistrial declaration was improper for these two counts and requested, at minimum, a postverdict inquiry to confirm whether the jury had agreed she was not guilty of those charges.

Defense counsel later supplemented the motion with accounts from two additional jurors.  One juror (juror E) stated that the jury had been deadlocked only on the "lower charges on count 2." The other juror (juror D) stated that the jury's disagreement

solely concerned "Count 2 and its lesser offenses."  Juror D indicated that the jury had debated whether to inform the judge of their decision on counts one and three, but they were uncertain "if they were allowed" to do so.  Juror D claimed that, after discussing the matter, the jury ultimately "decided to inform the court that they were deadlocked, and they expected they would get further instruction about the remaining (decided) counts thereafter."

The Commonwealth also submitted a posttrial filing notifying the court that, after the submission of defense counsel's affidavits, it had received two voicemail messages from a member of the jury.  The juror specified that the jury had voted not guilty on counts one and three, "and as of last vote[,] 9-3 guilty . . . on the lower-level manslaughter charges."  The Commonwealth also received e-mail messages from three individuals who identified themselves as jurors and asked to speak anonymously.  Once the Commonwealth informed them that it may be required to disclose the substance of their communications to defense counsel or the court, however, the jurors declined to communicate further.

The trial judge denied the defendant's motion to dismiss after a nonevidentiary hearing.  The judge reasoned that, "[b]ecause there was no open and public verdict affirmed in the open court rendered in this case, the defendant was not

acquitted of any of the charges," and that any posttrial voir dire of jurors would involve an impermissible inquiry into the substance of the jury's deliberations.

Additionally, the judge rejected the defendant's argument that declaring a mistrial was improper. She noted that defense counsel had twice requested the Tuey-Rodriquez instruction -- "the final step" preceding a mistrial -- and raised no objections nor made any request to be heard when the mistrial was declared. The judge remarked that "defense counsel were no shrinking violets" during the trial, making it unlikely that, "when counsel heard that the jury was at an impasse for a third time and a mistrial was inevitable, at perhaps the most crucial point in the trial, counsel would sit silently if they did not consent to a mistrial." She also concluded that, in any event, the mistrial was manifestly necessary given the jury's repeated statements of deadlock.

On September 11, 2024, the defendant filed a petition for relief under G. L. c. 211, § 3, in the county court.[8] A single

---

[8] Although a defendant ordinarily is not entitled to interlocutory review of the denial of a motion to dismiss, we have recognized a narrow exception to this general rule in the context of double jeopardy claims. See Neverson v. Commonwealth, 406 Mass. 174, 175 (1989). The Commonwealth does not contest that interlocutory review is appropriate in the circumstances of the instant case.

justice of this court reserved and reported the matter, without decision, to the full court.[9]

Discussion. 1. Propriety of declaring a mistrial. The double jeopardy clause of the Fifth Amendment to the United States Constitution "generally preclude[s] the Commonwealth from trying a defendant more than once for the same offense." Commonwealth v. Phim, 462 Mass. 470, 473 (2012). See Benton v. Maryland, 395 U.S. 784, 787, 795-796 (1969) (Federal double jeopardy clause applicable to States by Fourteenth Amendment). However, an exception to this general rule applies when a mistrial is declared due to "manifest necessity" (citation omitted). Ray v. Commonwealth, 463 Mass. 1, 3 (2012). In such instances, the double jeopardy clause does not bar the State from retrying the defendant. See id.

To determine whether the declaration of a mistrial is manifestly necessary, a trial judge balances "the defendant's valued right to have his or her trial completed by a particular tribunal against the interest of the public in fair trials designed to end in just judgments" (quotations and citation omitted). Commonwealth v. Edwards, 491 Mass. 1, 17 (2022). A hung jury has long been recognized as "a traditional example" of

---

[9] At the time this matter was reserved and reported, the defendant's retrial was scheduled to begin on January 27, 2025. The retrial has since been continued until April 2025.

manifest necessity, allowing retrial without offending the defendant's double jeopardy rights. Commonwealth v. Troila, 410 Mass. 203, 206 (1991). See Richardson v. United States, 468 U.S. 317, 326 (1984) ("jeopardy does not terminate when the jury is discharged because it is unable to agree").

The decision to declare a mistrial is entrusted to the "sound discretion" of the trial judge. Commonwealth v. Bryan, 476 Mass. 351, 352 (2017). Trial judges receive such discretion to avoid the possibility of coercive measures being used to force jury agreement, thereby protecting the fairness of the proceedings. See A Juvenile v. Commonwealth, 392 Mass. 52, 55 (1984). See also Renico v. Lett, 559 U.S. 766, 774 (2010). In evaluating whether a trial judge abused his or her discretion in declaring a mistrial, a reviewing court considers whether the judge carefully explored "alternatives to a mistrial," and whether counsel were "given full opportunity to be heard" (citation omitted). Commonwealth v. Taylor, 486 Mass. 469, 484-485 (2020). If these principles were followed, and there is no claim of insufficient evidence to support a conviction, "double jeopardy will not prevent [the defendant's] retrial" (citation omitted).[10] Ray, 463 Mass. at 4.

---

[10] The defendant has not argued that the evidence presented at her first trial was legally insufficient to sustain a conviction, and we thus do not address the issue.

Here, we discern no abuse of discretion in the trial judge's decision that the jury were at an impasse and that a mistrial was manifestly necessary.  After extensive, multiday deliberations, the jury submitted several increasingly emphatic notes about their inability to reach a unanimous verdict.  By the time the jury sent their first note, they had deliberated for approximately nineteen hours, over four days.  That note stated that they had conducted an "exhaustive review of the evidence," and given "diligent consideration of all disputed evidence."  Following the judge's instruction to continue their deliberations, the jury deliberated for another five to six hours -- spanning a Friday afternoon and the following Monday morning -- before sending a second note that was noticeably more definitive.  That note stated jurors were "deeply divided by fundamental differences" and that "consensus [was] unattainable," echoing language from other cases where we have characterized a jury's report of deadlock as "unambiguous." See, e.g., <u>Ray</u>, 463 Mass. at 5 (concluding that jury note stating jurors were "hopelessly deadlocked" was "unambiguous" about their inability to agree); <u>Fuentes</u> v. <u>Commonwealth</u>, 448 Mass. 1017, 1018 (2007) (final note stating that jurors were "unable to come to a unanimous decision" unequivocally reflected that they were deadlocked).

The second note further emphasized that the deadlock arose not from "a lack of understanding or effort," but from "deeply held convictions that each of [the jurors] carr[ied]."  By this point, the jury had already deliberated approximately twenty-four hours, see note 5, supra, and defense counsel described them as "hopelessly deadlocked."  But the trial judge did not immediately conclude that all hope of attaining a verdict was lost.  Instead, she issued the Tuey-Rodriquez charge, a standard instruction that encourages deadlocked juries to "reach a verdict by giving more serious consideration to opposing points of view" (citation omitted).  Commonwealth v. Chalue, 486 Mass. 847, 860 (2021).

After nearly four hours of additional deliberation —- bringing the total to approximately twenty-eight hours -- the jury submitted a third note that was even more emphatic.  It stated that further deliberations "would be futile and only serve to force us to compromise [our] deeply held beliefs."  While there is no "mechanical formula" for determining whether a jury is genuinely deadlocked, see Ray, 463 Mass. at 4-5, quoting Illinois v. Somerville, 410 U.S. 458, 462 (1973), the trial judge acted well within her discretion in concluding the jury were at an impasse and a mistrial was manifestly necessary.

The defendant contends that, despite the jury's deadlock, the trial judge failed to adequately consider alternatives to

declaring a mistrial.  Yet, as discussed, the trial judge did
consider and pursue such alternatives.  After the first note
reporting deadlock, the judge instructed jurors to continue
their deliberations.  After the second note, the judge issued
the Tuey-Rodriquez charge.  It was only when the jury submitted
their third report of deadlock, at which point the judge was
statutorily precluded from ordering them to continue
deliberations without their consent, see G. L. c. 234A, § 68C,
that the judge declared a mistrial.  Nonetheless, the defendant
argues that the judge should have inquired whether the jury had
reached agreement on any of the charges.  Had the judge done so,
the defendant asserts, she would have discovered that the jury
had agreed on counts one and three, allowing for a partial
verdict.  We disagree.

Rule 27 (b) of the Massachusetts Rules of Criminal
Procedure, 378 Mass. 897 (1979), "gives a trial judge discretion
to require a jury to return a verdict" for charges on which they
have unanimously agreed before declaring a mistrial (quotation
and citation omitted).  Commonwealth v. Floyd P., 415 Mass. 826,
830 (1993).  See Mass. R. Crim. P. 27 (b) ("judge may first
require the jury to return verdicts on those charges upon which
the jury can agree and direct that such verdicts be received and
recorded" [emphasis added]).  Rule 27 (d) also permits a judge
to poll the jury "[w]hen a verdict is returned and before the

verdict is recorded."  Mass. R. Crim. P. 27 (d).  However, "a judge is not required to accept" a partial verdict before declaring a mistrial, <u>Daniels</u> v. <u>Commonwealth</u>, 441 Mass. 1017, 1018 n.3 (2004), and is prohibited from doing so on a single indictment that contains lesser included offenses, see <u>Commonwealth</u> v. <u>Roth</u>, 437 Mass. 777, 787 (2002).

Here, the jury were instructed on three separate indictments, along with two lesser included offenses on count two, but the trial record offers no indication that a partial verdict was imminent or possible.  The jury's first note simply stated they were "unable to reach a unanimous verdict," without reference to any specific charge.  The second note reiterated that consensus was unattainable and acknowledged "the implications" of the jury's deadlock.  Neither note suggested the jury had reached, or could reach, consensus on any subset of the charges,[11] and we have cautioned against assuming a final verdict exists from general reports of deadlock.  See <u>Roth</u>, 437 Mass. at 793-794.

---

[11] As the trial judge observed in her memorandum of decision denying the defendant's motion to dismiss, it is particularly striking that the jury notes provided "no inkling" of agreement on any of the charges.  Additionally, the notes did not request clarification on whether a partial verdict could be returned. This absence is particularly significant given the evident "care that went into writing the notes and how articulately they expressed the jurors' disagreement."

In fact, the jury's third note implied they were deadlocked on <u>all</u> charges.  That note stated, in part:

> "Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of <u>the charges</u> [beyond] a reasonable doubt.  Convers[e]ly, others find the evidence fails to meet this standard, and does not sufficiently establish the necessary elements of <u>the charges</u>" (emphases added).

Although the defendant relies on posttrial affidavits to suggest "the charges" referred only to count two and its lesser included offenses, we assess the trial judge's decision based on what was known at the time of her decision.  See <u>Commonwealth</u> v. <u>Torres</u>, 453 Mass. 722, 736 (2009).  As one court has observed, allowing posttrial juror accounts to affect the analysis "would create endless confusion and controversy" in cases where a mistrial has already been declared due to deadlock.  <u>Fitzgerald</u> v. <u>Lile</u>, 732 F. Supp. 784, 789 (N.D. Ohio), aff'd, 918 F.2d 178 (6th Cir. 1990).

In short, the record before the trial judge suggested complete deadlock.  The first and second notes provided no indication of a partial consensus, and the third note plainly implied the opposite.  See <u>State</u> v. <u>Fennell</u>, 431 Md. 500, 522 (2013), and cases cited ("the mere theoretical availability of partial verdicts" does not obligate trial judge to conduct further inquiry where "no party has requested a partial verdict be taken or the jury does not indicate that it has reached

one").  Further still, these notes indicated that additional
inquiry into the jury's deliberations risked producing a coerced
verdict.

Judges must carefully avoid actions that might pressure
jurors into compromising their genuine views of the evidence.
See Commonwealth v. Foster, 411 Mass. 762, 765 (1992).  And we
have long recognized that "deadlocked juries are particularly
susceptible to coercion." Roth, 437 Mass. at 791.  See
Commonwealth v. O'Brien, 65 Mass. App. Ct. 291, 295 (2005), and
cases cited.  It is precisely for this reason that judges are
statutorily prohibited from ordering further deliberations by a
deadlocked jury that has twice reported being at an impasse
after due and thorough deliberation, unless they explicitly
consent or seek clarification on the law.  See Commonwealth v.
Tiscione, 482 Mass. 485, 492 (2019), quoting G. L. c. 234A,
§ 68C ("If, after 'due and thorough deliberation,' the jury
report to the judge twice that they are deadlocked, 'they shall
not be sent out again without their own consent, unless they ask
from the court some further explanation of the law'").  The risk
of coercion is also heightened when a judge inquires about the
possibility of a partial verdict following a deadlock.  As we
have explained:

> "Where the jurors have twice reported themselves
> deadlocked, and have already heard the Tuey-Rodriquez
> charge, a judge's inquiry concerning partial verdicts

cannot avoid communicating to the jury the judge's desire
to salvage <u>something</u> from the trial.  However the inquiry
is articulated or explained, the import of the inquiry is
unmistakable:  'Can't you at least decide a part of this
case?'  The inquiry, by its nature, plays on the deadlocked
jurors' natural sense of frustration, disappointment, and
failure.  The jurors are confronted with the request, and
asked to absorb its inherent complexity, at the worst
possible time, when they are tired, anxious to be
discharged, and perhaps angry at fellow jurors whom they
blame for failing to reach agreement."

<u>Roth</u>, <u>supra</u> at 792.

In this case, the risks of coercion were evident.  After
receiving the third note, the judge was statutorily barred from
ordering further deliberation without the jury's consent.  See
G. L. c. 234A, § 68C.  Far from suggesting that consent might be
obtained, the third note made clear that further deliberation
would "only serve to force [the jurors] to compromise . . .
deeply held beliefs" rooted in "sincere adherence to [their]
individual principles and moral convictions."  See <u>Commonwealth</u>
v. <u>Winbush</u>, 14 Mass. App. Ct. 680, 682 (1982) (statutory
prohibition on ordering further deliberation was designed to
prevent jurors "from being coerced into reaching a verdict in
the face of views conscientiously reached and held").  Asking
jurors whether they would nonetheless consent to further
deliberation would have implicitly pressured them to compromise
those beliefs in order to "salvage" some part of the trial.
<u>Roth</u>, 437 Mass. at 792.  In these circumstances, "[t]here is
simply too great a risk" that any resulting verdict "would

merely be the product of one hasty, final attempt to satisfy the judge's apparent desire for some form of decision on the case." Id. at 793.  And if the judge were to inquire about the possibility of a partial verdict, "by definition, any further discussion amongst the jurors regarding their response to the judge's partial verdict inquiry would itself be further deliberation" in violation of the statute.  Id. at 792.

Indeed, if the judge had inquired about a partial verdict on her own initiative, and the jury returned a verdict of guilty on any of the counts, "there is no question that this defendant would be making a strenuous -- and potentially meritorious -- argument that that guilty verdict was the product of coercive intrusion into the function of the jury."  Roth, 437 Mass. at 792.  Thus, given the entire course of jury deliberations, and the emphatic language of the third note that jurors were deadlocked on "the charges" and that further deliberation would be coercive, the judge acted within her discretion in declaring a mistrial without inquiring sua sponte about a partial verdict. See Fuentes, 448 Mass. at 1018-1019 (judge was not required to ask jury if they would consent to further deliberations before declaring mistrial because jury had already received Tuey-Rodriquez instruction and final note unequivocally stated they were deadlocked); Daniels, 441 Mass. at 1018 n.3.

For much the same reason, the trial judge's decision not to poll the jury sua sponte to confirm the deadlock before declaring a mistrial did not constitute an abuse of discretion. As we explained in Ray, 463 Mass. at 5 n.5, polling jurors about "whether further instructions or deliberation would be likely to resolve the deadlock" is discouraged due to the "risk of coercion inherent in questioning jurors, particularly in individual colloquies."  A trial judge is not "required to consider every conceivable alternative before declaring a mistrial," and we discern no abuse of discretion in the judge not pursuing alternatives suggested, after the fact, by defense counsel based on information obtained after the mistrial was declared.  Commonwealth v. Cassidy, 410 Mass. 174, 179 (1991) ("If an alternative which was neither suggested by counsel nor considered by the judge is later developed, we will not fault the judge, so long as an honest inquiry into alternatives is made").  See generally Blueford v. Arkansas, 566 U.S. 599, 609–610 (2012) ("We have never required a trial court, before declaring a mistrial because of a hung jury, to consider any particular means of breaking the impasse -- let alone to consider giving the jury new options for a verdict").

The defendant further contends, separately from the availability of alternatives, that it was an abuse of discretion to declare a mistrial without first notifying defense counsel of

the content of the third note and allowing an opportunity to be heard.  First, it is worth noting that the trial judge discredited defense counsel's claim that he lacked such an opportunity.  See generally Commonwealth v. Garner, 490 Mass. 90, 94 (2022) (appellate courts defer to credibility determinations of trial judge).  The judge explained that she had previously sought defense counsel's views after receiving each of the first two jury notes, when counsel had argued that the jury were at an impasse.  The only alternative proposed by defense counsel during these exchanges was the issuance of a Tuey-Rodriquez charge, which the judge granted.  When the third note prompted the mistrial, defense counsel neither objected nor expressed any dissatisfaction, even when the parties remained in the court room to schedule a subsequent status conference.

In any event, there is no indication that inviting defense counsel to participate in a third round of "consultation would have produced any fruitful alternatives." Fuentes, 448 Mass. at 1019.  As discussed, the receipt of the third note barred the judge from "requiring further deliberation without the jury's consent" because they had already engaged in due and thorough deliberations and twice reported being deadlocked.  Commonwealth v. Carnes, 457 Mass. 812, 829 (2010).  Furthermore, nothing suggested that defense counsel would have requested an inquiry into the possibility of a partial verdict based on the content

of the jury notes.[12]  See <u>Oliver</u> v. <u>Justices of the N.Y. Supreme Court of N.Y. County</u>, 36 N.Y.2d 53, 58 (1974) ("Having displayed no enthusiasm for the rendering of a partial verdict while the jury was still impaneled, and a guilty verdict still possible, the defense may not seek to overturn the court's order of mistrial after discharge of the jury . . .").  While the more prudent course might have been to read the third note to counsel and provide yet another opportunity to be heard before declaring a mistrial, the trial judge did not abuse her discretion in failing to do so.  See <u>Fuentes</u>, <u>supra</u>.

In sum, we conclude that the trial judge acted within her discretion in declaring a mistrial without first inquiring about a partial verdict or offering defense counsel an additional opportunity to be heard.  Considering the length of jury deliberations, the judge's prior efforts to encourage consensus, and the increasingly emphatic tone of the jury notes indicating deadlock, it was clear the jury had reached an impasse.

---

[12] It is difficult to imagine that a competent defense attorney, upon learning that some members of the jury "firmly believe[d]" the evidence proved "the elements of the charges" beyond a reasonable doubt, would request that the jury be instructed to return verdicts on any charges where agreement had been reached.  As other courts have recognized, "[a] defendant may have a tactical reason for not requesting the trial court to question the jury about a partial verdict," and trial judges should not be required to inquire about partial verdicts on their own initiative.  <u>State</u> v. <u>Tate</u>, 256 Conn. 262, 286 n.16 (2001).

Furthermore, nothing suggested that the deadlock was limited to a specific charge; on the contrary, the notes contained no inkling of agreement, and the third note implied the jury were deadlocked on <u>all</u> charges.  Under these circumstances, given the content of the notes and the fact that defense counsel did not request further inquiry, engaging in one sua sponte risked coercing a verdict.  Thus, the judge appropriately exercised her discretion in declaring a mistrial based on manifest necessity.  See <u>Daniels</u>, 441 Mass. at 1017, and cases cited (judge did not abuse discretion in declaring mistrial after four days of deliberation where jury had reported impasse and received <u>Tuey-Rodriquez</u> charge but remained unable to reach verdict and stated, in response to judicial inquiry, that additional deliberation would not result in verdict).  See also <u>Fuentes</u>, 448 Mass. at 1018-1019 (no abuse of discretion in declaring mistrial without first asking whether jury would consent to deliberate further where jury had already been given <u>Tuey-Rodriquez</u> instruction and final jury note "unequivocally stated that the jury were 'unable to come to a unanimous decision'").[13]

---

[13] Because we conclude that the trial judge acted within her discretion in determining that declaring a mistrial was manifestly necessary, we do not need to address the defendant's alternative argument that defense counsel did not consent to the mistrial.  Similarly, we do not address the defendant's ancillary argument, raised here for the first time, that the court should have conducted a colloquy with the defendant before finding such consent.  But see <u>Daniels</u>, 441 Mass. at 1018 n.2

2.  Defendant's claims of acquittal.  The defendant separately argues that she cannot be retried on count one or count three, regardless of whether the mistrial declaration was proper.  She contends that posttrial information from five deliberating jurors[14] -- indicating the jury were deadlocked only on count two and had unanimously found her not guilty on counts one and three[15] -- effectively amounts to an acquittal of those counts.  Alternatively, she asserts that the trial judge abused her discretion in denying a posttrial inquiry to verify these accounts of juror deliberations.  We examine each contention below.

a.  Claim of acquittal based on juror disclosures.  The double jeopardy clause of the United States Constitution prohibits retrial for the same offense after an acquittal.  See McElrath v. Georgia, 601 U.S. 87, 93-94 (2024).  See also G. L.

---

("That [the defendant] did not personally assent to the mistrial makes no difference").  Cf. Poretta v. Commonwealth, 409 Mass. 763, 766 (1991) ("there can be no doubt that the Federal Constitution does not condition the permissibility of retrial on the defendant's personal, explicit assent to a mistrial motion brought by his attorney").

[14] For purposes of adjudicating the motion to dismiss, the trial judge accepted the purported juror statements as true and accurate.  For purposes of this discussion, we similarly proceed from the assumption that the affidavits are accurate.

[15] Juror C did not disclose information indicating whether the jury had unanimously agreed that the defendant was not guilty on count three.

c. 263, § 7.  To determine whether an acquittal has occurred, we look to whether, "given the operation of state law," the jury "acted on [their] view that the prosecution had failed to prove its case" (citation omitted).  McElrath, supra at 96.  Because this presents a legal question, our review of the trial judge's decision is de novo.  Commonwealth v. Hebb, 477 Mass. 409, 411 (2017).

Relevant here, "the fundamental requirements" for a jury's issuance of a verdict in a criminal case are set forth in Mass. R. Crim. P. 27 (a).  Roth, 437 Mass. at 786.  Pursuant to that rule, a valid jury verdict must be unanimous and "returned by the jury to the judge in open court."  Mass. R. Crim. P. 27 (a). Our case law confirms that a criminal verdict is effective only when affirmed by jurors in open court.  See A Juvenile, 392 Mass. at 56-57, quoting Lawrence v. Stearns, 11 Pick. 501, 502 (1831) ("The only verdict which can be received and regarded, as a complete and valid verdict of a jury, upon which a judgment can be rendered, is an open and public verdict, given in and assented to, in open court, as the unanimous act of the jury, and affirmed and entered of record, in the presence and under the sanction of the court").  In other words, the distinction between informal "agreement on a verdict" and the actual "return, receipt, and recording of a verdict" in open court is central -- only the latter constitutes a final verdict of the

jury on a criminal charge.  <u>A Juvenile</u>, <u>supra</u>, quoting
<u>Commonwealth</u> v. <u>Kalinowski</u>, 12 Mass. App. Ct. 827, 830 (1981).
We have consistently reaffirmed this long-standing distinction
throughout our jurisprudence.[16]

In this case, it is undisputed that the jury did not
announce a final verdict on any charge.  Although the defendant
has submitted affidavits claiming the jurors reached an
agreement on counts one and three during deliberations, the only
statements made in open court reflected the jury's <u>inability</u> to
reach a unanimous verdict.  As discussed, the jury submitted
three separate notes to the judge indicating deadlock --
culminating in a final note indicating that "[s]ome members of
the jury firmly believe[d] that the evidence surpasse[d] the
burden of proof establishing the elements of the charges," while
others did not.

---

[16] See <u>Commonwealth</u> v. <u>Tennison</u>, 440 Mass. 553, 561 (2003)
(initial verdict "was sealed but not yet valid because it was
not given and affirmed orally by the jurors in open court");
<u>Gelmette</u> v. <u>Commonwealth</u>, 426 Mass. 1003, 1003 (1997) (polling
of jurors, after declaration of mistrial in murder case, showing
that eleven had voted to convict defendant of lesser included
offense of manslaughter, and one had voted to acquit, "was of no
effect and . . . did not constitute an acquittal on so much of
the indictment as charged murder in the first and second
degree").  See also <u>Rich</u> v. <u>Finley</u>, 325 Mass. 99, 105 (1949) (no
final verdict where one juror died after jury had unanimously
agreed to verdict, but before jury announced that verdict in
open court); <u>Lawrence</u>, 11 Pick. at 502 (no final verdict where
jury had come to unanimous agreement, but where one juror
changed his mind following morning when jury met to return final
verdict); <u>Kalinowski</u>, 12 Mass. App. Ct. at 830.

Far from an "affirmation in open court" of unanimous agreement on counts one and three, see A Juvenile, 392 Mass. at 57, these notes clearly reflected a lack of consensus on "the charges."  Even if the jury's deadlock pertained specifically to count two, their notes made no such distinction, nor did they indicate any verdict would be returned "to the judge in open court," as required by Mass. R. Crim. P. 27 (a).  In the absence of a verdict returned, received, and recorded in open court, we cannot conclude that the jury "acted on [their] view that the prosecution had failed to prove its case" (citation omitted).  McElrath, 601 U.S. at 96.  See Clark v. State, 170 Tenn. 494, 502 (1936) ("however fully it may be made to appear that the jury arrived among themselves at the decision that [the defendant] was not guilty, there is no claim that they agreed to so report or return, or that they agreed to report any agreement whatever, except that they could not agree").[17]

---

[17] The circumstances of Clark, 170 Tenn. 494, are very similar to those at issue here.  There, a defendant argued that he had been acquitted at his first trial, after learning that the jury had agreed he was not guilty and had deadlocked only as to his codefendant.  See id. at 497.  Rejecting this argument, the Supreme Court of Tennessee explained:

"Agreement on the issue of guilt or innocence is of the very essence of a verdict. . . .

"We have here no 'verdict' reported, and none 'agreed on and intended to be expressed.'  It is conceded here that the report of disagreement was that intended to be

The defendant nonetheless argues that "any lack of formality" in the jurors' intended dispositions of counts one and three should not prevent those dispositions from taking legal effect.  However, the requirement that a verdict be returned and affirmed in open court is far from a mere formality.  Rather, "[t]hese principles recognize that, as a practical matter, jurors may agree in the course of deliberations to a tentative compromise on the facts of a case or on the disposition of related charges as they attempt to reach unanimous agreement."  Floyd P., 415 Mass. at 831.  See Blueford, 566 U.S. at 608.  Since "[a] jury should not be precluded from reconsidering a previous vote on any issue" (citation omitted), A Juvenile, 392 Mass. at 56, tentative or conditional agreements reached amid deliberations "cannot have the force of a final verdict," Floyd P., supra.  See A Juvenile, supra ("A jury should not be precluded from reconsidering a previous vote on any issue, and the weight of final adjudication should not be given to any jury action that is not returned in a final verdict" [citation omitted]).

Requiring a jury to publicly affirm their verdict in open court thus serves a vital purpose -- it ensures that the verdict

---

reported.  This determinative distinction runs through all the cases we have examined."  (Citation omitted.)

Id. at 501, 503.

agreed upon in private truly reflects the unanimous and
deliberate judgment of each juror under public scrutiny, rather
than a tentative compromise.  See <u>Commonwealth</u> v. <u>Lawson</u>, 425
Mass. 528, 530 (1997).  See also <u>People</u> v. <u>Thornton</u>, 155 Cal.
App. 3d 845, 859 (1984).  Maintaining this distinction between
private deliberations and public verdicts is essential to
preserving both the confidentiality of jury discussions and the
integrity of the judicial system.  Thus, because the jury did
not publicly affirm that the defendant was not guilty of the
charges, there was no acquittal barring retrial under the double
jeopardy clause.  See <u>A Juvenile</u>, 392 Mass. at 56-57 (signed
verdict slips reflecting votes of not guilty, found in
deliberation room after mistrial had been declared due to
deadlock, did not constitute acquittals).  See also <u>Commonwealth</u>
v. <u>Mayfield</u>, 398 Mass. 615, 630 (1986) (information indicating
that "jury were deadlocked, eleven to one, for conviction of
murder but only in the second degree," and had purportedly
agreed that defendant was not guilty of murder in first degree,
did not bar retrial because "[t]here was no open and public
verdict of not guilty").

    b.  <u>Request for posttrial juror inquiry</u>.  Finally, we
consider the denial of the defendant's request for a posttrial
juror inquiry.  Generally, a judge is not obligated to
investigate jury deliberations unless there is evidence that

jurors were exposed to extraneous information or demonstrated racial or ethnic bias. See Commonwealth v. Pytou Heang, 458 Mass. 827, 858 (2011). Even in cases of alleged bias, however, judicial inquiry cannot delve into jurors' subjective reasoning or deliberative content. See Matter of the Enforcement of a Subpoena, 463 Mass. 162, 168 (2012). Because the trial judge is afforded "broad discretion" in assessing whether a posttrial juror inquiry is appropriate, Commonwealth v. Guisti, 434 Mass. 245, 251 (2001), S.C., 449 Mass. 1018 (2007), we review that determination only for an abuse of discretion, see Pytou Heang, supra.

Here, the defendant concedes that the affidavits do not indicate exposure to extraneous matters or juror bias that would suggest her right to an impartial jury was compromised. Contrast Commonwealth v. McCalop, 485 Mass. 790, 799 (2020). Instead, she argues that the affidavits suggest an "unannounced verdict" warranting further inquiry. Yet, as discussed, a verdict, as a matter of law, requires a public announcement in open court. No verdict exists if none was announced, or even intended to be announced, by the jury before they were discharged. See Commonwealth v. Brown, 367 Mass. 24, 28 (1975), S.C., 378 Mass. 165 (1979) and 470 Mass. 595 (2015) ("once the jury have been discharged, they have no further power to deliberate or to agree to a verdict").

Allowing inquiry into a private agreement reached in the secrecy of the deliberation room would also contravene our prohibition on probing the content of juror deliberations. Maintaining the secrecy of those deliberations is a "bedrock of our judicial system" (citation omitted). Commonwealth v. Moore, 474 Mass. 541, 548 (2016), S.C., 489 Mass. 735 (2022). See Woodward v. Leavitt, 107 Mass. 453, 460 (1871). It not only prevents jury tampering but also upholds the finality of jury verdicts and fosters confidence in the judicial process. See Commonwealth v. Fidler, 377 Mass. 192, 195 (1979). Probing secret deliberations to determine whether the jurors may have privately agreed on a verdict they never returned would undermine these fundamental principles. See Woodward, supra at 471 (juror testimony as to "part which he [or she] took in the discussions and votes of the jury" is not permissible "because it relate[s] to the private deliberations of the jury"); Brown v. State, 661 So. 2d 309, 311 (Fla. Dist. Ct. App. 1995) (even though postdischarge inquiry asked jurors to "disavow the nonexistence of a verdict rather than to impeach a verdict already in existence," it still constituted improper inquiry as to jurors' mental processes). Were it otherwise, "[j]urors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts" that might be used to set aside a final verdict (citation omitted). Fidler, supra.

Nor is the defendant merely seeking juror testimony as to a "mistake" entered on a final verdict slip.  See Mass. G. Evid. § 606(c) (2024) (permitting juror testimony about mistakes "made in entering the verdict on the verdict form").  Here, there is no suggestion that the jury's failure to return a verdict was the result of a clerical error.  The posttrial accounts do not dispute that the jurors had reached an impasse, as they reported, and had decided not to return a verdict slip on any charge, as occurred.  Contrast Brown, 367 Mass. at 27-28, and cases cited (permitting testimony to correct clerical mistakes in verdict where jury, without outside influence, "immediately indicated" error in announced verdict).  No juror expressed surprise or disagreement in court when the judge declared a mistrial based on the jury's report that they could not reach a unanimous verdict on "the charges."  Contrast Latino v. Crane Rental Co., 417 Mass. 426, 431 (1994) (juror inquiry permissible where jurors audibly answered "no" during polling of jury).

Additionally, the limited exception for juror testimony concerning mistaken verdicts only results in alteration of a verdict where there has been no "opportunity for outside influence."  Brown, 367 Mass. at 29, and cases cited.  Cf. Commonwealth v. DiBenedetto, 94 Mass. App. Ct. 682, 684-685 (2019).  Here, all the defendant's affidavits concern jurors' accounts to others after leaving "the control of the court."

Brown, supra at 28.  See Dietz v. Bouldin, 579 U.S. 40, 49
(2016); State v. Edwards, 15 Wash. App. 848, 850-852 (1976)
(when jury leave "the sterility of the court's control . . .
contamination is presumed").  A posttrial inquiry of these
jurors would similarly occur well after they became susceptible
to outside influences and would not provide a recognized basis
for altering the result of the first trial.  See Commonwealth v.
Johnson, 359 Pa. 287, 293-294 (1948) (court could not alter
verdict of acquittal upon learning that jury had intended to
convict defendant of lesser offense, where jury "had ample
opportunity" to clarify or express disagreement with original
verdict when it was announced in open court prior day).  Thus,
the trial judge did not err or abuse her discretion in denying
the defendant's request for such an inquiry where it would not
change the outcome of the defendant's first trial.  The jury
chose to report a deadlock, not a verdict, and no basis exists
for further investigation into private discussions or subjective
beliefs they declined to announce publicly in open court.

　　　Conclusion.  For the reasons stated above, the trial judge
correctly denied the defendant's motion to dismiss and request
for a posttrial juror inquiry.  The case is remanded to the
county court for entry of a judgment denying the defendant's
petition for relief.

So ordered.