COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

Suffolk, ss.                                                    No. SJC-13663

COMMONWEALTH,
Appellee

v.

KAREN READ,
Defendant-Appellant.

———————————————————————————

On Appeal from Reservation and Report of G.L. c. 211, § 3 Petition

———————————————————————————

**BRIEF OF APPELLANT KAREN READ**

MARTIN G. WEINBERG
Attorney for Appellant
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

MICHAEL PABIAN
Attorney for Appellant
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

ALAN J. JACKSON
Attorney for Appellant, *Pro Hac Vice*

Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com

DAVID R. YANNETTI
Attorney for Appellant
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

September 24, 2024

## **TABLE OF CONTENTS**

STATEMENT OF ISSUES PRESENTED…………………………………………...8

STATEMENT OF CASE…………………………………………………………..8

STATEMENT OF FACTS ………………………………………………………10

SUMMARY OF ARGUMENT…………………………………………………...17

ARGUMENT……………………………………………………........................19

I.     The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not
       Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-
       Prosecution…………………………………………………………………22

II.    Alternatively, the Defense Is Entitled to a Post-Verdict Judicial Inquiry to
       Determine Whether the Evidence Supports the Juror Representations as to
       Having Acquitted Ms. Read…………………………………………………..27

III.   Re-Prosecution Is Independently Barred Because There Was No Manifest
       Necessity to Declare a Mistrial on Counts on which the Jury Was Not
       Deadlocked…………………………………………………………………34

IV.    Assuming *Arguendo* this Court Finds that Counsel Consented to the
       Mistrial, the Defendant's Personal Consent Was Required………………..49

CONCLUSION………………………………………………………………...50

# TABLE OF AUTHORITIES

## Cases

*A Juvenile v. Commonwealth*, 392 Mass. 52 (1984).............................. 25, 33, 34, 47

*Arizona v. Washington*, 434 U.S. 497 (1978) ................................................... *passim*

*Ball v. United States*, 163 U.S. 662 (1896)........................................................ 23, 24

*Blueford v. Arkansas*, 566 U.S. 599 (2012) ...................................................... *passim*

*Commonwealth v. Babb*, 389 Mass. 275 (1983) ........................................................22

*Commonwealth v. DiBenedetto*, 94 Mass. App. Ct. 682 (2019)..............................34

*Commonwealth v. Dixon*, 395 Mass. 149 (1985)…………………………………32

*Commonwealth v. Edwards*, 491 Mass. 1 (2022) ....................................................40

*Commonwealth v. Fidler*, 377 Mass. 192 (1979)……………………..27, 28, 29, 32

*Commonwealth v. Floyd P.*, 415 Mass. 826 (1993)..................................................26

*Commonwealth v. Foster*, 411 Mass. 762 (1992) ............................................ 47, 48

*Commonwealth v. Guisti*, 434 Mass. 245 (2001)…………………………………32

*Commonwealth v. Horrigan*, 41 Mass. App. Ct. 337 (1996)..................... 35, 36, 44

*Commonwealth v. Jenkins*, 416 Mass. 736 (1994) ...................................................42

*Commonwealth v. LaFontaine*, 32 Mass. App. Ct. 529 (1992) ...............................48

*Commonwealth v. McCalop*, 485 Mass. 790 (2020) ...............................................28

*Commonwealth v. McCowen*, 458 Mass. 461 (2010)…………………………..27

*Commonwealth v. Moore*, 474 Mass. 541 (2016)…………………………………27

*Commonwealth v. Nicoll*, 452 Mass. 816 (2008)........................................ 35, 38, 39

*Commonwealth v. Nolan*, 427 Mass. 541 (1998)……………………………………….49

*Commonwealth v. Phetsaya*, 40 Mass. App. Ct. 293 (1996) ........................... 40, 41

*Commonwealth v. Roth*, 437 Mass. 777 (2002)........................................ 46, 47, 48

*Commonwealth v. Semedo*, 456 Mass. 1 (2010) ......................................................41

*Commonwealth v. Steward*, 396 Mass. 76 (1985) ..................................... 19, 35, 36

*Commonwealth v. Taylor*, 486 Mass. 469 (2020)........................................... *passim*

*Commonwealth v. Zekirias*, 443 Mass. 27 (2004)……………………………………...26

*Cruz v. Commonwealth*, 461 Mass. 664 (2012)........................................ 34, 35, 48

*Daniels v. Commonwealth*, 441 Mass. 1017 (2004) ................................................49

*Erlinger v. United States*, 144 S. Ct. 1840 (2024) ............................................ 19, 20

*Fuentes v. Commonwealth*, 448 Mass. 1017 (2007)........................................ 34, 45

*Gonzalez v. United States*, 553 U.S. 242 (2008).....................................................49

*Green v. United States*, 355 U.S. 185 (1957) ................................................... 20, 21

*Hudson v. Louisiana*, 450 U.S. 40 (1981) ...............................................................24

*Oregon v. Kennedy*, 456 U.S. 667 (1982)...............................................................35

*Pellegrine v. Commonwealth*, 446 Mass. 1004 (2006)...................................... 40, 43

*Picard v. Commonwealth*, 400 Mass. 115 (1987) ...................................................36

*Ray v. Commonwealth*, 463 Mass. 1 (2012) ............................................... 34, 41, 45

*Remmer v. United States*, 347 U.S. 227 (1954)……………………………………...32

*State v. Murdaugh*, No. 2023-000392 (S.C. Aug. 13, 2024) ....................................31

*United States v. Dinitz*, 424 U.S. 600 (1976)...........................................................35

*United States v. Goldstein*, 479 F.2d 1061 (2d Cir. 1973).......................................44

*United States v. Hashimi*, 110 F.4th 621 (4th Cir. 2024)…………………………49

*United States v. Jorn*, 400 U.S. 470 (1971) (plurality opinion) ...................... 35, 48

*United States v. Martin Linen Supply Co.*, 430 U.S. 564 (1977) ......... 20, 21, 22, 49

*United States v. McIntosh*, 380 F.3d 548 (1st Cir. 2004) ................................. 43, 44

*United States v. Mespoulede*, 597 F.2d 329 (2d Cir. 1979)............................. 37, 38

*United States v. Tsarnaev*, 96 F.4th 441 (1st Cir. 2024) ................................. 29, 30

*United States v. You*, 382 F.3d 958 (9th Cir. 2004)...................................................44

*Wallace v. Havener*, 552 F.2d 721 (6th Cir. 1977)...................................................38

## **Constitutional Provisions**

Fifth Amendment to U.S. Constitution ....................................................................20

Sixth Amendment to U.S. Constitution ...................................................................20

## **Statutes**

G.L. c. 234A, § 68C ........................................................................................... 12, 42

## **Rules**

Mass. R. Crim. P. 27(b) ................................................................................... *passim*

Mass. Guide Evid. 606(b)…………………………………………………29

Mass. Guide Evid. 606(c)(5)………………………………………………...29

## **STATEMENT OF ISSUES PRESENTED**

1.  Whether the jury's final, unanimous agreement, following trial, that Ms.
    Read is not guilty of Counts 1 and 3 constitutes an acquittal for Double
    Jeopardy purposes and precludes retrial on those counts.

2.  Whether Ms. Read was alternatively entitled to a post-trial inquiry to
    substantiate her claim that the jury acquitted her of Counts 1 and 3.

3.  Whether there was manifest necessity to support the declaration of a
    mistrial on Counts 1 and 3 where (1) the jury was not deadlocked, and in
    fact had reached a unanimous agreement, on those counts; (2) the trial
    court provided no opportunity for Ms. Read or her counsel to be heard
    regarding the declaration of mistrial; and (3) the record reflects no
    consideration of alternatives to a mistrial when in fact such alternatives
    existed and were codified in Mass. R. Crim. P. 27(b).

## **STATEMENT OF CASE**

On June 9, 2022, Ms. Read was charged in three separate indictments with
second-degree murder in violation of G.L. c. 265, § 1 (Count 1); manslaughter
while operating under the influence of alcohol in violation of G.L. c. 265, § 13½
(Count 2); and leaving the scene of a collision resulting in death in violation of

G.L. c. 90, § 24(2)(a½)(2).  (R. 139-44).[1]  A jury trial began on April 16, 2024.

The trial court declared a mistrial on July 1, 2024.

Ms. Read moved to dismiss Counts 1 and 3 on Double Jeopardy grounds,

contending (1) that the jury reached a final, unanimous decision to acquit her on

those charges; and (2) that there was no manifest necessity supporting the mistrial

given the evidence that the jury was not deadlocked, but was instead in agreement,

on those counts.  As set forth in more detail *infra*, the motion was predicated upon

affidavits by counsel reflecting statements of five deliberating jurors that the jury

had agreed Ms. Read is not guilty of the relevant counts.

After hearing oral argument on August 9, 2024, on August 23, the trial court

issued an order denying Ms. Read's motion to dismiss.  The court "accept[ed],"

"for the purposes of" the motion to dismiss, that ***the juror statements quoted in the***

***defense affidavits were "true and accurate."***  Order at 9 (R. 396, Add. 61)

(emphasis added).  It went on to hold, however, that "[b]ecause there was no open

and public verdict affirmed in open court rendered in this case, the defendant was

not acquitted of any of the charges."  *Id.* at 10 (R. 397, Add. 62).  The court

similarly rejected the defense argument regarding lack of manifest necessity,

---

[1] The page numbers for the record appendix cited in this brief appear in the lower
lefthand corner of each appendix page.  The page numbers in the center of the page
correspond to the record appendix filed in support of Ms. Read's single justice
petition.

finding that (a) Ms. Read's counsel consented to a mistrial via their failure to object; and (b) the jury notes reflecting an "impasse" established the requisite manifest necessity. *See id.* at 15-16 (R. 402-03, Add. 67-68). Finally, the court rejected the defense's alternative request for a post-trial inquiry on the grounds that Ms. Read's argument did "not implicate racial bias or her right to receive an impartial trial" and because it believed that the request implicated "the substance of the jury's deliberations." *Id.* at 20 (R. 407, Add. 72).

Ms. Read's retrial is currently scheduled for January 27, 2025. (R. 102).

On September 11, 2024, Ms. Read filed a petition for relief pursuant to G.L. c. 211, § 3. (R. 5). On September 19, 2024, the single justice (Dewar, J.) reserved and reported the case, without decision, to the full Court. (R. 423).

## STATEMENT OF FACTS

On June 25, 2024, the jury began deliberations after receiving instructions from the trial court. The court instructed the jurors, "You should continue deliberating until you have reached a final verdict on each charge." June 25, 2024 Tr. at 46 (R. 190). It also noted that Count 2 contained "lesser include[d] charge[s]" of involuntary manslaughter and motor vehicle homicide, which the jury should consider "even if [the Commonwealth] fail[ed] to prove the greater charge of manslaughter while operating a motor vehicle under the influence of liquor." *Id.* at 35, 38 (R. 179, 182).

10

The following day, on June 26, 2024, outside the presence of the jury, counsel for Ms. Read raised an issue regarding the verdict form. With respect to Count 2, the original verdict slip provided only one option to find Ms. Read not guilty before going on to ask whether Ms. Read was guilty of the offense charged, or guilty of one of the two lesser included offenses. *See* Exhibit B to Affidavit in Support of Motion to Amend Jury Verdict Slip (R. 239). Counsel asked that the form be amended to provide "not guilty options for the subordinate charges under Count 2." June 26, 2024 Tr. at 5 (R. 212). The trial court initially indicated its disagreement with counsel's request. *See id.* at 8 (R. 215). However, after considering the matter further, the court agreed to provide supplemental instructions and an amended verdict slip. *See id.* at 9-14 (R. 216-21). Later that day, the court provided the supplemental instructions, telling jurors that "Count 2 encompasses three separate charges, the most serious of which is manslaughter while operating a vehicle under the influence of liquor." *Id.* at 16 (R. 223). The jury should first focus on that "lead charge" and, "if the Commonwealth . . . failed to prove that crime beyond a reasonable doubt, then . . . consider the remaining lesser included offenses in descending order." *Id.* (R. 223).

On June 28, 2024, the jury sent the following note to the court: "I am writing to inform you on behalf of the jury that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been

unable to reach a unanimous verdict." June 28, 2024 Tr. at 4 (R. 250). The court

asked counsel for their views "on whether there ha[d] been due and thorough

deliberations" sufficient to support the giving of a so-called *Tuey-Rodriguez*

charge. *Id.* at 5 (R. 251); *see also* G.L. c. 234A, § 68C (permitting charge "[i]f a

jury, after due and thorough deliberation, returns to court without having agreed on

a verdict"). The Commonwealth responded that the charge should not be given

because there "simply ha[d]n't been sufficient time yet." June 28, 2024 Tr. at 5 (R.

251). Counsel for Ms. Read disagreed, requesting that the court "read the *Tuey-*

*Rodriguez* model instruction and go from there." *Id.* at 6 (R. 252). The trial court

sided with the Commonwealth ruling, "I am not prepared to find that there have

been due and thorough deliberations at this point. So I am going to send them back

out." *Id.* at 7 (R. 253).

On July 1, 2024, the jury presented another note, stating:

> despite our commitment to the duty entrusted to us, we
> find ourselves deeply divided by fundamental differences
> in our opinions and state of mind. The divergence in our
> views are not rooted in a lack of understanding or effort
> but deeply held convictions that each of us carry,
> ultimately leading to a point where consensus is
> unattainable. We recognize the weight of this admission
> and the implications it holds.

July 1, 2024 Tr. at 7 (R. 264). Upon being asked by the court, the parties reiterated

their same previously expressed views, with the Commonwealth taking the

position that due and thorough deliberations had not yet occurred and Ms. Read's

counsel arguing that the court should give a *Tuey-Rodriguez* instruction.  *See id.* at

4-6 (R. 261-63).  This time, the trial court decided to give the requested instruction.

Later that day, the jury sent yet another note.  Thereafter, without reading

the note to counsel, and without providing counsel with either an opportunity to be

heard or an opportunity to consult with their client about the implication of a

potential mistrial on one or more charges, the trial court simply stated, "The jury is

at an impasse" and called in the jurors.  *Id.* at 10 (R. 267).  It then read the note on

the record:

> despite our rigorous efforts, we continue to find ourselves
> at an impasse.  Our perspectives on the evidence are
> starkly divided.  Some members of the jury firmly
> believe that the evidence surpasses the burden of proof,
> establishing the elements of the charges beyond a
> reasonable doubt.  Conversely, others find the evidence
> fails to meet this standard and does not sufficiently
> establish the necessary elements of the charges.  The
> deep division is not due to a lack of effort or diligence
> but, rather, a sincere adherence to our individual
> principles and moral convictions.  To continue to
> deliberate would be futile and only serve to force us to
> compromise these deeply held beliefs.

*Id.* at 11 (R. 268).

After reading the note, and without soliciting the views of counsel in any

respect, the trial court stated, "I am not going to do that to you, folks.  Your service

is complete.  I am declaring a mistrial in this case."  *Id.* (R. 268).  The jury was

then excused and ordered to leave the courtroom.  Counsel was not invited to speak during this entire interaction.  *See id.* (R. 268).

The following day, on July 2, 2024, unsolicited by any party, one of the jurors ("Juror A") contacted one of the attorneys for Ms. Read, Alan Jackson. Juror A stated that s/he "wish[ed] to inform [Attorney Jackson] of the true *results*" of the jury's deliberations.  Affidavit of Alan J. Jackson ¶ 4 (R. 286).  According to Juror A, "the jury unanimously agreed that Karen Read is NOT GUILTY of Count 1 (second degree murder).  Juror A was emphatic that Count 1 (second degree murder) was 'off the table,' and that all 12 of the jurors were in agreement that she was NOT GUILTY of such crime."  *Id.* ¶ 5 (R. 287).  "[T]he jury also unanimously agreed that Karen Read is NOT GUILTY of Count 3 (leaving the scene with injury/death)."  *Id.* ¶ 6 (R. 287).

One day later, on July 3, 2024, another attorney for Ms. Read, David Yannetti, was contacted by "two different individuals (hereinafter, 'Informant B' and 'Informant C') who had received information from two distinct jurors (hereinafter 'Juror B' and 'Juror C') both of whom were part of the deliberating jury in this case."  Affidavit of David R. Yannetti ¶ 2 (R. 283).

Informant B sent Attorney Yannetti "a screenshot he/she had received from someone (hereinafter, 'Intermediary B') of text messages that Intermediary B had received from Juror B.  In that screenshot, Juror B texted the following to

14

Intermediary B:  'It was not guilty on second degree.  And split in half for the second charge. . . .  I thought the prosecution didn't prove the case.  No one thought she hit him on purpose or even thought she hit him on purpose [sic].'"  *Id.* ¶ 4 (R. 283).  Juror B later placed an unsolicited phone call to Attorney Yannetti, confirming that the information contained in the publicly filed Affidavit was accurate.  *See* Supplemental Affidavit of David R. Yannetti ¶ 4 (R. 330).  "Juror B clarified, however, that he/she meant to write, 'No one thought she hit him on purpose or even knew that she had hit him.'"  *Id.* (R. 330-31).  Juror B further told Attorney Yannetti s/he "believe[d] that every member of the jury, if asked, w[ould] confirm that the jury reached Not-Guilty verdicts on indictments (1) and (3)."  *Id.* ¶ 5 (R. 331).

Informant C had been in contact with another individual ("Intermediary C") who is a co-worker and friend of Juror C and joined a Zoom meeting during which Juror C discussed the trial.  Informant C sent Attorney Yannetti the below screenshots of his/her text messages with Intermediary C regarding what Juror C revealed in the Zoom meeting:

Intermediary C:    "no consideration for murder 2.  manslaughter started polling at 6/6 then ended deadlock @ 4no8yes."

. . . .

Informant C:    "interesting.  if it was no consideration for murder two, shouldn't she have been acquitted

15

on that count.   and hung on the remaining
chargers [sic] goes back to the jury verdict
slip that was all confusing"

Intermediary C:    "she should've been acquitted I agree.  Yes, the
remaining charges were what they were hung
on.  and that instruction paper was very
confusing."

Affidavit of David R. Yannetti ¶ 10 (R. 284-85).

In the ensuing days, after the filing of Ms. Read's initial motion to dismiss,
but before the Superior Court hearing on that motion, Attorney Jackson was
contacted by two other deliberating jurors.  The first, "Juror D," stated "that the
jury reached NOT GUILTY verdicts on Count 1 and Count 3, and that the
disagreement was solely as to Count 2 and its lesser offenses."  Supplemental
Affidavit of Alan J. Jackson ¶ 5 (R. 293).  S/he recounted that, "after the jury was
excused and aboard the bus, many of the jurors appeared uncomfortable with how
things ended, wondering, *Is anyone going to know that we acquitted [Karen Read]
on Count 1 and 3?*"  *Id.* ¶ 8 (R. 293).  Juror D unequivocally told counsel, "*Every
one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY
of Counts 1 and 3.  Because that's what happened.*"  *Id.* ¶ 10 (R. 293).  "Juror E"
similarly stated "that the jury was 'unanimous on 1 and 3' that Karen Read was
NOT GUILTY of those charges."  Second Supplemental Affidavit of Alan J.
Jackson ¶ 4 (R. 323).

The Commonwealth filed a post-trial notice of disclosure informing the court that, "[o]n Sunday July 21, 2024, Assistant District Attorney Adam Lally received an unsolicited voicemail on his office's phoneline from an individual, who identified their self as a juror by full name and seat number." Commonwealth Notice at 1 (R. 325). The message stated, "it is true what has come out recently about the jury being unanimous on charges 1 and 3." *Id.* (R. 325). ADA Lally received a subsequent message from the same individual stating he could "confirm unanimous on charges one and three, as not guilty and as of last vote 9-3 guilty on the manslaughter charges . . . ." *Id.* (R. 325). The Commonwealth additionally "received emails from three individuals who identified themselves as jurors" and "indicated they wished to speak anonymously." *Id.* (R. 325). The Commonwealth declined to substantively respond to the voice messages or emails, instead claiming in responsive emails that it was ethically prohibited from discussing such matters. *See id.* (R. 325).

## <u>SUMMARY OF ARGUMENT</u>

The very day after the trial court declared a mistrial, counsel for Ms. Read began receiving unsolicited communications from five of the twelve deliberating jurors (in four instances, directly from the jurors themselves) indicating, unequivocally and unconditionally, that the jury had a firm and unwavering 12-0 agreement that Ms. Read is ***not guilty*** of two of the three charges against her,

including the charge of murder in the second degree.  Crucially, neither the

Commonwealth, which frankly acknowledged receiving communications from one

juror to the same effect, nor the Superior Court judge, who expressly accepted the

veracity of juror statements relayed in affidavits by counsel, disputed the factual

basis for the defense motion in any meaningful respect.  Despite the widespread

media given to the defense filings of the attorney affidavits attesting to the jurors'

representation they had acquitted Ms. Read of two of three charges, no juror

disputed the facts represented by the attorneys in any manner.   Given the central

importance that acquittals have held in our criminal justice system for hundreds of

years, the defense respectfully submits that the jury's unanimous agreement

precludes re-prosecution of Ms. Read on Counts 1 and 3 and mandates dismissal of

those charges.  (pages 22-26).  This presents an issue of first impression for this

Court, as does the defense's alternative contention that Ms. Read was entitled to a

post-verdict inquiry to substantiate her claim and that this Court's precedents

permitting such inquiry regarding claims of external influence and/or juror bias

should be extended to the present context.  (pages 27-34).

Independently, while a jury deadlock constitutes manifest necessity to

support a mistrial, there is no authority for the proposition that disagreement as to

***some counts*** constitutes manifest necessity for the declaration of a mistrial with

respect to ***all counts***.  Put another way, there was no deadlock as to two of the

counts on which the trial court declared a mistrial.  The trial court's finding that Ms. Read's counsel consented to the mistrial is contrary to both the factual record and the clear binding case law.  The trial court in its opinion erroneously failed to apply clear state and federal case law that places the burden of establishing manifest necessity solely and exclusively on the prosecution rather than on the defendant.  The trial court also failed to address the two guiding principles set forth by this Court in *Commonwealth v. Steward*, 396 Mass. 76, 79 (1985), and *Commonwealth v Taylor*, 486 Mass. 469, 484 (2020) (citation omitted) – that before a mistrial is declared "(1) counsel must [have been] given full opportunity to be heard and (2) the trial judge must [have given] careful consideration to alternatives to a mistrial."  The court instead erroneously equated a request for a *Tuey-Rodriguez* instruction, which is designed to encourage a ***verdict***, with consent to a ***mistrial***.  In sum, whether the jury acquitted Ms. Read or, alternatively, was merely not deadlocked on the relevant counts, the Constitution requires the same result: dismissal.  (pages 34-49).

## ARGUMENT

The ancient right to a jury trial is no mere "procedural formalit[y] but [rather a] fundamental reservation[] of power to the American people."  *Erlinger v. United States*, 144 S. Ct. 1840, 1850 (2024) (citation omitted).  "By requiring the Executive Branch to prove its charges to a unanimous jury beyond a reasonable

doubt, the Fifth and Sixth Amendments seek to mitigate the risk of prosecutorial overreach and misconduct, including the pursuit of 'pretended offenses' and 'arbitrary convictions.'" *Id.* (citation omitted). "Prominent among the reasons colonists cited in the Declaration of Independence for their break with Great Britain was the fact Parliament and the Crown had 'depriv[ed] [them] in many cases, of the benefits of Trial by Jury.'" *Id.* at 1848 (citation omitted). "After securing their independence, the founding generation sought to ensure what happened before would not happen again. As John Adams put it, the founders saw representative government and trial by jury as 'the heart and lungs' of liberty." *Id.* (citation omitted). It follows that a jury acquittal is entitled to the utmost respect in our criminal justice system. *See Taylor*, 486 Mass. at 481 ("Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that [a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution." (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977)).

"The Double Jeopardy Clause provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Blueford v. Arkansas*, 566 U.S. 599, 605 (2012) (quoting U.S. Const., Amdt. 5). "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be

allowed to make repeated attempts to convict an individual for an alleged offense."

*Green v. United States*, 355 U.S. 185, 187 (1957). "Even if the first trial is not

completed, a second prosecution may be grossly unfair. It increases the financial

and emotional burden on the accused, prolongs the period in which [s]he is

stigmatized by an unresolved accusation of wrongdoing, and may even enhance the

risk that an innocent defendant may be convicted. . . . Consequently, as a general

rule, the prosecutor is entitled to one, and only one, opportunity to require an

accused to stand trial." *Arizona v. Washington*, 434 U.S. 497, 504-05 (1978)

(internal footnotes omitted); *see also Martin Linen*, 430 U.S. at 569 ("At the heart

of this policy is the concern that permitting the sovereign freely to subject the

citizen to a second trial for the same offense would arm Government with a potent

instrument of oppression."); *Blueford*, 566 U.S. at 605 ("The Clause guarantees

that the State shall not be permitted to make repeated attempts to convict the

accused, thereby subjecting h[er] to embarrassment, expense and ordeal and

compelling h[er] to live in a continuing state of anxiety and insecurity, as well as

enhancing the possibility that even though innocent [s]he may be found guilty."

(citation omitted)).

This Court "review[s] determinations regarding double jeopardy de novo."

*Taylor*, 486 Mass. at 477.

**I.    The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution**

"[W]hat constitutes an 'acquittal' is not to be controlled by the form" of the action in question. *Taylor*, 486 Mass. at 482 (quoting *Martinez v. Illinois*, 572 U.S. 833, 841-42 (2014)). "Rather, [the Court] must determine whether" the action "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *Commonwealth v. Babb*, 389 Mass. 275, 281 (1983) (quoting *Martin Linen*, 430 U.S. at 571). The mere presence or absence of "checkmarks on a form" is not dispositive. *Taylor*, 486 Mass. at 482 (citation omitted).

Here, the affidavits by Attorneys Jackson and Yannetti reflect statements by five deliberating jurors that the jury had reached a final, unanimous conclusion that Ms. Read is not guilty of Counts 1 and 3. There was nothing tentative about the jurors' statements. To the contrary, they were definitive in describing the result of the jury's deliberations. *See* Affidavit of Alan J. Jackson ¶ 5 (R. 287) ("Juror A was emphatic that Count 1 (second degree murder) was 'off the table,' and that all 12 of the jurors were in agreement that she was NOT GUILTY of such crime."); Affidavit of David R. Yannetti ¶ 4 (R. 283) (reflecting text message from Juror B, "It was not guilty on second degree. . . . No one thought she hit him on purpose or even [knew that she had hit him]"); *Id.* ¶ 10 (R. 284-85) (reflecting Juror C's

22

statement, relayed by Intermediary C, that there was "no consideration for murder 2" and Ms. Read "should've been acquitted" on that count); Supplemental Affidavit of Alan J. Jackson ¶ 10 (R. 293) ("Juror D, without hesitation, said in substance, *Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3.  Because that's what happened.*"); Second Supplemental Affidavit of Alan J. Jackson ¶ 4 (R. 323) ("Juror E explained that the jury was 'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges.").  As noted above, the trial court accepted the foregoing averments as true facts.  *See* Order at 9 (R. 396, Add. 61).[2]

In rejecting Ms. Read's claim of acquittal, the court relied solely upon the lack of an "open and public verdict affirmed in open court."  Order at 10 (R. 397, Add. 62).  This reasoning is rooted in a formalism that has been consistently rejected by the United States Supreme Court and this Court in a string of precedents spanning more than one hundred years.  *See supra* page 22 (citing cases); *Ball v. United States*, 163 U.S. 662, 671 (1896) ("However it may be in

---

[2] Just days ago, an article was published online reflecting an interview with an anonymous juror quoted as saying, "It was very clear on charge 1 and 3.  Murder was decided on day one.  She did not have an intent to murder."  Aidan Kearney, *Canton Coverup Part 397: Karen Read Juror Says They Switched on Manslaughter Verdict, Confirms Murder Acquittal, Says Jurors Couldn't Ask Judge Cannone Questions About 2 Verdicts* (Sept. 6, 2024), *available at* https://tbdailynews.com/canton-coverup-part-397-karen-read-juror-says-they-switched-on-manslaughter-verdict-confirms-murder-acquittal-says-jurors-couldnt-ask-judge-cannone-question-about-2-verdicts/.

England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense."); *Hudson v. Louisiana*, 450 U.S. 40, 41 & n.1 (1981) (holding that judicial grant of new trial prohibited retrial on Double Jeopardy grounds, notwithstanding that the state "Code of Criminal Procedure d[id] not authorize trial judges to enter judgments of acquittal in jury trials").

Indeed, under the trial court's reasoning, affidavits executed by all 12 jurors attesting to a final, unanimous decision to acquit would not be sufficient to mount a successful Double Jeopardy challenge. Surely, that cannot be the law. Indeed, it *must* not be the law. And, in the context of this highly publicized case, it strains credulity to suggest that, if the unequivocal statements of five jurors quoted above did not, in fact, represent the unanimous view of all 12, the remaining jurors would allow the inaccuracy to go uncorrected. Instead, they would predictably have notified the Commonwealth or the court of their own recollection. Here, to the contrary, the Commonwealth has received the exact same information as the defense regarding the jury's unanimous agreement to acquit Ms. Read on Counts 1 and 3.

The United States Supreme Court's decision in *Blueford* is not to the contrary, as it is factually distinguishable from the instant case. There, the foreperson had reported during deliberations that the jury "was unanimous against"

24

the charges of capital murder and first-degree murder but split on manslaughter. 566 U.S. at 603-04. The court sent the jury back to continue deliberations and, when the jury remained unable to reach a verdict, declared a mistrial. *See id.* at 604. The Supreme Court rejected the defendant's argument that the Double Jeopardy Clause prohibited re-prosecution for capital and first-degree murder. In doing so, the Court relied heavily upon the lack of finality of the juror's report. "[T]he jury's deliberations had not yet concluded," and it "went back to the jury room to deliberate further." *Id.* at 606. "The foreperson's report was not a final resolution of anything," and there was no indication at the conclusion of deliberations that "it was still the case that all 12 jurors believed [the defendant] was not guilty of capital or first-degree murder." *Id.* Here, by contrast, the jurors' statements reflect a final and indelible determination that persisted through the end of deliberations and following.

The contrast with *A Juvenile v. Commonwealth*, 392 Mass. 52 (1984), is even clearer. In that case, after the conclusion of trial, a court officer found four verdict slips in the deliberation room, two of which reflected entries of "not guilty." There was no indication as to when the entries were made or in what circumstances, much less that they reflected a final, unanimous conclusion of all jurors.

Neither the Commonwealth nor the trial court has cited any case in which a defendant was forced to stand trial a second time for an offense a previous jury had found her not guilty of simply because such final, unanimous agreement was not announced in open court. *See* Aug. 9, 2024 Tr. at 18 (R. 349) (arguing that Commonwealth had not cited "a single case with facts like this [that] have been ignored. Not a single precedent have they raised, nationwide, State Courts, murder cases, 50 States, [f]ederal, where there's been this kind of demonstration that we were silent when we shouldn't be, but she was acquitted").[3] The instant case squarely presents that issue, and the defense respectfully submits that this Court should hold that any lack of formality does not supersede the defendant's fundamental constitutional protections. This issue is one of existential importance—not merely to Ms. Read, but to the very foundation of the constitutional safeguards that protect her.

---

[3] Other cases cited by the trial court on this issue did not involve Double Jeopardy challenges at all. *See Commonwealth v. Zekirias*, 443 Mass. 27, 31-34 (2004); *Commonwealth v. Floyd P.*, 415 Mass. 826, 830-32 (1993). Instead, these cases both vacated convictions where courts responded to ambiguous communications by jurors in such a way as to improperly influence the return of guilty verdicts. Given the gravity of criminal conviction, it makes sense to insist on observance of procedural formalities before taking away a defendant's liberty. However, in light of the fundamental constitutional prohibition on Double Jeopardy, refusing to give effect to a verdict of acquittal due to its lack of formality is another matter altogether for which neither the Commonwealth nor the trial court has cited any precedent. Additionally, unlike in *Zekirias* and *Floyd P.*, there is nothing ambiguous or tentative about the post-trial evidence of verdicts here.

26

**II.    Alternatively, the Defense Is Entitled to a Post-Verdict Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Ms. Read**

The trial court was wrong to artificially limit the right to a post-trial inquiry to develop a substantial claim of a constitutional violation to the narrow context of claims implicating "racial bias" or the "right to receive an impartial trial."  Order at 20 (R. 407, Add. 72).  This Court has not framed the availability of post-trial inquiry so narrowly, instead stating, "we will permit juror testimony regarding 'overt factors . . . by which the verdict's validity can be objectively assessed,' such as extraneous influences on the jury, but not regarding 'the subjective mental processes of jurors, such as the reasons for their decisions.'"  *Commonwealth v. McCowen*, 458 Mass. 461, 494 n.35 (2010) (quoting *Commonwealth v. Fidler*, 377 Mass. 192, 198 (1979), *overruled on other grounds by Commonwealth v. Moore*, 474 Mass. 541 (2016)).

In *Fidler*, this Court rejected "[t]he Commonwealth's suggestion of an inflexible rule excluding all juror testimony offered to impeach verdicts" as "achiev[ing] stability at the expense of doing justice between the parties . . . ."  377 Mass. at 197.  Instead, the Court ruled, where the defendant's claim is predicated upon the presence of "overt factors," "the law's commitment to a just result warrants receiving evidence . . . .  But where the juror would testify solely to matters resting in his own consciousness, the dubious value of the testimony is

27

outweighed by the need for stability in verdicts." *Id.* at 198 (citation omitted).
*Fidler* expressly "recognize[d] that the line between overt factors and matters resting in a juror's consciousness is not easily drawn, and difficult cases will arise." *Id.* But it went on to observe, "we think it possible to draw the line in most cases, and, in any event, the better course is to try to do so rather than refuse to try." *Id.*

The law is clear that, in the context of "juror bias," an affidavit by counsel is sufficient to entitle the defendant to a "post-verdict inquiry" on the issue. *Commonwealth v. McCalop*, 485 Mass. 790, 798 (2020) (citation omitted).   If "the credibility of the affidavit is in issue, the trial judge should conduct a hearing to determine the truth or falsity of the affidavit's allegations." *Id.* at 799 (citation omitted).  In so holding, this Court stated, "where a defendant submits a motion raising the possibility that [s]he did not receive a trial by an impartial jury, which was h[er] fundamental right, [it] cannot be ignored." *Id.* (citation omitted).

No less than the right to an unbiased jury, it is "a fundamental tenet of our system of justice" that a defendant may not be retried for a crime of which she was previously acquitted by a jury, and the defense submits that post-verdict inquiry is equally warranted in the present context. *Id.*  Other than generally noting that the present case does not involve an allegation of juror bias, the trial court did nothing

to distinguish the legal basis and justifications in *McCalop* from those raised herein by the defendant.

The defense respectfully submits that the Court should hold that the presence of an unannounced verdict, supported by the unambiguous post-trial statements of five deliberating jurors, constitutes an "overt factor" at least entitling the defense to further inquiry. *Fidler*, 377 Mass. at 198; *cf.* Mass. Guide Evid. 606(b) ("During an inquiry into the validity of a verdict, the court may ask the jurors individually to affirm publicly that the verdict as recorded represents their decision."), 606(c)(5) (permitting juror testimony that "a mistake was made in entering the verdict on the verdict form"). Given the foundational importance of jury acquittals in our justice system, this is a circumstance in which "the law's commitment to a just result warrants receiving evidence." *Fidler*, 377 Mass. at 198 (citation omitted).

Recently, in *United States v. Tsarnaev*, 96 F.4th 441, 449 (1st Cir. 2024), the First Circuit Court of Appeals remanded the matter for further proceedings in the Boston Marathon bombing case due to two jurors' postings on social media "regarding the bombings and the district court proceedings," which came to light after the jurors had been provisionally selected to serve. *Id.* at 449. The comments did not reflect racial bias in any way, but rather possible bias specific to the defendant. *See id.* at 454, 461. The comments were also inconsistent with the jurors' assurances that they had not discussed the case online. *See id.* at 455, 461.

29

The First Circuit held that the district court erred by ***failing to inquire*** about these issues with the jurors.  *See id.* at 458, 462.  Given that "[t]he right to an impartial jury is a constitutional bedrock[,] . . . when there is a plausible claim that a prospective juror lied in a manner that may reveal bias, a court need conduct some inquiry reasonably calculated to determine whether the prospective juror did lie and, if so, why." *Id.* at 458 (citation omitted).

Crucially for present purposes, the First Circuit ordered the district court to *voir dire* the jurors.  In doing so, the court acknowledged, "[n]o doubt any juror would have strong incentives to avoid admitting having committed perjury during voir dire.  We also expect that most jurors, having taken time out of their daily lives to receive evidence at trial, deliberate with other jurors, and reach a verdict that they believe is just, would prefer not to have that verdict disturbed – especially as a result of their own actions. . . .  [W]e have no doubt that the able district court judge can do what judges regularly do – form a considered opinion about the sufficiency of the jurors' explanations once those explanations are given and explored." *Id.* at 464.  Likewise, the experienced trial court in the matter *sub judice* can, after conducting an appropriate judicial inquiry, make findings as to whether in fact Ms. Read was acquitted.

In another high-profile case, the South Carolina Supreme Court recently agreed to hear claims by Alex Murdaugh that, during his murder trial, the clerk of

court improperly influenced deliberating jurors.  *See State v. Murdaugh*, No. 2023-000392 (S.C. Aug. 13, 2024) (R. 43).  Jurors came forward after the clerk published a book about the trial describing her "efforts to obtain" a "guilty verdict through improper jury tampering."  Brief of Appellant at 2 (R. 53).  The clerk allegedly told jurors after the defense began its case "not to let the defense 'throw you all off,' or 'distract you or mislead you,'" and warned them "'not to be fooled' by Mr. Murdaugh's testimony in his own defense."  *Id.*  The trial court held an evidentiary hearing on the motion for new trial, including testimony by jurors.  *See id.* at 4-8 (R. 55-59).  As in *Tsarnaev*, the issue was not racial bias, but nonetheless implicated fundamental constitutional rights like Ms. Read's right not to be retried for offenses of which she has already been acquitted.

The trial judge dismissed Ms. Read's reliance upon *Tsarnaev* and *Murdaugh* in a brief footnote, simply stating that the circumstances "are readily distinguishable" from those at issue here.  Order at 21 n.11 (R. 408, Add. 73).  But this misses the forest for the trees.  While it is certainly true that all three cases raise different issues, the fundamental point remains the same: a defendant who comes forward with credible evidence of a serious constitutional violation post-trial must be entitled to an opportunity to prove those claims.  There is no apparent

reason to artificially limit the availability of such constitutional inquiry to the

singular context of racial bias, as the trial court suggested.[4]

The defense request does not, in any manner, infringe upon "the substance

of the jury's deliberations." Order at 20 (R. 407, Add. 72). To the contrary, the

motion to dismiss was predicated solely upon the **result** of such deliberations,

namely a unanimous decision that Ms. Read is not guilty of murder in the second

degree. The relevant inquiry could be accomplished by a single "yes" or "no"

question posed to jurors: *did you unanimously acquit Karen Read of the charges in*

*Counts 1 and 3*? Of course, the results of a jury's deliberations are not secret.

They are, in fact, routinely announced in open court. Here, the defense has learned

post-trial that the jury reached a verdict that was not so announced. It was at least

---

[4] This Court has permitted post-verdict inquiry of jurors consistent with the *Tsarnaev* and *Murdaugh* examples. *See Commonwealth v. Guisti*, 434 Mass. 245, 249-50 (2001) (juror "posted a message on an internet mail service" "stating that she was 'stuck in a 7 day-long Jury Duty rape/assault case . . . . Just say he's guilty and lets [*sic*] get on with our lives!" and it was unclear to what extent juror received responses); *Commonwealth v. Dixon*, 395 Mass. 149, 150 (1985) (attorney affidavit reflecting juror statement that "a female juror's husband had conversations with some of the witnesses in this case during the course of the trial and these conversations were made known to said female juror"); *Fidler*, 377 Mass. at 199 (juror affidavit "alleged that one juror stated [the defendant] had been shot at in Charlestown a month earlier," which had not been mentioned in court); *see also Remmer v. United States*, 347 U.S. 227, 228 (1954) ("After the jury had returned its verdict, the petitioner learned for the first time that during the trial a person unnamed had communicated with a certain juror, who afterwards became the jury foreman, and remarked to him that he could profit by bringing in a verdict favorable to the petitioner. . . . As a result, the Federal Bureau of Investigation was requested to make an investigation and report . . . .").

entitled to the opportunity to substantiate that fact in order to ensure Ms. Read is not unconstitutionally forced to stand trial for criminal offenses of which she has already been acquitted.  Such inquiry in no way intrudes on the deliberative process of the jury.  Such an inquiry instead honors the jury service which the trial court described as "extraordinary" rather than disregarding the efforts of five jurors to disclose that there was not an "impasse" on all three as contrasted to only one count.

Indeed, it was the trial court, not the defense, that injected issues regarding jury deliberations into the inquiry.  It is simply not true that, "given the content of the jury's final note to the Court, . . . [a]ny inquiry would necessarily require the Court to understand why the jury's final note communicated a deadlock on charges when post-trial, certain deliberating jurors are purportedly stating that the jury was, in fact, unanimous on most of the charges."  Order at 20 (R. 407, Add. 72).  As explained *infra* pages 45-46, in light of the trial court's instructions repeatedly characterizing the lesser included offenses within Count 2 as discrete "charges," the jury's note is readily susceptible to interpretation consistent with the post-trial evidence supporting the defense motion.[5]  In any event, if the jurors state that they

---

[5] This distinguishes the case from *A Juvenile*, where the jury foreman had expressly indicated "that the jurors were deadlocked on the complaint which charged murder," and the jurors subsequently reaffirmed that fact in open court. 392 Mass. at 53.  In these circumstances, a post-trial subpoena to the foreman

acquitted Ms. Read, no further inquiry regarding the contents of the jury note could

possibly remove the clear constitutional implications of such acquittal.[6]

### III.    Re-Prosecution Is Independently Barred Because There Was No Manifest Necessity to Declare a Mistrial on Counts on which the Jury Was Not Deadlocked

Absent the defendant's consent, "State and Federal double jeopardy

protections bar, 'as a general rule,' retrial of a defendant whose initial trial ends . . .

without a conviction."  *Ray v. Commonwealth*, 463 Mass. 1, 3 (2012) (quoting

*Washington*, 434 U.S. at 505).  This rule is rooted in "the importance to the

defendant of being able, once and for all, to conclude h[er] confrontation with

society through the verdict of a tribunal [s]he might believe to be favorably

───────────────

regarding verdict slips recovered from the deliberation room after trial regarding
that very count "could only be aimed" at impermissible "impeachment, months
after the fact, of the jury's report to the judge in open court."  *Id.* at 57.  Here, by
contrast, no statement or inquiry was made regarding whether the impasse related
to any specific count.  *Cf. also Fuentes v. Commonwealth*, 448 Mass. 1017, 1018
(2007) (jury note expressly "stated that the jury could not reach a unanimous
verdict as to either" of the two indictments).  Moreover, as discussed *supra* page
25, the unsubmitted verdict forms recovered in *A Juvenile* were far less clear than
the post-trial evidence at issue here in establishing a final, unanimous acquittal.
Accordingly, the instant case involves stronger "overt factors" warranting inquiry.

[6] In *Commonwealth v. DiBenedetto*, 94 Mass. App. Ct. 682, 688 (2019), the
defense argument that the jury's verdict (which had just been announced in open
court) was not, in fact, unanimous depended upon "juror testimony concerning
internal deliberations," namely "that they misunderstood the unanimity
instruction."  *DiBenedetto* also preceded this Court's opinion in *McCalop*, and
therefore must be disregarded to the extent the Court perceives an inconsistency
between the two.

disposed to h[er] fate." *Cruz v. Commonwealth*, 461 Mass. 664, 670 n.9 (2012)

(quoting *United States v. Jorn*, 400 U.S. 470, 486 (1971) (plurality opinion)); *see*

*also Taylor*, 486 Mass. at 483 ("[T]he [d]ouble [j]eopardy [c]lause affords a

criminal defendant a 'valued right to have h[er] trial completed by a particular

tribunal.'" (quoting *Oregon v. Kennedy*, 456 U.S. 667, 671-72 (1982)). "Thus,

where a mistrial is entered 'without the defendant's request or consent,' retrial is

impermissible unless there was a manifest necessity for the mistrial." *Id.* (quoting

*United States v. Dinitz*, 424 U.S. 600, 606-07 (1976)).

Importantly, the "heavy" burden of establishing "manifest necessity" to

justify a mistrial is ***exclusively*** on the Commonwealth. *Commonwealth v. Nicoll*,

452 Mass. 816, 818 (2008) (quoting *Washington*, 434 U.S. at 505); *see also*

*Steward*, 396 Mass. at 79. And this burden remains solely upon the

Commonwealth regardless of whether or not a defendant objects to the declaration

of a mistrial. *See Nicoll*, 452 Mass. at 818; *Commonwealth v. Horrigan*, 41 Mass.

App. Ct. 337, 340 (1996). Before a court declares a mistrial for manifest necessity,

"(1) counsel must [have been] given full opportunity to be heard and (2) the trial

judge must [have given] careful consideration to alternatives to a mistrial." *Taylor*,

486 Mass. at 484 (citation omitted).

Here, the defense respectfully submits that the lack of opportunity to be

heard, alone, is dispositive. Upon receiving the final jury note, the court declared a

mistrial and excused the jury without consulting counsel.  This action "was sudden, brief, and unexpected, neither preceded nor accompanied by discussion with counsel."  *Horrigan*, 41 Mass. App. Ct. at 341; *see also Picard v. Commonwealth*, 400 Mass. 115, 118-19 (1987) (finding no manifest necessity where "[n]o opportunity was given counsel to argue the propriety of the question or of the necessity of a mistrial"); *Steward*, 396 Mass. at 79 (finding no manifest necessity where "the trial judge . . . first ruled that he was going to declare a mistrial and then, almost as an afterthought, unenthusiastically asked whether counsel objected").  The defense was provided no opportunity to object to the declaration of a mistrial, or to advise the court of the imperatives of Mass. R. Crim. P. 27(b), request that the jury be polled, or discuss the issue with Ms. Read.

The defense respectfully submits that, given the importance of Double Jeopardy protections and the profound implications of a retrial for a criminal defendant, an opportunity to be heard must, in order to be meaningful, occur after a reasonable opportunity for counsel to consult with their client.  *See* Aug. 9, 2024 Tr. at 24 (R. 355) (arguing that counsel had "no opportunity . . . to speak to Ms. Read, after all, it's her rights, not theirs").  Counsel for Ms. Read clearly had no such opportunity here.  Whether or not the trial court was obligated to obtain Ms. Read's personal consent, *see infra* IV, its failure to at least ensure that counsel had

an opportunity to consult with Ms. Read on the issue undermines the existence of manifest necessity.

The record is independently lacking on the second prong, as it reflects no "careful consideration" of "alternatives to a mistrial." *Taylor*, 486 Mass. at 484 (citation omitted). Here, there was one obvious alternative: to simply ask the jury to specify the charge(s) on which it was deadlocked. This option is apparent from the face of Mass. R. Crim. P. 27(b) which states that "[t]he judge may declare a mistrial as to any charges upon which the jury cannot agree upon a verdict; ***provided***, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded." (Emphasis added). In fact, the reporter's notes expressly indicate that such reception of partial verdicts is ***required*** before a mistrial may be declared for manifest necessity. *See* Mass. R. Crim. P. 27, reporter's notes ("This rule also provides that the court may declare a mistrial in cases where the jury is unable to reach a verdict. However, it ***must*** first receive and record the verdicts which the jury can agree upon." (Emphasis added)). Had the court inquired as to the existence of any partial verdicts, and the jury articulated its verdict consistent with the statements of Juror A, Juror B, Juror C, Juror D, and Juror E, the Double Jeopardy implications would have been clear and decisive. "[I]ndeed, with virtual unanimity, the cases have applied collateral estoppel to bar the Government from

relitigating a question of fact that was determined in defendant's favor by a partial verdict." *United States v. Mespoulede*, 597 F.2d 329, 336 (2d Cir. 1979); *see also Wallace v. Havener*, 552 F.2d 721, 724 (6th Cir. 1977) ("When the jury hands down a partial verdict, a final judgment is rendered on the counts upon which the jury has reached agreement.").

In denying the motion to dismiss, the trial court erred by relying primarily upon the lack of objection by defense counsel. In doing so, it utterly neglected to acknowledge the clear and longstanding case law placing the burden of establishing manifest necessity squarely on the prosecution. *Nicoll* provides a helpful analogue.

The defendant in *Nicoll* was charged with operating a vehicle under the influence of alcohol. Only six jurors were empaneled and, after trial began, one juror recognized a witness "and informed the trial judge that he might not be able to be impartial." 452 Mass. at 817. The judge excused the juror. "Left with five jurors, the judge and attorneys briefly discussed how to proceed. Defense counsel expressed his frustration over the empanelment of only six jurors and then stated, 'I don't think we can go forward with five jurors, can we?' The judge responded, 'Not in a criminal case. . . . Okay, I'm going to declare a mistrial.'" *Id.* After a retrial was scheduled, the defendant moved to dismiss on Double Jeopardy grounds. The trial judge allowed the motion finding "that contrary to his initial

understanding, Massachusetts procedural rules would have allowed the trial to continue with five jurors (albeit with [defendant's] consent)." *Id.* The judge therefore found that he "had failed to give careful consideration to the alternative of proceeding with the trial before less than a full jury," and, accordingly, "there had been no 'manifest necessity' for the mistrial." *Id.* (internal quotation marks omitted).

On appeal, this Court began from the premise that, "[d]ue to the importance of the double jeopardy protection, the Commonwealth bears the 'heavy' burden of proving that a mistrial rested on manifest necessity." *Id.* at 818 (quoting *Washington*, 434 U.S. at 505). The Court then agreed with the trial judge that the defendant could waive his right to a trial by a jury of at least six. *See id.* at 821. It rejected the Commonwealth's argument that the defendant in the case at hand had not provided such a waiver observing, "the question is not whether [defendant] executed a valid waiver, but whether there was a 'manifest necessity' for declaring a mistrial. Such necessity would have presented itself if [defendant] had declined to execute a waiver, but the record is clear that neither the judge nor counsel was aware of or even considered the option." *Id.* at 821-22. "In these circumstances, the Commonwealth [wa]s unable to satisfy its ***heavy burden*** of proving that there was a 'manifest necessity' for declaring a mistrial." *Id.* at 822 (emphasis added).

The defense respectfully submits that the same result is required here.  It is the prosecution's burden alone to ensure that the declaration of a mistrial is supported by manifest necessity.  Even where, unlike in the present case, defense counsel was expressly offered the opportunity to be heard on how to proceed, and explicitly shared the judge's mistaken view that the trial could not continue with fewer than six jurors, this Court held that the alternative to declaring a mistrial was not adequately considered.  Here, there is no doubt that the Court was permitted to accept a partial verdict.  *See, e.g.*, Mass. R. Crim. P. 27(b).  But the record simply reflects no consideration of that option.  Accordingly, as in *Nicoll*, the charges in this matter must be dismissed.

Neither Ms. Read nor her counsel consented to the declaration of a mistrial.  Consent may be implied "where a defendant had the opportunity to object but failed to do so."  *Pellegrine v. Commonwealth*, 446 Mass. 1004, 1005 (2006) (citation omitted).  But the law is clear that such consent may not be inferred from counsel's silence alone.  *See Commonwealth v. Edwards*, 491 Mass. 1, 13 (2022) (rejecting argument "that the defendant consented to the declaration of a mistrial because he did not object when the judge ordered the case dismissed"); *Commonwealth v. Phetsaya*, 40 Mass. App. Ct. 293, 297-98 (1996) (holding that, where "the trial judge did not ask defense counsel to comment on the possible declaration of a mistrial," "the lack of an objection from defense counsel cannot be

construed as consent" to such action).  Here, no such consent was sought, nor was it given.

The trial court's ruling that Ms. Read's counsel impliedly consented to the mistrial was based primarily upon counsel's requests for a *Tuey-Rodriguez* instruction.  Of course, whether the jury has engaged in "due and thorough deliberation" to support a *Tuey-Rodriguez* instruction and whether there is manifest necessity to declare a mistrial are distinct legal questions.  In fact, the *Tuey-Rodriguez* charge is "designed to urge the jury to reach a verdict," not to avoid one. *Commonwealth v. Semedo*, 456 Mass. 1, 20 (2010).  Unsurprisingly, neither the Commonwealth nor the trial court cited any case finding a defendant's consent to a mistrial can be based on a prior request for a *Tuey-Rodriguez* charge.[7]  Here, defense counsel's requests did not reflect any implicit concession that the jury was deadlocked on all counts, nor did they commit the defense to any position regarding whether the court should *sua sponte* declare a mistrial.  It is true that, if

---

[7] In *Ray*, 463 Mass. at 2-3, after the jury reported a deadlock, "the judge indicated that he was inclined to declare a mistrial."  The parties responded by "request[ing] that the court give the jury a *Tuey-Rodriguez* instruction" as an alternative.  *Id.* at 3.  The judge "declined to give this instruction and declared a mistrial over the defendant's objection."  *Id.*  In these circumstances, where the request for a *Tuey-Rodriguez* charge came in response to a judge's statement of intent to declare a mistrial, it was a fair "inference that both parties were provided an opportunity to be heard on possible alternatives to a mistrial."  *Id.* at 4.  In the present case, by contrast, the *Tuey-Rodriguez* instruction was requested before any suggestion of a mistrial, not as a possible alternative thereto.

the jury reports an impasse after a *Tuey-Rodriguez* instruction, they "shall not be sent out again without their own consent."  G.L. c. 234A, § 68C.  That fact, however, does nothing to undermine the alternative of simply inquiring, pursuant to Mass. R. Crim. P. 27(b), whether the jury had reached any partial verdict. Doing so would not require the jury to be "sent out again."  The trial court was in error in equating a request for a *Tuey-Rodriguez* charge with any acceptance of or acquiescence to a mistrial.

Moreover, the trial court's characterization of the jury's final note as "making it clear that [the jurors] would not consent to continuing their deliberations," is belied by case law cited in the court's Order.  Order at 13 (R. 400, Add. 65).  In *Commonwealth v. Jenkins*, 416 Mass. 736, 739 (1994), the jury similarly reported, after a *Tuey* charge, "that they felt strongly that there was no hope of progress and requested further instructions."  The court responded by telling the jury, "I cannot force you to continue deliberations unless you agree to continue deliberations," but then asking them "to retire and decide whether further deliberations on the next day would be fruitful."  *Id.*  The jury "promptly reached a verdict."  *Id.* at 740.  This Court held that "[t]he object of" the statutory prohibition on sending the jury back out without consent "was fulfilled because the jury consented to continue their work. . . .  [T]he jury's return of a verdict after sending their last note implicitly satisfied the statutory requirement of jury consent."  *Id.*

42

Thus, another alternative to a mistrial (which the trial court did not consider) in this case would have been to (a) inform the jury that it could not be required to continue deliberations without its consent and (b) ask it to retire to consider whether it was prepared to return any partial verdict.

Here, neither Ms. Read nor her counsel were provided an opportunity to object to the declaration of a mistrial (as opposed to the appropriateness of a *Tuey-Rodriguez* instruction). All of the cases cited by the trial court on this issue are readily distinguishable on that basis. For example, in *Pellegrine*, a witness testified at trial to incriminating evidence that had not been disclosed to the defense. This Court held that the defense had an opportunity to object given that "[t]he mistrial was declared after a voir dire [of the witness] and colloquy after the jury were cleared from the court room." 446 Mass. at 1005. Here, by contrast, the defense did not learn of the contents of the jury note, or the court's intention to declare a mistrial, until the judge called the jury in and stated the declaration of mistrial on the record. Counsel was never shown the note from the jury. The judge indisputably never informed counsel of its intent to declare a mistrial, much less solicited counsel's views on the matter. *Compare United States v. McIntosh*, 380 F.3d 548, 555 (1st Cir. 2004) (ruling, in case where "defense counsel at one point implored the district court to declare a mistrial because the jury was deadlocked," "[i]t would be Kafkaesque–and wrong– . . . to allow parties freely to

43

advocate on appeal positions diametrically opposite to the positions taken by those parties in the trial court"); *United States v. You*, 382 F.3d 958, 962 (9th Cir. 2004) (after co-defendant moved for mistrial, the "court subsequently stated that it was going to declare [one]" and "asked the attorneys if either wished 'to make any record?'"); *United States v. Goldstein*, 479 F.2d 1061, 1067 (2d Cir. 1973) ("Defendants had moved for a mistrial a scant two hours before one was declared, at the first suggestion of jury deadlock . . . .").

As the Appeals Court has explained in an analogous factual context, the suggestion that counsel could or should have immediately objected to the *sua sponte* declaration of a mistrial "underestimates or ignores the difficulty of reaching a decision (in which the defendant has an evident personal stake) whether the defense would be advantaged or the opposite by a second trial: the possibilities ahead (such as the appearance of a new prosecution witness) cannot be instantly calculated.  Therefore, ***to equate silence with 'consent' when the occasion comes abruptly and unexpectedly seems quite unwise***."  *Horrigan*, 41 Mass. App. Ct. at 342 (emphasis added).

The trial court's suggestion that defense counsel had an opportunity to object to the declaration of a mistrial after it had occurred and the jury had been discharged is mistaken.  The judge expressly told jurors, "Your service is complete.  I am declaring a mistrial in this case."  July 1, 2024 Tr. at 11 (R. 268).

44

Given counsel's lack of an opportunity to be heard and the court's lack of consideration of alternatives, the defense respectfully submits that the prosecution has not satisfied its high burden of establishing manifest necessity for the mistrial. While the trial court correctly observed that jury deadlock may be grounds for a mistrial, *see, e.g.*, *Ray*, 463 Mass. at 3, it cited no precedent for the counter-intuitive proposition that a deadlock with respect to some but not all counts constitutes manifest necessity for the declaration of a mistrial as to all. *Compare Fuentes v. Commonwealth*, 448 Mass. 1017, 1018 (2007) (affirming declaration of mistrial where note expressly "stated that the jury could not reach a unanimous verdict as to either" of the two indictments). This lack of precedential support is no accident: such a rule would run counter to the important interests underlying the constitutional safeguards against Double Jeopardy.

Contrary to the trial court's suggestion, there was nothing in the jury's notes that "directly contradict[ed]" the post-trial affidavits by counsel. Order at 9 n.4 (R. 396, Add. 61). As an initial matter, there is a facial tension between this observation by the court and its stated acceptance of the affidavits as true for purposes of the motion to dismiss. And the jury's reference to "charges" is easily reconciled with the post-trial affidavits affirming that the only deadlock related to the lesser included offenses of Count 2. Indeed, the court repeatedly referred to those lesser included offenses as distinct "charge[s]," both in its initial and

45

supplemental instructions to the jury.  *See* June 25, 2024 Tr. at 35, 38 (R. 179, 182); June 26, 2024 Tr. at 16 (R. 223).  In this context, the jury's note was facially susceptible to two alternative interpretations: (1) that the jury had reached an impasse as to all charges, or (2) that the deadlock applied to only some of those charges (*e.g.*, on multiple lesser included allegations within a single count such as Count 2).  The information received from jurors post-trial proves the latter interpretation was correct.  The jury's failure to expressly mention its agreement on Counts 1 and 3 is understandable in light of the court's instruction that it "should continue deliberating until" it had "reached a final verdict on each charge."  June 25, 2024 Tr. 46 (R. 190).

This Court's holding, in *Commonwealth v. Roth*, 437 Mass. 777 (2002), that courts should not request partial verdicts on lesser included offenses charged in a single count does not pertain here.  *Roth* was rooted in the belief that "[i]nquiry concerning partial verdicts on lesser included offenses" *that have not been separately charged* "carries a significant potential for coercion."  *Id.* at 791; *see also Blueford*, 566 U.S. at 609-10 (declining to require court "to consider giving the jury new options for a verdict" in the form of partial verdicts on lesser included offenses where, "under Arkansas law, the jury's options . . . were limited to two: either convict on one of the offenses, or acquit on all").  Such inquiry, in effect, implies that the jury should consider conviction on the lesser count.  No similar

46

danger is present where, as here, the jury was asked to return three separate verdicts on three separate counts. *See Roth*, 437 Mass. at 793 n.13 (distinguishing situation "where a defendant has been charged in separate indictments or complaints, each with a separate verdict slip"); *A Juvenile*, 392 Mass. at 55 n.1 ("Where a complaint or indictment, in multiple counts, charges multiple crimes . . . a general verdict could be returned as to one of the counts, despite deadlock on the other counts."). In this circumstance, where the jury reports a deadlock without specifying the count(s) on which it has reached an impasse, it is a straightforward (and, the defense contends, constitutionally required) follow-up to ask whether the deadlock relates to some as opposed to all counts. Contrary to the trial court's suggestion, an inquiry regarding whether the jury had reached a partial verdict on any of the three separately charged counts would not necessitate any forbidden inquiry on the lesser included offenses contained within Count 2. *See* Order at 18 (R. 405, Add. 70). There is simply nothing coercive about asking a jury reporting a deadlock that fails to specify which counts the deadlock relates to the single question of whether its deadlock is on certain but not all counts and if it has reached a unanimous verdict on ***any*** counts. *See Commonwealth v. Foster*, 411 Mass. 762, 766 (1992) (affirming trial judge's taking of partial verdicts on two of four separate indictments and observing, "[t]o conclude that the jury could have felt pressure to convert provisional verdicts against the defendant into final ones

and to abandon all doubts that they may have privately entertained runs counter to the clear instructions of the judge and amounts to mere speculation without any support in the record"); *Roth*, 437 Mass. at 788 (noting, in the context of deadlocked jury, that "rule 27(b) permits taking verdicts on less than all of the charges set forth in . . . separate indictments"); *Commonwealth v. LaFontaine*, 32 Mass. App. Ct. 529, 534-35 (1992) (affirming partial verdicts taken after judge asked jury whether it had "reached a verdict on any of the indictments").

The inflexible prohibition on judicial inquiry regarding partial verdicts advocated by the Commonwealth would inevitably undermine defendants' important, and constitutionally protected, interest in "being able, once and for all, to conclude [their] confrontation[s] with society through the verdict of a tribunal [they] might believe to be favorably disposed to [their] fate." *Cruz*, 461 Mass. at 670 n.9 (quoting *Jorn*, 400 U.S. at 486 (plurality opinion)). And "[t]he danger of . . . unfairness to the defendant" from multiple prosecutions "exists when[] a trial is aborted before it is completed," as well as when the defendant is actually acquitted. *Washington*, 434 U.S. at 504. The Commonwealth's proposed rule would also undoubtedly hinder law enforcement interests by precluding courts from asking whether a jury may have reached a ***guilty*** verdict on some but not all stand alone counts.

It is uncontroverted that, according to the jury of her peers, following trial Ms. Read was unanimously found not guilty of Counts 1 and 3. That undisputed fact must not be lost in this analysis. It bears repeating that "[a]t the heart of this policy [against Double Jeopardy] is the concern that permitting the sovereign freely to subject the citizen to a second trial for the same offense would arm Government with a potent instrument of oppression." *Martin Linen*, 430 U.S. at 569.

## IV. Assuming *Arguendo* this Court Finds that Counsel Consented to the Mistrial, the Defendant's Personal Consent Was Required

The defense respectfully submits that whether to consent to a mistrial, and risk the prospect of retrial, should be a decision for the client who must bear the consequences. *Cf. Gonzalez v. United States*, 553 U.S. 242, 250-51 (2008) ("[S]ome basic trial choices," including the choices "to plead guilty, waive a jury, testify in . . . her own behalf, or take an appeal," "are so important that an attorney must seek the client's consent in order to waive the right." (citation omitted)); *Commonwealth v. Nolan*, 427 Mass. 541, 543 (1998) (holding defendant waived Double Jeopardy where, "after consultation with counsel, the defendant elected to accept the offer" of a mistrial). *But see Daniels v. Commonwealth*, 441 Mass. 1017, 1018 & n.2 (2004).[8] The Supreme Court has recently "shift[ed] the balance

---

[8] The defendant in *Daniels* does not appear to have briefed the issue.

of power between counsel and client" regarding fundamental decision-making in criminal cases. *United States v. Hashimi*, 110 F.4th 621, 625 (4th Cir. 2024) (citation omitted); *see also id.* at 627-29 (citing cases). Assuming *arguendo* the Court finds that counsel consented to the mistrial here, the defense contends it should additionally address whether the decision to forgo a jury verdict is among the fundamental questions that must be decided by the client, as urged by the defendant in the court below and in this appeal.[9]

## CONCLUSION

For the foregoing reasons, Ms. Read respectfully requests that this Honorable Court reverse the trial court and Order Counts 1 and 3 dismissed.

Respectfully Submitted,
For the Appellant,
Karen Read
By her attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

---

[9] Notably, the trial judge did ensure that Ms. Read was personally consulted regarding less weighty matters. For example, on May 24, 2024, the court called Ms. Read to sidebar and personally asked her to verbally consent to Attorney Jackson's absence on the Tuesday following Memorial Day, and that co-counsel, Attorney Yannetti, could represent her on that day. *See* May 24, 2024 Tr. at 3-5.

owlmgw@att.net

**/s/ Michael Pabian**
Michael Pabian, Esq.
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq., *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com

**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

Dated:        September 24, 2024

# **ADDENDUM**

<u>Table of Contents</u>

1.  Memorandum of decision and order on defendant's motion to dismiss,
    issued August 23, 2024……………………………………………………53

2.  Fifth Amendment to U.S. Constitution…………………………………74

3.  Sixth Amendment to U.S. Constitution…………………………………74

4.  G.L. c. 234A, § 68C……………………………………………………74

5.  Mass. R. Crim. P. 27(b)………………………………………………...74

6.  Mass. Guide Evid. 606(b)………………………………………………75

7.  Mass. Guide. Evid. 606(c)(5)…………………………………………..75

388

# COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, ss.**
                                                          **SUPERIOR COURT**
                                                          **CRIMINAL ACTION**
                                                          **22-00117**

## COMMONWEALTH

### vs.

## KAREN READ

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS

On June 9, 2022, a Norfolk County grand jury indicted defendant Karen Read on charges of murder in the second degree (Indictment 1), manslaughter while operating under the influence of alcohol (Indictment 2), and leaving the scene of personal injury and death (Indictment 3) following the death of her boyfriend, John O'Keefe, on January 29, 2022. Trial on the matter began in April 2024. There were eight weeks of evidence and nearly five days of deliberations. After the jurors expressed to the Court that they were deadlocked for a third time, the Court declared a mistrial.

The defendant now moves to dismiss the charges for murder in the second degree and leaving the scene of personal injury and death arguing that retrial would violate the double jeopardy protections of the federal and state constitutions because the jury, in fact, reached a unanimous decision to acquit the defendant on those charges. Alternatively, the defendant argues that dismissal is required because there was no manifest necessity to support the declaration of the mistrial with respect to those charges. After careful consideration, this Court concludes that because the defendant was not acquitted of any charges and defense counsel consented to the Court's declaration of a mistrial, double jeopardy is not implicated by retrial of the defendant. The motion is therefore **DENIED**.

# BACKGROUND

On June 25, 2024, the jury began its deliberations in the defendant's trial. In addition to the three indictments, the Court had instructed the jury to consider two lesser included offenses to manslaughter while operating under the influence of alcohol – involuntary manslaughter and motor vehicle homicide (OUI liquor and negligence).

On Friday, June 28, 2024, at approximately 12:10 p.m., the jury foreperson sent a note to the Court. It stated: "I am writing to inform you on behalf of the jury that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict." The Court requested argument from the Commonwealth and the defendant as to whether there had been due and thorough deliberation from the jury. Assistant District Attorney Lally, on behalf of the Commonwealth, argued that the jury had not had sufficient time to deliberate and that therefore, it was far too early in the deliberative process to give the jury the *Tuey-Rodriguez* instruction.[1] He also pointed out that although the note indicated that the jury had not yet come to a conclusion, it did not indicate that doing so was not possible. Attorney Yannetti, on behalf of the defendant, "disagree[d] with Mr. Lally's characterization of the note." He argued:

> "The word exhaustive is the word that I think is operative here. [The jury is] communicating to the court that they've exhausted all manner of compromise, all manner of persuasion and they're at an impasse. You know, this is a case where they jury has the legal instructions. They've only really asked one question, which was to try and get a report they were not allowed to get, and I think the message has been received that the evidence is closed and they won't get anything more. They've been essentially working nonstop

---

[1] The use of the *Tuey-Rodriguez* instruction is a matter of discretion of the trial judge. *Commonwealth* v. *Pérreira,* 72 Mass. App. Ct. 308, 316 (2008). It is the "orthodox approach to dealing with a deadlocked jury" see *Commonwealth* v. *Firmin,* 89 Mass. App. Ct. 62, 64 (2016) (citation omitted), and "designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view." *Commonwealth* v. *Semedo,* 456 Mass. 1, 20 (2010).

2

> over the last three, four days. We're approaching a weekend. They didn't come back with this at three o'clock or four o'clock. They're at twelve o'clock and they have nowhere to turn. So our position is the jury should be read the *Tuey-Rodriguez* model instructions and go from there."

The Court ruled that given the length of the trial, the number of exhibits and witnesses, the complexity of the issues, and that the jury had only been deliberating for three days, deliberations had not been sufficiently due and thorough to warrant a *Tuey-Rodriguiez* instruction. It instructed the jury to continue deliberating.

On Monday, July 1, 2024, at approximately 10:45 a.m., the jury sent another note to this Court. This note stated:

> "Despite our commitment to the duty entrusted in us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind. The divergence in our views are not rooted in a lack of understanding or effort but deeply held convictions that each of us carry, ultimately leading to a point where consensus is unattainable. We recognize the weight of this admission, and the implications it holds."

The Court again requested argument from counsel as to whether there had been due and thorough deliberations. The Commonwealth argued that the jury had been deliberating twenty-two to twenty-three hours but given the length of trial, number of exhibits and witnesses, and complexity of issues, they had not done a thorough deliberation up to this point. Attorney Yannetti, again, had a vastly different view. He argued:

> "Our view is that it is time for a *Tuey-Rodriguez* [instruction]. They have come back twice indicating essentially that they're hopelessly deadlocked but the content of this latest message is that they have been over all the evidence. The previous message said they did an exhaustive review. This time they said that . . . they have fundamental disagreements about what the evidence means. It's a matter of opinion. It's not a matter of lack of understanding. This court when you sent the jury out encouraged them not to take a straw vote, encouraged them to go over all the evidence in a very

3

**55**

methodical manner. I think all indications are that they have done that. This is what *Tuey-Rodriguez* is for."

The Court agreed that the jury had engaged in due and thorough deliberations, noting that this jury had been "extraordinary" and it had never seen a note like this from a jury. It thereafter provided the jury of the full *Tuey-Rodriguez* instruction and asked them to return to the deliberations with those instructions in mind.[2]

That same day, at approximately 2:30 p.m., the jury sent another note to the Court. The Court stated to counsel that the jury was at an impasse. After the jurors filed into the courtroom, the Court read the note:

> "Despite our rigorous efforts we continue to find ourselves at an impasse. Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyond a reasonable doubt. Conversely, others find the evidence fails to meet this standard and does not sufficiently establish the necessary elements of the charges. The deep division is not due to lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions. To continue to deliberate would

---

[2] The *Tuey-Rodriguez* instruction states: "Our Constitution and laws provide that in a criminal case, the principal method for deciding questions of fact is the verdict of a jury. In most cases and perhaps strictly speaking in all cases absolute certainly cannot be obtained nor is it expected. The verdict to which each juror agrees must of course be his or her own verdict, the result of his or her own convictions, and not merely an acquiescence in the conclusions of other jurors. Still, in order to bring twelve minds to a unanimous result, you must examine the issues you have to decide with candor and with the proper regard and respect for each other's opinions. You should consider that it is desirable that this case be decided. You have been selected in the same manner and from the same source as any future jury would be selected. There is no reason to suppose that this case will ever be submitted to twelve persons who are more intelligent, more impartial, or more competent to decide it than you are or that more or clearer evidence will be produced on either side. With all this in mind it is your duty to decide this case if you can do so conscientiously. In order to make a decision more attainable, the law always imposes the burden of proof on the Commonwealth to establish every essential element of each indictment beyond a reasonable doubt. If you are left with a reasonable doubt as to any essential element of any indictment, then the defendant is entitled to the benefit of that doubt and must be found 'not guilty' on that indictment. In conferring together, you are to give proper respect to each other's opinions, and listen with an open mind to each other's arguments. Where there is disagreement, those jurors who would find the defendant 'not guilty' should consider whether the doubt in their minds is a reasonable one if it makes no impression on the minds of the other jurors who are equally intelligent, who have heard the same evidence with the same attention, who have an equal desire to arrive at the truth and who have taken the same oath as jurors. At the same time, those jurors who would find the defendant 'guilty' ought seriously to ask themselves whether they may not reasonably doubt the correctness of their judgment if it is not shared by other members of the jury. They should ask themselves whether they should distrust the weight or sufficiency of the evidence if it has failed to convince the minds of their fellow jurors beyond a reasonable doubt."

4

be futile and only serve to force us to compromise these deeply held beliefs."

After reading this note, the Court declared a mistrial and discharged the jury back to the deliberation room to wait for the judge. Counsel remained in the courtroom to discuss an agreeable date to return for a status conference.

On July 8, 2024, the defendant filed the instant motion to dismiss supported by affidavits from Attorney Yannetti and co-counsel, Attorney Jackson. Attorney Jackson's affidavit stated that on July 2, 2024, a juror in the case ("Juror A") contacted him. Attorney Jackson was able to identify the person as a deliberating juror based on his/her description of who he/she is, where he/she was seated, and certain identifying information (name and occupation) disclosed during the voir dire process. According to Attorney Jackson's affidavit, Juror A told him that he/she wished to inform him of the true results of the deliberations because he/she believed those results significantly impact the defendant's rights. Juror A said the jury unanimously agreed that the defendant was not guilty of Counts 1 and 3 and specifically that the murder charge was "off the table." First Jackson Affidavit at par. 5.

In his affidavit, Attorney Jackson also stated: "Neither Ms. Read nor her counsel consented to the entry of the mistrial. Defense counsel was denied the opportunity to request that the Court inquire on which count or counts the jury may have been deadlocked (including lesser included offenses), and on which count or counts the jury may have arrived at a verdict." *Id.* at pars. 9 and 10.

Attorney Yannetti's affidavit averred that on July 3, 2024, he received communications from two "informants" who had received information from two deliberating jurors in the case. The first informant ("Informant B") sent him a screenshot he/she had received from someone else ("Intermediary B") of text messages that Intermediary B had purportedly received from a

5

juror ("Juror B").  Attorney Yannetti averred that he was able to positively identify which juror was Juror B based on a first name given to him from Informant B.  In the screenshot, Juror B texted Intermediary B, "It was not guilty on second degree.  And split in half for the second charge.  When the judge sent us back with that Hernandez thing to look at the other side it turned into a bully match.  I thought the prosecution didn't prove the case.  No one thought she hit him on purpose or even thought she hit him on purpose. . . ."  Yannetti Affidavit at par. 4.

Attorney Yannetti stated that another informant ("Informant C") contacted him on July 3, 2024.  Informant C told him he or she personally knows a juror ("Juror C") and that Informant C and Juror C have a mutual friend ("Intermediary C") who is a current coworker and friend of Juror C.  Intermediary C told Informant C via text message that Juror C was a deliberating juror in the case.  Intermediary C had a discussion over text message with Juror C about the experience of being a juror.  Intermediary C said that Juror C said there was "no consideration for murder 2.  Manslaughter started polling at 6/6 then ended deadlocked [at] 4no8yes. . ."  Yannetti Affidavit at par. 10.  Informant C texted back, "interesting. If there was no consideration for murder two, shouldn't she have been acquitted on that count[] and hung on the remaining chargers [sic] goes back to the jury verdict slip that was confusing."[3]  Id.  Intermediary C texted, "she should've been acquitted I agree.  Yes, the remaining charges were what they were hung on. And that instruction paper was very confusing."  Id.

Attorney Yannetti stated that based on the description of Juror C he received from Informant C and the description of what Juror C told Intermediary C, he could positively identify that Juror C was a deliberating juror.

---

[3] As noted below, defense counsel argued to the Court that the verdict slip for Indictment 2, which allowed the foreperson to check "guilty" for the lesser included offenses, would be confusing for the jury if they decided the defendant was not guilty of all the lesser included offenses.

Attorney Yannetti later filed a supplemental affidavit in support of the defendant's motion to dismiss wherein he stated that he received an unsolicited phone call from an individual identifying himself/herself as Juror B. Juror B told Attorney Yannetti that he/she was familiar with the affidavit he had previously filed and confirmed the substance of the conversation between Informant B and Intermediary B. Juror B clarified that he/she meant to write, "No one thought she hit him on purpose or even knew that she had hit him." Yannetti Supplemental Affidavit at par. 4.

On July 10, 2024, Attorney Jackson submitted a supplemental affidavit stating that on July 8, 2024, another juror ("Juror D") contacted him. He identified this person as a juror by the description of who he/she is, where he/she was seated, and certain identifying information (name and occupation) disclosed during the voir dire process. Juror D told Attorney Jackson that "he/she was 'uncomfortable' with how the trial ended. . . . Juror D said that it was very troubling that the entire case ended without the jury being asked about each count, especially Count 1 and Count 3." Jackson Supplemental Affidavit at pars. 3-4. According to Jackson's Supplemental Affidavit, Juror D told him that the jury agreed that the defendant was not guilty on Counts 1 and 3, that they disagreed solely on Count 2's lesser offenses, but that they believed that they were compelled to come to a resolution on all counts before they could or should report verdicts on any counts. Juror D believed all jurors would corroborate his/her account. He/she also stated that if necessary, he/she would testify before the court as long as his/her identity remained protected.

On July 18, 2024, Attorney Jackson submitted a second supplemental affidavit stating that on July 17, 2024, he was contacted by another juror ("Juror E") who he identified by the description of who he/she is, where he/she was seated, and certain identifying information (name

and occupation) disclosed during the voir dire process.  Juror E also stated that the jury was

unanimous on Counts 1 and 3, that the defendant was not guilty of those charges, and that they

were deadlocked on one of the "lower charges" on Count 2.  Jackson Second Supplemental

Affidavit at par. 5.

On August 1, 2024, the Commonwealth filed a Post-Trial Notice of Disclosure stating

that ADA Lally had received two unsolicited voicemails from an individual identifying

themselves as a deliberating juror stating that the jury had been unanimous on Counts 1 and 3.

The Commonwealth also received emails from three individuals identifying themselves as jurors

stating that they wished to speak anonymously.  In its response to the emails, the Commonwealth

stated that it was ethically prohibited from inquiring as to the substance of the jury deliberations,

and that it could not promise confidentiality as it may be required to disclose the substance of

any conversation to the defendant or the Court.  All three jurors declined to communicate further

with the Commonwealth.

## DISCUSSION

The Fifth Amendment to the United States Constitution, applicable to the States through

the Fourteenth Amendment to the United States Constitution, and Massachusetts common and

statutory law protect an individual defendant from being twice placed in jeopardy for the same

crime.  *Perrier* v. *Commonwealth*, 489 Mass. 28, 31 (2022).  See *Commonwealth* v. *Taylor*, 486

Mass. 469, 483 (2020), quoting *Oregon* v. *Kennedy*, 456 U.S. 667, 671–672 (1982) ("[T]he

[d]ouble [j]eopardy [c]lause affords a criminal defendant a 'valued right to have his trial

completed by a particular tribunal'" [citation omitted]).  A defendant is entitled to protection

from double jeopardy "if there had been some event, such as an acquittal, which terminates the

original jeopardy," see *Commonwealth* v. *Hebb*, 477 Mass. 409, 413 (2017), or if a mistrial is

entered "without the defendant's request or consent . . . unless there was a manifest necessity for the mistrial" (quotation and citations omitted). *Taylor*, 486 Mass. at 483. See *Hebb*, 477 Mass. at 413, quoting *Yeager* v. *United States*, 557 U.S. 110, 118 (2009) ("The 'interest in giving the prosecution one complete opportunity to convict those who have violated its laws' justifies treating the jury's inability to reach a verdict as a nonevent that does not bar retrial.").

In her motion to dismiss, the defendant argues that retrial on Indictments 1 and 3 would violate the double jeopardy protections of the federal and state constitutions because, despite absence of a jury verdict, the jury, in fact, reached a unanimous decision to acquit her on those charges, or alternatively, because there was no manifest necessity to support the declaration of the mistrial with respect to the charges. After careful consideration, the Court concludes that the defendant's arguments are without merit.

## I.    Acquittal of the Defendant

The defendant first contends that she was acquitted on Indictments 1 and 3, and that therefore retrial is barred based on her attorneys' affidavits purporting to reflect statements by jurors that the jury reached a unanimous conclusion that she was not guilty on those charges. Although all the statements in the affidavits are from purported jurors who wish to remain anonymous, for the purposes of this motion, the Court accepts the statements as true and accurate.[4] Even doing so, any agreement among the jurors as to Counts 1 and 3 cannot be considered acquittals for purposes of double jeopardy.

To trigger double jeopardy protection, "[a]n acquittal requires a verdict on the facts and merits" (citations and quotations omitted). *Commonwealth* v. *Brown*, 470 Mass. 595, 603

---

[4] While the Court accepts the averments as true and accurate, it disagrees with defense counsel's characterization of the statements as "strong and uncontradicted." The substance of the conversations directly contradicts the notes the jury wrote to the Court during deliberations, the last of which expresses disagreement over whether the Commonwealth met its burden as to the "elements of the *charges*." (Emphasis added).

9

(2015). See G. L. c. 263, § 7 ("A person shall not be held to answer on a second indictment or complaint for a crime of which he has been acquitted upon the facts and merits . . ."). And, "the only verdict which can be received and regarded, as a complete and valid verdict of a jury . . ., is an open and public verdict . . . affirmed in open court, as the unanimous act of the jury, and in presence of the whole panel, so that each juror has an opportunity to express his dissent to the court, in case his decision has been mistaken or misrepresented by the foreman or his fellows, or in case he has been forced into acquiescence by improper means" (citations omitted). *Commonwealth* v. *Zekirias*, 443 Mass. 27, 33 (2004). See Mass. R. Crim. P. 27(a) ("The verdict shall be unanimous. It shall be a general verdict returned by the jury to the judge in open court. The jury shall file a verdict slip with the clerk upon the return of the verdict."). As such, "the weight of final adjudication" cannot "be given to any jury action that is not returned in a final verdict" and a distinction must be made "between agreement on a verdict, and return, receipt, and recording of a verdict" (citations omitted). *A Juvenile* v. *Commonwealth*, 392 Mass. 52, 56–57 (1984).

Because there was no open and public verdict affirmed in open court rendered in this case, the defendant was not acquitted of any of the charges. The only unanimous act of the jury here was their representation to the Court that they were "at an impasse" and unable to agree on whether the Commonwealth had established beyond a reasonable doubt the "elements of the *charges*." The purported later attestations by some jurors, after they had been dismissed, that the jury had in fact agreed on some of the charges during deliberations do not have the "force of a final verdict." *Commonwealth* v. *Floyd P.*, 415 Mass. 826, 831 (1993). See *A Juvenile*, 392 Mass. at 57 (after mistrial was declared due to deadlock, judge did not err in refusing to accept signed verdict slips recovered from deliberation room showing "not guilty" because "[i]t is not

enough to show that the jury may have agreed on some issues at some time; if that limited

showing were to control, uncertainties would be invited"); see also *Blueford* v. *Arkansas*, 566

U.S. 599, 606 (2012) (double jeopardy did not bar retrial after hung jury where foreperson

reported unanimous vote on offense before deliberations had concluded but deadlock at

conclusion).

    The defendant argues that it is elevating form over substance to not accept that the

statements in the affidavits reflect an acquittal of the defendants on Counts 1 and 3.  However,

the rendering of a verdict in open court is not a "ministerial act" as the defendant contends.

Rather, it communicates the finality of the deliberations, and its pronouncement in open court

ensures its unanimity. See *A Juvenile*, 392 Mass. at 57 ("Public affirmation in open court

provides safeguards against mistakes.").  Indeed, the authority upon which the defendant relies

places particular importance upon the jury's pronouncement of its findings in open court.  See

*Blueford*, 566 U.S. at 613 (Sotomayor, J., dissenting) (arguing that "the forewoman's

*announcement in open court* that the jury was 'unanimous against' conviction on capital and

first-degree murder . . . was an acquittal for double jeopardy purposes").[5]  Thus, a "verdict in

substance" is a "final collective decision . . . reached after full deliberation, consideration, and

compromise among the individual jurors . . . And when that decision [is] *announced in open

court*, it [becomes] entitled to full double jeopardy protection" (emphasis added). *Id.* at 616,

citing *Commonwealth* v. *Roth,* 437 Mass. 777, 796 (2002) ("declining to give effect to 'the

verdict received from the lips of the foreman in open court' would 'elevate form over

---

[5] In written and oral argument, the defendant also relies on language from *Taylor*, 486 Mass. at 482. *Taylor* discussed whether a judicial determination to terminate proceeding based on a procedural ground implicated double jeopardy. The Supreme Judicial Court explained, "What constitutes an 'acquittal' is not to be controlled by the form of the judge's action," and that the determination does not depend on "checkmarks on a form." *Id.*  This language in *Taylor* does not inform the Court as to the circumstances here.

substance'"). Where there was no verdict announced in open court here, retrial of the defendant does not violate the principle of double jeopardy.

## II.    Manifest Necessity of Mistrial

The defendant's motion to dismiss also argues that double jeopardy bars re-prosecution because she did not consent to a mistrial and there was no manifest necessity to declare one. This argument, too, is without merit.

"A defendant's consent to a mistrial removes any double jeopardy bar to retrial" (quotation and citation omitted). *Pellegrine* v. *Commonwealth*, 446 Mass. 1004, 1005 (2006). Consent may be explicit or implicit. Explicit consent may occur by either moving for a mistrial or agreeing to one. *Commonwealth* v. *Edwards*, 491 Mass. 1, 13 (2022). Consent to a mistrial may be implied "where a defendant had the opportunity to object [to a declaration of a mistrial] and failed to do so." *Pellegrine*, 446 Mass. at 1005. See *United States* v. *McIntosh*, 380 F.3d 548, 554 (1st Cir. 2004) ("Where the defendant sits silently by and does not object to the declaration of a mistrial even though he has a fair opportunity to do so, a court may presume his consent" [quotation and citation omitted]). See also *United States* v. *You*, 382 F.3d 958, 964-965 (9th Cir. 2004), cert. denied, 543 U.S. 1076 (2005) ("a court may infer consent only where the circumstances positively indicate a defendant's willingness to acquiesce in the mistrial order" [quotations and citations omitted]); *United States* v. *Goldstein*, 479 F.2d 1061, 1067 (2d Cir. 1973) ("Consent [to a mistrial] need not be express, but may be implied from the totality of the circumstances attendant on a declaration of a mistrial.").

As noted, the Court here declared a mistrial after the jury reported three times that they were deadlocked. After the second time, the Court determined that the jury had engaged in due and thorough deliberations and gave the *Tuey-Rodriguez* instruction before sending the jury to

12

**64**

deliberate further.  Massachusetts General Laws c. 234A, § 68C, provides that if "a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; *but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent,* unless they ask from the court some further explanation of the law" (emphasis added).  See *Commonwealth* v. *Jenkins*, 416 Mass. 736, 737 (1994)("If, after due and thorough deliberation, the jury twice advise the judge that they are unable to reach a verdict, the judge may not properly send the jury out again without their consent, unless the jury ask for some further explanation of the law.").  In their note to the Court, the jury specifically stated, "[t]o continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs," making it clear that they would not consent to continuing their deliberations.

Attorney Yannetti *twice* argued for the Court to give the *Tuey-Rodriguez* instruction—the final step before the Court would declare a mistrial.  See *Jenkins*, 416 Mass. at 737; see also *Ray* v. *Commonwealth*, 463 Mass. 1, 4 (2012) (counsels' request for *Tuey-Rodriquez* instruction "permit[ed] the inference that both parties were provided an opportunity to be heard on possible alternatives to a mistrial").  Specifically, on Friday, June 28, 2024, after three days of deliberations, when the jury sent their first note indicating that they had engaged in an "exhaustive review of the evidence" and "ha[d] been unable to reach a unanimous verdict," Attorney Yannetti argued that the jury had engaged in due and thorough deliberations, was at an impasse, and should be given the *Tuey-Rodriguez* instruction.  The following Monday, when the jury sent a second note after deliberating for approximately two hours, stating that "consensus was unattainable," Attorney Yannetti again argued that due and thorough deliberations had

13

occurred and described the jury as "hopelessly deadlocked." Defense counsel, in arguing twice that due and thorough deliberations had occurred and pushing for the instruction, presumably was aware of the legal implications if the jury returned deadlocked again. Nevertheless, in a remarkable turnaround, defense counsel now argues that the result they twice advocated for was "sudden" and "unexpected." See Defendant Karen Read's Motion to Dismiss at 8.

Although the Court did not specifically ask defense counsel if they had any objection to the declaration of a mistrial, counsel had multiple opportunities to voice an objection if they in fact had one. While waiting for the jury to enter the courtroom after the Court announced the jury was again at an impasse on the afternoon of July 1, 2024, defense counsel could have asked to be heard on the issue. During the subsequent discussion about scheduling a status hearing right after the Court declared a mistrial, counsel had yet another opportunity to inform the Court of its dissatisfaction. Lastly, counsel could have communicated to the Court any objection or request to poll the jurors while the jury was still at the courthouse waiting in the deliberation room after the declaration of the mistrial. Instead, defense counsel said nothing to the Court about the mistrial and then proceeded to the courthouse steps where Attorney Jackson declared to the media and onlookers that the "[Commonwealth] failed miserably and will continue to fail" with its prosecution of the defendant.[6]

It strains credulity to believe that if defense counsel wanted to voice any objection to the Court, it would not have been heard. Significantly, defense counsel were no shrinking violets. Neither Attorney Jackson nor Attorney Yannetti has ever needed this Court to inquire whether counsel had an objection in order to be heard, and the Court has never denied counsel the opportunity to be heard in open court or at sidebar. The Court reconvened many times at

---

[6] See https://www.youtube.com/watch?v=TrsJPBRVqDg

counsel's request.  Just days before the declaration of mistrial, defense counsel asked to address

the Court while the jury was deliberating to raise an objection about the verdict slip.  Attorney

Jackson was not shy in informing the Court that he wanted to "make [his] argument" and that the

Court's decision about the verdict slip was "not how it should be and it's over our strong

objection." [7]  Attorney Jackson went so far as to suggest that "it was almost like the Court is

directing a verdict of the subordinate charges" by not making changes he wanted.  The Court

finds it hard to believe that when counsel heard that the jury was at an impasse for a third time

and a mistrial was inevitable, at perhaps the most crucial point in the trial, counsel would sit

silently if they did not consent to a mistrial.

       As such, the Court does not credit Attorney Jackson's averment that he lacked an

opportunity to be heard.  Defense counsel's silence despite ample opportunity to be heard is

deemed consent.  See *Pellegrine*, 446 Mass. at 1005 (when trial judge on own initiative declared

mistrial, defendant's silence was deemed consent where there was ample time to object despite

not being directly asked by judge).  Cf. *Commonwealth* v. *Phetsaya*, 40 Mass. App. Ct. 293, 298

(1996) (silence was not consent where judge's conduct was "so intimidating to defense counsel .

. . as to foreclose any objection from defense counsel to the declaration of a mistrial").

       Even assuming *arguendo* that the defendant here did not consent to the mistrial, the law

is clear that a retrial is permissible so long as there was manifest necessity for the mistrial.

*Taylor*, 486 Mass. at 483.  "The trial judge's belief that the jury is unable to reach a verdict has

long been considered the classic basis for a proper mistrial" (quotation and citation omitted).

*Ray*, 463 Mass. at 3.  See *Oregon*, 456 U.S. at 672 (describing "hung jury" as "prototypical

example" of manifest necessity).  Because the Court here had no doubt based on the jury's notes

---

[7] See https://www.youtube.com/watch?v=BjPsNvnLXV0

to the Court that it was unable to reach a unanimous verdict and the jury represented to the Court

that continued deliberations would be futile, there was manifest necessity for the mistrial based

on the deadlock.

As stated above, the foreperson, on behalf of the jury in this case, sent the Court three

notes, none of which indicated agreement on any of the charges. In the first note, the jury wrote

that they had been "unable to reach a unanimous verdict." In the second note, they stated that

they were "deeply divided by fundamental differences in our opinions and state of mind" and

that "consensus is unattainable." In their third and final note, after they had been given the *Tuey-*

*Rodriguez* instruction, the jury stated that they continued to be "at an impasse." They described

themselves as "starkly divided" on their "perspectives on the evidence" explaining:

> "Some members of the jury firmly believe that the evidence
> surpasses the burden of proof establishing the elements of the
> charges beyond a reasonable doubt. Conversely, others find the
> evidence fails to meet this standard and does not sufficiently
> establish the necessary elements of the charges. The deep division
> is not due to lack of effort or diligence, but rather a sincere
> adherence to our individual principles and moral convictions. To
> continue to deliberate would be futile and only serve to force us to
> compromise these deeply held beliefs."

The only reasonable interpretation of these notes, and specifically the final note, was that the jury

could not agree on any of the three charges and further deliberations would serve no purpose.[8]

For the defense to now claim that the notes were susceptible to different interpretations

such that the Court should have inquired further rings hollow, particularly where Attorney

Yannetti had twice argued that the jury had engaged in due and thorough deliberations and could

not agree. See *United States* v. *Keene*, 287 F.3d 229, 234 (1st Cir. 2002) (no abuse of discretion

---

[8] Given the care that went into writing the notes and how articulately they expressed the jurors' disagreement, it
strikes this Court as odd that there was no inkling of an indication of agreement in the content of the notes or that if
the jurors were uncertain whether they could return a partial verdict, they would not have asked the Court.

16

in declaring a mistrial given "the increasingly adamant manner in which the jurors announced that they were deadlocked"). Moreover, defense counsel's conduct immediately after the declaration of the mistrial in no way suggests that they thought otherwise.

The defendant contends that the Court failed to carefully consider that as an alternative to a mistrial, it could have "simply ask[ed] the jury to specify the charge(s) on which it was deadlocked." Defendant Karen Read's Motion to Dismiss at 8. However, "[t]he question whether a mistrial is appropriate in the circumstances of a given case is not answered by application of a 'mechanical formula.'" *Ray*, 463 Mass. at 4, quoting *Illinois* v. *Somerville*, 410 U.S. 458, 462 (1973). See *Commonwealth* v. *Bryant*, 447 Mass. 494, 503 (2006) (decision whether to declare a mistrial is within the discretion of the trial judge). Rather, the Court considers several facts such as the statements in a jury's note concerning their inability to reach an agreement, the time spent in deliberations, and the length and complexity of the trial. *Ray*, 463 Mass. at 4-5. See *Renico* v. *Lett*, 559 U.S. 766, 775 (2010) ("we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse").

Where here, the jury had been deliberating five days, had returned to the Court three times stating they could not agree, had been given the *Tuey-Rodrigez* instruction and returned hours later with a note plainly indicating that they could not agree as to the "elements of the *charges*" and that "to continue to deliberate would be futile," asking the jury on which charges they were deadlocked was not necessary to determine that there was manifest necessity for a mistrial. See *Fuentes* v. *Commonwealth*, 448 Mass. 1017, 1018–1019 (2007) (where final note

from the foreperson unequivocally stated that the jury were "unable to come to a unanimous decision," judge was not required to inquire whether there was any reasonable probability of unanimous verdicts or if the jury would consent to further deliberations); *Ray*, 463 Mass. at 6 n.5 (judge did not err in declining to poll jury on whether further instructions or deliberation would be likely to resolve the deadlock).

Moreover, the defendant's argument ignores the fact that one of the three charges had lesser included offenses. Therefore, if upon questioning, the jury had indicated to the Court that they were not deadlocked on all the charges, the only option would have been for the Court to send the jury back for further deliberations. See *A Juvenile*, 392 Mass. at 56 (judge should not inquire as to partial verdicts on lesser included offenses). Such action would be improperly coercive under the circumstances. It has been repeatedly recognized that deadlocked juries are particularly susceptible to coercion. *Roth*, 437 Mass. at 791. "Where the jurors have twice reported themselves deadlocked, and have already heard the *Tuey-Rodriquez* charge, a judge's inquiry concerning partial verdicts cannot avoid communicating to the jury the judge's desire to salvage *something* from the trial." *Id.* at 792 (emphasis in original). Where here the jury had before it one indictment which included lesser included offenses, had three times reported themselves deadlocked on separate charges, had already heard the *Tuey-Rodriguez* charge, and had sent a final note indicating that continued deliberations would only "serve to force [them] to compromise [their] deeply held beliefs," sending them to deliberate further would have been improperly coercive.[9]

---

[9] It is the Court's view that under these circumstances, even posing the question to the jury of whether they actually were deadlocked would have implied to the jurors that the Court wanted them to resume deliberations to reach a verdict. Given that Attorney Jackson had already expressed concern that the Court was "directing a verdict of the subordinate charges," the Court was extremely cautious to not give any appearance of partiality. See *United States* v. *Hotz*, 620 F.2d 5, 7 (1st Cir. 1980) (noting that a court must avoid putting pressure on the jury).

18

The defendant's argument suggests that questioning or polling jurors who report a deadlock is best practice or at least commonly done by trial judges. However, the defendant has not cited any cases saying as much and indeed, such an inquiry is not undertaken in the regular course.[10]  For a judge to make such an inquiry on her own accord could impede upon the strategic decision of counsel to not make such a request. The defendant's argument is based on hindsight. No one other than the jury knew that questioning the jurors as to their deadlock would have yielded a favorable outcome for the defendant. It is likely for that reason, defense counsel consented to this Court's declaration of a mistrial.

### III.    Post-Trial Inquiry

The defendant alternatively requests that the Court allow counsel to conduct a post-trial inquiry of the jurors to "substantiate the existence of an acquittal." Defendant Karen Read's Motion to Dismiss at 9. Such an inquiry is impermissible.

The defendant's argument relies solely on *Commonwealth* v. *McCalop*, 485 Mass. 790 (2020). In *McCalop*, the Supreme Judicial Court held that the trial court should have allowed the defendant's motion for jurors' names and contact information based on the post-trial statement of a deliberating juror regarding racist statements made during deliberations. *Id.* at 791. The Supreme Judicial Court explained, "[t]he presence of even one juror who is not impartial violated a defendant's right to trial by an impartial jury." *Id.* at 798, quoting *Commonwealth* v. *McCowen*, 458 Mass. 461, 494 (2010). Recognizing that "[r]acial bias in the jury system is 'a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the

---

[10] The defendant relies on *Commonwealth* v. *Foster*, 411 Mass. 762 (1992) and *Commonwealth* v. *LaFontaine*, 32 Mass. App. Ct. 529 (1992) to argue that there would be nothing coercive about asking a jury reporting a deadlock whether they had reached a unanimous verdict on any of the counts. Because neither the jury in *Foster* nor the jury in *LaFontaine* reported being deadlock in its deliberations, and none of the offenses charged had lesser included offenses, there was clearly no risk of coercion in the courts seeking partial verdicts on the separate indictments in those case. The circumstances here are markedly different.

19

administration of justice,'" the *McCalop* court held that the defendant should have been given a "fair opportunity to obtain an affidavit from that juror setting forth with some specificity who among the jurors made statements reflecting racial bias . . . and the statements that were made." *McCalop*, 485 Mass. at 799, quoting *Pena-Rodriguez* v. *Colorado*, 580 U.S. 206, 224 (2017). The defendant's argument here does not implicate racial bias or her right to receive an impartial trial. Thus, the reasoning the Court employed in *McCalop* does not extend to this case. See *Commonwealth* v. *DiBenedetto*, 94 Mass. App. Ct. 682, 687 (2019) (declining to extend racial bias exception to inquiry of jury unanimity because "infection of the criminal justice system with racial or ethnic bias is a unique type of constitutional deprivation that requires a vigilant response not warranted in the circumstances presented here").

The defendant's request effectively seeks permission from the Court to inquire from deliberating jurors that which is impermissible—information regarding the substance of the jury's deliberations. "The secrecy of jury deliberations has served as a bedrock of our judicial system, and inquiry into the 'jury's deliberative processes . . . would intrude improperly into the jury's function" (quotation and citation omitted). *Commonwealth* v. *Moore*, 474 Mass. 541, 548 (2016). It is simply not the case, given the content of the jury's final note to the Court, that any inquiry to jurors now could be limited solely to the results of the deliberative process and not implicate the process itself. Any inquiry would necessarily require the Court to understand why the jury's final note communicated a deadlock on the charges when post-trial, certain deliberating jurors are purportedly stating that the jury was, in fact, unanimous on most of the charges. While the defendant contends that the conflict is reflective of the fact that the instructions given to the jury by the Court were confusing, determining whether this is true would necessarily require inquiry into the back and forth among the jurors during deliberations.

20

72

See *DiBenedetto*, 94 Mass. App. Ct. at 686 ("The judge is precluded from inquiring into the internal decision making process of the jury as a whole or of the individual juror being questioned . . . Accordingly, evidence that jurors misunderstood the instructions of the presiding judge . . . cannot be considered" [internal quotations and citations omitted]). Thus, such an inquiry is prohibited.

The defense counsel has not cited one case suggesting the post-trial inquiry they now seek is appropriate or that it could change the outcome of the proceedings.[11] For the reasons already discussed, an acquittal of the defendant now on Indictments 1 and 3 based on conclusions purportedly reached during the jury's deliberations is not possible. Therefore, there is no reason for the Court to allow post-trial inquiry of the jurors. See *A Juvenile*, 392 Mass. at 57 (no error in denial of motion to subpoena the foreman where process would only serve to impeach jury's report to the judge in open court).

## **CONCLUSION AND ORDER**

This Court recognizes that the bar on retrials following acquittals is "[p]erhaps the most fundamental rule in the history of double jeopardy jurisprudence." *Taylor*, 486 Mass. at 481, quoting *United States* v. *Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977). However, where there was no acquittal on any of the charges in the defendant's first trial, there is no risk of subjecting the defendant to double jeopardy by retrial on all the charges.

Therefore, the Defendant's Motion to Dismiss is **DENIED**.

Date:   August 22, 2024

Beverly J. Cannone
Justice of the Superior Court

---

[11] Cases that defense counsel referred to at the hearing on this motion concerning post-trial inquiry of jurors where juror bias or outside influence was at issue are readily distinguishable from the circumstances here.

21

## Fifth Amendment to U.S. Constitution

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## Sixth Amendment to U.S. Constitution

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

## G.L. c. 234A, § 68C

If a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law.

## Mass. R. Crim. P. 27(b)

If there are two or more offenses or defendants tried together, the jury may, with the consent of the judge at any time during its deliberations return or be required by the judge to return a verdict or verdicts with respect to the defendants or charges as to which a verdict has been reached; and thereafter the jury may in the discretion of the judge resume deliberation. The judge may declare a mistrial as to any charges upon which the jury cannot agree upon a verdict; provided, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded.

**Mass. Guide Evid. 606(b)**

During an inquiry into the validity of a verdict, the court may ask the jurors individually to affirm publicly that the verdict as recorded represents their decision.  However, a juror may not testify about any statement made or incident that occurred during the jury's deliberations, the effect of anything on that juror's or another juror's vote, or any juror's mental processes concerning a verdict. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

**Mass. Guide Evid. 606(c)(5)**

A juror may testify about whether . . . a mistake was made in entering the verdict on the verdict form.

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO MASS. R. APP. P. 16(k)</u>

I hereby certify that the above document complies with the rules of this Court pertaining to the filing of briefs, including, but not limited to: Mass. Rule 16(a)(13) (addendum); Rule 16(e) (references to the record); Rule 18 (appendix to the briefs); Rule 20 (form of briefs, appendices, and other papers); and Rule 21 (redaction).

This brief complies with the length and typeface limitations in Rule 20(a)(2) and 20(a)(4) because it is in the proportional font Times New Roman at size 14, and contains 10,996 total words in the parts of the brief required by Rule 16(a)(5)-(11) as counted using the word count feature of Microsoft Word.

Date: September 24, 2024

**<u>/s/ Martin G. Weinberg</u>**
Martin G. Weinberg

## <u>CERTIFICATE OF SERVICE</u>

Date: September 24, 2024

Supreme Judicial Court – Clerk's Office
John Adams Courthouse
1 Pemberton Square, Suite 1400
Boston, MA 02108

Dear Sir/Madam:

Herewith is the Brief and Record Appendix of Defendant-Appellant Karen Read in No. SJ-13663.

COMMONWEALTH

v.

KAREN READ

I certify that I have made service via email of this brief to Caleb Schillinger, Norfolk District Attorney's Office, 45 Shawmut Road, Canton, MA 02021, Caleb.J.Schillinger@mass.gov.

<u>**/s/ Martin G. Weinberg**</u>
Martin G. Weinberg
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net