COMMONWEALTH OF MASSACHUSETTS

SUPREME JUDICIAL COURT

NO. SJC-13663

―――――――――――――――

COMMONWEALTH,
Appellee

V.

KAREN READ,
Appellant

―――――――――――――――

ON A RESERVATION AND REPORT BY THE SINGLE JUSTICE
OF A PETITION FOR EXTRAORDINARY RELIEF
PURSUANT TO G.L. c. 211, § 3

―――――――――――――――

COMMONWEALTH'S BRIEF

―――――――――――――――

For the Commonwealth:

Michael W. Morrissey
District Attorney
For the Norfolk District

Caleb J. Schillinger
Adam C. Lally
Laura A. McLaughlin
Assistant District Attorneys
BBO#s 676592, 664079, 684295
45 Shawmut Road
Canton, Massachusetts 02021
(781) 830-4800

October 16, 2024

## **TABLE OF CONTENTS**

Table of Authorities...................................................................... 3

Issues Presented .......................................................................... 6

Statement of the Case ................................................................... 7

Statement of the Facts .................................................................. 9

      a.   Jury Deadlock and Mistrial ......................................... 9

      b.   Purported Post-Trial Juror Statements..............13

      c.   Juror Privacy and Safety Concerns ......................18

Summary of Argument......................................................................22

Argument .......................................................................................24

      I.    The judge soundly exercised her
           discretion in declaring a mistrial
           where the jury repeatedly reported it
           was deadlocked, gave no indication of
           unanimity on any charge, and stated
           that further deliberations would be
           futile ...........................................................24

      II.   The judge properly found the
           defendant consented to the mistrial
           where counsel consistently pushed for
           that result, had several days to
           prepare for it, and when it was
           declared, did not object despite
           multiple opportunities to do so ..........................37

      III. The defendant was not acquitted of any
           charge where no verdicts of acquittal
           were returned, announced, and affirmed
           by the jurors in open court....................40

Conclusion.....................................................................................52

Addendum .......................................................................................54

Certificates of Compliance and Service ...................77

## TABLE OF AUTHORITIES

### Cases

A Juvenile v. Commonwealth,
     392 Mass. 52 (1984) ............................................................*passim*

Arizona v. Washington,
     434 U.S. 497 (1978) ............................................................25, 29

Ball v. United States,
     163 U.S. 662 (1896) ............................................................43

Blueford v. Arkansas,
     566 U.S. 599 (2012) ............................................................*passim*

Commonwealth v. Babb,
     389 Mass. 275 (1983) ..........................................................42, 43

Commonwealth v. Bettencourt,
     447 Mass. 631 (2006) ..........................................................39

Commonwealth v. Blanchard,
     476 Mass. 1026 (2017) .........................................................46

Commonwealth v. Brown,
     470 Mass. 595 (2015) ..........................................................41

Commonwealth v. Cassidy,
     410 Mass. 174 (1991) ..........................................................32

Commonwealth v. Connor,
     392 Mass. 838 (1984) ..........................................................30

Commonwealth v. Curtis,
     53 Mass. App. Ct. 636 (2002) .................................................37

Commonwealth v. DiBenedetto,
     94 Mass. App. Ct. 682 (2019) .................................................48

Commonwealth v. Fidler,
     377 Mass. 192 (1979) ..........................................................47, 52

Commonwealth v. Floyd P.,
     415 Mass. 826 (1993) ..........................................................28, 42

Commonwealth v. Foster,
     411 Mass. 762 (1992) ..........................................................31

Commonwealth v. Horrigan,
    41 Mass. App. Ct. 337 (1996) ....................................38, 39

Commonwealth v. LaFontaine,
    32 Mass. App. Ct. 529 (1992) ................................................31

Commonwealth v. McCalop,
    485 Mass. 790 (2020)...................................................................46

Commonwealth v. McCowen,
    458 Mass. 461 (2010)...................................................................47

Commonwealth v. Moore,
    474 Mass. 541 (2016).......................................................46, 47

Commonwealth v. Phetsaya,
    40 Mass. App. Ct. 293 (1996) ................................................38

Commonwealth v. Rodriguez,
    364 Mass. 87 (1973) .......................................................10, 29

Commonwealth v. Roth,
    437 Mass. 777 (2002)................................................30, 31, 46

Commonwealth v. Rzepphiewski,
    431 Mass. 48 (2000) .....................................................................37

Commonwealth v. Taylor,
    486 Mass. 469 (2020)...............................................27, 42, 43

Commonwealth v. Tuey,
    8 Cush. (62 Mass.) 1 (1851) .................................................10

Commonwealth v. Zekirias,
    443 Mass. 27 (2004) .....................................................................41

Cruz v. Commonwealth,
    461 Mass. 664 (2012)...................................................................24

Daniels v. Commonwealth,
    441 Mass. 1017 (2004) .............................................28, 39, 42

Fuentes v. Commonwealth,
    448 Mass. 1017 (2007) ......................................................*passim*

Hudson v. Louisiana,
    450 U.S. 40 (1981) .........................................................................42

*Lawrence* v. *Stearns*,
     11 Pick. (28 Mass.) 501 (1831) ............................................40

*Pellegrine* v. *Commonwealth*,
     446 Mass. 1004 (2006) ...................................................37, 38

*Poretta* v. *Commonwealth*,
     409 Mass. 763 (1991) ..........................................................39

*Ray* v. *Commonwealth*,
     463 Mass. 1 (2012) ........................................................*passim*

*United States* v. *Martin Linen Supply Co.*,
     430 U.S. 564 (1977) ........................................................42, 43

*Woodward* v. *Leavitt*,
     107 Mass. 453 (1871) ..........................................................52

<u>Statutes</u>

G.L. c. 234, § 34 ............................................................9, 27

G.L. c. 234A, § 68C ..........................................................9, 27

<u>Rules</u>

Mass. R. Crim. P. 27(a) ........................................................40

Mass. G. Evid. § 606(b) .......................................................47

### ISSUES PRESENTED

I.  The jury reported three times, in increasingly sharper terms, that it was deadlocked.  Its third and final note said that the jurors remained "starkly divided" over "the charges" and further deliberations "would be futile."  At no point did the jury express the prospect of unanimity on any charge, and the defendant argued at the time that the jurors were "at an impasse" and "hopelessly deadlocked."  Did the trial judge abuse her discretion in declaring a mistrial based on the deadlock reported by the jury?

II.  The defendant did not object to the declaration of the mistrial.  The judge found that defense counsel had multiple opportunities to raise any objection and she explicitly found not credible the defendant's assertions that the mistrial was sudden and unexpected, or that defense counsel was not afforded an opportunity to be heard.  Did the judge err in concluding the defendant consented to the mistrial?

III. The jury did not return, announce, and affirm any verdicts in open court.  Was the defendant acquitted of the charges of second-degree murder and leaving the scene?

## STATEMENT OF THE CASE

On June 9, 2022, a Norfolk County grand jury indicted the defendant, Karen Read, for murder in the second degree, G.L. c. 265, § 1; manslaughter while operating a motor vehicle under the influence of alcohol or having a blood alcohol concentration of 0.08 or greater ("OUI manslaughter"), G.L. c. 265, § 13½; and leaving the scene of personal injury resulting in death, G.L. c. 90, § 24(2)(a½)(2) (R.102, 139-144).[1]

A jury trial on the three indictments began on April 16, 2024 (Beverly J. Cannone, J., presiding) (R.100).  On June 25, 2024, the thirty-seventh day of trial, the jury began deliberating (R.145, 197). In addition to the three charged offenses, the trial judge instructed the jury on two lesser-included offenses of OUI manslaughter: (1) involuntary manslaughter by wanton or reckless conduct, G.L. c. 265, § 13; and (2) motor vehicle homicide by negligent operation while under the influence of

---

[1]  The record appendix is cited as "R."; the Commonwealth's supplemental record appendix as "S.R."; the defendant's brief as "D.Br."; and the addendum to this brief as "Add."  All citations are followed by page number(s).

alcohol, G.L. c. 90, § 24G(a) (R.168-187).  On July 1, 2024, the fifth day of deliberations, the trial judge declared a mistrial based on jury deadlock (R.268).

On July 8, 2024, the defendant moved to dismiss the charges of second-degree murder and leaving the scene on double jeopardy grounds (R.137, 272). The motion was accompanied by two affidavits from her attorneys (R.137, 283-288).  The Commonwealth filed a written opposition to the motion (R.137, 295), and the defendant filed a reply (R.137, 310).  The defendant also filed three supplemental memoranda, each accompanied by an affidavit of counsel (R.137-138, 289, 320, 327).

On August 9, 2024, the trial judge heard argument on the motion (R.138, 332).  In a memorandum of decision and order entered on August 23, 2024, the judge denied the motion (R.138, 388; Add.55).

On September 11, 2024, the defendant filed in the county court a petition for extraordinary relief pursuant to G.L. c. 211, § 3, seeking review of the order denying her motion to dismiss (R.5, 418). A single justice (Elizabeth N. Dewar, J.) reserved and reported the case without decision for determination by this Court (R.423).

## STATEMENT OF THE FACTS

### a.    Jury Deadlock and Mistrial

The jury began its deliberations on Tuesday, June 25, 2024, at about 1:25 p.m. (R.197). Deliberations continued over the next three days (R.210-211, 228-229, 242-245, 247-250).  On Friday, June 28, around noon, the jury foreperson sent the trial judge a note stating:

> Dear Judge Cannone,
>
> I am writing to inform you, on behalf of the jury, that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict.

(S.R.3; R.250).

The judge asked the parties for their views on whether at that point the jury had engaged in "due and thorough" deliberation (R.251).[2]  The Commonwealth

---

[2]  G.L. c. 234A, § 68C, formerly codified at G.L. c. 234, § 34, see St. 2016, c. 36, §§ 1, 5 (effective May 10, 2016), provides:

> If a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law.

asserted that the jury had not had sufficient time to
deliberate and it was therefore too soon to give a
Tuey-Rodriguez instruction (R.251).[3]  The Commonwealth
noted that, although the jury said it had not reached
a unanimous verdict, it did not convey that doing so
would not be possible (R.251).  The defendant
disagreed with the Commonwealth's "characterization of
the note" and argued that the jury was "communicating
to the Court that they've exhausted all manner of
compromise, all manner of persuasion and they are at
an impasse" (R.252).  Defense counsel asked the judge
to give the Tuey-Rodriguez instruction (R.252).

The judge ruled there had not yet been due and
thorough deliberation, given the length of the trial,
the amount of evidence presented through 74 witnesses
and 657 exhibits, the complexity of the issues, and
that each of the prior days of deliberations had been
shortened (R.253).  She instructed the jurors to
continue deliberating (R.254).  They deliberated until
about 4:15 p.m., when the judge released them for the
weekend (R.255-256).

---

[3]  See Commonwealth v. Rodriguez, 364 Mass. 87,
98-103 (1973) (approving modified version of charge
set out in Commonwealth v. Tuey, 8 Cush. 1, 2-3
[1851], for prospective use with deadlocked juries).

Deliberations resumed on Monday, July 1 (R.260-261).  Around 10:45 a.m., the jury sent the judge the following note:

> Judge Cannone
>
> Despite our commitment to the duty entrusted to us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind.
>
> The divergence in our views are not rooted in a lack of understanding or effort, but deeply held convictions that each of us carry ultimately leading to a point where consensus is unattainable.  We recognize the weight of this admission and the implications it holds.

(S.R.4; R.261, 264, 390).  The judge again requested argument on whether there had been due and thorough deliberation (R.261-262).  The Commonwealth acknowledged the length of the deliberations up to that point -- around 22 or 23 hours in total by its estimation -- but it argued that the jury still had not conducted a thorough deliberation considering the trial length, voluminous evidence, and complex issues (R.261-262).  The defendant argued it was "time for a *Tuey-Rodriguez*" as the jury had "come back now twice, indicating essentially that they are hopelessly deadlocked" (R.262).  Defense counsel again asked the judge to give the instruction (R.263).

11

The judge found that the jury had engaged in due
and thorough deliberation, noting the jury had been
"extraordinary" and that she had "never seen a note
like this reporting to be at an impasse" (R.263).
She gave the jury the full <u>Tuey</u>-<u>Rodriguez</u> charge and
deliberations resumed (R.264-267).

At about 2:30 p.m. that same day, the jury sent
another note to the judge (R.267-268, 391; S.R.5).
The parties returned to the courtroom, the case was
called, and the judge informed counsel, "The jury is
at an impasse" (R.267).

After the jurors entered the courtroom, the judge
read the note aloud:

> Judge Cannone,
>
> Despite our rigorous efforts, we continue to find
> ourselves at an impasse.
>
> Our perspectives on the evidence are starkly
> divided.  Some members of the jury firmly believe
> that the evidence surpasses the burden of proof
> establishing the elements of the charges beyond a
> reasonable doubt.  Convers[el]ly, others find the
> evidence fails to meet this standard, and does
> not sufficiently establish the necessary elements
> of the charges[.]
>
> The deep division is not due to a lack of effort
> or diligence, but rather a sincere adherence to
> our individual principles and moral convictions.
>
> To continue to deliberate would be futile and
> only serve to force us to compromise these deeply
> held beliefs.

(S.R.5; R.267-268).  The judge told the jurors, "I am
not going to do that to you, folks.  Your service is
complete" (R.268).  She declared a mistrial and
excused them to the jury room, where she said she
would see them "in a few minutes" (R.268).  The judge
and counsel remained in the courtroom and scheduled a
date to return for a status conference (R.269-270).

    **b.    Purported Post-Trial Juror Statements**

    One week later, on July 8, the defendant filed
her motion to dismiss along with affidavits from her
counsel, Attorneys Alan Jackson and David Yannetti
(R.137, 283, 286).  Attorney Jackson's affidavit
stated that on July 2 a purported juror ("Juror A")
contacted him (R.286).  He said he was able to
identify which juror they were from his conversation
with them (R.286).  According to Attorney Jackson's
description of the conversation, Juror A said the jury
had unanimously agreed that the defendant was not
guilty of second-degree murder (count 1), and "shortly
following that determination," they also had
unanimously agreed that she was not guilty of leaving
the scene (count 3) (R.287).

    Attorney Yannetti's affidavit stated he had
received communications from two "informants," both on

July 3 (R.283).  He said one of these informants
("Informant B") sent him a screenshot that Informant B
had received from some other person ("Intermediary B")
of text messages that Intermediary B allegedly had
received from a purported juror ("Juror B") (R.283).
Attorney Yannetti believed he could confirm Juror B
had been a deliberating juror based on a first name
for Juror B given to him by Informant B (R.283).
According to Attorney Yannetti's description of the
screenshot, Juror B allegedly texted Intermediary B:
"It was not guilty on second degree.  And split in
half for the second charge.  When the judge sent us
back with that Hernandez [sic] thing to look at the
other side it turned into a bully match.  I thought
the prosecution didn't prove the case.  No one thought
she hit him on purpose or even thought she hit him on
purpose [sic]" (R.189).

    Attorney Yannetti stated that the other informant
("Informant C") had contacted him to say that they
personally knew a purported juror ("Juror C"), as they
and Juror C used to work together and had a mutual
friend ("Intermediary C") who was a current co-worker
and friend of Juror C (R.284).  Informant C also knew
from Intermediary C that Juror C would be

14

participating in a Zoom meeting with friends to discuss the trial (R.284).  Three days later, Informant C sent Attorney Yannetti screenshots of text messages exchanged between Informant C and Intermediary C, in which Intermediary C purportedly reported what Juror C had allegedly said during the Zoom meeting (R.284).

According to Attorney Yannetti's representation of that exchange, Intermediary C texted, "no consideration for murder 2.  manslaughter started polling at 6/6 then ended deadlocked @ 4no8yes"; Informant C texted back, "if it was no consideration for murder two, shouldn't she have been acquitted on that count. and hung on the remaining chargers [sic]," and Intermediary C responded, "she should've been acquitted I agree.  Yes, the remaining charges were what they were hung on" (R.284-285).  Based on the descriptions of Juror C by Informant C and Intermediary C, Attorney Yannetti said he could positively identify Juror C as a deliberating juror (R.285).

On July 10, Attorney Jackson submitted a supplemental affidavit stating that on July 8 he was contacted by a purported juror ("Juror D") (R.137,

15

292).  He said he was able to identify which juror
they were from his conversation with them (R.292).
According to Attorney Jackson's description of the
conversation, Juror D said the jury had unanimously
agreed the defendant was not guilty of counts 1 and 3,
and the jury's disagreement was solely as to count 2
and its lesser-included offenses (R.293).

Attorney Jackson submitted a second supplemental
affidavit on July 18 (R.137, 323).  He stated that he
had been contacted the day before, July 17, by a
purported juror ("Juror E") (R.323).  He again said he
could identify the individual as a deliberating juror
(R.323).  According to Attorney Jackson, Juror E said
the jury was "unanimous on 1 and 3," the defendant was
not guilty, and the jurors deadlocked only on the
"lower charges" on count 2 (R.323).

On August 1, 2024, the Commonwealth filed in the
trial court a notice disclosing that on July 21 an
unsolicited voicemail was left on the office phoneline
of one of the trial prosecutors (R.325).  The caller,
who identified themself as a juror by full name and
seat number, stated, "it is true what has come out
recently about the jury being unanimous on charges 1
and 3" (R.325).  That same individual left another

16

unsolicited voicemail for the prosecutor on July 26, stating that they "can confirm unanimous on charges one and three, as not guilty[,] and as of last vote 9-3 guilty on the manslaughter charges . . . on the lower-level manslaughter charges" (R.325).

The Commonwealth's notice further disclosed that it also had received emails from three individuals who identified themselves as jurors and wished to speak anonymously (R.325).  The Commonwealth had responded to the emails by stating that, although it would welcome the opportunity to discuss the evidence or its case, it was ethically prohibited from inquiring into the substance of the jury's deliberations and could not promise confidentiality, as it might be required to disclose any such communications to the defendant or the court (R.325-326).  All three individuals declined to communicate further with the Commonwealth and provided no information about the jury's purported votes (R.326).

On August 5, Attorney Yannetti submitted a supplemental affidavit stating that he had received an unsolicited phone call on July 31 (R.138, 330).  The caller said they had been a juror in the case, and based on what they represented to Attorney Yannetti to

17

be their full name, Attorney Yannetti stated he was
able to confirm that the caller was the person
identified as Juror B in his prior affidavit (R.330).
According to him, the caller said the jury had reached
unanimous not-guilty verdicts on "indictments (1) and
(3)" and had been deadlocked only on "indictment (2)"
(R.330).

The caller also said they were familiar with
Attorney Yannetti's prior affidavit and the text
message exchange referenced in paragraph 4 of the
affidavit (quoted above) was accurate, except that
they had meant to write, "No one thought she hit him
on purpose or even knew that she had hit him" (R.330-
331).  The caller "believe[d] that other jurors ha[d]
been reluctant to come forward because there is so
much public and media attention focused on this case"
(R.331).

    **c.**   **Juror Privacy and Safety Concerns**

On July 8, the same day the defendant filed her
motion to dismiss, the trial judge sua sponte issued
an order impounding the list of names of the empaneled
jurors (R.137; S.R.6).  The judge noted that the case
had "garnered significant and divisive attention in
Massachusetts and across the nation," and that the

18

proceedings continued to be "the daily subject of
commentary on various social media platforms" (S.R.6).
She noted too that "[p]eople associated with the case
have been charged with intimidation" (S.R.6).

She found that there was a real and present risk
of personal harm to the jurors and to the integrity of
their service if their names were to be made available
to the public at that time, and thus a risk of
immediate and irreparable injury establishing good
cause to impound the list (S.R.6-7).  The order stated
that it would expire ten days from its issuance unless
otherwise ordered by the court for good cause shown
(S.R.7).

On July 18, one of the deliberating jurors,
represented by counsel and proceeding under the
pseudonym "Juror Doe," filed an emergency motion for
an indefinite extension of the impoundment order
(R.137; S.R.8).  The motion was supported by an
affidavit from Juror Doe (R.137; S.R.11).

Juror Doe averred that they feared for their
personal safety and the safety of their family if the
jurors' names were made public (S.R.12).  In addition
to the conduct noted in the impoundment order, Juror
Doe recalled trial testimony from at least one witness

who had described herself and her family being
harassed because of her involvement in this case
(S.R.12).

Juror Doe also stated that during deliberations
the jurors "could hear protesters outside screaming
and yelling," and after the jurors were discharged and
transported by bus back to what was supposed to be a
secret location, they were met there by what appeared
to be members of the media, including photographers
(S.R.12). Juror Doe cited recent examples of news
articles and social-media commentary in which
individuals had expressed anger at the jurors, sought
to identify the jurors, and advocated publicizing the
jurors' home addresses, occupations, and other
identifying information to harass and shame them
(S.R.13-15).

In closing, Juror Doe said:

My affidavit and motion should not be interpreted
as indicating how I or any other juror voted on
this case, or how I or any other juror feel about
this case. Every member of the jury, regardless
of how they voted, is likely to face backlash
from a segment of the large portion of the public
who intensely followed this case. I wish to
remain anonymous, and I bring this motion on
behalf of myself and any other juror who does not
wish to be identified, regardless of whether or
not we agreed during our deliberations.

It was an honor to serve on the jury.  It also
was a significant sacrifice of time, which I
understood and anticipated when I was selected.
What I did not anticipate, however, was the
likelihood that I and other members of the jury
would become targets of intense public scrutiny
and likely harassment campaigns strictly due to
the outcome of our private deliberations.

If jury names are made public, I will be subject
to nonstop requests for comment about jury
deliberations.  I would prefer to not have to
respond to these inquiries.  However, what I fear
is not only will I be subject to requests for
interviews, but that I will be targeted and
harassed because of what I did, or did not do on
that jury.  I fear that verbal harassment will
likely lead to physical confrontation and
physical harm.  I am not prepared or equipped to
anticipate and prepare for any surprise personal
attack.  More importantly, I fear that I will not
be able to protect myself and my family.

(S.R.16).

The trial judge credited Juror Doe's affidavit
and found that Juror Doe had established good cause to
extend the impoundment order unless and until
otherwise ordered by the court (R.137; S.R.38-39).

## SUMMARY OF ARGUMENT [4]

The trial judge soundly exercised her discretion in declaring a mistrial on the ground of manifest necessity. The jury repeatedly reported it was deadlocked and further stated that continuing to deliberate would be futile and only force the jurors to compromise their deeply held beliefs. The jury gave no indication it had reached a unanimous verdict on any charge, and the defendant argued at the time against finding any such unanimity. There was no viable alternative to a mistrial, but even so, the defendant was afforded a meaningful opportunity to be heard on any purported alternative. (Pages 24-37).

Even assuming there was no manifest necessity, the trial judge properly ruled that the defendant consented to the mistrial. The possibility of a mistrial because of deadlock was clear from the jury's first note, and clearer still from its second note.

_____

[4] The Commonwealth addresses first the defendant's arguments concerning the mistrial before turning to the supposed acquittals. That was the order in which the issues arose before the trial judge. Moreover, the defendant attempts to use the purported juror statements in hindsight to challenge the necessity of a mistrial, even though those alleged statements were unknown to the judge and the parties at the time of the mistrial and could not have factored into the judge's exercise of her discretion.

Defense counsel consistently pushed for that result in response to those notes, had ample time to prepare for a mistrial before it was later declared, and raised no objection despite multiple opportunities to do so. The defendant's personal assent to the mistrial was not required.  (Pages 37-39).

The defendant was not acquitted of any charge because the jury did not return, announce, and affirm any open and public verdicts of acquittal.  That requirement is not a mere formalism, ministerial act, or empty technicality.  It is a fundamental safeguard that ensures no juror's position is mistaken, misrepresented, or coerced by other jurors.  It also protects each juror's right to rethink their position and to change their vote before reaching a final verdict.  The alleged post-trial statements from certain purported jurors do not constitute acquittals, and the judge properly denied the defendant's request for a post-trial inquiry of the jurors.  That inquiry would necessarily require delving into the jurors' deliberations, which this Court has consistently and firmly held impermissible.  (Pages 40-52).

## ARGUMENT

I.   **The judge soundly exercised her discretion in declaring a mistrial where the jury repeatedly reported it was deadlocked, gave no indication of unanimity on any charge, and stated that further deliberations would be futile.**

Double jeopardy principles do not bar retrying a defendant when a mistrial is declared as a matter of manifest necessity. See Ray v. Commonwealth, 463 Mass. 1, 3 (2012); Cruz v. Commonwealth, 461 Mass. 664, 671 (2012) ("'manifest necessity' is another way of saying that in a particular case, the right of the defendant must yield to that of the public"). A deadlocked jury is the "prototypical example" of a manifest necessity justifying declaration of a mistrial. Fuentes v. Commonwealth, 448 Mass. 1017, 1018 (2007) (quotation omitted). See Ray, 463 Mass. at 3, quoting Blueford v. Arkansas, 566 U.S. 599, 609 (2012) (trial judge's belief that jury is unable to reach verdict "has long been considered the 'classic basis' for a proper mistrial."). On review, "the question for decision is whether the petitioner has shown an abuse of discretion by the trial judge in declaring a mistrial." Ray, 463 Mass. at 4 (quotation omitted). Accord Fuentes, 448 Mass. at 1018. This

Court accords "great deference to the trial judge's
determination when a mistrial is premised upon the
trial judge's belief that the jury is unable to reach
a verdict." Fuentes, 448 Mass. at 1018 (quotations
omitted).  Accord Ray, 463 Mass. at 5; Arizona v.
Washington, 434 U.S. 497, 509-510 (1978).

The propriety of a deadlock-based mistrial "is
not answered by application of a mechanical formula."
Ray, 463 Mass. at 4 (quotation omitted).  It is a
circumstantial inquiry, and the "pertinent factors"
correspond to those informing whether the jury has
conducted due and thorough deliberation under G.L.
c. 234A, § 68C.  Id. at 4-5.  These factors include
the time spent deliberating relative to the length of
the trial, the complexity of the disputed factual
issues, and "statements by the jury that they cannot
agree." Id. (quotation omitted).  See Fuentes, 448
Mass. at 1018-1019 (analyzing factors).

Here, after deliberating across four days, the
jury told the judge it had exhaustively reviewed the
evidence and diligently considered all disputed
evidence but had been "unable to reach a unanimous
verdict" (S.R.3; R.250).  Considering the jury's note,
the extent of deliberations thus far in view of the

trial length, the amount of evidence presented, and the complexity of the issues to be decided, the judge found the jury's deliberations had not yet been due and thorough, and she instructed the jury to continue deliberating (R.253-254).

On the next day of deliberations the jury sent the judge a second note, stating in stronger terms, "we find ourselves deeply divided by fundamental differences in our opinions and state of mind," the "divergence in our views are not rooted in a lack of understanding or effort, but deeply held convictions," and "consensus is unattainable" (S.R.4; R.261, 264). Considering again the jury's statements and the additional time spent deliberating, the judge found the jury had conducted due and thorough deliberation and provided the Tuey-Rodriguez charge (R.264-267).[5]

Later that afternoon the jurors returned a third and even more emphatic note that said, "we continue to find ourselves at an impasse," "[o]ur perspectives on the evidence are starkly divided" stemming from

---

[5] Giving a Tuey-Rodriguez instruction is "the orthodox approach to dealing with a deadlocked jury" and "ordinarily the preferable course." Ray, 463 Mass. at 5-6 (quotation omitted). It encourages a jury "to consider seriously and with an open mind the views and arguments of each member." Id. at 3 n.3.

"a sincere adherence to our individual principles and moral convictions," and further deliberations "would be futile and only serve to force us to compromise these deeply held beliefs" (S.R.5; R.267-268).

The judge "had no doubt based on the jury's notes to the Court that it was unable to reach a unanimous verdict" (Add.69-70; R.402-403). It was also "clear" to her from the third note that the jurors "would not consent to continuing their deliberations" (Add.67; R.400). See R.268 (telling the jurors, "I am not going to do that to you, folks"). And at that point the jurors could not be compelled to continue deliberating without their consent. See G.L. c. 234A, § 68; Fuentes, 448 Mass. at 1019, citing former G.L. c. 234, § 34.

In short, the judge's declaration of a mistrial due to deadlock was informed by her consideration and weighing of the specific factors pertinent to that decision. She did not abuse her discretion. See Ray, 463 Mass. at 4-6; Fuentes, 448 Mass. at 1019.

The defendant nonetheless claims the judge erred by failing to consider alternatives to a mistrial and to give defense counsel an opportunity to be heard. See D.Br.35, quoting Commonwealth v. Taylor, 486 Mass.

27

469, 484 (2020).  As to purported alternatives, she
contends the judge should have inquired whether the
jury had reached a unanimous verdict on any charge or
asked the jurors if they would consent to further
deliberations.  See D.Br.37, 43.  The judge was not
obligated to make "either inquiry as a matter of
course."  Fuentes, 448 Mass. at 1018 (judge under no
duty to inquire about possibility of unanimous
verdicts or willingness to continue deliberating).
See Blueford, 566 U.S. at 609 (rejecting argument that
judge needed to give effect to any potential unanimity
on charges before declaring mistrial because of hung
jury); Daniels v. Commonwealth, 441 Mass. 1017, 1017
n.3 (2004) (judge not required to receive partial
verdicts under Mass. R. Crim. P. 27[b]); Commonwealth
v. Floyd P., 415 Mass. 826, 830 (1993) (judge has
discretion as to partial verdicts).

     "[T]he circumstances before the judge [also] did
not necessitate either inquiry."  Fuentes, 448 Mass.
at 1018.  There was no reason for the judge to ask if
the jurors would consent to further deliberations.
The jurors' final note made abundantly clear that they
did not consent, and that if they continued to
deliberate, any verdicts reached would not have been

each juror's "own verdict, the result of [their] own
convictions," but rather, "a mere acquiescence in the
conclusions" of the other jurors.  <u>Rodriguez</u>, 364
Mass. at 101.  See <u>Arizona</u>, 434 U.S. at 510 n.28
(trial judge best positioned to assess whether jury
able to reach just verdict if deliberations continue).

    There was also no basis for the judge to inquire
whether the jury had reached a unanimous verdict on
any charge.  Nothing in the jury's three notes
"indicated agreement on any of the charges," or even
an "inkling of an indication of agreement" (Add.70;
R.403).  To the contrary, the first note said the jury
had been "unable to reach a unanimous verdict,"
declaring outright that the jury had not reached a
unanimous decision on any charge (S.R.3; R.250).
The second note stated, "consensus is unattainable,"
which would be a peculiar way of describing the jury's
deadlock if consensus had in fact been attained on any
charge (S.R.4; 264).  The third and final note,
returned after the <u>Tuey-Rodriguez</u> instruction, stated
the jury remained "at an impasse" on "the charges,"
not just a particular charge (S.R.5; R.268).  As the
judge found, the "only reasonable interpretation of
these notes, and specifically the final note, was that

the jury could not agree on any of the three charges
and further deliberations would serve no purpose"
(Add.70; R.403).  See <u>Fuentes</u>, 448 Mass. at 1018-1019
(when final jury note unequivocally stated jury was
deadlocked, judge properly declared mistrial without
inquiring into possibility of unanimous verdicts or
whether jury would consent to further deliberations);
<u>Commonwealth</u> v. <u>Roth</u>, 437 Mass. 777, 793-794 (2002)
(improper to assume "there is any 'final' verdict
lurking within that deadlock that may be extracted").

Moreover, the judge was mindful of this Court's
repeated admonitions that "deadlocked juries are
particularly susceptible to coercion" (Add.72; R.405).
<u>Roth</u>, 437 Mass. at 791, citing <u>Commonwealth</u> v. <u>Connor</u>,
392 Mass. 838, 844 (1984).  The jurors in this case
had reported three times that they were unable to
reach agreement and had been given <u>Tuey-Rodriguez</u>.
See <u>Roth</u>, 437 Mass. at 792 (in these circumstances,
"a judge's inquiry concerning partial verdicts cannot
avoid communicating to the jury the judge's desire to
salvage *something* from the trial" [emphasis in
original]).  The jurors also had been instructed on
lesser-included offenses (R.168-187).  See <u>Roth</u>, 437
Mass. at 790-795 (judge precluded from initiating any

inquiry into partial verdicts premised on lesser-
included offenses due to heightened risk of coercion);
A Juvenile v. Commonwealth, 392 Mass. 52, 55-56 (1984)
(same).  The judge recognized that even asking the
jurors if they were truly deadlocked, let alone
probing on which charges they were deadlocked, would
have been coercive.  See Add.72 (R.405) (such
questioning "would have implied to the jurors that the
Court wanted them to resume deliberations to reach a
verdict"); Ray, 463 Mass. at 6 (judge "interacts
directly with the jurors while presiding at trial,"
and thus "is ordinarily in the best position" to
assess potential for coercion); Roth, 437 Mass. at 794
("In many instances, asking a deadlocked jury about
partial verdicts would constitute attempting to
extract from the jury something that does not
exist.").[6]

---

[6] The defendant relies on Commonwealth v. Foster,
411 Mass. 762 (1992), and Commonwealth v. LaFontaine,
32 Mass. App. Ct. 529 (1992), to argue that there is
nothing coercive about asking a deadlocked jury
whether it has reached a unanimous verdict on any
charge.  See D.Br.47-48.  Those cases are inapposite
because neither of those juries reported being
deadlocked.  See Foster, 411 Mass. at 763-765;
LaFontaine, 32 Mass. App. Ct. at 534-535.

The judge further recognized that "to make such an inquiry on her own accord could impede upon the strategic decision of counsel to not make such a request" (Add.73; R.406). Given that defense counsel had previously accused her of "directing a verdict" on the lesser-included offenses because of how the OUI manslaughter verdict slip was initially worded (R.215), she was all the more attentive to avoid pressuring the jury (Add.72; R.405). Far from failing to consider an inquiry into the nature or extent of the jury's deadlock as an alternative to a mistrial, the judge was acutely aware of the concerns that would have made such an inquiry improper under the circumstances. See Commonwealth v. Cassidy, 410 Mass. 174, 179 (1991) (judge need only consider "reasonable available alternatives" to mistrial).

Nor was defense counsel denied a meaningful opportunity to be heard. In response to the jury's first note, counsel disagreed with the prosecutor's "characterization" that the note left open the possibility the jury might yet achieve unanimity (R.252). Counsel argued the note could only mean the jury had already "exhausted all manner of compromise, all manner of persuasion," was "at an impasse," and

should be given <u>Tuey</u>-<u>Rodriguez</u> (R.252).  He did not
ask the judge to inquire of the jurors what they meant
when they said, "we have been unable to reach a
unanimous verdict," or whether they had reached
verdicts on some but not all charges.

With the jury's second note, counsel argued the
jury "have come back now twice, indicating essentially
that they are hopelessly deadlocked" (R.262).
Leveraging the language in the note, he emphasized
that the jurors had "fundamental disagreements about
what the evidence means and it's a matter of opinion.
It's not a matter of lack of understanding" (R.263).
He again argued in favor of a finding of due and
thorough deliberation and again requested <u>Tuey</u>-
<u>Rodriguez</u> (R.262-263).  He exhibited no curiosity at
all about the extent of the jury's deadlock and did
not ask the judge to inquire of the jurors.

The defendant now claims that her attorneys, by
repeatedly requesting the <u>Tuey</u>-<u>Rodriguez</u> instruction,
were merely trying to encourage the jury to reach
unanimous verdicts.  See D.Br.41.  In reality, and as
the judge found, counsel were "pushing" for "the
result" of a mistrial, knowing that the judge would
not declare one until the instruction had been given,

and that if after the instruction the jury returned
deadlocked again, G.L. c. 234A, § 68C would be
triggered and a mistrial would be all but inevitable.
(Add.67-68; R.400-401).

When the jury sent its third and final note, the
judge informed counsel in open court, while waiting
for the jurors to enter the courtroom, "The jury is at
an impasse" (R.267).  Counsel could not credibly have
believed that the result of that note would be
anything other than the mistrial for which they had
consistently pushed.  And it can fairly be inferred
from counsels' silence as the judge read the note
aloud and declared a mistrial that counsel neither
objected to the mistrial nor would have suggested any
alternative.  See Add.69; R.402 ("The Court finds it
hard to believe that when counsel heard that the jury
was at an impasse for a third time and a mistrial was
inevitable, at perhaps the most crucial point in the
trial, counsel would sit silently if they did not
consent to a mistrial."); Fuentes, 448 Mass. at 1018-
1019 (no abuse of discretion in declaring mistrial
without first informing defense counsel of contents of
jury's final note or consulting with counsel when, as
here, note indicated jury was deadlocked and offered

no reasonable probability jury would consent to further deliberations; G.L. c. 234, § 34 (now c. 234A, § 68C) was triggered; and thus "record d[id] not show that such consultation would have produced any fruitful alternatives").

Even so, counsel still had multiple opportunities to object if they in fact objected (Add.68; R.401). Counsel could have objected, or at least asked to be heard on the matter, at any point while waiting for the jurors to enter the courtroom after the judge announced the jury remained at an impasse (R.267); during the subsequent discussion with the judge about scheduling a status hearing (R.269-270); or while the jurors were still at the courthouse and waiting in the deliberation room for the judge to speak to them (R.268). See Add.68 (R.401). See also, e.g., Fuentes, 448 Mass. at 1018 (counsel objected to mistrial after jury was dismissed, judge then heard from both parties and recessed case).

Had defense counsel raised an objection they would have been heard (Add.68; R.401). The judge made a point to note that counsel were "no shrinking violets"; they had never needed the judge to inquire whether they had an objection in order to be heard,

35

and she had never refused them an opportunity to be heard in open court or at sidebar (Add.68; R.401).[7]

Despite several opportunities to do so, counsel raised no objection to the mistrial.  Instead, counsel said nothing about the mistrial to the judge, and after engaging in a scheduling conference in open court before the judge, proceeded together with the defendant to the courthouse steps, where counsel made statements to the media and onlookers (Add.68; R.401). Counsels' statements also expressed no objection to or dissatisfaction with the mistrial.  Rather, counsel declared the Commonwealth "failed miserably and will continue to fail" (Add.68; R.401).[8]

For these reasons, the judge found not credible the assertions in the defendant's motion that the declaration of the mistrial was "sudden" and

---

[7]  Counsel's objection to the initial version of the OUI manslaughter verdict slip serves as an illustrative example.  See Add.68 (R.401); R.213-215 (counsel accusing judge of directing verdict on lesser-included offenses and telling her: "I don't really care how it always i[s] i[n] Massachusetts"; "I'd like an answer from the Court"; and "that's not how it should be, and it's over our strong objection").

[8]  A video of counsel's statements is available at the following link, cited by the judge in her Order: https://www.youtube.com/watch?v=TrsJPBRVqDg.

"unexpected," or defense counsel's assertion in his affidavit that he lacked an opportunity to be heard. See Add.68-69 (R.401-402); R.287; D.Br.36.  The defendant cannot overcome those credibility determinations, fully supported by the record, which show the "remarkable turnaround" in her position post-trial for what it is:  a hindsight contrivance based on the purported juror statements (Add.68; R.401). See Commonwealth v. Rzepphiewski, 431 Mass. 48, 55 (2000) (motion judge not required to accept self-serving assertions in supporting affidavit, even if, unlike here, nothing in record directly contradicts them).

**II.  The judge properly found the defendant consented to the mistrial where counsel consistently pushed for that result, had several days to prepare for it, and when it was declared, did not object despite multiple opportunities to do so.**

"A defendant's consent to a mistrial removes any double jeopardy bar to retrial."  Pellegrine v. Commonwealth, 446 Mass. 1004, 1005 (2006) (quotation omitted).  See Commonwealth v. Curtis, 53 Mass. App. Ct. 636, 640 (2002) ("manifest necessity" test inapplicable to mistrial declared with defendant's consent).  Such consent "may be inferred from silence

where a defendant had the opportunity to object and
failed to do so." Pellegrine, 446 Mass. at 1005,
quoting Commonwealth v. Phetsaya, 40 Mass. App. Ct.
293, 298 (1996). A defendant's silence in the face of
a mistrial declaration has also been held to
demonstrate consent when "the total situation was such
that the defendant could reasonably have anticipated
that the issue of a mistrial would arise and could
prepare himself for the event; silence could then be
plausibly read as acquiescence." Commonwealth v.
Horrigan, 41 Mass. App. Ct. 337, 342 (1996).

As discussed above, defense counsel consistently
sought a mistrial, and when it later transpired,
raised no objection. Counsel also had ample time to
prepare for that outcome. The jury returned its first
note around noon on Friday, June 28 (R.250); its
second note on the following Monday, July 1, around
10:45 a.m. (R.261, 264, 390); and its third and final
note around 2:30 p.m. that same day (R.267-268, 391).
Counsel had three days between the first and second
notes and several more hours between the second and
third notes to prepare for a possible mistrial and to
discuss the matter with the defendant.

The defendant cites <u>Horrigan</u> for support
(D.Br.36, 44), but the "total situation" here was
markedly different than in that case.  In <u>Horrigan</u>,
on the morning of the second day of trial, the first
justice of the district court abruptly, and with no
prior warning to the parties or counsel, walked into
the courtroom and announced a mistrial because the
trial judge had a medical emergency and could not
preside.  See <u>Horrigan</u>, 41 Mass. App. Ct. at 338-339.
There, the mistrial was truly sudden and unexpected.
Here, it was entirely foreseeable and played out over
days.

The defendant also argues that her personal
assent to the mistrial was required.  See D.Br.49-50.
She did not raise this argument before the trial
judge, and it is waived.  See R.272-281, 216-318;
<u>Commonwealth</u> v. <u>Bettencourt</u>, 447 Mass. 631, 633-634
(2006) (this Court need not consider arguments raised
for first time on appeal, and rarely does so if
argument is dispositive in favor of party raising it).
In any event, the judge was not required to secure the
defendant's personal consent.  See <u>Daniels</u>, 441 Mass.
at 1017 n.3; <u>Poretta</u> v. <u>Commonwealth</u>, 409 Mass. 763,
766-769 (1991).

### III. The defendant was not acquitted of any charge where no verdicts of acquittal were returned, announced, and affirmed by the jurors in open court.

As this Court has explained in rejecting a claim of double jeopardy based on purported acquittals:

> The only verdict which can be received and regarded, as a complete and valid verdict of a jury, upon which a judgment can be rendered, is an open and public verdict, given in and assented to, in open court, as the unanimous act of the jury, and affirmed and entered of record, in the presence and under the sanction of the court.

A Juvenile, 392 Mass. at 56-57, quoting Lawrence v. Stearns, 11 Pick. (28 Mass.) 501, 502 (1831).  See Mass. R. Crim. P. 27(a) (verdict must be "returned by the jury to the judge in open court").  "It is not enough to show that the jury may have agreed on some issues at some time; if that limited showing were to control, uncertainties would be invited."  A Juvenile, 392 Mass. at 57 (signed verdict slips showing "not guilty" entries, found in deliberation room after mistrial declared due to deadlock, not acquittals).

The jurors here did not return, announce, and affirm any verdict.  Their only open and public, unanimous acts were their statements to the judge that they were unable to reach a unanimous verdict or to attain consensus, remained at an impasse, and were

starkly divided on whether the evidence was sufficient to establish "the elements of the charges" (S.R.5; R.268).  See Commonwealth v. Brown, 470 Mass. 595, 603-604 (2015) (acquittal requires verdict resolving all elements of charged offense).  The trial judge correctly ruled that the defendant was not acquitted of any charge.  See Add.64; R.397.

The requirement of an open and public verdict announced and affirmed in court is not a mere "formalism" (D.Br.23).  "Public affirmation in open court provides safeguards against mistakes." A Juvenile, 392 Mass. at 57.  See also Commonwealth v. Zekirias, 443 Mass. 27, 33 (2004) (verdict must be "affirmed in open court, as the unanimous act of the jury, and in presence of the whole panel," so that each juror may express dissent if their decision has been mistaken, misrepresented, or coerced by other jurors [quotation omitted]).  It also protects each juror's right to re-evaluate their position, and to change their mind on any issue or their vote on any charge, during deliberations.  See A Juvenile, 392 Mass. at 56 ("A jury should not be precluded from reconsidering a previous vote on any issue, and the weight of final adjudication should not be given to

41

any jury action that is not returned in a final

verdict" [quotation omitted]).[9]  As the judge aptly put

it, the rendering of a verdict "communicates the

finality of the deliberations, and its pronouncement

in open court ensures its unanimity" (Add.65; R.398).

None of the cases relied on by the defendant

holds otherwise.  Those cases addressed criminal

proceedings terminated by judicial action, not a

jury's determination on the evidence and the law.[10]

---

[9]  See also, e.g., Daniels, 441 Mass. at 1017
(on first full day of deliberations, jury told judge
it had reached unanimous verdict on one charge but not
others; judge ordered jury to resume deliberations;
next day, jury reported it had not reached unanimous
decision on any charge); Floyd P., 415 Mass. at 829
(jury note requesting instruction on how to proceed
where jury had unanimously voted guilty on charges of
armed robbery and aggravated rape, but where two
jurors stated they would change their votes "if the
conviction on rape has to result in first degree
murder"); A Juvenile, 392 Mass. at 53 (jury initially
reported it could reach verdict on murder charge, but
next day it sent judge note indicating it was
deadlocked on that charge).

[10]  See D.Br.22-24; Hudson v. Louisiana, 450 U.S.
40, 40-41 & n.1 (1981) (motion for new trial on ground
that evidence was legally insufficient, which was only
procedural means available under state criminal code
for raising sufficiency challenge); United States v.
Martin Linen Supply Co., 430 U.S. 564, 570-572 (1977)
(motion for judgment of acquittal under Fed. R. Crim.
P. 29[c]); Taylor, 486 Mass. at 481-482 (judge's
directing of verdict functionally equivalent to
declaration of mistrial); Commonwealth v. Babb, 389
Mass. 275, 281-282 (1983) (dismissal of complaints for
failure to comply with "no-fix" law).  The defendant

The defendant's argument proceeds from a selective quotation of those cases, removing the references to judicial action.  Compare D.Br.22 with Taylor, 486 Mass. at 482 and Babb, 389 Mass. at 281, both quoting from United States v. Martin Linen Supply Co., 430 U.S. 564, 571 (1977) ("What constitutes an 'acquittal' is not to be controlled by the form of the *judge's action*. . . . Rather, we must determine whether the *ruling of the judge*, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.") (emphases added).  The omission is significant. With judicial action, double jeopardy principles distinguish between a ruling on the merits and a ruling on procedural grounds; the substance of the ruling, regardless of its form (or how it is styled), makes a difference.  See Taylor, 486 Mass. at 481-482; Babb, 389 Mass. at 281.  There is no such distinction with a jury determination, and judicial action does not require the same safeguards that are served by the verdict requirement.  Judicial action and jury

---

also cites Ball v. United States, 163 U.S. 662 (1896), but in that case there was a jury verdict "duly returned and received."  Ball, 163 U.S. at 671.

determinations occur in different contexts.  The rule for the former does not logically or necessarily extend to the latter.

Even granting the defendant her flawed premise, there were no acquittals here for the same reasons as in Blueford and A Juvenile.  In Blueford, the foreperson disclosed to the judge that the jury had voted unanimously against guilt on two of the offenses, was deadlocked on a third, and had not voted on a fourth.  See Blueford, 566 U.S. at 603-604.  The jury continued to deliberate, later reported to the judge that it had not reached a verdict, and the judge declared a mistrial.  See id. at 604.

The defendant there similarly argued "acquittal is a matter of substance, not form," and that he had been "actually acquitted" of the two offenses based on the foreperson's report of the jury's unanimous votes.  Id. at 605-606.  The United States Supreme Court expressed no approval of his premise of substance-not-form and instead rejected the argument on its own terms.  See id. at 606, 608 (reported votes were not acquittals, "quite apart from any requirement that a formal verdict be returned or judgment entered").  "The foreperson's report was not a final resolution of

44

anything," the Court held, because the jurors
continued to deliberate after that report and were
therefore free to revisit their prior votes and to
change their minds.  Id. at 606-608.  The Court
further noted that it would be "unjustified" to assume
the reported votes did not later change given the
possibility that even a single juror could have
rethought their position on those offenses.  Id. at
608.

Likewise, in A Juvenile, this Court held that the
signed verdict slips showing "not guilty" entries,
which were found in the deliberation room after the
declaration of a mistrial due to deadlock, did not
constitute acquittals.  See A Juvenile, 392 Mass. at
56-57.  It was "not enough to show that the jury may
have agreed on some issues at some time," otherwise
"uncertainties would be invited."  Id. at 57.  As the
defendant points out, "[t]here was no indication as to
when the entries were made or in what circumstances,
much less that they reflected a final, unanimous
conclusion of all jurors" (D.Br.25).

The same is true of the purported juror
statements here.  A closer reading of them reveals
that they do not identify at what point during the

45

five days of deliberations the jury allegedly reached
unanimous agreements on two of the charges.  See
R.283-287, 292-293, 323-326, 330-331.  As such, they
do not foreclose the possibility that the supposed
unanimity perceived by some jurors was based on a
preliminary discussion or straw poll conducted early
on in, or at the start of, the deliberations -- the
very scenario cited by the Supreme Court as a
cautionary example.  See Blueford, 566 U.S. at 607-608
("A single juror's change of mind is all it takes to
require the jury to reconsider").  See also Roth, 437
Mass. at 793 (even "most recent 'vote' immediately
prior to reporting deadlock may well be tentative, a
failed experiment in compromise, and not a true
expression of each juror's assessment of the case").

The trial judge properly rejected the defendant's
attempt to bolster these statements with a post-trial
inquiry of the jurors, as it is well settled that
inquiring into the jury's deliberations, including a
juror's individual or the jury's collective decision-
making or thought processes, is impermissible.  See
Add.73-75; R.406-408; Commonwealth v. McCalop, 485
Mass. 790, 799-800 (2020); Commonwealth v. Blanchard,
476 Mass. 1026, 1027-1028 (2017); Commonwealth v.

_Moore_, 474 Mass. 541, 553 (2016); _Commonwealth_ v. _McCowen_, 458 Mass. 461, 494 n.35 (2010); _A Juvenile_, 392 Mass. at 57; _Commonwealth_ v. _Fidler_, 377 Mass. 192, 198-201 (1979), overruled on other grounds, _Moore_, 474 Mass. at 547-548.[11]

The defendant argues that an alleged unanimous but unannounced agreement among the jurors should be considered the type of "overt factor" that is an appropriate subject of inquiry.  See D.Br.27-29, relying on _Fidler_, 377 Mass. at 198.  But, in _Fidler_ itself, this Court explained that a jury's decision-making process, any individual juror's thought processes or mental impressions, the reasons for the jurors' decisions, or anything else that intrudes on the jury's deliberations do not constitute "overt factors."  See _Fidler_, 377 Mass. at 198-201.  See also _McCowen_, 458 Mass. at 494 n.35 (reaffirming that "overt factors" appropriate for inquiry do not include content of jury's deliberations); _A Juvenile_, 392

---

[11]  See also Mass. G. Evid. § 606(b) (Add.##) (during inquiry into validity of verdict, "a juror may not testify about any statement made or incident that occurred during the jury's deliberations, the effect of anything on that juror's or another juror's vote, or any juror's mental processes concerning a verdict," and judge may not "receive a juror's affidavit or evidence of a juror's statement on these matters").

Mass. at 57, citing Fidler, 377 Mass. at 193-198
(no error in denying post-trial request to subpoena
foreperson because "[t]hat process could only be aimed
at an impeachment, months after the fact, of the
jury's report to the judge in open court, and we
conclude that such an impeachment, in the
circumstances shown here, would be impermissible").

The defendant further argues that inquiry should
be permitted here because double jeopardy is a
fundamental constitutional right.  See D.Br.29-32.
The Appeals Court rejected a similar argument in
Commonwealth v. DiBenedetto, 94 Mass. App. Ct. 682
(2019), where it noted if that logic were to control
and inquiry could be made whenever "bedrock
constitutional rights" are implicated, "the exceptions
[would] swallow the rule."  DiBenedetto, 94 Mass. App.
Ct. at 687 (declining to permit inquiry into whether
verdict announced in court was unanimous).  See also
A Juvenile, 392 Mass. at 57 (affirming denial of
request for post-trial inquiry based on double
jeopardy claim).

Attempting to establish any alleged unanimity
reached by the jurors here in the course of their
deliberations would necessarily entail proscribed

48

inquiry into deliberations.  Although the judge
accepted the purported juror statements (which contain
two, three, or even four levels of hearsay) as true
and accurate for purposes of deciding the motion, she
explicitly disagreed with the defendant's
characterization of those statements as being "strong
and uncontradicted" (Add.63; R.396).  For one thing,
the statements "directly contradict[ed]" the jurors'
notes during their deliberations, including their
final note expressing their stark divide as to "the
elements of the *charges*" (Add.63; R.396).

The defendant says the jurors' reference to
"charges" can be readily understood to mean the OUI
manslaughter charge and its lesser-included offenses.
See D.Br.33, 45.  That is not the more natural and
straightforward reading, nor is it consistent with the
defendant's position at trial.  See Add.70; R.403
("For the defense to now claim that the notes were
susceptible to different interpretations such that the
Court should have inquired further rings hollow,
particularly where Attorney Yannetti had twice argued
that the jury had engaged in due and thorough
deliberations and could not agree.").  But more
importantly, it does not matter how the defendant now,

49

in hindsight, interprets it; it matters what the jurors meant at the time, and why they said it. That cannot be determined without inquiring into their thinking and deliberations. See Add.74-75; R.407-408.

As another example, according to Juror C, the jury was unanimous only as to second-degree murder and "the remaining charges were what they were hung on" (R.284-285).[12] Apparently even the five purported jurors, to say nothing of the seven other jurors, were not of one mind. These and other discrepancies would need to be reconciled to establish with any confidence whether in fact, or to what extent, any unanimity may have been reached, and that would require an impermissible inquiry into the jurors' deliberative process.

Additional considerations militate against the requested inquiry. Jurors questioned at this point,

---

[12] There are additional contradictions. Juror B said that following Tuey-Rodriguez, the deliberations "turned into a bully match" (R.283, 330). Juror C, however, said the jurors "all got along and never heated. They agreed to disagree and respected each other" (R.285). Juror B also said the jury's vote on the OUI manslaughter charge was "split in half" (R.283, 330); Juror C said the vote "started polling at 6/6," but "ended deadlock[ed] @ 4no8yes" (R.284); and the purported juror who left a voicemail for the prosecutor said the final vote was "9-3 guilty" (R.325).

more than three months after they were discharged, may
feel pressured to provide responses that they believe
will minimize their risk of being harmed or harassed.
As described in the judge's order impounding the list
of the jurors' names, and in Juror Doe's affidavit,
people associated with this case have been charged
criminally with witness intimidation.  Individuals
have also expressed outrage at the jurors and sought
to identify them and release their personal
information for the purposes of harassing and shaming
them.  Juror Doe said they fear for their personal
safety and that of their family, and they worry that
they will be subject to harassment or even physical
harm because of what they did or did not do on the
jury and the outcome of the jury's deliberations.
Several of the purported jurors also wish to remain
anonymous (R.293, 324-325).[13]

---

[13]  The defendant claims that, "in the context of
this highly publicized case, it strains credulity to
suggest" that if the purported juror statements did
not "represent the unanimous view of all 12, the
remaining jurors would allow the inaccuracy to go
uncorrected" (D.Br.24).  Clearly, there is another
reasonable explanation for why other jurors have not
drawn further attention to themselves.  See also R.331
(Juror B stating they believe "other jurors have been
reluctant to come forward because there is so much
public and media attention focused on this case").

The concerns are forward-looking as well:

> The proper evidence of the decision of the jury
> is the verdict returned by them upon oath and
> affirmed in open court; it is essential to the
> freedom and independence of their deliberations
> that their discussions in the jury room should be
> kept secret and inviolable; and to admit the
> testimony of jurors to what took place there
> would create distrust, embarrassment and
> uncertainty.

Fidler, 377 Mass. at 196, quoting Woodward v. Leavitt,

107 Mass. 453, 460 (1871).  If jurors' deliberations

are allowed to become the subject of post-trial

inquiry because of purported statements like those

here, future jurors may be hesitant to express their

views fully and honestly during deliberations.  It

also may be more difficult to find jurors willing to

serve, both in the retrial here and in other cases,

when jurors know their service may not end when the

trial ends but could instead subject them to further

inconvenience, embarrassment, or harassment well into

the future.

## CONCLUSION

For these reasons, the Commonwealth respectfully

requests that this case be remanded to the county

court for entry of a judgment denying the petition.

Respectfully submitted for
the Commonwealth,

Michael W. Morrissey
District Attorney for the
Norfolk District

*/s/ Caleb J. Schillinger*

Caleb J. Schillinger
Adam C. Lally
Laura A. McLaughlin
Assistant District Attorneys
BBO#s 676592, 664079, 684295
45 Shawmut Road
Canton, MA 02021
(781) 830-4800

October 16, 2024

**ADDENDUM**

## Table of Contents

Memorandum of Decision and Order
  on Defendant's Motion to Dismiss,
  entered August 23, 2024 (Cannone, J.) ................................55

G.L. c. 234, § 34.........................................................................76

G.L. c. 234A, § 68C....................................................................76

Mass. R. Crim. P. 27(a) .............................................................76

Mass. G. Evid. § 606(b) ............................................................76

# COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, ss.**
                                        **SUPERIOR COURT**
                                        **CRIMINAL ACTION**
                                        **22-00117**

## COMMONWEALTH

### vs.

### KAREN READ

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS

On June 9, 2022, a Norfolk County grand jury indicted defendant Karen Read on charges of murder in the second degree (Indictment 1), manslaughter while operating under the influence of alcohol (Indictment 2), and leaving the scene of personal injury and death (Indictment 3) following the death of her boyfriend, John O'Keefe, on January 29, 2022. Trial on the matter began in April 2024. There were eight weeks of evidence and nearly five days of deliberations. After the jurors expressed to the Court that they were deadlocked for a third time, the Court declared a mistrial.

The defendant now moves to dismiss the charges for murder in the second degree and leaving the scene of personal injury and death arguing that retrial would violate the double jeopardy protections of the federal and state constitutions because the jury, in fact, reached a unanimous decision to acquit the defendant on those charges. Alternatively, the defendant argues that dismissal is required because there was no manifest necessity to support the declaration of the mistrial with respect to those charges. After careful consideration, this Court concludes that because the defendant was not acquitted of any charges and defense counsel consented to the Court's declaration of a mistrial, double jeopardy is not implicated by retrial of the defendant. The motion is therefore **DENIED**.

## **BACKGROUND**

On June 25, 2024, the jury began its deliberations in the defendant's trial. In addition to the three indictments, the Court had instructed the jury to consider two lesser included offenses to manslaughter while operating under the influence of alcohol – involuntary manslaughter and motor vehicle homicide (OUI liquor and negligence).

On Friday, June 28, 2024, at approximately 12:10 p.m., the jury foreperson sent a note to the Court. It stated: "I am writing to inform you on behalf of the jury that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict." The Court requested argument from the Commonwealth and the defendant as to whether there had been due and thorough deliberation from the jury. Assistant District Attorney Lally, on behalf of the Commonwealth, argued that the jury had not had sufficient time to deliberate and that therefore, it was far too early in the deliberative process to give the jury the *Tuey-Rodriguez* instruction.[1] He also pointed out that although the note indicated that the jury had not yet come to a conclusion, it did not indicate that doing so was not possible. Attorney Yannetti, on behalf of the defendant, "disagree[d] with Mr. Lally's characterization of the note." He argued:

> "The word exhaustive is the word that I think is operative here. [The jury is] communicating to the court that they've exhausted all manner of compromise, all manner of persuasion and they're at an impasse. You know, this is a case where they jury has the legal instructions. They've only really asked one question, which was to try and get a report they were not allowed to get, and I think the message has been received that the evidence is closed and they won't get anything more. They've been essentially working nonstop

---

[1] The use of the *Tuey-Rodriguez* instruction is a matter of discretion of the trial judge. *Commonwealth* v. *Parreira*, 72 Mass. App. Ct. 308, 316 (2008). It is the "orthodox approach to dealing with a deadlocked jury" see *Commonwealth* v. *Firmin*, 89 Mass. App. Ct. 62, 64 (2016) (citation omitted), and "designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view." *Commonwealth* v. *Semedo*, 456 Mass. 1, 20 (2010).

> over the last three, four days. We're approaching a weekend. They
> didn't come back with this at three o'clock or four o'clock. They're
> at twelve o'clock and they have nowhere to turn. So our position is
> the jury should be read the *Tuey-Rodriguez* model instructions and
> go from there."

The Court ruled that given the length of the trial, the number of exhibits and witnesses, the

complexity of the issues, and that the jury had only been deliberating for three days,

deliberations had not been sufficiently due and thorough to warrant a *Tuey-Rodriguez*

instruction. It instructed the jury to continue deliberating.

On Monday, July 1, 2024, at approximately 10:45 a.m., the jury sent another note to this

Court. This note stated:

> "Despite our commitment to the duty entrusted in us, we find
> ourselves deeply divided by fundamental differences in our opinions
> and state of mind. The divergence in our views are not rooted in a
> lack of understanding or effort but deeply held convictions that each
> of us carry, ultimately leading to a point where consensus is
> unattainable. We recognize the weight of this admission, and the
> implications it holds."

The Court again requested argument from counsel as to whether there had been due and

thorough deliberations. The Commonwealth argued that the jury had been deliberating twenty-

two to twenty-three hours but given the length of trial, number of exhibits and witnesses, and

complexity of issues, they had not done a thorough deliberation up to this point. Attorney

Yannetti, again, had a vastly different view. He argued:

> "Our view is that it is time for a *Tuey-Rodriguez* [instruction]. They
> have come back twice indicating essentially that they're hopelessly
> deadlocked but the content of this latest message is that they have
> been over all the evidence. The previous message said they did an
> exhaustive review. This time they said that . . . they have
> fundamental disagreements about what the evidence means. It's a
> matter of opinion. It's not a matter of lack of understanding. This
> court when you sent the jury out encouraged them not to take a straw
> vote, encouraged them to go over all the evidence in a very

3

57

> methodical manner. I think all indications are that they have done that. This is what *Tuey-Rodriguez* is for."

The Court agreed that the jury had engaged in due and thorough deliberations, noting that this jury had been "extraordinary" and it had never seen a note like this from a jury. It thereafter provided the jury of the full *Tuey-Rodriguez* instruction and asked them to return to the deliberations with those instructions in mind.[2]

That same day, at approximately 2:30 p.m., the jury sent another note to the Court. The Court stated to counsel that the jury was at an impasse. After the jurors filed into the courtroom, the Court read the note:

> "Despite our rigorous efforts we continue to find ourselves at an impasse. Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyond a reasonable doubt. Conversely, others find the evidence fails to meet this standard and does not sufficiently establish the necessary elements of the charges. The deep division is not due to lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions. To continue to deliberate would

---

[2] The *Tuey-Rodriguez* instruction states: "Our Constitution and laws provide that in a criminal case, the principal method for deciding questions of fact is the verdict of a jury. In most cases and perhaps strictly speaking in all cases absolute certainly cannot be obtained nor is it expected. The verdict to which each juror agrees must of course be his or her own verdict, the result of his or her own convictions, and not merely an acquiescence in the conclusions of other jurors. Still, in order to bring twelve minds to a unanimous result, you must examine the issues you have to decide with candor and with the proper regard and respect for each other's opinions. You should consider that it is desirable that this case be decided. You have been selected in the same manner and from the same source as any future jury would be selected. There is no reason to suppose that this case will ever be submitted to twelve persons who are more intelligent, more impartial, or more competent to decide it than you are or that more or clearer evidence will be produced at another trial. With all this in mind it is your duty to decide this case if you can do so conscientiously. In order to make a decision more attainable, the law always imposes the burden of proof on the Commonwealth to establish every essential element of each indictment beyond a reasonable doubt. If you are left with a reasonable doubt as to any essential element of any indictment, then the defendant is entitled to the benefit of that doubt and must be found 'not guilty' on that indictment. In conferring together, you are to give proper respect to each other's opinions, and listen with an open mind to each other's arguments. Where there is disagreement, those jurors who would find the defendant 'not guilty' should consider whether the doubt in their minds is a reasonable one if it makes no impression on the minds of the other jurors who are equally intelligent, who have heard the same evidence with the same attention, who have an equal desire to arrive at the truth and who have taken the same oath as jurors. At the same time, those jurors who would find the defendant 'guilty' ought seriously to ask themselves whether they may not reasonably doubt the correctness of their judgment if it is not shared by other members of the jury. They should ask themselves whether they should distrust the weight or sufficiency of the evidence if it has failed to convince the minds of their fellow jurors beyond a reasonable doubt."

4

be futile and only serve to force us to compromise these deeply held beliefs."

After reading this note, the Court declared a mistrial and discharged the jury back to the deliberation room to wait for the judge. Counsel remained in the courtroom to discuss an agreeable date to return for a status conference.

On July 8, 2024, the defendant filed the instant motion to dismiss supported by affidavits from Attorney Yannetti and co-counsel, Attorney Jackson. Attorney Jackson's affidavit stated that on July 2, 2024, a juror in the case ("Juror A") contacted him. Attorney Jackson was able to identify the person as a deliberating juror based on his/her description of who he/she is, where he/she was seated, and certain identifying information (name and occupation) disclosed during the voir dire process. According to Attorney Jackson's affidavit, Juror A told him that he/she wished to inform him of the true results of the deliberations because he/she believed those results significantly impact the defendant's rights. Juror A said the jury unanimously agreed that the defendant was not guilty of Counts 1 and 3 and specifically that the murder charge was "off the table." First Jackson Affidavit at par. 5.

In his affidavit, Attorney Jackson also stated: "Neither Ms. Read nor her counsel consented to the entry of the mistrial. Defense counsel was denied the opportunity to request that the Court inquire on which count or counts the jury may have been deadlocked (including lesser included offenses), and on which count or counts the jury may have arrived at a verdict." *Id.* at pars. 9 and 10.

Attorney Yannetti's affidavit averred that on July 3, 2024, he received communications from two "informants" who had received information from two deliberating jurors in the case. The first informant ("Informant B") sent him a screenshot he/she had received from someone else ("Intermediary B") of text messages that Intermediary B had purportedly received from a

5

juror ("Juror B"). Attorney Yannetti averred that he was able to positively identify which juror was Juror B based on a first name given to him from Informant B. In the screenshot, Juror B texted Intermediary B, "It was not guilty on second degree. And split in half for the second charge. When the judge sent us back with that Hernandez thing to look at the other side it turned into a bully match. I thought the prosecution didn't prove the case. No one thought she hit him on purpose or even thought she hit him on purpose. . . ." Yannetti Affidavit at par. 4.

Attorney Yannetti stated that another informant ("Informant C") contacted him on July 3, 2024. Informant C told him he or she personally knows a juror ("Juror C") and that Informant C and Juror C have a mutual firiend ("Intermediary C") who is a current coworker and friend of Juror C. Intermediary C told Informant C via text message that Juror C was a deliberating juror in the case. Intermediary C had a discussion over text message with Juror C about the experience of being a juror. Intermediary C said that Juror C said there was "no consideration for murder 2. Manslaughter started polling at 6/6 then ended deadlocked [at] 4no8yes..." Yannetti Affidavit at par. 10. Informant C texted back, "interesting. If there was no consideration for murder two, shouldn't she have been acquitted on that count[] and hung on the remaining chargers [sic] goes back to the jury verdict slip that was confusing."[3] Id. Intermediary C texted, "she should've been acquitted I agree. Yes, the remaining charges were what they were hung on. And that instruction paper was very confusing." Id.

Attorney Yannetti stated that based on the description of Juror C he received from Informant C and the description of what Juror C told Intermediary C, he could positively identify that Juror C was a deliberating juror.

---

[3] As noted below, defense counsel argued to the Court that the verdict slip for Indictment 2, which allowed the foreperson to check "guilty" for the lesser included offenses, would be confusing for the jury if they decided the defendant was not guilty of all the lesser included offenses.

6

Attorney Yannetti later filed a supplemental affidavit in support of the defendant's motion to dismiss wherein he stated that he received an unsolicited phone call from an individual identifying himself/herself as Juror B. Juror B told Attorney Yannetti that he/she was familiar with the affidavit he had previously filed and confirmed the substance of the conversation between Informant B and Intermediary B. Juror B clarified that he/she meant to write, "No one thought she hit him on purpose or even knew that she had hit him." Yannetti Supplemental Affidavit at par. 4.

On July 10, 2024, Attorney Jackson submitted a supplemental affidavit stating that on July 8, 2024, another juror ("Juror D") contacted him. He identified this person as a juror by the description of who he/she is, where he/she was seated, and certain identifying information (name and occupation) disclosed during the voir dire process. Juror D told Attorney Jackson that "he/she was 'uncomfortable' with how the trial ended…. Juror D said that it was very troubling that the entire case ended without the jury being asked about each count, especially Count 1 and Count 3." Jackson Supplemental Affidavit at pars. 3-4. According to Jackson's Supplemental Affidavit, Juror D told him that the jury agreed that the defendant was not guilty on Counts 1 and 3, that they disagreed solely on Count 2's lesser offenses, but that they believed that they were compelled to come to a resolution on all counts before they could or should report verdicts on any counts. Juror D believed all jurors would corroborate his/her account. He/she also stated that if necessary, he/she would testify before the court as long as his/her identity remained protected.

On July 18, 2024, Attorney Jackson submitted a second supplemental affidavit stating that on July 17, 2024, he was contacted by another juror ("Juror E") who he identified by the description of who he/she is, where he/she was seated, and certain identifying information (name

7

and occupation) disclosed during the voir dire process. Juror E also stated that the jury was unanimous on Counts 1 and 3, that the defendant was not guilty of those charges, and that they were deadlocked on one of the "lower charges" on Count 2. Jackson Second Supplemental Affidavit at par. 5.

On August 1, 2024, the Commonwealth filed a Post-Trial Notice of Disclosure stating that ADA Lally had received two unsolicited voicemails from an individual identifying themselves as a deliberating juror stating that the jury had been unanimous on Counts 1 and 3. The Commonwealth also received emails from three individuals identifying themselves as jurors stating that they wished to speak anonymously. In its response to the emails, the Commonwealth stated that it was ethically prohibited from inquiring as to the substance of the jury deliberations, and that it could not promise confidentiality as it may be required to disclose the substance of any conversation to the defendant or the Court. All three jurors declined to communicate further with the Commonwealth.

## DISCUSSION

The Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment to the United States Constitution, and Massachusetts common and statutory law protect an individual defendant from being twice placed in jeopardy for the same crime. *Perrier* v. *Commonwealth*, 489 Mass. 28, 31 (2022). See *Commonwealth* v. *Taylor*, 486 Mass. 469, 483 (2020), quoting *Oregon* v. *Kennedy*, 456 U.S. 667, 671–672 (1982) ("[T]he [d]ouble [j]eopardy [c]lause affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal'" [citation omitted]). A defendant is entitled to protection from double jeopardy "if there had been some event, such as an acquittal, which terminates the original jeopardy," see *Commonwealth* v. *Hebb*, 477 Mass. 409, 413 (2017), or if a mistrial is

8

62

entered "without the defendant's request or consent . . . unless there was a manifest necessity for the mistrial" (quotation and citations omitted). *Taylor*, 486 Mass. at 483. See *Hebb*, 477 Mass. at 413, quoting *Yeager* v. *United States*, 557 U.S. 110, 118 (2009) ("The 'interest in giving the prosecution one complete opportunity to convict those who have violated its laws' justifies treating the jury's inability to reach a verdict as a nonevent that does not bar retrial.").

In her motion to dismiss, the defendant argues that retrial on Indictments 1 and 3 would violate the double jeopardy protections of the federal and state constitutions because, despite absence of a jury verdict, the jury, in fact, reached a unanimous decision to acquit her on those charges, or alternatively, because there was no manifest necessity to support the declaration of the mistrial with respect to the charges. After careful consideration, the Court concludes that the defendant's arguments are without merit.

## I.    Acquittal of the Defendant

The defendant first contends that she was acquitted on Indictments 1 and 3, and that therefore retrial is barred based on her attorneys' affidavits purporting to reflect statements by jurors that the jury reached a unanimous conclusion that she was not guilty on those charges. Although all the statements in the affidavits are from purported jurors who wish to remain anonymous, for the purposes of this motion, the Court accepts the statements as true and accurate.[4] Even doing so, any agreement among the jurors as to Counts 1 and 3 cannot be considered acquittals for purposes of double jeopardy.

To trigger double jeopardy protection, "[a]n acquittal requires a verdict on the facts and merits" (citations and quotations omitted). *Commonwealth* v. *Brown*, 470 Mass. 595, 603

---

[4] While the Court accepts the averments as true and accurate, it disagrees with defense counsel's characterization of the statements as "strong and uncontradicted." The substance of the conversations directly contradicts the notes the jury wrote to the Court during deliberations, the last of which expresses disagreement over whether the Commonwealth met its burden as to the "elements of the *charges*." (Emphasis added).

9

(2015). See G. L. c. 263, § 7("A person shall not be held to answer on a second indictment or complaint for a crime of which he has been acquitted upon the facts and merits..."). And, "the only verdict which can be received and regarded, as a complete and valid verdict of a jury ..., is an open and public verdict... affirmed in open court, as the unanimous act of the jury, and in presence of the whole panel, so that each juror has an opportunity to express his dissent to the court, in case his decision has been mistaken or misrepresented by the foreman or his fellows, or in case he has been forced into acquiescence by improper means" (citations omitted). *Commonwealth* v. *Zekirias*, 443 Mass. 27, 33 (2004). See Mass. R. Crim. P. 27(a) ("The verdict shall be unanimous. It shall be a general verdict returned by the jury to the judge in open court. The jury shall file a verdict slip with the clerk upon the return of the verdict."). As such, "the weight of final adjudication" cannot "be given to any jury action that is not returned in a final verdict" and a distinction must be made "between agreement on a verdict, and return, receipt, and recording of a verdict" (citations omitted). *A Juvenile* v. *Commonwealth*, 392 Mass. 52, 56–57 (1984).

Because there was no open and public verdict affirmed in open court rendered in this case, the defendant was not acquitted of any of the charges. The only unanimous act of the jury here was their representation to the Court that they were "at an impasse" and unable to agree on whether the Commonwealth had established beyond a reasonable doubt the "elements of the *charges*." The purported later attestations by some jurors, after they had been dismissed, that the jury had in fact agreed on some of the charges during deliberations do not have the "force of a final verdict." *Commonwealth* v. *Floyd P.*, 415 Mass. 826, 831 (1993). See *A Juvenile*, 392 Mass. at 57 (after mistrial was declared due to deadlock, judge did not err in refusing to accept signed verdict slips recovered from deliberation room showing "not guilty" because "[i]t is not

10

enough to show that the jury may have agreed on some issues at some time; if that limited showing were to control, uncertainties would be invited"); see also *Blueford* v. *Arkansas*, 566 U.S. 599,606 (2012) (double jeopardy did not bar retrial after hung jury where foreperson reported unanimous vote on offense before deliberations had concluded but deadlock at conclusion).

The defendant argues that it is elevating form over substance to not accept that the statements in the affidavits reflect an acquittal of the defendants on Counts 1 and 3. However, the rendering of a verdict in open court is not a "ministerial act" as the defendant contends. Rather, it communicates the finality of the deliberations, and its pronouncement in open court ensures its unanimity. See *A Juvenile*, 392 Mass. at 57 ("Public affirmation in open court provides safeguards against mistakes."). Indeed, the authority upon which the defendant relies places particular importance upon the jury's pronouncement of its findings in open court. See *Blueford*, 566 U.S. at 613 (Sotomayor, J., dissenting) (arguing that "the forewoman's *announcement in open court* that the jury was 'unanimous against' conviction on capital and first-degree murder... was an acquittal for double jeopardy purposes").[5] Thus, a "verdict in substance" is a "final collective decision... reached after full deliberation, consideration, and compromise among the individual jurors... And when that decision [is] *announced in open court*, it [becomes] entitled to full double jeopardy protection" (emphasis added). *Id.* at 616, citing *Commonwealth* v. *Roth,* 437 Mass. 777, 796 (2002) ("declining to give effect to 'the verdict received from the lips of the foreman in open court' would 'elevate form over

---

[5] In written and oral argument, the defendant also relies on language from *Taylor*, 486 Mass. at 482. *Taylor* discussed whether a judicial determination to terminate proceeding based on a procedural ground implicated double jeopardy. The Supreme Judicial Court explained, "What constitutes an 'acquittal' is not to be controlled by the form of the judge's action," and that the determination does not depend on "checkmarks on a form." *Id.* This language in *Taylor* does not inform the Court as to the circumstances here.

11

substance'"). Where there was no verdict announced in open court here, retrial of the defendant does not violate the principle of double jeopardy.

## II.    Manifest Necessity of Mistrial

The defendant's motion to dismiss also argues that double jeopardy bars re-prosecution because she did not consent to a mistrial and there was no manifest necessity to declare one. This argument, too, is without merit.

"A defendant's consent to a mistrial removes any double jeopardy bar to retrial" (quotation and citation omitted). *Pellegrine* v. *Commonwealth*, 446 Mass. 1004, 1005 (2006). Consent may be explicit or implicit. Explicit consent may occur by either moving for a mistrial or agreeing to one. *Commonwealth* v. *Edwards*, 491 Mass. 1, 13 (2022). Consent to a mistrial may be implied "where a defendant had the opportunity to object [to a declaration of a mistrial] and failed to do so." *Pellegrine*, 446 Mass. at 1005. See *United States* v. *McIntosh*, 380 F.3d 548, 554 (1st Cir. 2004) ("Where the defendant sits silently by and does not object to the declaration of a mistrial even though he has a fair opportunity to do so, a court may presume his consent" [quotation and citation omitted]). See also *United States* v. *You*, 382 F.3d 958, 964-965 (9th Cir. 2004), cert. denied, 543 U.S. 1076 (2005) ("a court may infer consent only where the circumstances positively indicate a defendant's willingness to acquiesce in the mistrial order" [quotations and citations omitted]); *United States* v. *Goldstein*, 479 F.2d 1061, 1067 (2d Cir. 1973) ("Consent [to a mistrial] need not be express, but may be implied from the totality of the circumstances attendant on a declaration of a mistrial.").

As noted, the Court here declared a mistrial after the jury reported three times that they were deadlocked. After the second time, the Court determined that the jury had engaged in due and thorough deliberations and gave the *Tuey-Rodriguez* instruction before sending the jury to

12

deliberate further. Massachusetts General Laws c. 234A, § 68C, provides that if "a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; *but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent,* unless they ask from the court some further explanation of the law" (emphasis added). See *Commonwealth* v. *Jenkins*, 416 Mass. 736, 737 (1994) ("If, after due and thorough deliberation, the jury twice advise the judge that they are unable to reach a verdict, the judge may not properly send the jury out again without their consent, unless the jury ask for some further explanation of the law."). In their note to the Court, the jury specifically stated, "[t]o continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs," making it clear that they would not consent to continuing their deliberations.

Attorney Yannetti *twice* argued for the Court to give the *Tuey-Rodriguez* instruction—the final step before the Court would declare a mistrial. See *Jenkins*, 416 Mass. at 737; see also *Ray* v. *Commonwealth*, 463 Mass. 1, 4 (2012) (counsels' request for *Tuey-Rodriquez* instruction "permit[ed] the inference that both parties were provided an opportunity to be heard on possible alternatives to a mistrial"). Specifically, on Friday, June 28, 2024, after three days of deliberations, when the jury sent their first note indicating that they had engaged in an "exhaustive review of the evidence" and "ha[d] been unable to reach a unanimous verdict," Attorney Yannetti argued that the jury had engaged in due and thorough deliberations, was at an impasse, and should be given the *Tuey-Rodriguez* instruction. The following Monday, when the jury sent a second note after deliberating for approximately two hours, stating that "consensus was unattainable," Attorney Yannetti again argued that due and thorough deliberations had

13

occurred and described the jury as "hopelessly deadlocked." Defense counsel, in arguing twice that due and thorough deliberations had occurred and pushing for the instruction, presumably was aware of the legal implications if the jury returned deadlocked again. Nevertheless, in a remarkable turnaround, defense counsel now argues that the result they twice advocated for was "sudden" and "unexpected." See Defendant Karen Read's Motion to Dismiss at 8.

Although the Court did not specifically ask defense counsel if they had any objection to the declaration of a mistrial, counsel had multiple opportunities to voice an objection if they in fact had one. While waiting for the jury to enter the courtroom after the Court announced the jury was again at an impasse on the afternoon of July 1, 2024, defense counsel could have asked to be heard on the issue. During the subsequent discussion about scheduling a status hearing right after the Court declared a mistrial, counsel had yet another opportunity to inform the Court of its dissatisfaction. Lastly, counsel could have communicated to the Court any objection or request to poll the jurors while the jury was still at the courthouse waiting in the deliberation room after the declaration of the mistrial. Instead, defense counsel said nothing to the Court about the mistrial and then proceeded to the courthouse steps where Attorney Jackson declared to the media and onlookers that the "[Commonwealth] failed miserably and will continue to fail" with its prosecution of the defendant.[6]

It strains credulity to believe that if defense counsel wanted to voice any objection to the Court, it would not have been heard. Significantly, defense counsel were no shrinking violets. Neither Attorney Jackson nor Attorney Yannetti has ever needed this Court to inquire whether counsel had an objection in order to be heard, and the Court has never denied counsel the opportunity to be heard in open court or at sidebar. The Court reconvened many times at

---

[6] See https://www.youtube.com/watch?v=TrsJPBRVqDg

14

counsel's request. Just days before the declaration of mistrial, defense counsel asked to address the Court while the jury was deliberating to raise an objection about the verdict slip. Attorney Jackson was not shy in informing the Court that he wanted to "make [his] argument" and that the Court's decision about the verdict slip was "not how it should be and it's over our strong objection."[7] Attorney Jackson went so far as to suggest that "it was almost like the Court is directing a verdict of the subordinate charges" by not making changes he wanted. The Court finds it hard to believe that when counsel heard that the jury was at an impasse for a third time and a mistrial was inevitable, at perhaps the most crucial point in the trial, counsel would sit silently if they did not consent to a mistrial.

As such, the Court does not credit Attorney Jackson's averment that he lacked an opportunity to be heard. Defense counsel's silence despite ample opportunity to be heard is deemed consent. See *Pellegrine*, 446 Mass. at 1005 (when trial judge on own initiative declared mistrial, defendant's silence was deemed consent where there was ample time to object despite not being directly asked by judge). Cf. *Commonwealth* v. *Phetsaya*, 40 Mass. App. Ct. 293, 298 (1996) (silence was not consent where judge's conduct was "so intimidating to defense counsel. . . as to foreclose any objection from defense counsel to the declaration of a mistrial").

Even assuming *arguendo* that the defendant here did not consent to the mistrial, the law is clear that a retrial is permissible so long as there was manifest necessity for the mistrial. *Taylor*, 486 Mass. at 483. "The trial judge's belief that the jury is unable to reach a verdict has long been considered the classic basis for a proper mistrial" (quotation and citation omitted). *Ray*, 463 Mass. at 3. See *Oregon*, 456 U.S. at 672 (describing "hung jury" as "prototypical example" of manifest necessity). Because the Court here had no doubt based on the jury's notes

---

[7] See https://www.youtube.com/watch?v=BjPsNvnLXV0

15

to the Court that it was unable to reach a unanimous verdict and the jury represented to the Court

that continued deliberations would be futile, there was manifest necessity for the mistrial based

on the deadlock.

As stated above, the foreperson, on behalf of the jury in this case, sent the Court three

notes, none of which indicated agreement on any of the charges. In the first note, the jury wrote

that they had been "unable to reach a unanimous verdict." In the second note, they stated that

they were "deeply divided by fundamental differences in our opinions and state of mind" and

that "consensus is unattainable." In their third and final note, after they had been given the *Tuey-*

*Rodriguez* instruction, the jury stated that they continued to be "at an impasse." They described

themselves as "starkly divided" on their "perspectives on the evidence" explaining:

> "Some members of the jury firmly believe that the evidence
> surpasses the burden of proof establishing the elements of the
> charges beyond a reasonable doubt. Conversely, others find the
> evidence fails to meet this standard and does not sufficiently
> establish the necessary elements of the charges. The deep division
> is not due to lack of effort or diligence, but rather a sincere
> adherence to our individual principles and moral convictions. To
> continue to deliberate would be futile and only serve to force us to
> compromise these deeply held beliefs."

The only reasonable interpretation of these notes, and specifically the final note, was that the jury

could not agree on any of the three charges and further deliberations would serve no purpose.[8]

For the defense to now claim that the notes were susceptible to different interpretations

such that the Court should have inquired further rings hollow, particularly where Attorney

Yannetti had twice argued that the jury had engaged in due and thorough deliberations and could

not agree. See *United States* v. *Keene*, 287 F.3d 229, 234 (1st Cir. 2002) (no abuse of discretion

---

[8] Given the care that went into writing the notes and how articulately they expressed the jurors' disagreement, it strikes this Court as odd that there was no inkling of an indication of agreement in the content of the notes or that if the jurors were uncertain whether they could return a partial verdict, they would not have asked the Court.

in declaring a mistrial given "the increasingly adamant manner in which the jurors announced that they were deadlocked"). Moreover, defense counsel's conduct immediately after the declaration of the mistrial in no way suggests that they thought otherwise.

The defendant contends that the Court failed to carefully consider that as an alternative to a mistrial, it could have "simply ask[ed] the jury to specify the charge(s) on which it was deadlocked." Defendant Karen Read's Motion to Dismiss at 8. However, "[t]he question whether a mistrial is appropriate in the circumstances of a given case is not answered by application of a 'mechanical formula.'" *Ray*, 463 Mass. at 4, quoting *Illinois* v. *Somerville,* 410 U.S. 458, 462 (1973). See *Commonwealth* v. *Bryant*, 447 Mass. 494, 503 (2006) (decision whether to declare a mistrial is within the discretion of the trial judge). Rather, the Court considers several facts such as the statements in a jury's note concerning their inability to reach an agreement, the time spent in deliberations, and the length and complexity of the trial. *Ray*, 463 Mass. at 4-5. See *Renico* v. *Lett*, 559 U.S. 766, 775 (2010) ("we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse").

Where here, the jury had been deliberating five days, had returned to the Court three times stating they could not agree, had been given the *Tuey-Rodrigez* instruction and returned hours later with a note plainly indicating that they could not agree as to the "elements of the *charges*" and that "to continue to deliberate would be futile," asking the jury on which charges they were deadlocked was not necessary to determine that there was manifest necessity for a mistrial. See *Fuentes* v. *Commonwealth*, 448 Mass. 1017, 1018–1019 (2007) (where final note

17

from the foreperson unequivocally stated that the jury were "unable to come to a unanimous decision," judge was not required to inquire whether there was any reasonable probability of unanimous verdicts or if the jury would consent to further deliberations); *Ray*, 463 Mass. at 6 n.5 (judge did not err in declining to poll jury on whether further instructions or deliberation would be likely to resolve the deadlock).

Moreover, the defendant's argument ignores the fact that one of the three charges had lesser included offenses. Therefore, if upon questioning, the jury had indicated to the Court that they were not deadlocked on all the charges, the only option would have been for the Court to send the jury back for further deliberations. See *A Juvenile*, 392 Mass. at 56 (judge should not inquire as to partial verdicts on lesser included offenses). Such action would be improperly coercive under the circumstances. It has been repeatedly recognized that deadlocked juries are particularly susceptible to coercion. *Roth*, 437 Mass. at 791. "Where the jurors have twice reported themselves deadlocked, and have already heard the *Tuey-Rodriquez* charge, a judge's inquiry concerning partial verdicts cannot avoid communicating to the jury the judge's desire to salvage *something* from the trial." *Id.* at 792 (emphasis in original). Where here the jury had before it one indictment which included lesser included offenses, had three times reported themselves deadlocked on separate charges, had already heard the *Tuey-Rodriguez* charge, and had sent a final note indicating that continued deliberations would only "serve to force [them] to compromise [their] deeply held beliefs," sending them to deliberate further would have been improperly coercive.[9]

---

[9] It is the Court's view that under these circumstances, even posing the question to the jury of whether they actually were deadlocked would have implied to the jurors that the Court wanted them to resume deliberations to reach a verdict. Given that Attorney Jackson had already expressed concern that the Court was "directing a verdict of the subordinate charges," the Court was extremely cautious to not give any appearance of partiality. See *United States v. Hotz*, 620 F.2d 5, 7 (1st Cir. 1980) (noting that a court must avoid putting pressure on the jury).

18

The defendant's argument suggests that questioning or polling jurors who report a deadlock is best practice or at least commonly done by trial judges. However, the defendant has not cited any cases saying as much and indeed, such an inquiry is not undertaken in the regular course.[10]  For a judge to make such an inquiry on her own accord could impede upon the strategic decision of counsel to not make such a request. The defendant's argument is based on hindsight. No one other than the jury knew that questioning the jurors as to their deadlock would have yielded a favorable outcome for the defendant. It is likely for that reason, defense counsel consented to this Court's declaration of a mistrial.

### III.    Post-Trial Inquiry

The defendant alternatively requests that the Court allow counsel to conduct a post-trial inquiry of the jurors to "substantiate the existence of an acquittal." Defendant Karen Read's Motion to Dismiss at 9.  Such an inquiry is impermissible.

The defendant's argument relies solely on *Commonwealth* v. *McCalop*, 485 Mass. 790 (2020). In *McCalop*, the Supreme Judicial Court held that the trial court should have allowed the defendant's motion for jurors' names and contact information based on the post-trial statement of a deliberating juror regarding racist statements made during deliberations. *Id.* at 791. The Supreme Judicial Court explained, "[t]he presence of even one juror who is not impartial violated a defendant's right to trial by an impartial jury." *Id.* at 798, quoting *Commonwealth* v. *McCowen*, 458 Mass. 461, 494 (2010). Recognizing that "[r]acial bias in the jury system is 'a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the

---

[10] The defendant relies on *Commonwealth* v. *Foster*, 411 Mass. 762 (1992) and *Commonwealth* v. *LaFontaine*, 32 Mass. App. Ct. 529 (1992) to argue that there would be nothing coercive about asking a jury reporting a deadlock whether they had reached a unanimous verdict on any of the counts. Because neither the jury in *Foster* nor the jury in *LaFontaine* reported being deadlock in its deliberations, and none of the offenses charged had lesser included offenses, there was clearly no risk of coercion in the courts seeking partial verdicts on the separate indictments in those case. The circumstances here are markedly different.

19

administration of justice,'" the *McCalop* court held that the defendant should have been given a "fair opportunity to obtain an affidavit from that juror setting forth with some specificity who among the jurors made statements reflecting racial b i a s ... and the statements that were made." *McCalop*, 485 Mass. at 799, quoting *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017). The defendant's argument here does not implicate racial bias or her right to receive an impartial trial. Thus, the reasoning the Court employed in *McCalop* does not extend to this case. See *Commonwealth v. DiBenedetto*, 94 Mass. App. Ct. 682, 687 (2019) (declining to extend racial bias exception to inquiry of jury unanimity because "infection of the criminal justice system with racial or ethnic bias is a unique type of constitutional deprivation that requires a vigilant response not warranted in the circumstances presented here").

The defendant's request effectively seeks permission from the Court to inquire from deliberating jurors that which is impermissible—information regarding the substance of the jury's deliberations. "The secrecy of jury deliberations has served as a bedrock of our judicial system, and inquiry into the 'jury's deliberative p r o c e s s e s ... would intrude improperly into the jury's function" (quotation and citation omitted). *Commonwealth v. Moore*, 474 Mass. 541, 548 (2016). It is simply not the case, given the content of the jury's final note to the Court, that any inquiry to jurors now could be limited solely to the results of the deliberative process and not implicate the process itself. Any inquiry would necessarily require the Court to understand why the jury's final note communicated a deadlock on the charges when post-trial, certain deliberating jurors are purportedly stating that the jury was, in fact, unanimous on most of the charges. While the defendant contends that the conflict is reflective of the fact that the instructions given to the jury by the Court were confusing, determining whether this is true would necessarily require inquiry into the back and forth among the jurors during deliberations.

20

See *DiBenedetto*, 94 Mass. App. Ct. at 686 ("The judge is precluded from inquiring into the internal decision making process of the jury as a whole or of the individual juror being questioned... Accordingly, evidence that jurors misunderstood the instructions of the presiding judge... cannot be considered" [internal quotations and citations omitted]). Thus, such an inquiry is prohibited.

The defense counsel has not cited one case suggesting the post-trial inquiry they now seek is appropriate or that it could change the outcome of the proceedings.[11] For the reasons already discussed, an acquittal of the defendant now on Indictments 1 and 3 based on conclusions purportedly reached during the jury's deliberations is not possible. Therefore, there is no reason for the Court to allow post-trial inquiry of the jurors. See *A Juvenile*, 392 Mass. at 57 (no error in denial of motion to subpoena the foreman where process would only serve to impeach jury's report to the judge in open court).

## CONCLUSION AND ORDER

This Court recognizes that the bar on retrials following acquittals is "[p]erhaps the most fundamental rule in the history of double jeopardy jurisprudence." *Taylor*, 486 Mass. at 481, quoting *United States* v. *Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977). However, where there was no acquittal on any of the charges in the defendant's first trial, there is no risk of subjecting the defendant to double jeopardy by retrial on all the charges.

Therefore, the Defendant's Motion to Dismiss is **DENIED**.

Date:   August 22, 2024

Beverly J. Cannone
Justice of the Superior Court

---

[11] Cases that defense counsel referred to at the hearing on this motion concerning post-trial inquiry of jurors where juror bias or outside influence was at issue are readily distinguishable from the circumstances here.

21

### G.L. c. 234, § 34

(repealed by St. 2016, c. 36, § 1, eff. May 10, 2016)

If a jury, after due and thorough deliberation, return to court without having agreed on a verdict, the court may state anew the evidence or any part thereof, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law.

### G.L. c. 234A, § 68C

(added by St. 2016, c. 36, § 5, eff. May 10, 2016)

If a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law.

### Mass. R. Crim. P. 27(a)

The verdict shall be unanimous.  It shall be a general verdict returned by the jury to the judge in open court.  The jury shall file a verdict slip with the clerk upon the return of the verdict.

### Mass. G. Evid. § 606(b)

During an inquiry into the validity of a verdict, the court may ask the jurors individually to affirm publicly that the verdict as recorded represents their decision.  However, a juror may not testify about any statement made or incident that occurred during the jury's deliberations, the effect of anything on that juror's or another juror's vote, or any juror's mental processes concerning a verdict.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

76

## <u>Certificate of Compliance</u>

Pursuant to Mass. R. A. P. 16(k), I certify that this brief complies with the rules of this Court that pertain to the filing of briefs.  This brief comprises 47 non-excluded pages and uses Courier New, 12 point, a monospaced font that produces 10 characters per horizontal inch.

*/s/ Caleb J. Schillinger*
Caleb J. Schillinger

## <u>Certificate of Service</u>

Pursuant to Mass. R. A. P. 13(e), I certify under the penalties of perjury that I served copies of this brief and the Commonwealth's supplemental record appendix on Attorney Martin Weinberg, counsel for the defendant, via email on October 16, 2024.

*/s/ Caleb J. Schillinger*
Caleb J. Schillinger