COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

Suffolk, ss.                                              No. SJC-13663


COMMONWEALTH,
Appellee

v.

KAREN READ,
Defendant-Appellant.
_____

On Appeal from Reservation and Report of G.L. c. 211, § 3 Petition
_____


**REPLY BRIEF OF APPELLANT KAREN READ**


MARTIN G. WEINBERG
Attorney for Appellant
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

MICHAEL PABIAN
Attorney for Appellant
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

ALAN J. JACKSON
Attorney for Appellant, *Pro Hac Vice*

Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com

DAVID R. YANNETTI
Attorney for Appellant
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

October 23, 2024

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION………………………………………………………………....6

ARGUMENT……………………………………………….........................7

I.    The Commonwealth Did Not Satisfy Its Burden of Establishing Manifest Necessity……………………………………………………………7

II.    The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution………………..………………………………………..16

III.    The Defense Is Entitled to a Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Ms. Read……...…………………………………………………………19

CONCLUSION…………………………………………………………..24

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Washington*, 434 U.S. 497 (1978) ............................................................7

*Ball v. United States*, 163 U.S. 662 (1896).............................................................16

*Blueford v. Arkansas*, 566 U.S. 599 (2012) .........................................................9, 17

*Capen v. Inhabitants of Stoughton*, 82 Mass. 364 (1860) .....................................22

*Commonwealth v. Dixon*, 395 Mass. 149 (1985)....................................................21

*Commonwealth v. Fidler*, 377 Mass. 192 (1979) ...................................... 19, 21, 24

*Commonwealth v. Floyd P.*, 415 Mass. 826 (1993)................................................11

*Commonwealth v. Foster*, 411 Mass. 762 (1992)...................................................10

*Commonwealth v. Guisti*, 434 Mass. 245 (2001)....................................................21

*Commonwealth v. Horrigan*, 41 Mass. App. Ct. 337 (1996)........................... 12, 13

*Commonwealth v. Jenkins*, 416 Mass. 736 (1994) .................................................14

*Commonwealth v. LaFontaine*, 32 Mass. App. Ct. 529 (1992).............................10

*Commonwealth v. McCalop*, 485 Mass. 790 (2020) ..............................................20

*Commonwealth v. Nicoll*, 452 Mass. 816 (2008)....................................................12

*Commonwealth v. Philyaw*, 55 Mass. App. Ct. 730 (2002)....................................21

*Commonwealth v. Roth*, 437 Mass. 777 (2002)........................................... 9, 11, 16

*Commonwealth v. Spann*, 383 Mass. 142 (1981) ...................................................22

*Commonwealth v. Steward*, 396 Mass. 76 (1985) ......................................... 6, 8, 13

*Commonwealth v. Taylor*, 486 Mass. 469 (2020)..................................................6, 7

*Daniels v. Commonwealth*, 441 Mass. 1017 (2004) .................................................9

*Fuentes v. Commonwealth*, 448 Mass. 1017 (2007)........................................9, 15

*Green v. United States*, 355 U.S. 184 (1957) ...........................................16

*Malpica-Cue v. Fangmeier*, 395 P.3d 1234 (Colo. App. 2017) .............................22

*Martin v. Mississippi*, 732 So. 2d 847 (Miss. 1998)................................20

*Price v. Georgia*, 398 U.S. 323 (1970) ........................................16

*Ray v. Commonwealth*, 463 Mass. 1 (2012) ............................................14

*Remmer v. United States*, 347 U.S. 227 (1954) .....................................20

*Smith v. Massachusetts*, 543 U.S. 462 (2005) ..........................................16

*United States v. Dotson*, 817 F.2d 1127 (5th Cir. 1987) .................................. 17, 22

*United States v. Stauffer*, 922 F.2d 508 (9th Cir. 1990) ..........................................17

*United States v. Tsarnaev*, 96 F.4th 441 (1st Cir. 2024) ........................................20

## **Constitutional Provisions**

Fifth Amendment to U.S. Constitution ..................................................................20

Sixth Amendment to U.S. Constitution ................................................................20

## **Statutes**

G.L. c. 234A, § 68C ..............................................................................14

## **Rules**

Mass. R. Crim. P. 27(b) ................................................................... *passim*

## INTRODUCTION

Ms. Read's motion to dismiss is predicated upon post-trial statements of five jurors (four directly and one indirectly) that the jury reached a final, unanimous decision to acquit her of second-degree murder.  In the usual course, that verdict would have been announced in open court, and re-prosecution for that charge would be constitutionally prohibited.  Here, however, the trial court failed to inquire, pursuant to Mass. R. Crim. P. 27(b), regarding the existence of any partial verdicts, and, for that reason, the jury acquittal was not announced.

The Commonwealth's argument that this Court should defer to the trial judge regarding the necessity of a mistrial seeks to inappropriately bypass the clear prerequisites that have been in place for almost four decades: that before the declaration of a mistrial: "(1) counsel must be given full opportunity to be heard and (2) the trial judge must give careful consideration to alternatives to a mistrial." *Commonwealth v. Steward*, 396 Mass. 76, 79 (1985); *see Commonwealth v. Taylor*, 486 Mass. 469, 484 (2020) (referring to these two considerations as "principles guid[ing] our review").  Here, there is no indication that the court gave ***any*** consideration to alternatives, most notably inquiry regarding partial verdicts. And counsel was not given a ***full opportunity*** to be heard.  The court never asked for counsel's views, or even mentioned the word "mistrial," before *sua sponte* declaring one in open court.   The Commonwealth's attempt to shift blame for

6

these omissions to Ms. Read and her counsel utterly neglects the blackletter law that the Commonwealth, as the party seeking retrial, bears the exclusive burden of establishing manifest necessity.

The defense independently maintains that a jury's final, unanimous agreement that Ms. Read is not guilty constitutes an acquittal for Double Jeopardy purposes, and that the trustworthy and uncontradicted post-trial affidavits entitle her to a judicial inquiry on this issue. There is no precedent for the Commonwealth's contention that the lack of formal announcement alone can overcome the defendant's fundamental right not to be tried a second time for a murder that a jury already determined she did not commit.

## ARGUMENT

### I.    The Commonwealth Did Not Satisfy Its Burden of Establishing Manifest Necessity

As noted in Ms. Read's opening brief, "[t]his Court review[s] determinations regarding double jeopardy de novo." Def. Br. 21 (quoting *Taylor*, 486 Mass. at 477). While the Court has sometimes reviewed "determination[s] regarding manifest necessity for … abuse of discretion," such "[a]ppellate deference will be accorded … only if the record reflects that the trial judge gave reasoned consideration to the various available alternatives." *Taylor*, 486 Mass. at 484-85 (citation omitted); *see Arizona v. Washington*, 434 U.S. 497, 510 n.28 (1978) ("If the record reveals that the trial judge has failed to exercise the 'sound discretion'

7

entrusted to him, the reason for … deference by an appellate court disappears."). Here, it is not "clear from the record that the judge" gave "careful consideration to the available alternatives and to the defendant's interest in having the trial concluded in a single proceeding," and accordingly the abuse of discretion standard does not apply. *Steward*, 396 Mass. at 79 (citation omitted).

The Commonwealth's heavy reliance upon purported discretion, without acknowledging the foregoing principles, represents an attempt to bypass the two guideposts that have governed this Court's manifest necessity jurisprudence for nearly 40 years: "(1) counsel must be given full opportunity to be heard and (2) the trial judge must give careful consideration to alternatives to a mistrial." *Steward*, 396 Mass. at 79. Contrary to the Commonwealth's suggestion, resolution of these issues does not depend upon any "credibility determination[]." Commonwealth Br. 37. Rather, the Court must simply determine whether the record in this case satisfies the applicable standard as construed by its precedents.

Nothing in the Commonwealth Brief justifies the trial court's failure to consider the alternative of inquiring regarding the existence of any partial verdicts, pursuant to Rule 27(b). While the timing of whether to accept a partial verdict is ordinarily discretionary, Rule 27(b) requires the trial court to accept such partial verdicts before declaring a mistrial. *See* Mass. R. Crim. P. 27, reporter's notes ("This rule … provides that the court may declare a mistrial in cases where the jury

is unable to reach a verdict. However, it ***must*** first receive and record the verdicts which the jury can agree upon." (emphasis added)).

None of the cases cited by the Commonwealth is to the contrary. In two of those cases, the jury expressly indicated it was deadlocked on all counts. *See Fuentes v. Commonwealth*, 448 Mass. 1017, 1018 (2007) (note "stated that the jury could not reach a unanimous verdict as to either" of two indictments); *Daniels v. Commonwealth*, 441 Mass. 1017, 1017 (2004) (jury said, "[f]urther deliberation will not yield a unanimous verdict on any indictments," and defense counsel having been provided an opportunity to respond, agreed that the jury was at an impasse on all indictments, and said he had no objection to mistrial). In these circumstances, inquiry regarding partial verdicts is (understandably) not required. But here the jury never specified (or was asked to specify) on which counts it had reached an impasse nor had counsel consented as in *Daniels* to a mistrial. *Blueford v. Arkansas*, 566 U.S. 599 (2012), is also readily distinguishable. There, state law prohibited a partial acquittal for offenses included within a single charge. *See id.* at 610. Here, in contrast, it is clear that "rule 27(b) permits taking verdicts on less than all of the charges set forth in … separate indictments." *Commonwealth v. Roth*, 437 Mass. 777, 788 (2002). *Roth* and *A Juvenile*, like *Blueford*, involved lesser included offenses within a single count, and are thus inapposite as to

whether the court should have considered the possibility of partial verdicts on separate counts under Rule 27(b). *See* Def. Br. 46-47.

As set forth above, because the record reflects no consideration of alternatives to a mistrial, this Court should not defer to the trial court's construction of the jury notes. In any event, the notes were readily susceptible to a reading consistent with the post-trial juror statements. *See* Def. Br. 45-46. The first note, stating that the jury was "unable to reach a unanimous verdict" (R.250), did not preclude the existence of final, unanimous agreement on some but not all counts particularly in the context of the court's prior instruction to "continue deliberating until you have reached a final verdict ***on each charge***." (R.190) (emphasis added). The Commonwealth states that the defense's reading of the notes "is not the more natural and straightforward," but it does not explain why the defendant's alternative (and in retrospect correct) reading is not a reasonable alternative that the court completely failed to consider. Commonwealth Br. 49.

The Commonwealth cites no authority for its contention that it is necessarily coercive for a court to inquire regarding the possibility of partial verdicts on separate indictments. Indeed, the caselaw holds that such inquiry is not coercive. *See Commonwealth v. Foster*, 411 Mass. 762, 766 (1992); *Commonwealth v. LaFontaine*, 32 Mass. App. Ct. 529, 534-35 (1992). The Commonwealth claims *Foster* and *LaFontaine* are "inapposite because neither of those juries reported

being deadlocked." Commonwealth Br. 31 n.6. But *Roth* cited both those cases, in the context of a deadlock, for the proposition that partial verdicts are permissible when there are separate indictments rather than a single indictment. *See* 437 Mass. at 788; *Commonwealth v. Floyd P.*, 415 Mass. 826, 829-31 (1993) (acknowledging authority to accept partial verdicts from jury deadlocked on one but not all counts).

The trial court's failure to consider inquiry regarding partial verdicts cannot be excused based on speculation that defense counsel may have objected to such inquiry when, in fact, defense counsel never did. The court could and should have raised the issue with the parties and considered their respective views. This is precisely what the two-pronged *Steward/Taylor* test requires. Defense counsel's earlier argument regarding the propriety of the Count 2 verdict form, which the trial court ultimately agreed with (R.216-21), did not excuse the judge from complying with this Court's manifest necessity jurisprudence.

Another alternative to a mistrial was to poll the jury. *See* ACLU Br. 17-20. The record reflects no consideration of that alternative either.

The Commonwealth follows the trial court's lead in utterly failing to acknowledge the clear and longstanding caselaw placing the burden of establishing manifest necessity squarely and exclusively on the Commonwealth, the party seeking retrial. *See* Def. Br. 35, 38-40. Indeed, the Commonwealth Brief fails to so much as mention the applicable burden, or to cite *Commonwealth v. Nicoll*, 452

11

Mass. 816 (2008), which the defense brief discussed at length on this issue. The

trial court's misallocation of the burden constitutes legal error requiring reversal.

The record is similarly lacking on the second *Steward/Taylor* requirement,

the opportunity to be heard. The Commonwealth does not dispute, because it

cannot, that the trial court never asked counsel for their views regarding a mistrial.

In fact, the first time the word "mistrial" appears in the record is when it was

declared in open court. (R.268). The court's *sua sponte* action, in these

circumstances, was aptly described as "sudden, brief, and unexpected, neither

preceded nor accompanied by discussion with counsel." Def. Br. 36 (quoting

*Commonwealth v. Horrigan*, 41 Mass. App. Ct. 337, 341 (1996)). The

Commonwealth cites no comparable case finding the requirement of an

opportunity to be heard satisfied.

Video footage[1] reinforces the suddenness of the court's action and

corresponding lack of any meaningful opportunity to be heard. At the

approximately 5:47:25 mark of the video, the court took the bench and stated,

"[t]he jury is at an impasse." At approximately 5:47:55, a mere 30 seconds later,

the jury arrived in the courtroom. The court then read the note, which had not

previously been provided or read to counsel, on the record. At 5:49:23, the court

---

[1] https://www.youtube.com/watch?v=0An5qcRINe8&list=PLGE3I9evF9H_XqVRt
8WzVmdICluMirtCg&t=7s

stated it was declaring a mistrial and immediately discharged the jury at 5:49:30, a mere seven seconds later.  To suggest that counsel must have lodged an objection within this brief interval or that counsel had any, much less a full, opportunity to take a position or even communicate with their client "underestimates or ignores the difficulty of reaching a decision (in which the defendant has an evident personal stake) whether the defense would be advantaged or the opposite by a second trial." *Horrigan*, 41 Mass. App. Ct. at 342.

Legal and factual context renders the trial court's action even more unexpected.  Legally, trial counsel was entitled to rely on decades of caselaw expressly requiring a "full opportunity to be heard" before declaration of a mistrial. *Steward*, 396 Mass. at 79.  Factually, in response to multiple prior jury notes in this case, the trial court had advised counsel of the contents and afforded them time first to consider and then be heard regarding any issues raised.  (R.250-51, 261-62). The trial court's deviation from that well-known and accepted practice with respect to the final note was, indeed, sudden and unexpected.

The Court should reject the Commonwealth's attempt to conflate a request for a *Tuey-Rodriguez* charge with a request for a mistrial.  As the Commonwealth acknowledges, a *Tuey-Rodriguez* charge is designed to "encourage[] a jury to consider seriously and with an open mind the views and arguments of each member," with the ultimate goal of reaching a verdict.  Commonwealth Br. 26 n.5

13

(quoting *Ray v. Commonwealth*, 463 Mass. 1, 5-6 (2012)).  Importantly, a *Tuey-Rodriguez* instruction is not a necessary prerequisite for a mistrial.  *See Ray*, 463 Mass. at 6.  If the defense wanted a mistrial, it could have simply requested one (which it undisputedly never did).  Counsel was not required to affirmatively "exhibit[]" any "curiosity … about the extent of the jury's deadlock" until that deadlock had been firmly established.  Commonwealth Br. 33.  It was at that point, before declaring a mistrial, that the court was ***required*** to "receive and record the verdicts which the jury c[ould] agree upon."  Mass. R. Crim. P. 27, reporter's notes.

G.L. c. 234A, § 68C provides that, if the jury reports an impasse after a *Tuey-Rodriguez* instruction, they "shall not be sent out again without their own consent."  G.L. c. 234A, § 68C.  The Commonwealth does not explain how this statute would, in any respect, impact the court's ability to simply ask the jury whether it had reached any partial verdicts.  Moreover, as explained in Ms. Read's opening brief, the court could have alternatively "(a) inform[ed] the jury that it could not be required to continue deliberations without its consent and [still] (b) ask[ed] it to retire to consider whether it was prepared to return any partial verdict."  Def. Br. 42-43 (citing *Commonwealth v. Jenkins*, 416 Mass. 736, 739-40 (1994)).  The Commonwealth does not respond to the defense argument on this point.

The Commonwealth cites no authority for its suggestion that an opportunity to be heard after the jury had been discharged is somehow sufficient to support manifest necessity. *Fuentes* suggests such after-the-fact opportunity is not sufficient. *See* 448 Mass. at 1018-19 (observing that "the more prudent course would have been to consult with counsel" before declaring mistrial, notwithstanding that court gave the parties an opportunity to be heard "[a]fter the jury were dismissed").

The Commonwealth's contention that Ms. Read consented to the mistrial is based on the unsupported assertion that "defense counsel consistently sought a mistrial." Commonwealth Br. 38. It bears repeating that neither Ms. Read nor her counsel ever requested a mistrial. Instead, by requesting a *Tuey-Rodriguez* charge, counsel indicated that they wanted the jury to be instructed to try to reach a verdict rather than consenting to the ordeal and risks of a second trial.

The defense argued that Ms. Read's personal consent was required at the Superior Court hearing on her motion to dismiss. Counsel stated that, after the final jury note, "there was … no opportunity for [trial counsel] to speak to Ms. Read, after all, it's her rights, not just theirs." (R.354-55). The defense contends that this was sufficient to preserve the argument that Ms. Read's personal consent was required. At the very least, it was sufficient to preserve the contention that "an opportunity to be heard must, in order to be meaningful, occur after a reasonable

15

opportunity for counsel to consult with their client," Def. Br. 36, and the

Commonwealth does not suggest otherwise.

## II.    The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not Guilty on Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution

For more than a century, binding caselaw has warned against the exaltation

of form over substance in determining what constitutes an acquittal for Double

Jeopardy purposes. *See Ball v. United States*, 163 U.S. 662, 671 (1896) ("However

it may be in England, in this country a verdict of acquittal, although not followed

by any judgment, is a bar to a subsequent prosecution for the same offense.").

While many of these cases have arisen in the context of judicial acquittals, the

Commonwealth does not explain why form should outweigh substance with

respect to jury acquittals. *See Roth*, 437 Mass. at 796 (rejecting Commonwealth

argument that "would elevate form over substance").  Indeed, "the Double

Jeopardy Clause … prohibits reexamination of a court decreed acquittal to the

same extent it prohibits reexamination of an acquittal by jury verdict." *Smith v.

Massachusetts*, 543 U.S. 462, 467 (2005).  The Supreme Court has, for example,

"consistently refused to rule that jeopardy for an offense continues after an

acquittal, ***whether that acquittal is express or implied*** by a conviction on a lesser

included offense …." *Price v. Georgia*, 398 U.S. 323, 329 (1970) (emphasis

added); *see Green v. United States*, 355 U.S. 184, 190 (1957) (similar).

16

Despite the defense repeatedly pointing out the absence of contrary authority, the Commonwealth still cites no "case in which a defendant was forced to stand trial a second time for an offense a previous jury had found her not guilty of simply because [a] final, unanimous agreement was not announced in open court." Def. Br. 26; *see United States v. Dotson*, 817 F.2d 1127, 1129 (5th Cir. 1987) (affirming correction of verdict on one count after "receiv[ing] a telephone call from two of the jurors … stat[ing] that, contrary to the verdict read in court, the jury had unanimously voted to acquit"), *vacated in part on other grounds*; *United States v. Stauffer*, 922 F.2d 508, 511 (9th Cir. 1990) (affirming changing verdict on count where "[p]ost-verdict interviews of several jurors … determined that the jury had … intended to acquit"). *Blueford* and *A Juvenile* both turned on lack of finality, not form. *See* Def. Br. 25; *Blueford*, 566 U.S. at 608 ("[T]he foreperson's report prior to the end of deliberations lacked the finality necessary to amount to an acquittal … , quite apart from any requirement that a formal verdict be returned or judgment entered.").

There is no serious question here regarding finality. The affidavits, all based on post-trial statements, reflect a clear and unambiguous decision that Ms. Read is not guilty. This is not a case like *Blueford* where the jury continued deliberations after allegedly reaching a verdict. *See* 566 U.S. at 606. And there is simply nothing tentative or conditional about the jurors' post-trial statements. *See* (R.283)

(Juror B texting, "It was not guilty on second degree….  No one thought she hit

him on purpose or even [knew that she had hit him]"); (R.284) (Intermediary C

relaying Juror C's statement that there was "no consideration for murder 2");

(R.287) ("Juror A told me that the result of the deliberations was that the jury

unanimously agreed that Karen Read is NOT GUILTY of Count 1 (second degree

murder).  Juror A was emphatic that Count 1 … was 'off the table,' and that all 12

of the jurors were in agreement that she was NOT GUILTY of such crime.");

(R.293) ("Juror D explained that the jury reached NOT GUILTY verdicts on Count

1 and Count 3 ….  Juror D, without hesitation, said in substance, *Every one of us*

*will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts*

*1 and 3.  Because that's what happened*."); (R.323) ("Juror E stated that he/she

decided to contact me to provide information about the results of the jury's

decision-making following deliberations….  Juror E explained that the jury was

'unanimous on 1 and 3' that Karen Read was NOT GUILTY of those charges.").

The foregoing was corroborated by two voicemails received by the prosecutor

stating, "it is true what has come out recently about the jury being unanimous on

charges 1 and 3."  (R.325).  One juror expressly stated that the agreement persisted

after the jury was discharged.  *See* (R.293) ("Juror D explained that after the jury

was excused and aboard the bus, many of the jurors appeared uncomfortable with

how things ended, wondering, *Is anyone going [to] know that we acquitted [Karen*

*Read] on Count 1 and 3?*").  In these circumstances, the Commonwealth's

unsupported suggestion that jurors may have changed their minds is purely

hypothetical.  *See* Commonwealth Br. 41-42.  The post-trial affidavits are more

than sufficient to entitle the defense to an evidentiary hearing.  *See infra*.

## III. The Defense Is Entitled to a Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Ms. Read

The Commonwealth, in opposing the defense request for a post-verdict

judicial inquiry to substantiate the acquittals, takes a striking position.  Under the

Commonwealth's logic, no defendant claiming that the jury acquitted her but failed

to announce that verdict would be entitled to further inquiry, no matter how clear

and well-supported her claim.  In other words, even if all 12 jurors submitted

affidavits saying they unanimously and finally agreed to acquit the defendant, their

failure to announce that verdict (and the trial court's failure to follow Rule 27(b))

would take precedence over the defendant's fundamental constitutional protection

against Double Jeopardy.

The Commonwealth's position is not required by any precedent of this Court

and is insufficiently protective of defendants' rights.  The Court should reject this

"inflexible rule" as "achiev[ing] stability at the expense of doing justice between

the parties."  *Commonwealth v. Fidler*, 377 Mass. 192, 197 (1979).  As noted in the

defense opening brief, this Court and others have permitted post-verdict inquiry

regarding claims of extraneous influence and juror bias.  *See* Def. Br. 28-32;

ACLU Br. 20-22 (citing other examples).

In *United States v. Tsarnaev*, 96 F.4th 441, 458 (1st Cir. 2024) (citation

omitted), for example, the First Circuit Court of Appeals held that, because "[t]he

right to an impartial jury is a constitutional bedrock," the defendant's "plausible

claim of juror misconduct" required the district court to question the relevant

jurors.  The First Circuit remanded the case, about ***nine years after trial***, for the

district court to conduct *voir dire*.  While the present case raises a Fifth

Amendment Double Jeopardy claim rather than a Sixth Amendment issue, the

defendant's rights under that provision are no less fundamental.  *See Martin v.*

*Mississippi*, 732 So. 2d 847, 849-50 (Miss. 1998) (remanding for hearing where,

15 days after verdict, defense counsel was contacted by jurors stating "that they

had not intended to find [defendant] guilty of" offense).  And the defense affidavits

certainly support a "plausible claim" of a Double Jeopardy violation.

In *Remmer v. United States*, 347 U.S. 227 (1954), the United States Supreme

Court held that the defendant was entitled to post-verdict inquiry regarding the

FBI's unauthorized contact with jurors.  Much like in the context of juror bias or

untruthfulness, *see Commonwealth v. McCalop*, 485 Mass. 790 (2020), courts

regularly follow *Remmer* and hold post-verdict inquiries when there is a reasonable

basis to support a claim of external influence.  *See Commonwealth v. Dixon*, 395

Mass. 149, 150 (1985) (holding inquiry was required where counsel was told by someone purporting to be a juror "that a female juror's husband had some conversations with some of the witnesses in this case during the course of trial and these conversations were made known to said female juror"); *Commonwealth v. Guisti*, 434 Mass. 245, 249-50 (2001) (juror "posted a message on an internet mail service" "stating that she was 'stuck in a 7 day-long Jury Duty rape/assault case …. Just say he's guilty and lets [*sic*] get on with our lives!'" and it was unclear to what extent juror received responses); *Fidler*, 377 Mass. at 199 (juror affidavit "alleged that one juror stated [defendant] had been shot at in Charlestown a month earlier," which had not been mentioned in court); *Commonwealth v. Philyaw*, 55 Mass. App. Ct. 730, 736 (2002) (ordering evidentiary hearing where, more than two years after sentencing, witness affidavit stated that juror told him two other jurors "had gone to the scene" and "reported back to the jury").  In fact, this Court has instructed, "***[w]here a case is close, … a judge should exercise discretion in favor of conducting a judicial inquiry***." *Dixon*, 395 Mass. 153 (emphasis added).  In sum, courts have found an entitlement to post-trial *voir dire* on far less compelling showings than the consensus of four jurors that they reached a final, unanimous verdict of not guilty.

As the defense has previously argued, the relevant inquiry here "could be accomplished by a single 'yes' or 'no' question posed to jurors: *did you*

*unanimously acquit Karen Read of the charges in Counts 1 and 3*?"[2]  Def. Br. 32.

The Commonwealth asserts that such inquiry "would necessarily entail proscribed inquiry into deliberations," but it provides no convincing explanation as to why. Commonwealth Br. 48-49.  It has long been clear that post-trial juror statements are admissible to correct a mistaken verdict.  In that context, as here, "[t]he error consisted, not in making up the[] verdict on wrong principles … , but in an omission to state correctly in writing the verdict to which they had, by a due and regular course of proceeding, honestly and fairly arrived….  No considerations of public policy require that the uncontradicted testimony of jurors to establish an error of this nature should be excluded."  *Capen v. Inhabitants of Stoughton*, 82 Mass. 364, 367-68 (1860); *see Commonwealth v. Spann*, 383 Mass. 142, 151 (1981) (poll "did not intrude into the deliberative processes of the jury"); *Dotson*, 817 F.2d at 1130 ("It has long been well settled that the affidavit of a juror is admissible to show the true verdict …." (citation omitted)); *Malpica-Cue v. Fangmeier*, 395 P.3d 1234, 1238 n.2 (Colo. App. 2017) ("[J]urors may testify regarding the verdict to which the jury actually agreed." (citing cases)).

The Commonwealth's focus on a few purported inconsistencies among the juror statements overlooks the overarching consistency: that the jury unanimously

---

[2] If it believed necessary, the court could add another question regarding whether that determination was final.

acquitted Ms. Read of two of the three counts pending against her, including the count alleging second-degree murder.  The largely peripheral inconsistencies cited by the Commonwealth simply pale in comparison and are irrelevant to the Double Jeopardy issue.  *See, e.g.*, Commonwealth Br. 50 n.12 (noting that one juror relayed the final vote on Count 2 as 8-4, whereas another reported it was 9-3).  All four jurors who directly contacted defense counsel expressly stated unanimous and unconditional agreement on Counts 1 and 3.  *See* (R.287) (Juror A); (R.293) (Juror D); R.323 (Juror E); R.330 (Juror B).  The Commonwealth received the same information via voicemails from one juror.  (R.325).  To the extent the Commonwealth or the Court perceive any ambiguity, it would be readily resolved by the narrow judicial inquiry proposed herein.  The defendant has ***clearly*** met her burden of production and a post-trial *voir dire* is required.

Finally, the Commonwealth's proffered concerns regarding jurors being required to give testimony simply cannot justify permitting Ms. Read to be retried for a murder that a jury has already acquitted her of.  To be clear, the defense is not seeking to have the jurors identified (and it did not oppose the request to impound the juror list).  There are a number of protective measures that could be considered by the Superior Court, including holding an impounded hearing (at which Ms. Read is prepared to waive any right to a public proceeding) or a hearing at which cameras are excluded.

The defense, however, submits that Ms. Read's rights must also be protected.  The defense has received information from five deliberating jurors (four of them directly) that the jury reached a final, unanimous decision to acquit Ms. Read of murder.  This is a situation in which "the law's commitment to a just result warrants receiving evidence."  *Fidler*, 377 Mass. at 198.  Ms. Read's rights are not less worthy of protection simply because her case has received more publicity than others.  Rather, the trial court should be required to allow her an opportunity to substantiate her constitutional claim, while protecting jurors' anonymity to the maximum extent possible in that process.

## **CONCLUSION**

For the foregoing reasons, and those set forth in her opening brief, Ms. Read respectfully requests that this Honorable Court reverse the trial court and Order Counts 1 and 3 dismissed.

Respectfully Submitted,
For the Appellant,
Karen Read
By her attorneys,


**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700

24

owlmgw@att.net

**/s/ Michael Pabian**
Michael Pabian, Esq.
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq., *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com

**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

Dated:        October 23, 2024

# **ADDENDUM**

Table of Contents

1.  Memorandum of decision and order on defendant's motion to dismiss,
    issued August 23, 2024……………………………………………………27

2.  Fifth Amendment to U.S. Constitution…………………………………48

3.  Sixth Amendment to U.S. Constitution…………………………………48

4.  G.L. c. 234A, § 68C……………………………………………………48

5.  Mass. R. Crim. P. 27(b)………………………………………………...48

6.  Mass. Guide Evid. 606(b)………………………………………………49

7.  Mass. Guide. Evid. 606(c)(5)…………………………………………..49

388

## COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, ss.**

**SUPERIOR COURT
CRIMINAL ACTION
22-00117**

### COMMONWEALTH

#### vs.

### KAREN READ

### MEMORANDUM OF DECISION AND ORDER ON
### DEFENDANT'S MOTION TO DISMISS

On June 9, 2022, a Norfolk County grand jury indicted defendant Karen Read on charges of murder in the second degree (Indictment 1), manslaughter while operating under the influence of alcohol (Indictment 2), and leaving the scene of personal injury and death (Indictment 3), following the death of her boyfriend, John O'Keefe, on January 29, 2022. Trial on the matter began in April 2024. There were eight weeks of evidence and nearly five days of deliberations. After the jurors expressed to the Court that they were deadlocked for a third time, the Court declared a mistrial.

The defendant now moves to dismiss the charges for murder in the second degree and leaving the scene of personal injury and death arguing that retrial would violate the double jeopardy protections of the federal and state constitutions because the jury, in fact, reached a unanimous decision to acquit the defendant on those charges. Alternatively, the defendant argues that dismissal is required because there was no manifest necessity to support the declaration of the mistrial with respect to those charges. After careful consideration, this Court concludes that because the defendant was not acquitted of any charges and defense counsel consented to the Court's declaration of a mistrial, double jeopardy is not implicated by retrial of the defendant. The motion is therefore **DENIED**.

27

## **BACKGROUND**

On June 25, 2024, the jury began its deliberations in the defendant's trial. In addition to the three indictments, the Court had instructed the jury to consider two lesser included offenses to manslaughter while operating under the influence of alcohol – involuntary manslaughter and motor vehicle homicide (OUI liquor and negligence).

On Friday, June 28, 2024, at approximately 12:10 p.m., the jury foreperson sent a note to the Court. It stated: "I am writing to inform you on behalf of the jury that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict." The Court requested argument from the Commonwealth and the defendant as to whether there had been due and thorough deliberation from the jury. Assistant District Attorney Lally, on behalf of the Commonwealth, argued that the jury had not had sufficient time to deliberate and that therefore, it was far too early in the deliberative process to give the jury the *Tuey-Rodriguez* instruction.[1] He also pointed out that although the note indicated that the jury had not yet come to a conclusion, it did not indicate that doing so was not possible. Attorney Yannetti, on behalf of the defendant, "disagree[d] with Mr. Lally's characterization of the note." He argued:

> "The word exhaustive is the word that I think is operative here. [The jury is] communicating to the court that they've exhausted all manner of compromise, all manner of persuasion and they're at an impasse. You know, this is a case where they jury has the legal instructions. They've only really asked one question, which was to try and get a report they were not allowed to get, and I think the message has been received that the evidence is closed and they won't get anything more. They've been essentially working nonstop

---

[1] The use of the *Tuey-Rodriguez* instruction is a matter of discretion of the trial judge. *Commonwealth* v. *Perreira*, 72 Mass. App. Ct. 308, 316 (2008). It is the "orthodox approach to dealing with a deadlocked jury" see *Commonwealth* v. *Firmin*, 89 Mass. App. Ct. 62, 64 (2016) (citation omitted), and "designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view." *Commonwealth* v. *Semedo*, 456 Mass. 1, 20 (2010).

> over the last three, four days. We're approaching a weekend. They
> didn't come back with this at three o'clock or four o'clock. They're
> at twelve o'clock and they have nowhere to turn. So our position is
> the jury should be read the *Tuey-Rodriguez* model instructions and
> go from there."

The Court ruled that given the length of the trial, the number of exhibits and witnesses, the

complexity of the issues, and that the jury had only been deliberating for three days,

deliberations had not been sufficiently due and thorough to warrant a *Tuey-Rodriguiez*

instruction. It instructed the jury to continue deliberating.

On Monday, July 1, 2024, at approximately 10:45 a.m., the jury sent another note to this

Court. This note stated:

> "Despite our commitment to the duty entrusted in us, we find
> ourselves deeply divided by fundamental differences in our opinions
> and state of mind. The divergence in our views are not rooted in a
> lack of understanding or effort but deeply held convictions that each
> of us carry, ultimately leading to a point where consensus is
> unattainable. We recognize the weight of this admission, and the
> implications it holds."

The Court again requested argument from counsel as to whether there had been due and

thorough deliberations. The Commonwealth argued that the jury had been deliberating twenty-

two to twenty-three hours but given the length of trial, number of exhibits and witnesses, and

complexity of issues, they had not done a thorough deliberation up to this point. Attorney

Yannetti, again, had a vastly different view. He argued:

> "Our view is that it is time for a *Tuey-Rodriguez* [instruction]. They
> have come back twice indicating essentially that they're hopelessly
> deadlocked but the content of this latest message is that they have
> been over all the evidence. The previous message said they did an
> exhaustive review. This time they said that . . . they have
> fundamental disagreements about what the evidence means. It's a
> matter of opinion. It's not a matter of lack of understanding. This
> court when you sent the jury out encouraged them not to take a straw
> vote, encouraged them to go over all the evidence in a very

3

**29**

methodical manner.  I think all indications are that they have done
that.  This is what *Tuey-Rodriguez* is for."

The Court agreed that the jury had engaged in due and thorough deliberations, noting that this

jury had been "extraordinary" and it had never seen a note like this from a jury.  It thereafter

provided the jury of the full *Tuey-Rodriguez* instruction and asked them to return to the

deliberations with those instructions in mind.[2]

That same day, at approximately 2:30 p.m., the jury sent another note to the Court.  The

Court stated to counsel that the jury was at an impasse.  After the jurors filed into the courtroom,

the Court read the note:

> "Despite our rigorous efforts we continue to find ourselves at an
> impasse.  Our perspectives on the evidence are starkly divided.
> Some members of the jury firmly believe that the evidence surpasses
> the burden of proof establishing the elements of the charges beyond
> a reasonable doubt.  Conversely, others find the evidence fails to
> meet this standard and does not sufficiently establish the necessary
> elements of the charges.  The deep division is not due to lack of
> effort or diligence, but rather a sincere adherence to our individual
> principles and moral convictions.  To continue to deliberate would

---

[2] The *Tuey-Rodriguez* instruction states: "Our Constitution and laws provide that in a criminal case, the principal method for deciding questions of fact is the verdict of a jury.  In most cases and perhaps strictly speaking in all cases absolute certainly cannot be obtained nor is it expected.  The verdict to which each juror agrees must of course be his or her own verdict, the result of his or her own convictions, and not merely an acquiescence in the conclusions of other jurors.  Still, in order to bring twelve minds to a unanimous result, you must examine the issues you have to decide with candor and with the proper regard and respect for each other's opinions.  You should consider that it is desirable that this case be decided.  You have been selected in the same manner and from the same source as any future jury would be selected.  There is no reason to suppose that this case will ever be submitted to twelve persons who are more intelligent, more impartial, or more competent to decide it than you are or that more or clearer evidence will be produced at another trial.  With all this in mind it is your duty to decide this case if you can do so conscientiously.  In order to make a decision more attainable, the law always imposes the burden of proof on the Commonwealth to establish every essential element of each indictment beyond a reasonable doubt.  If you are left with a reasonable doubt as to any essential element of any indictment, then the defendant is entitled to the benefit of that doubt and must be found 'not guilty' on that indictment.  In conferring together, you are to give proper respect to each other's opinions, and listen with an open mind to each other's arguments.  Where there is disagreement, those jurors who would find the defendant 'not guilty' should consider whether the doubt in their minds is a reasonable one if it makes no impression on the minds of the other jurors who are equally intelligent, who have heard the same evidence with the same attention, who have an equal desire to arrive at the truth and who have taken the same oath as jurors.  At the same time, those jurors who would find the defendant 'guilty' ought seriously to ask themselves whether they may not reasonably doubt the correctness of their judgment if it is not shared by other members of the jury.  They should ask themselves whether they should distrust the weight or sufficiency of the evidence if it has failed to convince the minds of their fellow jurors beyond a reasonable doubt."

4

> be futile and only serve to force us to compromise these deeply held
> beliefs."

After reading this note, the Court declared a mistrial and discharged the jury back to the

deliberation room to wait for the judge.  Counsel remained in the courtroom to discuss an

agreeable date to return for a status conference.

On July 8, 2024, the defendant filed the instant motion to dismiss supported by affidavits

from Attorney Yannetti and co-counsel, Attorney Jackson.  Attorney Jackson's affidavit stated

that on July 2, 2024, a juror in the case ("Juror A") contacted him.  Attorney Jackson was able to

identify the person as a deliberating juror based on his/her description of who he/she is, where

he/she was seated, and certain identifying information (name and occupation) disclosed during

the voir dire process.  According to Attorney Jackson's affidavit, Juror A told him that he/she

wished to inform him of the true results of the deliberations because he/she believed those results

significantly impact the defendant's rights.  Juror A said the jury unanimously agreed that the

defendant was not guilty of Counts 1 and 3 and specifically that the murder charge was "off the

table."  First Jackson Affidavit at par. 5.

In his affidavit, Attorney Jackson also stated: "Neither Ms. Read nor her counsel

consented to the entry of the mistrial.  Defense counsel was denied the opportunity to request

that the Court inquire on which count or counts the jury may have been deadlocked (including

lesser included offenses), and on which count or counts the jury may have arrived at a verdict."

*Id.* at pars. 9 and 10.

Attorney Yannetti's affidavit averred that on July 3, 2024, he received communications

from two "informants" who had received information from two deliberating jurors in the case.

The first informant ("Informant B") sent him a screenshot he/she had received from someone

else ("Intermediary B") of text messages that Intermediary B had purportedly received from a

5

**31**

juror ("Juror B").  Attorney Yannetti averred that he was able to positively identify which juror was Juror B based on a first name given to him from Informant B.  In the screenshot, Juror B texted Intermediary B, "It was not guilty on second degree.  And split in half for the second charge.  When the judge sent us back with that Hernandez thing to look at the other side it turned into a bully match.  I thought the prosecution didn't prove the case.  No one thought she hit him on purpose or even thought she hit him on purpose. . . ."  Yannetti Affidavit at par. 4.

Attorney Yannetti stated that another informant ("Informant C") contacted him on July 3, 2024.  Informant C told him he or she personally knows a juror ("Juror C") and that Informant C and Juror C have a mutual friend ("Intermediary C") who is a current coworker and friend of Juror C.  Intermediary C told Informant C via text message that Juror C was a deliberating juror in the case.  Intermediary C had a discussion over text message with Juror C about the experience of being a juror.  Intermediary C said that Juror C said there was "no consideration for murder 2.  Manslaughter started polling at 6/6 then ended deadlocked [at] 4no8yes. . ."  Yannetti Affidavit at par. 10.  Informant C texted back, "interesting. If there was no consideration for murder two, shouldn't she have been acquitted on that count[] and hung on the remaining chargers [sic] goes back to the jury verdict slip that was confusing."[3]  *Id.*  Intermediary C texted, "she should've been acquitted I agree.  Yes, the remaining charges were what they were hung on. And that instruction paper was very confusing."  *Id.*

Attorney Yannetti stated that based on the description of Juror C he received from Informant C and the description of what Juror C told Intermediary C, he could positively identify that Juror C was a deliberating juror.

---

[3] As noted below, defense counsel argued to the Court that the verdict slip for Indictment 2, which allowed the foreperson to check "guilty" for the lesser included offenses, would be confusing for the jury if they decided the defendant was not guilty of all the lesser included offenses.

6

Attorney Yannetti later filed a supplemental affidavit in support of the defendant's motion to dismiss wherein he stated that he received an unsolicited phone call from an individual identifying himself/herself as Juror B. Juror B told Attorney Yannetti that he/she was familiar with the affidavit he had previously filed and confirmed the substance of the conversation between Informant B and Intermediary B. Juror B clarified that he/she meant to write, "No one thought she hit him on purpose or even knew that she had hit him." Yannetti Supplemental Affidavit at par. 4.

On July 10, 2024, Attorney Jackson submitted a supplemental affidavit stating that on July 8, 2024, another juror ("Juror D") contacted him. He identified this person as a juror by the description of who he/she is, where he/she was seated, and certain identifying information (name and occupation) disclosed during the voir dire process. Juror D told Attorney Jackson that "he/she was 'uncomfortable' with how the trial ended. . . . Juror D said that it was very troubling that the entire case ended without the jury being asked about each count, especially Count 1 and Count 3." Jackson Supplemental Affidavit at pars. 3-4. According to Jackson's Supplemental Affidavit, Juror D told him that the jury agreed that the defendant was not guilty on Counts 1 and 3, that they disagreed solely on Count 2's lesser offenses, but that they believed that they were compelled to come to a resolution on all counts before they could or should report verdicts on any counts. Juror D believed all jurors would corroborate his/her account. He/she also stated that if necessary, he/she would testify before the court as long as his/her identity remained protected.

On July 18, 2024, Attorney Jackson submitted a second supplemental affidavit stating that on July 17, 2024, he was contacted by another juror ("Juror E") who he identified by the description of who he/she is, where he/she was seated, and certain identifying information (name

and occupation) disclosed during the voir dire process.  Juror E also stated that the jury was unanimous on Counts 1 and 3, that the defendant was not guilty of those charges, and that they were deadlocked on one of the "lower charges" on Count 2.  Jackson Second Supplemental Affidavit at par. 5.

On August 1, 2024, the Commonwealth filed a Post-Trial Notice of Disclosure stating that ADA Lally had received two unsolicited voicemails from an individual identifying themselves as a deliberating juror stating that the jury had been unanimous on Counts 1 and 3. The Commonwealth also received emails from three individuals identifying themselves as jurors stating that they wished to speak anonymously.  In its response to the emails, the Commonwealth stated that it was ethically prohibited from inquiring as to the substance of the jury deliberations, and that it could not promise confidentiality as it may be required to disclose the substance of any conversation to the defendant or the Court.  All three jurors declined to communicate further with the Commonwealth.

## DISCUSSION

The Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment to the United States Constitution, and Massachusetts common and statutory law protect an individual defendant from being twice placed in jeopardy for the same crime.  *Perrier* v. *Commonwealth*, 489 Mass. 28, 31 (2022).  See *Commonwealth* v. *Taylor*, 486 Mass. 469, 483 (2020), quoting *Oregon* v. *Kennedy*, 456 U.S. 667, 671–672 (1982) ("[T]he [d]ouble [j]eopardy [c]lause affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal'" [citation omitted]).  A defendant is entitled to protection from double jeopardy "if there had been some event, such as an acquittal, which terminates the original jeopardy," see *Commonwealth* v. *Hebb*, 477 Mass. 409, 413 (2017), or if a mistrial is

8

entered "without the defendant's request or consent . . . unless there was a manifest necessity for

the mistrial" (quotation and citations omitted). *Taylor*, 486 Mass. at 483. See *Hebb*, 477 Mass.

at 413, quoting *Yeager* v. *United States*, 557 U.S. 110, 118 (2009) ("The 'interest in giving the

prosecution one complete opportunity to convict those who have violated its laws' justifies

treating the jury's inability to reach a verdict as a nonevent that does not bar retrial.").

      In her motion to dismiss, the defendant argues that retrial on Indictments 1 and 3 would

violate the double jeopardy protections of the federal and state constitutions because, despite

absence of a jury verdict, the jury, in fact, reached a unanimous decision to acquit her on those

charges, or alternatively, because there was no manifest necessity to support the declaration of

the mistrial with respect to the charges. After careful consideration, the Court concludes that the

defendant's arguments are without merit.

## I.    Acquittal of the Defendant

      The defendant first contends that she was acquitted on Indictments 1 and 3, and that

therefore retrial is barred based on her attorneys' affidavits purporting to reflect statements by

jurors that the jury reached a unanimous conclusion that she was not guilty on those charges.

Although all the statements in the affidavits are from purported jurors who wish to remain

anonymous, for the purposes of this motion, the Court accepts the statements as true and

accurate.[4] Even doing so, any agreement among the jurors as to Counts 1 and 3 cannot be

considered acquittals for purposes of double jeopardy.

      To trigger double jeopardy protection, "[a]n acquittal requires a verdict on the facts and

merits" (citations and quotations omitted). *Commonwealth* v. *Brown*, 470 Mass. 595, 603

---

[4] While the Court accepts the averments as true and accurate, it disagrees with defense counsel's characterization of the statements as "strong and uncontradicted." The substance of the conversations directly contradicts the notes the jury wrote to the Court during deliberations, the last of which expresses disagreement over whether the Commonwealth met its burden as to the "elements of the *charges*." (Emphasis added).

(2015). See G. L. c. 263, § 7 ("A person shall not be held to answer on a second indictment or complaint for a crime of which he has been acquitted upon the facts and merits . . ."). And, "the only verdict which can be received and regarded, as a complete and valid verdict of a jury . . ., is an open and public verdict . . . affirmed in open court, as the unanimous act of the jury, and in presence of the whole panel, so that each juror has an opportunity to express his dissent to the court, in case his decision has been mistaken or misrepresented by the foreman or his fellows, or in case he has been forced into acquiescence by improper means" (citations omitted). *Commonwealth* v. *Zekirias*, 443 Mass. 27, 33 (2004). See Mass. R. Crim. P. 27(a) ("The verdict shall be unanimous. It shall be a general verdict returned by the jury to the judge in open court. The jury shall file a verdict slip with the clerk upon the return of the verdict."). As such, "the weight of final adjudication" cannot "be given to any jury action that is not returned in a final verdict" and a distinction must be made "between agreement on a verdict, and return, receipt, and recording of a verdict" (citations omitted). *A Juvenile* v. *Commonwealth*, 392 Mass. 52, 56-57 (1984).

Because there was no open and public verdict affirmed in open court rendered in this case, the defendant was not acquitted of any of the charges. The only unanimous act of the jury here was their representation to the Court that they were "at an impasse" and unable to agree on whether the Commonwealth had established beyond a reasonable doubt the "elements of the charges." The purported later attestations by some jurors, after they had been dismissed, that the jury had in fact agreed on some of the charges during deliberations do not have the "force of a final verdict." *Commonwealth* v. *Floyd P.*, 415 Mass. 826, 831 (1993). See *A Juvenile*, 392 Mass. at 57 (after mistrial was declared due to deadlock, judge did not err in refusing to accept signed verdict slips recovered from deliberation room showing "not guilty" because "[i]t is not

10

enough to show that the jury may have agreed on some issues at some time; if that limited

showing were to control, uncertainties would be invited"); see also *Blueford* v. *Arkansas*, 566

U.S. 599, 606 (2012) (double jeopardy did not bar retrial after hung jury where foreperson

reported unanimous vote on offense before deliberations had concluded but deadlock at

conclusion).

  The defendant argues that it is elevating form over substance to not accept that the

statements in the affidavits reflect an acquittal of the defendants on Counts 1 and 3. However,

the rendering of a verdict in open court is not a "ministerial act" as the defendant contends.

Rather, it communicates the finality of the deliberations, and its pronouncement in open court

ensures its unanimity. See *A Juvenile*, 392 Mass. at 57 ("Public affirmation in open court

provides safeguards against mistakes."). Indeed, the authority upon which the defendant relies

places particular importance upon the jury's pronouncement of its findings in open court. See

*Blueford*, 566 U.S. at 613 (Sotomayor, J., dissenting) (arguing that "the forewoman's

*announcement in open court* that the jury was 'unanimous against' conviction on capital and

first-degree murder . . . was an acquittal for double jeopardy purposes").[5] Thus, a "verdict in

substance" is a "final collective decision . . . reached after full deliberation, consideration, and

compromise among the individual jurors . . . And when that decision [is] *announced in open*

*court*, it [becomes] entitled to full double jeopardy protection" (emphasis added). *Id.* at 616,

citing *Commonwealth* v. *Roth*, 437 Mass. 777, 796 (2002) ("declining to give effect to 'the

verdict received from the lips of the foreman in open court' would 'elevate form over

---

[5] In written and oral argument, the defendant also relies on language from *Taylor*, 486 Mass. at 482. *Taylor* discussed whether a judicial determination to terminate proceeding based on a procedural ground implicated double jeopardy. The Supreme Judicial Court explained, "What constitutes an 'acquittal' is not to be controlled by the form of the judge's action," and that the determination does not depend on "checkmarks on a form." *Id.* This language in *Taylor* does not inform the Court as to the circumstances here.

11

substance'"").  Where there was no verdict announced in open court here, retrial of the defendant does not violate the principle of double jeopardy.

## II.   Manifest Necessity of Mistrial

The defendant's motion to dismiss also argues that double jeopardy bars re-prosecution because she did not consent to a mistrial and there was no manifest necessity to declare one. This argument, too, is without merit.

"A defendant's consent to a mistrial removes any double jeopardy bar to retrial" (quotation and citation omitted).  *Pellegrine* v. *Commonwealth*, 446 Mass. 1004, 1005 (2006). Consent may be explicit or implicit.  Explicit consent may occur by either moving for a mistrial or agreeing to one.  *Commonwealth* v. *Edwards*, 491 Mass. 1, 13 (2022).  Consent to a mistrial may be implied "where a defendant had the opportunity to object [to a declaration of a mistrial] and failed to do so."  *Pellegrine*, 446 Mass. at 1005.  See *United States* v. *McIntosh*, 380 F.3d 548, 554 (1st Cir. 2004) ("Where the defendant sits silently by and does not object to the declaration of a mistrial even though he has a fair opportunity to do so, a court may presume his consent" [quotation and citation omitted]).  See also *United States* v. *You*, 382 F.3d 958, 964-965 (9th Cir. 2004), cert. denied, 543 U.S. 1076 (2005) ("a court may infer consent only where the circumstances positively indicate a defendant's willingness to acquiesce in the mistrial order" [quotations and citations omitted]); *United States* v. *Goldstein*, 479 F.2d 1061, 1067 (2d Cir. 1973) ("Consent [to a mistrial] need not be express, but may be implied from the totality of the circumstances attendant on a declaration of a mistrial.").

As noted, the Court here declared a mistrial after the jury reported three times that they were deadlocked.  After the second time, the Court determined that the jury had engaged in due and thorough deliberations and gave the *Tuey-Rodriguez* instruction before sending the jury to

12

**38**

deliberate further.  Massachusetts General Laws c. 234A, § 68C, provides that if "a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; *but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent,* unless they ask from the court some further explanation of the law" (emphasis added).  See *Commonwealth* v. *Jenkins*, 416 Mass. 736, 737 (1994)("If, after due and thorough deliberation, the jury twice advise the judge that they are unable to reach a verdict, the judge may not properly send the jury out again without their consent, unless the jury ask for some further explanation of the law.").  In their note to the Court, the jury specifically stated, "[t]o continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs," making it clear that they would not consent to continuing their deliberations.

Attorney Yannetti *twice* argued for the Court to give the *Tuey-Rodriguez* instruction—the final step before the Court would declare a mistrial.  See *Jenkins*, 416 Mass. at 737; see also *Ray* v. *Commonwealth*, 463 Mass. 1, 4 (2012) (counsels' request for *Tuey-Rodriquez* instruction "permit[ed] the inference that both parties were provided an opportunity to be heard on possible alternatives to a mistrial").  Specifically, on Friday, June 28, 2024, after three days of deliberations, when the jury sent their first note indicating that they had engaged in an "exhaustive review of the evidence" and "ha[d] been unable to reach a unanimous verdict," Attorney Yannetti argued that the jury had engaged in due and thorough deliberations, was at an impasse, and should be given the *Tuey-Rodriguez* instruction.  The following Monday, when the jury sent a second note after deliberating for approximately two hours, stating that "consensus was unattainable," Attorney Yannetti again argued that due and thorough deliberations had

13

**39**

occurred and described the jury as "hopelessly deadlocked." Defense counsel, in arguing twice that due and thorough deliberations had occurred and pushing for the instruction, presumably was aware of the legal implications if the jury returned deadlocked again. Nevertheless, in a remarkable turnaround, defense counsel now argues that the result they twice advocated for was "sudden" and "unexpected." See Defendant Karen Read's Motion to Dismiss at 8.

Although the Court did not specifically ask defense counsel if they had any objection to the declaration of a mistrial, counsel had multiple opportunities to voice an objection if they in fact had one. While waiting for the jury to enter the courtroom after the Court announced the jury was again at an impasse on the afternoon of July 1, 2024, defense counsel could have asked to be heard on the issue. During the subsequent discussion about scheduling a status hearing right after the Court declared a mistrial, counsel had yet another opportunity to inform the Court of its dissatisfaction. Lastly, counsel could have communicated to the Court any objection or request to poll the jurors while the jury was still at the courthouse waiting in the deliberation room after the declaration of the mistrial. Instead, defense counsel said nothing to the Court about the mistrial and then proceeded to the courthouse steps where Attorney Jackson declared to the media and onlookers that the "[Commonwealth] failed miserably and will continue to fail" with its prosecution of the defendant.[6]

It strains credulity to believe that if defense counsel wanted to voice any objection to the Court, it would not have been heard. Significantly, defense counsel were no shrinking violets. Neither Attorney Jackson nor Attorney Yannetti has ever needed this Court to inquire whether counsel had an objection in order to be heard, and the Court has never denied counsel the opportunity to be heard in open court or at sidebar. The Court reconvened many times at

---

[6] See https://www.youtube.com/watch?v=TrsJPBRVqDg

14

**40**

counsel's request. Just days before the declaration of mistrial, defense counsel asked to address the Court while the jury was deliberating to raise an objection about the verdict slip. Attorney Jackson was not shy in informing the Court that he wanted to "make [his] argument" and that the Court's decision about the verdict slip was "not how it should be and it's over our strong objection."[7] Attorney Jackson went so far as to suggest that "it was almost like the Court is directing a verdict of the subordinate charges" by not making changes he wanted. The Court finds it hard to believe that when counsel heard that the jury was at an impasse for a third time and a mistrial was inevitable, at perhaps the most crucial point in the trial, counsel would sit silently if they did not consent to a mistrial.

As such, the Court does not credit Attorney Jackson's averment that he lacked an opportunity to be heard. Defense counsel's silence despite ample opportunity to be heard is deemed consent. See *Pellegrine*, 446 Mass. at 1005 (when trial judge on own initiative declared mistrial, defendant's silence was deemed consent where there was ample time to object despite not being directly asked by judge). Cf. *Commonwealth* v. *Phetsaya*, 40 Mass. App. Ct. 293, 298 (1996) (silence was not consent where judge's conduct was "so intimidating to defense counsel . . . as to foreclose any objection from defense counsel to the declaration of a mistrial").

Even assuming *arguendo* that the defendant here did not consent to the mistrial, the law is clear that a retrial is permissible so long as there was manifest necessity for the mistrial. *Taylor*, 486 Mass. at 483. "The trial judge's belief that the jury is unable to reach a verdict has long been considered the classic basis for a proper mistrial" (quotation and citation omitted). *Ray*, 463 Mass. at 3. See *Oregon,* 456 U.S. at 672 (describing "hung jury" as "prototypical example" of manifest necessity). Because the Court here had no doubt based on the jury's notes

---

[7] See https://www.youtube.com/watch?v=BjPsNvnLXV0

to the Court that it was unable to reach a unanimous verdict and the jury represented to the Court

that continued deliberations would be futile, there was manifest necessity for the mistrial based

on the deadlock.

As stated above, the foreperson, on behalf of the jury in this case, sent the Court three

notes, none of which indicated agreement on any of the charges. In the first note, the jury wrote

that they had been "unable to reach a unanimous verdict." In the second note, they stated that

they were "deeply divided by fundamental differences in our opinions and state of mind" and

that "consensus is unattainable." In their third and final note, after they had been given the *Tuey-*

*Rodriguez* instruction, the jury stated that they continued to be "at an impasse." They described

themselves as "starkly divided" on their "perspectives on the evidence" explaining:

> "Some members of the jury firmly believe that the evidence
> surpasses the burden of proof establishing the elements of the
> charges beyond a reasonable doubt. Conversely, others find the
> evidence fails to meet this standard and does not sufficiently
> establish the necessary elements of the charges. The deep division
> is not due to lack of effort or diligence, but rather a sincere
> adherence to our individual principles and moral convictions. To
> continue to deliberate would be futile and only serve to force us to
> compromise these deeply held beliefs."

The only reasonable interpretation of these notes, and specifically the final note, was that the jury

could not agree on any of the three charges and further deliberations would serve no purpose.[8]

For the defense to now claim that the notes were susceptible to different interpretations

such that the Court should have inquired further rings hollow, particularly where Attorney

Yannetti had twice argued that the jury had engaged in due and thorough deliberations and could

not agree. See *United States* v. *Keene*, 287 F.3d 229, 234 (1st Cir. 2002) (no abuse of discretion

---

[8] Given the care that went into writing the notes and how articulately they expressed the jurors' disagreement, it strikes this Court as odd that there was no inkling of an indication of agreement in the content of the notes or that if the jurors were uncertain whether they could return a partial verdict, they would not have asked the Court.

in declaring a mistrial given "the increasingly adamant manner in which the jurors announced that they were deadlocked"). Moreover, defense counsel's conduct immediately after the declaration of the mistrial in no way suggests that they thought otherwise.

The defendant contends that the Court failed to carefully consider that as an alternative to a mistrial, it could have "simply ask[ed] the jury to specify the charge(s) on which it was deadlocked." Defendant Karen Read's Motion to Dismiss at 8. However, "[t]he question whether a mistrial is appropriate in the circumstances of a given case is not answered by application of a 'mechanical formula.'" *Ray*, 463 Mass. at 4, quoting *Illinois* v. *Somerville*, 410 U.S. 458, 462 (1973). See *Commonwealth* v. *Bryant*, 447 Mass. 494, 503 (2006) (decision whether to declare a mistrial is within the discretion of the trial judge). Rather, the Court considers several facts such as the statements in a jury's note concerning their inability to reach an agreement, the time spent in deliberations, and the length and complexity of the trial. *Ray*, 463 Mass. at 4-5. See *Renico* v. *Lett*, 559 U.S. 766, 775 (2010) ("we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse").

Where here, the jury had been deliberating five days, had returned to the Court three times stating they could not agree, had been given the *Tuey-Rodrigez* instruction and returned hours later with a note plainly indicating that they could not agree as to the "elements of the *charges*" and that "to continue to deliberate would be futile," asking the jury on which charges they were deadlocked was not necessary to determine that there was manifest necessity for a mistrial. See *Fuentes* v. *Commonwealth*, 448 Mass. 1017, 1018–1019 (2007) (where final note

17

**43**

from the foreperson unequivocally stated that the jury were "unable to come to a unanimous decision," judge was not required to inquire whether there was any reasonable probability of unanimous verdicts or if the jury would consent to further deliberations); *Ray*, 463 Mass. at 6 n.5 (judge did not err in declining to poll jury on whether further instructions or deliberation would be likely to resolve the deadlock).

Moreover, the defendant's argument ignores the fact that one of the three charges had lesser included offenses. Therefore, if upon questioning, the jury had indicated to the Court that they were not deadlocked on all the charges, the only option would have been for the Court to send the jury back for further deliberations. See *A Juvenile*, 392 Mass. at 56 (judge should not inquire as to partial verdicts on lesser included offenses). Such action would be improperly coercive under the circumstances. It has been repeatedly recognized that deadlocked juries are particularly susceptible to coercion. *Roth*, 437 Mass. at 791. "Where the jurors have twice reported themselves deadlocked, and have already heard the *Tuey-Rodriquez* charge, a judge's inquiry concerning partial verdicts cannot avoid communicating to the jury the judge's desire to salvage *something* from the trial." *Id.* at 792 (emphasis in original). Where here the jury had before it one indictment which included lesser included offenses, had three times reported themselves deadlocked on separate charges, had already heard the *Tuey-Rodriguez* charge, and had sent a final note indicating that continued deliberations would only "serve to force [them] to compromise [their] deeply held beliefs," sending them to deliberate further would have been improperly coercive.[9]

---

[9] It is the Court's view that under these circumstances, even posing the question to the jury of whether they actually were deadlocked would have implied to the jurors that the Court wanted them to resume deliberations to reach a verdict. Given that Attorney Jackson had already expressed concern that the Court was "directing a verdict of the subordinate charges," the Court was extremely cautious to not give any appearance of partiality. See *United States* v. *Hotz*, 620 F.2d 5, 7 (1st Cir. 1980) (noting that a court must avoid putting pressure on the jury).

18

The defendant's argument suggests that questioning or polling jurors who report a deadlock is best practice or at least commonly done by trial judges. However, the defendant has not cited any cases saying as much and indeed, such an inquiry is not undertaken in the regular course.[10]  For a judge to make such an inquiry on her own accord could impede upon the strategic decision of counsel to not make such a request. The defendant's argument is based on hindsight. No one other than the jury knew that questioning the jurors as to their deadlock would have yielded a favorable outcome for the defendant. It is likely for that reason, defense counsel consented to this Court's declaration of a mistrial.

### III.    Post-Trial Inquiry

The defendant alternatively requests that the Court allow counsel to conduct a post-trial inquiry of the jurors to "substantiate the existence of an acquittal." Defendant Karen Read's Motion to Dismiss at 9. Such an inquiry is impermissible.

The defendant's argument relies solely on *Commonwealth* v. *McCalop*, 485 Mass. 790 (2020). In *McCalop*, the Supreme Judicial Court held that the trial court should have allowed the defendant's motion for jurors' names and contact information based on the post-trial statement of a deliberating juror regarding racist statements made during deliberations. *Id.* at 791. The Supreme Judicial Court explained, "[t]he presence of even one juror who is not impartial violated a defendant's right to trial by an impartial jury." *Id.* at 798, quoting *Commonwealth* v. *McCowen*, 458 Mass. 461, 494 (2010). Recognizing that "[r]acial bias in the jury system is 'a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the

---

[10] The defendant relies on *Commonwealth* v. *Foster*, 411 Mass. 762 (1992) and *Commonwealth* v. *LaFontaine*, 32 Mass. App. Ct. 529 (1992) to argue that there would be nothing coercive about asking a jury reporting a deadlock whether they had reached a unanimous verdict on any of the counts. Because neither the jury in *Foster* nor the jury in *LaFontaine* reported being deadlock in its deliberations, and none of the offenses charged had lesser included offenses, there was clearly no risk of coercion in the courts seeking partial verdicts on the separate indictments in those case. The circumstances here are markedly different.

19

**45**

administration of justice,'" the *McCalop* court held that the defendant should have been given a "fair opportunity to obtain an affidavit from that juror setting forth with some specificity who among the jurors made statements reflecting racial bias . . . and the statements that were made." *McCalop*, 485 Mass. at 799, quoting *Pena-Rodriguez* v. *Colorado*, 580 U.S. 206, 224 (2017). The defendant's argument here does not implicate racial bias or her right to receive an impartial trial. Thus, the reasoning the Court employed in *McCalop* does not extend to this case. See *Commonwealth* v. *DiBenedetto*, 94 Mass. App. Ct. 682, 687 (2019) (declining to extend racial bias exception to inquiry of jury unanimity because "infection of the criminal justice system with racial or ethnic bias is a unique type of constitutional deprivation that requires a vigilant response not warranted in the circumstances presented here").

The defendant's request effectively seeks permission from the Court to inquire from deliberating jurors that which is impermissible—information regarding the substance of the jury's deliberations. "The secrecy of jury deliberations has served as a bedrock of our judicial system, and inquiry into the 'jury's deliberative processes . . . would intrude improperly into the jury's function" (quotation and citation omitted). *Commonwealth* v. *Moore*, 474 Mass. 541, 548 (2016). It is simply not the case, given the content of the jury's final note to the Court, that any inquiry to jurors now could be limited solely to the results of the deliberative process and not implicate the process itself. Any inquiry would necessarily require the Court to understand why the jury's final note communicated a deadlock on the charges when post-trial, certain deliberating jurors are purportedly stating that the jury was, in fact, unanimous on most of the charges. While the defendant contends that the conflict is reflective of the fact that the instructions given to the jury by the Court were confusing, determining whether this is true would necessarily require inquiry into the back and forth among the jurors during deliberations.

20

**46**

See *DiBenedetto*, 94 Mass. App. Ct. at 686 ("The judge is precluded from inquiring into the internal decision making process of the jury as a whole or of the individual juror being questioned . . . Accordingly, evidence that jurors misunderstood the instructions of the presiding judge . . . cannot be considered" [internal quotations and citations omitted]). Thus, such an inquiry is prohibited.

The defense counsel has not cited one case suggesting the post-trial inquiry they now seek is appropriate or that it could change the outcome of the proceedings.[11] For the reasons already discussed, an acquittal of the defendant now on Indictments 1 and 3 based on conclusions purportedly reached during the jury's deliberations is not possible. Therefore, there is no reason for the Court to allow post-trial inquiry of the jurors. See *A Juvenile*, 392 Mass. at 57 (no error in denial of motion to subpoena the foreman where process would only serve to impeach jury's report to the judge in open court).

## **CONCLUSION AND ORDER**

This Court recognizes that the bar on retrials following acquittals is "[p]erhaps the most fundamental rule in the history of double jeopardy jurisprudence." *Taylor*, 486 Mass. at 481, quoting *United States* v. *Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977). However, where there was no acquittal on any of the charges in the defendant's first trial, there is no risk of subjecting the defendant to double jeopardy by retrial on all the charges.

Therefore, the Defendant's Motion to Dismiss is **DENIED**.

Date:  August 22, 2024

Beverly J. Cannone
Justice of the Superior Court

---

[11] Cases that defense counsel referred to at the hearing on this motion concerning post-trial inquiry of jurors where juror bias or outside influence was at issue are readily distinguishable from the circumstances here.

21

## Fifth Amendment to U.S. Constitution

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## Sixth Amendment to U.S. Constitution

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

## G.L. c. 234A, § 68C

If a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law.

## Mass. R. Crim. P. 27(b)

If there are two or more offenses or defendants tried together, the jury may, with the consent of the judge at any time during its deliberations return or be required by the judge to return a verdict or verdicts with respect to the defendants or charges as to which a verdict has been reached; and thereafter the jury may in the discretion of the judge resume deliberation. The judge may declare a mistrial as to any charges upon which the jury cannot agree upon a verdict; provided, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded.

**Mass. Guide Evid. 606(b)**

During an inquiry into the validity of a verdict, the court may ask the jurors individually to affirm publicly that the verdict as recorded represents their decision.  However, a juror may not testify about any statement made or incident that occurred during the jury's deliberations, the effect of anything on that juror's or another juror's vote, or any juror's mental processes concerning a verdict. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

**Mass. Guide Evid. 606(c)(5)**

A juror may testify about whether . . . a mistake was made in entering the verdict on the verdict form.

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO MASS. R. APP. P. 16(k)</u>

I hereby certify that the above document complies with the rules of this Court pertaining to the filing of briefs, including, but not limited to: Mass. Rule 16(a)(13) (addendum); Rule 16(e) (references to the record); Rule 18 (appendix to the briefs); Rule 20 (form of briefs, appendices, and other papers); and Rule 21 (redaction).

This brief complies with the length and typeface limitations in Rule 20(a)(2) and 20(a)(4) because it is in the proportional font Times New Roman at size 14, and contains 4,492 total words in the parts of the brief required by Rule 16(a)(5)-(11) as counted using the word count feature of Microsoft Word.

Date: October 23, 2024

**/s/ Martin G. Weinberg**
Martin G. Weinberg

## <u>CERTIFICATE OF SERVICE</u>

Date: October 23, 2024

Supreme Judicial Court – Clerk's Office
John Adams Courthouse
1 Pemberton Square, Suite 1400
Boston, MA 02108

Dear Sir/Madam:

     Herewith is the Reply Brief of Defendant-Appellant Karen Read in No. SJ-13663.

COMMONWEALTH

v.

KAREN READ

     I certify that I have made service via email of this brief to Caleb Schillinger, Norfolk District Attorney's Office, 45 Shawmut Road, Canton, MA 02021, Caleb.J.Schillinger@mass.gov.

                                 **/s/ Martin G. Weinberg**
                                   Martin G. Weinberg
                                   BBO #519480
                                   20 Park Plaza, Suite 1000
                                   Boston, MA 02116
                                   (617) 227-3700
                                   owlmgw@att.net