**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| KAREN READ, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. |
| v. | ) | 25-cv-10399-FDS |
| | ) | |
| NORFOLK COUNTY SUPERIOR COURT and | ) | |
| MASSACHUSETTS ATTORNEY GENERAL, | ) | |
| | ) | |
| Respondents. | ) | |

**RESPONDENT NORFOLK COUNTY SUPERIOR COURT'S OPPOSITION TO**
**THE PETITION FOR A WRIT OF HABEAS CORPUS**

In July 2024, the petitioner's criminal trial in a Massachusetts state court ended when the judge declared a mistrial based on jury deadlock. The petitioner claims that the Double Jeopardy Clause of the United States Constitution bars retrial on two of the three charges she faces because, as to those two charges, there was no manifest necessity for the mistrial and statements purportedly made by some jurors after the mistrial show that the jury unanimously agreed she was not guilty. In the alternative, she seeks a posttrial inquiry of the jurors.

These claims having been rejected on the merits by the Massachusetts Supreme Judicial Court ("SJC"), the petitioner filed this habeas corpus petition pursuant to 28 U.S.C. § 2241. None of the petitioner's contentions is a valid basis for habeas relief, particularly given the factual findings in the proceedings below and the SJC's construction of Massachusetts law, both of which are binding in this action. The trial judge exercised sound discretion in declaring a mistrial, and the petitioner was not acquitted of any charges. The petition should be denied.

## I.    Procedural Posture

In 2022, a grand jury returned three indictments against the petitioner, charging her with murder in the second degree, Mass. Gen. Laws ch. 265, § 1 ("count one"); manslaughter while operating a motor vehicle under the influence of alcohol, Mass. Gen. Laws ch. 265, § 13½ ("count two"); and leaving the scene of personal injury resulting in death, Mass. Gen. Laws ch. 90, § 24(2)(a½)(2) ("count three").  (R.139-144).[1]  A jury trial on the three indictments began in April 2024 and lasted over two months.  (R.100-101).  On July 1, 2024, the fifth day of deliberations, the trial judge declared a mistrial based on jury deadlock.  (R.268).

Following the mistrial, the petitioner filed a motion to dismiss counts one and three on double jeopardy grounds, or in the alternative, to conduct a posttrial juror inquiry.  (R.137, 272). The motion was accompanied by two affidavits from her attorneys.  (R.137, 283-288).  The Commonwealth filed a written opposition to the motion (R.137, 295), and the petitioner filed a reply (R.137, 310).  The petitioner also filed three supplemental memoranda, each accompanied by an affidavit of counsel.  (R.137-138, 289, 320, 327).  On August 9, 2024, the trial judge heard argument on the motion.  (R.138, 332).  In a memorandum of decision and order entered on August 23, 2024, the judge denied the motion.  (R.138, 388).

On September 11, 2024, the petitioner filed a petition for extraordinary relief pursuant to Mass. Gen. Laws ch. 211, § 3, seeking review of the order denying her motion to dismiss.  (R.5,

---

[1] The docket entries in this case are cited as Doc. No. __ at __.  The record appendix for the petitioner's appeal to the SJC was filed at Doc. No. 2-1.  In her memorandum in support of the petition, the petitioner cited to the record appendix as R.__, corresponding to the page numbers in the lower lefthand corner of each page.  The respondent will adopt the same citation format for consistency.  The supplemental record appendix submitted by the Commonwealth in the SJC appeal is attached as Exhibit A to this Opposition and is cited as S.R.__, also consistent with that document's pagination.

418).[2]  A single justice of the SJC reserved and reported the case without decision for

determination by the full court.  (R.423).

On February 11, 2025, the full SJC issued an opinion affirming the trial judge's denial of

the petitioner's motion and remanding the case to the single justice for entry of a judgment

denying the petition for relief.  Read v. Commonwealth, 495 Mass. 312 (2025).[3]  The petitioner

then filed this federal habeas corpus petition pursuant to 28 U.S.C. § 2241 on February 18, 2025.

(Doc. No. 1).

## II.    Facts

### A.    Jury Deadlock and Mistrial

On Tuesday, June 25, 2024, the thirty-seventh day of trial, the judge charged the jury.

(R.145, 147).  She instructed the jury on the three indictments, as well as two lesser-included

offenses of count two:  involuntary manslaughter and motor vehicle homicide.  (R.168-187).

Before deliberations began, the judge indicated that the jury would be given separate verdict

slips for each of the three indictments.  (R.189).  She explained to the jury the procedure for

delivering the verdicts:

> "After the final vote of the jury, the foreperson should check the appropriate boxes as to
> each charge, then sign and date the verdict slips and notify the court officer that you have
> reached a unanimous verdict.  You will then be brought back into the courtroom, where
> the foreperson will deliver the verdicts to the Court."

(R.195).  She also instructed the jury to "continue deliberating until you have reached a final

verdict on each charge," and not to disclose to anyone, including the judge, their numerical

---

[2] Mass. Gen. Laws ch. 211, § 3 confers upon the SJC a power of "general superintendence of all
courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy
is expressly provided . . . ."

[3] The petitioner filed a copy of the slip opinion at Doc. No. 2-2.  References herein to the opinion
are made to the official version published in the Massachusetts Reports.

standing or progress "before such time as you have reached a unanimous verdict." (R.194).

The jury then began deliberations that same afternoon. (R.197).

Deliberations continued over the next three days. (R.210-211, 228-229, 242-245, 247-250). On Friday, June 28, after approximately 19 hours of deliberations, the foreperson submitted a note to the judge ("first note") that stated:

> "I am writing to inform you, on behalf of the jury, that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict."

(S.R.3; R.250; Read, 495 Mass. at 314). After reading the note into the record, the judge requested argument from the parties on whether the jury had engaged in "due and thorough" deliberation.[4] (R.251). The Commonwealth argued that the jury had not had sufficient time to deliberate, and that it was therefore too soon to give a Tuey-Rodriguez instruction.[5] (R.251). The defense disagreed and argued that the jury were "communicating to the Court that they've exhausted all manner of compromise, all manner of persuasion and they are at an impasse." (R.252). Defense counsel asked the judge to give the Tuey-Rodriguez instruction. (R.252).

---

[4] Mass. Gen. Laws ch. 234A, § 68C, formerly codified at Mass. Gen. Laws ch. 234, § 34 (see Mass. St. 2016, ch. 36, §§ 1, 5, effective May 10, 2016), provides:

> "If a jury, after due and thorough deliberation, returns to court without having agreed on a verdict, the court may state anew the evidence or any part of the evidence, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law."

[5] See Commonwealth v. Rodriguez, 364 Mass. 87, 98-103 (1973) (approving modified version of charge set out in Commonwealth v. Tuey, 8 Cush. 1, 2-3 [1851], for prospective use with deadlocked juries). "The Tuey-Rodriguez charge is a model instruction given when jurors report deadlock after due and thorough deliberation that is designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view. Once a deadlocked jury receives the Tuey-Rodriguez charge and resumes their deliberations, 'they shall not be sent out again without their own consent.'" Read, 495 Mass. at 315 n.4, quoting Mass. Gen. Laws ch. 234A, § 68C (other internal quotations and citation omitted).

The judge determined that there had not yet been due and thorough deliberation, given the length of the trial, the amount of evidence presented through 74 witnesses and 657 exhibits, the complexity of the issues, and the fact that each of the prior days of deliberations had been shortened.  (R.253).  She instructed the jury to continue deliberating.  (R.254).

Deliberations extended through that Friday afternoon and resumed the following Monday morning.  (R.255-256, 260-261).  At around 10:45 a.m. on Monday, the jury foreperson submitted another note to the judge ("second note"), which stated:

> "Despite our commitment to the duty entrusted to us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind.
>
> The divergence in our views are [sic] not rooted in a lack of understanding or effort, but deeply held convictions that each of us carry ultimately leading to a point where consensus is unattainable.
>
> We recognize the weight of this admission and the implications it holds."

(S.R.4; R.261, 264, 390).  Upon receiving this note, the judge again invited argument on whether there had been due and thorough deliberation.  (R.261-262).  Although by this point the jury had already deliberated for approximately 24 to 25 hours, the Commonwealth argued it was still premature to conclude their deliberations had been due and thorough.  (R.261-262; Read, 495 Mass. at 315 n.5).  Defense counsel, however, maintained that the jury had "come back now twice, indicating essentially that they are hopelessly deadlocked," and that it was "time for a Tuey-Rodriguez."  (R.262).  The defense again requested the Tuey-Rodriguez instruction.  (R.263).  The judge determined that the jury had engaged in due and thorough deliberation, noting that this jury had been "extraordinary" and that she had "never seen a note like this reporting to be at an impasse."  (R.263).  The judge gave the jury the Tuey-Rodriguez instruction and sent them back to deliberate further.  (R.264-267).

At about 2:30 p.m. that same day, the foreperson submitted yet another note to the judge ("third note"), which stated:

> "Despite our rigorous efforts, we continue to find ourselves at an impasse.
>
> Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyound [sic] a reasonable doubt. Convers[e]ly, others find the evidence fails to meet this standard, and does not sufficiently establish the necessary elements of the charges[.]
>
> The deep division is not due to a lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions.
>
> To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs."

(S.R.5; R.267-268, 391). After the judge received the third note, the parties returned to the courtroom, the case was called, and the judge informed counsel that "[t]he jury is at an impasse." (R.267). The jury were called back into the courtroom, and the third note was read aloud into the record. (R.267-268). Upon reaching the final line of the note—stating that further deliberation would "force [the jury] to compromise these deeply held beliefs"—the judge addressed the jury, saying, "I am not going to do that to you, folks," and she declared a mistrial. (R.268).

The judge discharged the jury back to the deliberation room, explaining that she would meet them there privately to thank them for their service. (R.268). The judge and the parties remained in the courtroom and scheduled a date to return for a status conference. (R.269-270). At no point during this discussion did defense counsel object to the declaration of a mistrial or express disagreement with that outcome. (R.269-270; Read, 495 Mass. at 316).

### B.    Purported Posttrial Juror Statements

One week later, on July 8, the petitioner filed her motion to dismiss along with affidavits from her counsel, Attorneys Alan Jackson and David Yannetti. (R.137, 283, 286). Attorney Jackson's affidavit stated that on July 2 a purported juror ("Juror A") contacted him. (R.286).

He said he was able to identify which juror they were from his conversation with them.  (R.286).
According to Attorney Jackson's description of the conversation, Juror A said the jury had
unanimously agreed that the petitioner was not guilty of count one (murder in the second
degree), and "shortly following that determination," they also had unanimously agreed that she
was not guilty of count three (leaving the scene of personal injury resulting in death).  (R.287).

Attorney Yannetti's affidavit stated that he had received communications from two
"informants," both on July 3.  (R.283).  He said one of these informants ("Informant B") sent
him a screenshot that Informant B had received from some other person ("Intermediary B") of
text messages that Intermediary B allegedly had received from a purported juror ("Juror B").
(R.283).  Attorney Yannetti believed he could confirm Juror B had been a deliberating juror
based on a first name for Juror B given to him by Informant B.  (R.283).  According to Attorney
Yannetti's description of the screenshot, Juror B allegedly texted Intermediary B: "It was not
guilty on second degree.  And split in half for the second charge.  When the judge sent us back
with that Hernandez [sic] thing to look at the other side it turned into a bully match.  I thought
the prosecution didn't prove the case.  No one thought she hit him on purpose or even thought
she hit him on purpose [sic]."  (R.283).

Attorney Yannetti stated that the other informant ("Informant C") had contacted him to
say that they personally knew a purported juror ("Juror C"), as they and Juror C used to work
together and had a mutual friend ("Intermediary C") who was a current co-worker and friend of
Juror C.  (R.284).  Informant C also knew from Intermediary C that Juror C would be
participating in a Zoom meeting with friends to discuss the trial.  (R.284).  Three days later,
Informant C sent Attorney Yannetti screenshots of text messages exchanged between

Informant C and Intermediary C, in which Intermediary C purportedly reported what Juror C had allegedly said during the Zoom meeting.  (R.284).

According to Attorney Yannetti's representation of that exchange, Intermediary C texted, "no consideration for murder 2.  manslaughter started polling at 6/6 then ended deadlocked @ 4no8yes"; Informant C texted back, "if it was no consideration for murder two, shouldn't she have been acquitted on that count. and hung on the remaining chargers [sic]," and Intermediary C responded, "she should've been acquitted I agree.  Yes, the remaining charges were what they were hung on."  (R.284-285).  Based on the descriptions of Juror C by Informant C and Intermediary C, Attorney Yannetti said he could positively identify Juror C as a deliberating juror.  (R.285).

On July 10, Attorney Jackson submitted a supplemental affidavit stating that on July 8 he was contacted by a purported juror ("Juror D").  (R.137, 292).  He said he was able to identify which juror they were from his conversation with them.  (R.292).  According to Attorney Jackson's description of the conversation, Juror D said the jury had unanimously agreed that the petitioner was not guilty of counts one and three, and that the jury's disagreement was solely as to count two and its lesser-included offenses.  (R.293).

Attorney Jackson submitted a second supplemental affidavit on July 18.  (R.137, 323).  He stated that he had been contacted the day before, July 17, by a purported juror ("Juror E").  (R.323).  He again said he could identify the individual as a deliberating juror.  (R.323).  According to Attorney Jackson, Juror E said the jury was "unanimous on 1 and 3," the petitioner was not guilty, and the jurors deadlocked only on the "lower charges" on count two.  (R.323).

On August 1, 2024, the Commonwealth filed in the trial court a notice disclosing that, on July 21, an unsolicited voicemail was left on the office phoneline of one of the trial prosecutors.

(R.325).  The caller, who identified themself as a juror by full name and seat number, stated, "it is true what has come out recently about the jury being unanimous on charges 1 and 3."  (R.325). That same individual left another unsolicited voicemail for the prosecutor on July 26, stating that they "can confirm unanimous on charges one and three, as not guilty[,] and as of last vote 9-3 guilty on the manslaughter charges . . . on the lower-level manslaughter charges."  (R.325).

The Commonwealth's notice further disclosed that it also had received emails from three individuals who identified themselves as jurors and wished to speak anonymously.  (R.325). The Commonwealth had responded to the emails by stating that, although it would welcome the opportunity to discuss the evidence or its case, it was ethically prohibited from inquiring into the substance of the jury's deliberations and could not promise confidentiality, as it might be required to disclose any such communications to the defense or the court.  (R.325-326). All three individuals declined to communicate further with the Commonwealth and provided no information about the jury's purported votes.  (R.326).

On August 5, Attorney Yannetti submitted a supplemental affidavit stating that he had received an unsolicited phone call on July 31.  (R.138, 330).  The caller said they had been a juror in the case, and based on what they represented to Attorney Yannetti to be their full name, Attorney Yannetti stated that he was able to confirm that the caller was the person identified as Juror B in his prior affidavit.  (R.330).  According to him, the caller said the jury had reached unanimous not-guilty verdicts on "indictments (1) and (3)" and had been deadlocked only on "indictment (2)."  (R.330).  The caller also said they were familiar with Attorney Yannetti's prior affidavit and the text message exchange referenced in paragraph four of the affidavit (quoted above) was accurate, except that they had meant to write, "No one thought she hit him on purpose or even knew that she had hit him."  (R.330-331).  The caller "believe[d] that other

jurors ha[d] been reluctant to come forward because there is so much public and media attention focused on this case."  (R.331).

## III.    Argument

### A.    Jurisdiction and Ripeness

This pretrial challenge is governed by the general habeas provision, 28 U.S.C. § 2241 ("section 2241").  The First Circuit's section 2241 precedent instructs that, to the extent this petitioner may presently be "in custody" for purposes of federal habeas relief, it is not pursuant to the SJC's ruling, but, rather, it is because of any state-imposed restrictions on her liberty while she is awaiting retrial on the existing indictments.  See Gonzalez v. Justices of Mun. Court of Bos., 382 F.3d 1, 5-6 (1st Cir. 2004), judgment vacated on other grounds, 544 U.S. 918 (2005), and reinstated, 420 F.3d 5 (1st Cir. 2005) (petitioner in custody due to personal recognizance order pending retrial, not SJC's judgment vacating required finding of not guilty in first trial and reinstating case for further proceedings before trial court).  The petitioner is subject to such restrictions.  She remains admitted to bail and must comply with certain pretrial conditions of release inapplicable to the public generally.  (R.102, 105).  That suffices to meet the "in custody" requirement of section 2241.  See Justices of BMC v. Lydon, 466 U.S. 294, 300-301 (1984) (petitioner's release on personal recognizance pending retrial, by itself, was sufficient to deem him "in custody" under section 2241 given penalties prescribed under Massachusetts law if he failed to appear in court); Gonzalez, 382 F.3d at 5 (same).  Having obtained review on the merits of her claim by the SJC, she has exhausted her available state interlocutory remedies, and as her claim is one of double jeopardy based on alleged successive prosecutions, her resort to federal habeas corpus relief need not await retrial and conviction on the two challenged indictments. See Allen v. Att'y Gen. of Me., 80 F.3d 569, 572-573 (1st Cir. 1996).

B.    **Standard of Review**

On review under section 2241, this Court "must defer to the SJC's findings of facts but must undertake plenary review of that court's resolution of issues of law." Marshall v. Bristol Superior Ct., 753 F.3d 10, 16 (1st Cir. 2014), quoting Gonzalez, 382 F.3d at 7 (citation omitted). In conducting its "plenary" review, however, this Court also is bound by and must accept the SJC's interpretations of Massachusetts law. See Marshall, 753 F.3d at 12, 19 ("We are similarly bound by the state court's construction of its state statutes and other issues of state law.").

C.    **As a matter of federal constitutional law, the trial judge exercised sound discretion in declaring a mistrial based on the jury's deadlock.**

"A mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict has been long considered the classic basis for a proper mistrial" and poses no double jeopardy bar to retrial. Renico v. Lett, 559 U.S. 766, 774 (2010) (quotation omitted).[6] The decision to declare a mistrial because of a deadlocked jury is entrusted to the trial judge's "broad discretion" and "accorded great deference" on review. Id. at 774, quoting Arizona v. Washington, 434 U.S. 497, 509, 510 (1978). In Renico, the Court reiterated that "[t]he reasons for 'allowing the trial judge to exercise broad discretion' are 'especially compelling' in cases involving a potentially deadlocked jury" because "'the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate,'" and absent "such deference, trial judges might otherwise 'employ coercive means to break the apparent deadlock,' thereby creating a 'significant risk that a verdict may result from pressures inherent in the situation rather than the

---

[6] As noted by the SJC, the petitioner presented no claim below that the evidence adduced at her first trial "was legally insufficient to support a conviction on any of the charges, which would preclude retrial." Read, 495 Mass. at 313. Nor was the record she submitted on appeal adequate in any event to establish such a claim. See id. at n.2. She does not raise a sufficiency claim in this petition.

considered judgment of all the jurors.'" Renico, 559 U.S. at 774, quoting Washington, 434 U.S. at 509-510 & n.28. See also Read, 495 Mass. at 319 ("Trial judges receive such discretion to avoid the possibility of coercive measures being used to force jury agreement, thereby protecting the fairness of the proceedings.").

In addition, and notably for purposes of this case, the Court went on to reaffirm what is _not_ required as a matter of federal constitutional law in exercising that broad discretion:

> "We have expressly declined to require the mechanical application of any rigid formula when trial judges decide whether jury deadlock warrants a mistrial. We have also explicitly held that a trial judge declaring a mistrial is not required to make explicit findings of manifest necessity nor to articulate on the record all the factors which informed the deliberate exercise of [their] discretion. And we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse. In 1981, then-Justice Rehnquist noted that this Court had never overturned a trial court's declaration of a mistrial after a jury was unable to reach a verdict on the ground that the manifest necessity standard had not been met. The same remains true today, nearly 30 years later."

Renico, 559 U.S. at 775 (quotations and citations omitted). Accord Blueford v. Arkansas, 566 U.S. 599, 609 (2012). Following Renico and Blueford, the First Circuit similarly has held that trial judges are not required "to take specific steps or make specific findings before concluding that a jury is deadlocked and unlikely to reach a verdict." United States v. Candelario-Santana, 977 F.3d 146, 158 (1st Cir. 2020). Rather, a judge exercises sound discretion to declare a mistrial based on deadlock so long as she "take[s] some step to ensure that the jury truly is unable to reach a verdict before discharging it." Id. (emphasis in original).

Here, the trial judge more than satisfied this requirement. The jury's first note was delivered to the judge after approximately 19 hours of deliberations over four days. In it, they stated that "despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict." The judge did not rush

to declare a mistrial.  Instead, she heard from the parties.  And even though defense counsel argued that the jury already had "exhausted all manner of compromise, all manner of persuasion," and were "at an impasse," the judge still did not immediately declare a mistrial. She took the measured approach of considering the extent of the jury's deliberations in view of the trial length, the amount of evidence presented, and the complexity of the issues to be decided; she concluded the deliberations had not yet been due and thorough; and she instructed the jury to continue deliberating.

The jury then "deliberated for another five to six hours -- spanning a Friday afternoon and the following Monday morning -- before sending a second note that was noticeably more definitive."  Read, 495 Mass. at 320.  The second note stated, "we find ourselves deeply divided by fundamental differences in our opinions and state of mind," the "divergence in our views are [sic] not rooted in a lack of understanding or efforts, but deeply held convictions," and "consensus is unattainable."  Again, the judge did not race to declare a mistrial.  She once more gave the parties an opportunity to be heard.  Defense counsel argued the jury were "hopelessly deadlocked."  Still, the judge did not declare a mistrial.  See id. (noting that, despite second note's definitive language and counsel's argument, judge still "did not immediately conclude that all hope of attaining a verdict was lost").  Instead, she gave the Tuey-Rodriguez charge.

"After nearly four hours of additional deliberation -[- ] bringing the total to approximately twenty-eight hours -- the jury submitted a third note that was even more emphatic."  Read, 495 Mass. at 320.  The third note stated, "we continue to find ourselves at an impasse," "[o]ur perspectives on the evidence are starkly divided" stemming from "a sincere adherence to our individual principles and moral convictions," and further deliberations "would be futile and only serve to force us to compromise these deeply held beliefs."  It was only then,

after all of the steps described above, and in light of the tone and content of the jury's final note, that the judge declared a mistrial.

In her memorandum of decision denying the petitioner's motion to dismiss, the trial judge explained that she "had no doubt based on the jury's notes to the Court that [the jury] was unable to reach a unanimous verdict." (R.402-403). Nothing in the jury's three notes, she found, "indicated agreement on any of the charges," or even an "inkling of an indication of agreement," despite the evident "care that went into writing the notes and how articulately they expressed the jurors' disagreement." (R.403). It was also "clear" to the judge from the third note that the jurors "would not consent to continuing their deliberations." (R.400). And at that point the judge was precluded by Massachusetts law from ordering the jury to continue deliberations without their consent. See Mass. Gen. Laws ch. 234A, § 68; Read, 495 Mass. at 321, 323.

The SJC likewise found that "[t]he jury clearly stated during deliberations that they had not reached a unanimous verdict on any of the charges and could not do so." Read, 495 Mass. at 313. "The first and second notes provided no indication of a partial consensus, and the third note"—with its repeated references to "the charges"—"plainly implied the opposite." Id. at 322. "In short, the record before the trial judge suggested complete deadlock." Id.

The trial judge took not just "some step," but multiple steps, to determine that the jury was "genuinely deadlocked" before declaring a mistrial. Candelario-Santana, 977 F.3d at 158 (emphases in original). Both the trial judge and the SJC found that the jury truly was unable to reach a verdict. See Marshall, 753 F.3d at 16 (federal habeas court must defer to state courts' factual findings). The judge acted well within her broad discretion in declaring a mistrial. See Renico, 559 U.S. at 775, quoting Washington, 434 U.S. at 510 n.28, 514 (exercise of

discretion is sound where judge does not act "irrationally or irresponsibly" or "for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling").

The petitioner's argument to the contrary proceeds from a flawed premise. Pointing to the language in Washington that the burden of justifying a mistrial rests on the prosecution, she claims the SJC improperly shifted that burden to her. See Pet. Mem. (Doc. No. 2) at 15, quoting Washington, 434 U.S. at 505. The Court went on to explain in Washington, however, that a deadlocked jury is the type of manifest necessity sufficient to meet that burden—indeed, it is the "classic basis for a proper mistrial." Washington, 434 U.S. at 509. The question then becomes whether the judge abused her "broad discretion" in declaring a mistrial for that reason, id., which is exactly the question that the SJC addressed. There was no burden shifting.

The petitioner maintains that the trial judge abused her discretion by failing to consider alternatives to a mistrial and to afford defense counsel an opportunity to be heard concerning the declaration of a mistrial. See Pet. Mem. at 16-24. To begin with, the Court in Renico expressly rejected the proposition that a judge's exercise of sound discretion hinges on "whether the judge (1) heard the opinions of the parties' counsel about the propriety of the mistrial; (2) considered the alternatives to a mistrial; and (3) acted deliberately, instead of abruptly." Renico, 559 U.S. at 778-779 (quotation omitted). The Court cautioned that Washington "nowhere established these three factors as a constitutional test that determines whether a trial judge has exercised sound discretion in declaring a mistrial," nor could such factors properly be understood as merely an "illuminat[ion]" of Washington. Id. at 779 (quotations and citations omitted). The Court further noted that although the trial judge in that case "could have asked the foreperson additional followup questions, granted additional time for further deliberations, or consulted with the prosecutor and defense counsel before acting," and that "[a]ny of these steps would have been

appropriate under the circumstances," none of these steps "was required" under the Court's "double jeopardy precedents." Renico, 559 U.S. at 779.[7]  The trial judge's purported failure here to do that which was not required by the federal constitution is not a basis for granting habeas relief.

Even assuming federal law, like Massachusetts law, mandates that a judge consider alternatives to a mistrial and afford counsel an opportunity to be heard, the petitioner still would not be entitled to relief.  See Read, 485 Mass. at 319, quoting Commonwealth v. Taylor, 486 Mass. 469, 484-485 (under state law, reviewing court "considers whether the judge carefully explored 'alternatives to a mistrial,' and whether counsel were 'given full opportunity to be heard'" [citation omitted]).  As described above, and as the SJC found, the judge "did consider and pursue such alternatives." Id. at 321.  After the jury's first note reporting a deadlock, the judge instructed the jury to continue deliberating.  Following the second note, reporting a deadlock in even stronger terms, she issued the Tuey-Rodriguez instruction.  "It was only when the jury submitted their third report of deadlock, at which point the judge was statutorily precluded from ordering them to continue deliberations without their consent, see [Mass. Gen. Laws ch.] 234A, § 68C, that the judge declared a mistrial." Id.

The petitioner glosses over these alternatives that the judge employed in response to the first and second notes.  She focuses in isolation on the third note and contends that the judge, in response to that note, should have inquired pursuant to Mass. R. Crim. P. 27 as to the existence

---

[7] Although the habeas petition in Renico was brought pursuant to 28 U.S.C. § 2254, the case is not distinguishable on that basis.  The Court's discussion of what trial judges are not obligated to do before declaring a mistrial when the jury is at an impasse, and its rejection of a multi-factor test for determining whether a judge has exercised sound discretion in declaring a mistrial, was based on the Court's double jeopardy jurisprudence, separate and apart from the additional deference required under section 2254 and the federal habeas statute.  See Renico, 559 U.S. at 778-779.

of any partial verdicts.  See Pet. Mem. at 2, 19-22.  But the SJC, construing Massachusetts law—

Rule 27; ch. 234A, § 68C; and that court's prior precedents—held that the judge was not required

to make additional inquiry into the jury's deliberations, including the possibility of a partial

verdict, or to poll the jurors to confirm their deadlock, and that had she done so, it would have

improperly "risked coercing a verdict."  See Read, 495 Mass. at 321-324, 326.  As there was no

federal constitutional imperative that the trial judge make these inquiries, see Renico, 559 U.S. at

775, the SJC's determination that further inquiry was not a viable alternative to a mistrial as a

matter of state law is dispositive.  See Marshall, 753 F.3d at 12, 19 (federal habeas court "bound

by the state court's construction of its state statutes and other issues of state law").[8]

Nor did the trial judge fail to provide defense counsel an opportunity to be heard.  See

Read, 495 Mass. at 325-326.  In addition to soliciting counsel's views after the first and second

notes, the judge found that counsel had multiple opportunities to object to the declaration of a

mistrial if they in fact wanted to do so at the time.  (R.401).  Counsel could have objected, or at

least have asked to be heard on the matter—whether it was a request to be heard at that moment

or at some point before any final decision was made on a mistrial—while waiting for the jurors

to enter the courtroom, especially since the judge had announced to counsel that the jury

remained at an impasse.  The defense also could have voiced an objection or asked to be heard

during the subsequent discussion with the judge about scheduling a status hearing, or even while

---

[8] Even if there had been an error under state law in the application of Mass. R. Crim. P. 27, such a state-law error alone would not be a basis for relief.  As relevant here, section 2241 does not permit relief unless a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  Cf. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (affirming, in section 2254 context, that "'federal habeas corpus relief does not lie for errors of state law'" and "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States").

the jurors were still at the courthouse and waiting in the deliberation room for the judge to speak

to them. The judge further found that, had counsel objected or raised an issue, she would have

heard from counsel. She also made a point to note that "defense counsel were no shrinking

violets"—they had never needed the judge to inquire whether they had an objection in order to

be heard, and she had never refused them an opportunity to be heard in open court or at sidebar

—making it difficult for the judge "to believe that when counsel heard that the jury was at an

impasse for a third time and a mistrial was inevitable, at perhaps the most crucial point in the

trial, counsel would sit silently if they did not consent to a mistrial." (R.401-402). See Read,

495 Mass. at 318.

Despite several opportunities to do so, defense counsel neither objected to nor expressed

any dissatisfaction with the declaration of a mistrial. See id. at 325. For these reasons, the trial

judge found not credible the assertions in the petitioner's motion to dismiss that the declaration

of the mistrial was "sudden" and "unexpected," or defense counsel's assertion in his affidavit in

support of the motion that he lacked an opportunity to be heard. See id.; R.287, 401-402.

These findings and credibility determinations, which are binding, belie the petitioner's claim that

counsel was not afforded "any meaningful opportunity to be heard." (Pet. Mem. at 16).

> ### D. Alternatively, the petitioner may be retried on counts one and three because she consented to the mistrial.

For much the same reason, the trial judge also concluded that counsel's lack of objection

constituted consent to the mistrial. (R.399-402). Having determined that the mistrial was

manifestly necessary, the SJC did not need to reach that issue of consent, and it declined to do so.

See Read, 495 Mass. at 326 n.13.[9] The petitioner addresses the issue in a footnote in her

---

[9] The SJC also declined to reach the petitioner's "ancillary argument, raised [on appeal] for the
first time, that the court should have conducted a colloquy with the [petitioner] before finding
such consent." Read, 495 Mass. at 326 n.13. The petitioner does not attempt to develop this

memorandum in support of her petition, asserting that this Court should find that she did not

consent because she did not affirmatively do so and she did not impliedly consent because she

had no opportunity to object.  See Pet. Mem. at 15 n.5.  As detailed above, counsel had ample

opportunity to object but neither did so nor even asked to be heard concerning the mistrial

declaration.  Counsel instead proceeded to schedule a status conference in preparation for the

retrial.  That is sufficient to permit a finding of implied consent, which independently removes

any bar to retrying the petitioner, irrespective of whether there was a manifest necessity for the

mistrial.  See United States v. DiPietro, 936 F.2d 6, 8-10 (1st Cir. 1991) (implying consent where,

following judge's sua sponte announcement of mistrial, defense counsel sat in courtroom for

several minutes without objecting and participated in setting new trial date).  Contrast United

States v. Toribio-Lugo, 376 F.3d 33, 40-41 (1st Cir. 2004) (counsel had no fair opportunity to

object where she made attempts to be heard but judge repeatedly cut her off).

> **E.    The petitioner was not acquitted of any charge because no verdicts of acquittal were returned, announced, and affirmed by the jurors in open court.**

In determining "whether the Double Jeopardy Clause recognizes an event as an

acquittal," the question is whether, "given the operation of state law," the jury "acted on [their]

view that the prosecution had failed to prove its case."  McElrath v. Georgia, 601 U.S. 87, 96

---

ancillary argument in her memorandum or list it in her petition.  It is, therefore, waived for at
least two different reasons.  See Logan v. Gelb, 790 F.3d 65, 70 (1st Cir. 2015) (per curiam)
(noting, in section 2254 case, that an argument not included in a federal habeas petition is
"waived"); Woods v. Medeiros, 465 F. Supp. 3d 1, 8 (D. Mass. 2020), aff'd on other grounds,
993 F.3d 39 (1st Cir. 2021) (noting, in section 2254 case, that argument not developed in
supporting memorandum is deemed waived).  And, in any event, the Supreme Court and the
First Circuit have rejected the argument.  See United States v. Dinitz, 424 U.S. 600, 609 n.11
(1976) (permissibility of retrial following mistrial does not depend on defendant's knowing,
intelligent, and voluntary waiver of double jeopardy rights); United States v. DiPietro, 936 F.2d
6, 11 (1st Cir. 1991) (noting Dinitz's rejection in double jeopardy context of "a waiver theory
analogous to the requirement that waiver of the Sixth Amendment right to counsel must be
knowing, voluntary and intelligent").

(2024) (quotation omitted). See <u>Read</u>, 495 Mass. at 327 (acknowledging same). The SJC's

instruction on what constitutes a valid jury verdict under "the operation of state law" is definitive

and binding in this habeas action:

> "[T]he fundamental requirements for a jury's issuance of a verdict in a criminal case are
> set forth in Mass. R. Crim. P. 27(a). Pursuant to that rule, a valid jury verdict must be
> unanimous and returned by the jury to the judge in open court. Our case law confirms
> that a criminal verdict is effective only when affirmed by jurors in open court. In other
> words, the distinction between informal agreement on a verdict and the actual return,
> receipt, and recording of a verdict in open court is central -- only the latter constitutes a
> final verdict of the jury on a criminal charge. We have consistently reaffirmed this long-
> standing distinction throughout our jurisprudence."

<u>Read</u>, 495 Mass. at 327-328 (quotations and citations omitted). See also <u>A Juvenile</u> v.

<u>Commonwealth</u>, 392 Mass. 52, 56-57 (1984), quoting <u>Lawrence</u> v. <u>Stearns</u>, 11 Pick. 501, 502

(1831) ("The only verdict which can be received and regarded, as a complete and valid verdict of

a jury, upon which a judgment can be rendered, is an open and public verdict, given in and

assented to, in open court, as the unanimous act of the jury, and affirmed and entered of record,

in the presence and under the sanction of the court").

Here, the jury did not return, announce, and affirm a final verdict on any charge. Their

only open and public, unanimous acts were their statements to the judge that they were unable to

reach a unanimous verdict or to attain consensus, remained at an impasse, and were starkly

divided on whether the evidence was sufficient to establish the elements of "the charges."

See <u>Read</u>, 495 Mass. at 328 ("Far from an affirmation in open court of unanimous agreement on

counts one and three, these notes clearly reflected a lack of consensus on 'the charges.' Even if

the jury's deadlock pertained specifically to count two, their notes made no such distinction, nor

did they indicate any verdict would be returned to the judge in open court, as required by Mass.

R. Crim. P. 27(a)" [quotations and citations omitted]). As such, the trial judge and the SJC

correctly ruled that the petitioner was not acquitted of any charge. See <u>id</u>., quoting <u>McElrath</u>,

601 U.S. at 96 ("In the absence of a verdict returned, received, and recorded in open court, we cannot conclude that the jury 'acted on [their] view that the prosecution had failed to prove its case.'").

The requirement of an open and public verdict announced and affirmed in court "is far from a mere formality," id. at 329, though the petitioner argues otherwise (Pet. Mem. at 26). "Public affirmation in open court provides safeguards against mistakes." A Juvenile, 392 Mass. at 57. See also Commonwealth v. Zekirias, 443 Mass. 27, 33 (2004) (verdict must be "affirmed in open court, as the unanimous act of the jury, and in presence of the whole panel," so that each juror may express dissent if their decision has been mistaken, misrepresented, or coerced by other jurors [quotation omitted]). It also protects each juror's right to re-evaluate their position, and to change their mind on any issue or their vote on any charge, during deliberations. See Read, 495 Mass. at 329 ("these principles recognize that, as a practical matter, jurors may agree in the course of deliberations to a tentative compromise on the facts of a case or on the disposition of related charges as they attempt to reach unanimous agreement," and "[s]ince a jury should not be precluded from reconsidering a previous vote on any issue, tentative or conditional agreements reached amid deliberations cannot have the force of a final verdict" [quotations and citations omitted]).[10] Indeed, under state law, even after jurors agree upon a verdict, fill out a

_____

[10] State law confirms that the possibility of a juror changing their mind is not merely hypothetical. See, e.g., Daniels v. Commonwealth, 441 Mass. 1017, 1017 (2004) (on first full day of deliberations, jury told judge they had reached unanimous verdict on one charge but not others; judge ordered jury to resume deliberations; next day, jury reported they had not reached unanimous decision on any charge); Commonwealth v. Floyd P., 415 Mass. 826, 829 (1993) (in delinquency proceeding on charges of armed robbery, aggravated rape, and murder in the first degree, jury note requested instruction on how to proceed where jury had unanimously voted guilty on charges of armed robbery and aggravated rape, but where two jurors stated they would change their votes "if the conviction on rape has to result in first degree murder"); A Juvenile, 392 Mass. at 53 (jury initially reported they could reach verdict on murder charge, but next day they sent judge note indicating they were deadlocked on that charge).

verdict slip, and walk into the courtroom, any juror still remains free to change their mind before the verdict is affirmed and recorded. See Commonwealth v. Nettis, 418 Mass. 715, 718-719 (1994). "Requiring a jury to publicly affirm their verdict in open court thus serves a vital purpose -- it ensures that the verdict agreed upon in private truly reflects the unanimous and deliberate judgment of each juror under public scrutiny, rather than a tentative compromise." Read, 495 Mass. at 329.

Federal precedent does not command a different result here, as Blueford makes clear.[11] There, the foreperson disclosed to the judge that the jury had voted unanimously against guilt on two of the offenses, were deadlocked on a third, and had not voted on a fourth. See Blueford, 566 U.S. at 603-604. The jury continued to deliberate, later reported to the judge that they had not reached a verdict, and the judge declared a mistrial. See id. at 604.

The defendant in that case similarly argued "acquittal is a matter of substance, not form," and that he had been "actually acquitted" of the two offenses based on the foreperson's earlier report of the jury's unanimous votes. Id. at 605-606. The Supreme Court expressed no endorsement of his premise of substance-not-form and instead rejected the argument on its own

_____

[11] In the other cases relied on by the petitioner, the jury did return a verdict or the proceedings were terminated by judicial action. See Pet. Mem. at 24, 26. As to the latter category, the passages quoted in the petitioner's memorandum omit important context, namely the express references to judicial action contained in those decisions. Compare Pet. Mem. at 24 with Martinez v. Illinois, 572 U.S. 833, 841-842 (2014), quoting United States v. Martin Linen Supply Co., 430 U.S. 564, 571 (1977) ("'We have emphasized that what constitutes an "acquittal" is not to be controlled by the form of the *judge's action*'; it turns on 'whether the *ruling of the judge*, whatever its label, actually represents a resolution of some or all of the factual elements of the offense charged'" [emphases added]). In the context of decisions involving the termination of a case by judicial action, double jeopardy principles distinguish between a ruling on the merits and a ruling on procedural grounds; the substance of the ruling, regardless of its form (or how it is styled), makes a difference. There is no such distinction with a jury determination at least because juries do not make procedural rulings, and judicial action does not require the same safeguards that are served by the verdict-in-open-court requirement to confirm that actual and final outcome of deliberations by twelve individuals.

terms.  See id. at 606, 608 (reported votes "lacked the finality necessary to amount to an acquittal on those offenses, *quite apart from any requirement that a formal verdict be returned or judgment entered*" [emphasis added]).  "The foreperson's report was not a final resolution of anything," the Court held, because the jurors continued to deliberate after that report and were therefore free to revisit their prior votes and to change their minds.  Id. at 606-608.  The Court further noted that it would be "unjustified" to assume the reported votes did not later change given the possibility that even a single juror could have rethought their position on those offenses.  Id. at 608.

The petitioner argues that Blueford is "factually distinguishable from the instant case" based on a flawed assumption that the purported juror statements at issue here reflect the jury's position at "the end of deliberations."  (Pet. Mem. at 27-28).  For one thing, a closer reading of the statements reveals that they do not identify at what point during the five days of deliberations the jury allegedly reached unanimous agreements on two of the charges.  See R.283-287, 292-293, 323-326, 330-331.  They therefore do not foreclose the possibility that the supposed unanimity perceived by some jurors was based on a preliminary discussion or straw poll conducted early on in, or at the start of, the deliberations—the very scenario cited by the Supreme Court as a cautionary example.  See Blueford, 566 U.S. at 607-608 ("A single juror's change of mind is all it takes to require the jury to reconsider").  See also Commonwealth v. Roth, 437 Mass. 777, 793 (2002) (even "most recent 'vote' immediately prior to reporting deadlock may well be tentative, a failed experiment in compromise, and not a true expression of each juror's assessment of the case").  For another thing, the purported statements also do not— and cannot—establish that none of the twelve jurors would have changed their mind had the jury gone through the process of returning and affirming a verdict in open court, and the solemnity

that attends such an occasion.  It is the rendering of a verdict that communicates the _true_ finality

and unanimity of the deliberations.  And "[b]ecause the jury did not publicly affirm that the

[petitioner] was not guilty of the charges, there was no acquittal barring retrial under the double

jeopardy clause."  Read, 495 Mass. at 329-330.

F.    **The petitioner's requested posttrial inquiry would require delving into the jury's deliberations, an impermissible subject.**

The petitioner contends, in the alternative, that she is entitled to a posttrial inquiry of the

jurors.  See Pet. Mem. at 28.  The SJC rightly rejected that contention, concluding that the

requested inquiry would contravene Massachusetts law and its "prohibition on probing the

content of juror deliberations."  Read, 495 Mass. at 330.  The court emphasized that

"[m]aintaining the secrecy of those deliberations is a bedrock of our judicial system," which "not

only prevents jury tampering but also upholds the finality of jury verdicts and fosters confidence

in the judicial process."  Id. at 330-331 (quotation omitted).  "Probing secret deliberations to

determine whether the jurors may have privately agreed on a verdict they never returned would

undermine these fundamental principles."  Id. at 331.

Federal law is not to the contrary and does not compel such an inquiry be made

notwithstanding state law.  Compare Fed. R. Evid. 606(b) (during inquiry into validity of verdict,

"a juror may not testify about any statement made or incident that occurred during the jury's

deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental

processes concerning the verdict," and "[t]he court may not receive a juror's affidavit or

evidence of a juror's statement on these matters") with Mass. G. Evid. § 606(b) (prescribing

same limitations).  The Supreme Court has repeatedly affirmed the common law anti-

impeachment principle, which is embodied in Federal Rule of Evidence 606(b)(1).  As noted, it

provides that jurors may not be asked to impeach a verdict by testifying about matters internal to

their deliberations.  See, e.g., <u>Warger</u> v. <u>Shauers</u>, 574 U.S. 40, 47 (2014) (juror may not testify to remarks made by another juror during deliberations which showed that the juror at issue lied during voir dire); <u>Tanner</u> v. <u>United States</u>, 483 U.S. 107, 127 (1987) (anti-impeachment rule bars juror testimony about the consumption of drugs and alcohol by members of the jury during trial).

The requested inquiry would necessarily entail delving into the jury's subjective reasoning and deliberative content.  Although the trial judge accepted the purported juror statements (which contain two, three, or even four levels of hearsay) as true and accurate for purposes of deciding the motion to dismiss, as did the SJC for purposes of the appeal, the judge explicitly disagreed with the petitioner's characterization of those statements as being "strong and uncontradicted."  (R.396).  The judge found that the statements "directly contradict[ed]" the jury's notes during their deliberations, including their final note expressing their stark divide as to the elements of "the charges."  (R.396).  The SJC also found that the statements were "inconsistent with" and "contradict[ed] their prior notes."  <u>Read</u>, 495 Mass. at 313-314.

The petitioner argues, as she did in state court, that the jury's reference to "the charges" can readily be understood to mean count two and its lesser-included offenses.  See Pet. Mem. at 23.  That is not the more natural and straightforward reading, it is not what the trial judge and the SJC found it to mean (findings that are entitled to deference here), nor is it consistent with the petitioner's position at trial.  See R.403 (trial judge noting, "[f]or the defense to now claim that the notes were susceptible to different interpretations such that the Court should have inquired further rings hollow, particularly where [defense counsel] had twice argued that the jury had engaged in due and thorough deliberations and could not agree").  But more importantly, it does not matter what the petitioner now, in hindsight, claims the reference to "the charges" might

25

mean; it matters what the jury meant at the time, and why they said it. That cannot be determined without inquiring into their thinking and deliberations.

Further undermining the petitioner's assertions of some form of finality is the inconsistency even among the jurors who are said to have made statements after the trial. For example, according to Juror C, the jury were unanimous only as to second-degree murder and "the remaining charges were what they were hung on." (R.284-285).[12] Such a statement does not reflect unanimity on counts one and three. Apparently even the five purported jurors, to say nothing of the seven other jurors, were not of one mind. These and other discrepancies would need to be reconciled to establish with any confidence whether in fact, or to what extent, any unanimity may have been reached. That would require an impermissible inquiry into the jurors' deliberative process.

The petitioner claims that her inquiry is directed solely to the "result" of the jury's deliberations and can be accomplished with a single "yes" or "no" question posed to each juror. See Pet. Mem. at 32. But a juror's stated agreement in the jury room to find the petitioner not guilty on a particular charge may have been only a tentative compromise. That juror cannot disclose where they truly stood—that their agreement was merely tentative and may not have been their final position depending on the resolution of the other charges, the jury's further discussion of evidence, or some other reason—without "intrud[ing] into the heart of jury deliberations." (Pet. Mem. at 32).

---

[12] There are additional contradictions. Juror B said that following Tuey-Rodriguez, the deliberations "turned into a bully match." (R.283, 330). Juror C, however, said the jurors "all got along and never heated. They agreed to disagree and respected each other." (R.285). Juror B also said the jury's vote on count two was "split in half" (R.283, 330); Juror C said the vote "started polling at 6/6," but "ended deadlock[ed] @ 4no8yes" (R.284); and the purported juror who left a voicemail for the prosecutor said the final vote was "9-3 guilty" (R.325).

Additional considerations militate against the requested inquiry. Jurors questioned at this point, more than seven months after they were discharged, may feel pressured to provide responses that they believe will minimize their risk of being harmed or harassed. See Read, 495 Mass. at 332 (noting an inquiry of the jurors, now, would "occur well after they became susceptible to outside influences"). People associated with this case have been charged criminally with witness intimidation. (S.R.6). Individuals have also expressed outrage at the jurors and sought to identify them and release their personal information. (S.R. 13-15). One of the jurors has said they fear for their personal safety and that of their family, and they worry that they will be subject to harassment or even physical harm because of what they did or did not do on the jury and the outcome of the jury's deliberations. (S.R.16). Several of the purported jurors wish to remain anonymous. (R.293, 324-325).[13] In view of these circumstances, a "yes"/"no" question may not capture a juror's nuanced views or concerns, or lead to a reliable and accurate understanding.[14]

Allowing such an inquiry raises forward-looking concerns as well:

> "The proper evidence of the decision of the jury is the verdict returned by them upon oath and affirmed in open court; it is essential to the freedom and independence of their deliberations that their discussions in the jury room should be kept secret and inviolable; and to admit the testimony of jurors to what took place there would create distrust, embarrassment and uncertainty."

---

[13] The petitioner remarks, "in the context of this highly publicized case, it strains credulity to suggest" that if the purported juror statements did not "represent the unanimous view of all 12, the remaining jurors would allow the inaccuracy to go uncorrected." (Pet. Mem. at 27). Clearly, there is another reasonable explanation for why other jurors have not drawn further attention to themselves. See also R.331 (Juror B stating they believe "other jurors have been reluctant to come forward because there is so much public and media attention focused on this case").

[14] The extraneous-influence cases cited in the petitioner's memorandum (e.g., Pet. Mem. at 30) are readily distinguishable. Those cases involve inquiry, in certain circumstances, into external or outside-the-courtroom matters that may impermissibly have intruded into deliberations. They rest largely on the principle that a verdict should be based on the evidence heard in court. The inquiry proposed here goes directly to the deliberations themselves.

Commonwealth v. Fidler, 377 Mass. 192, 196 (1979), quoting Woodward v. Leavitt, 107 Mass. 453, 460 (1871). If jurors' deliberations are allowed to become the subject of a posttrial inquiry because of purported statements like those here, future jurors may be hesitant to express their views fully and honestly during deliberations. It also may be more difficult to find jurors willing to serve, both in the retrial here and in other cases, when jurors know their service may not end when the trial ends but could instead subject them to further inconvenience, embarrassment, or harassment well into the future.[15]

## IV.    Conclusion

For the foregoing reasons, the Court should deny the petition for a writ of habeas corpus.

Respectfully submitted,

NORFOLK COUNTY SUPERIOR COURT

By its attorney:

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

By: */s/ Caleb J. Schillinger*
Caleb J. Schillinger
Special Assistant Attorney General
(BBO# 676592)
Assistant Norfolk District Attorney
45 Shawmut Road
Canton, MA 02021
(781) 830-4800

Dated:  February 26, 2025

---

[15] If this Court concludes that the state courts erred by refusing to conduct a posttrial inquiry, it should, in the interest of comity, remand this matter to the state courts to undertake that task.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system on February 26, 2025, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including Martin G. Weinberg, Esq., and Michael Pabian, Esq., counsel for the petitioner in this matter.  There are no non-registered participants involved in this case.


<u>/s/ Caleb J. Schillinger</u>

Caleb J. Schillinger
Special Assistant Attorney General