UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____ )
                                )
                                )
KAREN READ,                     )
            Petitioner          )
                                )
v.                              )          No. 25-CV-10399-FDS
                                )
NORFOLK COUNTY SUPERIOR         )
COURT, MASSACHUSETTS            )
ATTORNEY GENERAL,               )
            Respondents         )
                                )
_____ )

## REPLY TO RESPONDENT NORFOLK COUNTY SUPERIOR COURT'S OPPOSITION TO PETITION FOR A WRIT OF HABEAS CORPUS

**I.      Introduction**

On the first issue raised by Ms. Read's petition, namely the existence of manifest necessity to support a mistrial, the question pending before this Court is whether, as a matter of federal constitutional law, a criminal defendant may be retried where (a) the record reflects no consideration by the court of any alternatives to the declaration of a mistrial, (b) the trial court never consulted with counsel regarding its intention to declare a mistrial or even mentioned the possibility before declaring a mistrial in open court, and (c) the court precipitously declared a mistrial and discharged the jury without evidencing any consideration of the defendant's "valued right . . . to have [her] guilt or innocence determined at" a single trial. *Brady v. Samaha*, 667 F.2d 224, 230 (1st Cir. 1981). Under the binding First Circuit precedents cited below and in her initial Memorandum, Ms. Read respectfully submits that the answer is clearly no.

1

In an effort to avoid this result, Respondent largely relies upon procedural arguments that are directly contradicted by binding precedent. Whether there was manifest necessity to support a mistrial is a question of law, not a "factual finding" for which deference to the state court is due. The First Circuit expressly so held in *Brady*. *See* 667 F.2d at 229 n.6. Similarly, in the context of this petition under 28 U.S.C. § 2241, § 2254's restrictions on the scope of this Court's habeas review, central to the Supreme Court's decision in *Renico v. Lett*, 559 U.S. 766 (2010) that is so heavily relied upon by Respondent, are clearly inapplicable. Respondent concedes as much while, at the same time, relying upon caselaw heavily dependent on those very restrictions.

Finally, Respondent (like the SJC) takes the position that no possible showing, no matter how compelling, that the jury unanimously, unconditionally, and with finality agreed to acquit a defendant but failed to announce such acquittal in open court could ever entitle the defendant to a post-trial judicial inquiry – whether by the federal or state court – to substantiate the fact of an acquittal when that acquittal was reached but not announced. Post-verdict juror *voir dires* are required when a defendant like Ms. Read has met her burden of production showing the high probability that the jury reached a final unanimous verdict of not guilty and no precedent cited by Respondent prohibits either this Court or the state court judge from conducting such an inquiry.

## II.    Standard of Review

As noted in Ms. Read's opening Memorandum, "[o]rdinarily, a motion to dismiss on double jeopardy grounds rests on a pure question of law that [the Court] review[s] de novo." Dkt. 2 at 13 (quoting *United States v. Candelario-Santana*, 977 F.3d 146, 154 (1st Cir. 2020)). But Respondent seeks to avoid the merits of the legal issue, repeatedly citing purported "factual findings" by the state courts on the issue of manifest necessity. Dkt. 18 at 1, 14, 18. But this

underpinning of the Opposition is contrary to binding First Circuit law holding that "the inquiry into the [trial] judge's discretion and the existence vel non of manifest necessity" is "a question of law or, at most, a mixed question of law and fact," "***not*** a habeas corpus factual review." *Brady*, 667 F.2d at 229 n.6 (emphasis added).

Along similar lines, while nominally acknowledging that this § 2241 petition is not subject to the strictures of § 2254, enacted in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Dkt. 18 at 11 & 16 n.7, Respondent's argument proceeds as if this were a § 2254 case. Its leading authority, *Renico v. Lett*, arose in that context. Respondent's contention that *Renico* "is not distinguishable on that basis" because its "rejection of a multi-factor test for determining whether a judge has exercised sound discretion in declaring a mistrial[] was based on the Court's double jeopardy jurisprudence, separate and apart from the additional deference required under section 2254," simply cannot be squared with the *Renico* opinion itself.

The very first words of the *Renico* Court's legal analysis were:

> It is important at the outset to define the question before us. That question is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." § 2254(d)(1).

559 U.S. at 772-73. Notably, the Court characterized this as "a substantially higher threshold for obtaining relief than [the] *de novo*" standard applicable here. *Id.* at 773 (citation omitted). *Renico* repeated in its closing words, "[w]hether or not the Michigan Supreme Court's opinion reinstating [the petitioner's] conviction in this case was *correct,* it was clearly *not unreasonable.*" *Id.* at 779 (emphasis in original).

3

In addition to imposing an onerous standard of review on petitioners, § 2254 also severely restricts the scope of authority on which they may rely.  It requires "an unreasonable application of . . . clearly established Federal law, ***as determined by the Supreme Court of the United States***."  *Id.* at 772 (quoting § 2254(d)(1)) (emphasis added).  It was based on this statutory provision, which it bears repeating Respondent concedes is inapplicable here, that *Renico* "expressly rejected," Dkt. 18 at 15, the petitioner's reliance on Sixth Circuit precedent analyzing "whether the judge (1) heard the opinions of the parties' counsel about the propriety of the mistrial; (2) considered the alternatives to a mistrial; and (3) acted deliberately, instead of abruptly."  *Renico*, 559 U.S. at 778-79 (citation omitted).  The Sixth Circuit caselaw did "not constitute 'clearly established Federal law, as determined by the Supreme Court,' so any failure to apply that decision [could not] independently authorize habeas relief under AEDPA."  *Id.* at 779 (citation omitted).

As the authorities cited in Ms. Read's opening Memorandum make clear, the First Circuit, like the Sixth Circuit, has adopted this three-factor inquiry regarding whether the declaration of a mistrial was supported by manifest necessity.  *See* Dkt. 2 at 15-21 (citing *United States v. Garske*, 939 F.3d 321, 334 (1st Cir. 2019); *Brady*, 667 F.2d at 229; *United States v. Ramirez*, 884 F.2d 1524, 1529-30 (1st Cir. 1989); *United States v. Toribio-Lugo*, 376 F.3d 33, 39 (1st Cir. 2004)).  Respondent appears to incorrectly take *Renico* as license to ignore the foregoing authority, which it does not cite at all on the issue of manifest necessity.  In the context of this § 2241 petition, however, the First Circuit's construction of federal Double Jeopardy protections is binding on this Court.

4

**III.    Re-Prosecution Is Barred Because There Was No Manifest Necessity to Declare a Mistrial on Counts on which the Jury Was Not Deadlocked**

The question facing this Court is whether, applying the foregoing First Circuit precedent, the Commonwealth has satisfied its burden of establishing manifest necessity for a mistrial.  The answer is clearly no.

A.    <u>The Record Indisputably Establishes That the Trial Court Did Not Consult Counsel Regarding the Declaration of a Mistrial</u>

First, the record makes clear that the trial court "did not give counsel an opportunity to object or discuss with them the advisability of a mistrial." *Ramirez*, 884 F.2d at 1529.  Neither the court nor either party even mentioned the possibility of a mistrial until the trial judge *sua sponte* declared one in the presence of the jury.  Respondent argues that, "assuming federal law" requires consultation with counsel, Dkt. 18 at 16, counsel for Ms. Read "could have objected, or at least have asked to be heard on the matter . . . while waiting for the jurors to enter the courtroom." *Id.* at 17.[1]  It bears repeating that this was a mere 30-second interval, during which counsel could not possibly have known precisely when the jury would arrive, or, once they did, what the court intended to say to the jury, whether the court intended to question the jury, and when the court would consult with counsel before deciding on how to respond to the jury note. *See* Dkt. 2 at 17.

In any event, Respondent's claim that the mere theoretical possibility of an uninvited objection during this interval was sufficient is foreclosed by First Circuit precedent.  In *Ramirez*,

---

[1] Respondent's suggestion that counsel had a sufficient opportunity to be heard in response to the first two jury notes overlooks the fact that, at that point, the issue was whether a *Tuey-Rodriguez* instruction, sought by the defense alone, should be given to break any impasse whether on one or more charges.  *See infra* pages 7-8.

5

after taking witness testimony regarding a possible defect in the jury venire, the trial court declared a mistrial "without consulting defense counsel or the prosecutor." 884 F.2d at 1527. "The jury was then brought in, thanked for their services and discharged." *Id.* The First Circuit held that this did not constitute a sufficient opportunity to object for Double Jeopardy purposes, even though counsel (no less than in the present case) could have lodged an objection or asked to be heard after the court stated its intention to declare a mistrial. In fact, in *Ramirez*, unlike in the present case, the court had, prior to taking the witness testimony, already asked counsel for their position regarding a mistrial, putting them on notice of the issue. *See id.* at 1526. Similarly, in *Brady*, the trial court, shortly after appointing standby counsel, "heard the defendants . . . outside the presence of the jury" regarding an order it had issued "to govern the conduct of . . . the trial." 667 F.2d at 227. When the defendants became argumentative, the court "order[ed] a mistrial." *Id.* Given that the jury was not present, defendants or standby counsel could theoretically have objected. But the First Circuit nonetheless found insufficient consultation with counsel. *See id.* at 229. These precedents are dispositive here. In fact, unlike in the present case, the trial court in *Ramirez* and *Brady* stated its intent to declare a mistrial ***before*** calling in the jury, providing more of an opportunity to object than that afforded to Ms. Read.

Contrary to Respondent's suggestion, whether counsel had an adequate opportunity to object is a question for this Court to decide applying the foregoing First Circuit caselaw to the transcripts and video footage of the proceedings (which Respondent does not in any respect question the accuracy of). In doing so, the Court is not bound by any purported "credibility determination[]," Dkt. 18 at 18, by the trial court. *See United States v. Donald*, 84 F.4th 59, 68 (1st Cir. 2023) (rejecting district court finding as to officer's statement during recorded

interrogation as clear error because Court's "review of the recording" led it "to conclude that it [wa]s clear that" the officer made the disputed statement); *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (granting summary judgment on grounds that "[r]espondent's version of events [wa]s so utterly discredited by the [videotape recording of the car chase at issue] that no reasonable jury could have believed him" and commenting that the "Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape").

B.    The Record Reflects No Consideration by the Trial Court of Any Alternatives to a Mistrial

The record is equally insufficient regarding the requirement that the trial court consider alternatives to a mistrial. First Circuit law could hardly be clearer that, "[w]here there is a viable alternative to a mistrial and the [trial] court fails adequately to explore it, a finding of manifest necessity cannot stand." Dkt. 2 at 21 (quoting *Toribio-Lugo*, 376 F.3d at 39).[2] The key here is that the alternatives considered must relate to the prospect of a mistrial. "[T]he test is not whether the judge considered that [s]he had a potential problem on h[er] hands but rather whether [s]he accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding." Dkt. 2 at 21 (quoting *Brady*, 667 F.2d at 230). Accordingly, Respondent's reliance upon the trial court's consideration, in response to the first and second jury notes, of a *Tuey-Rodriguez* instruction is insufficient as a matter of law. On both occasions, the trial court asked for counsels' views on a single legal issue: "whether there ha[d] been due and thorough deliberations" sufficient to support the giving of a *Tuey-Rodriguez* charge under

---

[2] Again, Respondent, despite this clear binding precedent, merely "assum[es]" that federal law requires consideration of alternatives to a mistrial. Dkt. 18 at 16.

state law.  (R. 251; *see also* R. 261).  "But there is nothing in the record to indicate that the judge was considering a mistrial at that time."  *Brady*, 667 F.2d at 230.

Under binding First Circuit caselaw, the trial court's consideration of a distinct legal issue, *i.e.*, whether state law permitted a *Tuey-Rodriguez* instruction, did not constitute the required consideration of alternatives **to a mistrial**.  *See id.* at 230 (rejecting state court's conclusion that trial judge's "instruction to the defendants to read a case on contempt," in response to conduct similar to that which ultimately resulted in the mistrial declaration, was sufficient); *Toribio-Lugo*, 376 F.3d at 39 (holding that district court "never exhausted" the alternative of proceeding with 11 jurors, even though it had "presented the lawyers with" the options of "postpon[ing] the proceedings until the vanished juror could be located or . . . proceed[ing] with a jury of eleven," because "[t]he court never offered the [defendant] a choice between proceeding with eleven jurors or accepting a mistrial").

As the foregoing authorities make clear, the sufficiency of the trial court's consideration of alternatives is a question of federal, not state, law.  In a habeas case, state law, of course, informs the alternatives available to the court, but neither the trial court nor the SJC held that state law **precluded** inquiry (setting aside whether such inquiry is required as a matter of state law) into the existence of any partial verdicts on separately charged counts.  *See Read v. Commonwealth*, 495 Mass. 312, 321 (2025) ("Rule 27(b) . . . gives a trial judge discretion to require a jury to return a verdict for charges on which they have unanimously agreed before declaring a mistrial." (citation omitted)).  Indeed, they could not have reached any such conclusion because it would be contrary to both the applicable rule and binding SJC precedent.  *See* Mass. R. Crim. P. 27(b) ("The judge may declare a mistrial as to any charges upon which the

jury cannot agree upon a verdict; provided, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded."); *A Juvenile v. Commonwealth*, 392 Mass. 52, 55 n.1 (1984) ("Where a complaint or indictment, in multiple counts, charges multiple crimes . . . a general verdict could be returned as to one of the counts, despite deadlock on the other counts.").  Accordingly, inquiry regarding partial verdicts was an available alternative.  *See Dunkerly v. Hogan*, 579 F.2d 141, 147 (2d Cir. 1978) (observing in finding lack of manifest necessity that the trial judge did not "suggest that the alternative of a short continuance would be . . . violative of any state law").  Importantly, the Court need not hold that the trial judge was required to pursue that alternative.  Rather, it is the trial court's failure to even consider available alternatives that precludes a finding of manifest necessity.

      C.      <u>The Commonwealth Has Not Satisfied Its Heavy Burden of Establishing Manifest Necessity based on the Existence of a "Genuine" Deadlock</u>

Ms. Read maintains that the foregoing failure to consult counsel or consider alternatives alone precludes a finding of manifest necessity and that, in these circumstances, no deference is due to the trial court's declaration of a mistrial.  As the Supreme Court has made clear, "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to h[er], the reason for such deference . . . disappears."  *Washington*, 434 U.S. at 510 n.28.  Here, "[w]ith the record barren of any hint whatsoever that the judge was aware of the double jeopardy implications of h[er] decision," the Court cannot find that "h[er] discretion was sound."  *Brady*, 667 F.2d at 230-31; *see also id.* at 229 (distinguishing *Washington*, where the "trial judge listened to counsel, deliberated, and expressed his concern for the double jeopardy implications of his ruling, thus persuading the Supreme Court that he had acted responsibly in light of the

importance of the defendant's constitutional right").  At the very least, the trial court's discretion

(assuming *arguendo* any deference is due) cannot be as standardless as Respondent suggests.

Rather, as the First Circuit has repeatedly held, the court's exercise of discretion must be cabined

by factors designed to ensure "careful consideration of the valued right of the defendants to have

their guilt or innocence determined at" a single trial.  *Id.* at 230.

       As Respondent now acknowledges for the first time, the Commonwealth, as the party

seeking a second trial, unequivocally bears the "heavy" burden to establish that the requisite

careful consideration occurred.  *Washington*, 434 U.S. at 505; Dkt. 18 at 15.  Notwithstanding

the clear binding precedent on this issue and Ms. Read's raising it repeatedly, neither the trial

court, the SJC, nor the Commonwealth even mentioned the appropriate allocation of this burden

in the state court proceedings.  Instead, the SJC repeatedly read ambiguous aspects of the record

in favor of the Commonwealth and against Ms. Read.  *See, e.g.*, *Read*, 495 Mass. at 321

(observing that neither of first two jury notes "suggested the jury had reached, or could reach,

consensus on any subset of the charges"); *id.* at 325 ("[T]here is no indication that inviting

defense counsel to participate in" consultation regarding third note "would have produced any

fruitful alternatives." (citation omitted)).  Respondent's contention that a "deadlocked jury is the

type of manifest necessity sufficient to meet" the Commonwealth's "burden," of course, simply

begs the question as to whether such deadlock has been established.  Dkt. 18 at 15; *see*

*Candelario-Santana*, 977 F.3d at 158 ("The key to this principle . . . is that the jury must be

*genuinely* deadlocked." (emphasis in original)).  The SJC's reversal of the burden on this issue

constitutes a clear error of law that, in itself, violated Ms. Read's constitutional rights.  *See, e.g.*,

*United States v. McIntosh*, 380 F.3d 548, 554 (1st Cir. 2004) ("An error of law, of course, is

tantamount to an abuse of discretion."); *Candelario-Santana*, 977 F.3d at 161 ("[A]mbiguous

verdicts . . . must be construed in favor of the defendant.").

Notwithstanding its provision of a *Tuey-Rodriguez* charge earlier in the day, at the crucial

point after the jury sent its final note, the "trial court took no steps to clarify" the scope of the

jury's impasse. *Candelario-Santana*, 977 F.3d at 160. In fact, while the prior instruction

encouraged the jury to reach a verdict, at no time did the trial judge do anything at all to confirm

whether the jury had reached an impasse on all counts, as opposed to merely some subset of the

counts (as the post-trial affidavits powerfully indicate is the case) and, post-trial, both the trial

judge and Respondent have been unwavering in their opposition to a *voir dire* of the jurors so

that there can be certitude as to whether the jury reached a final, unambiguous, collective, and

unanimous decision that acquitted Ms. Read of second-degree murder and leaving the scene of a

collision.

> D.    The Court Should Reject Respondent's Alternative Argument that Ms. Read
>        Consented to the Mistrial

The Court should reject Respondent's alternative contention, which the SJC did not rule

upon, that Ms. Read's counsel consented to the mistrial. The sole authority relied upon in

support of that argument, *United States v. DiPietro*, 936 F.2d 6 (1st Cir. 1991), is readily

distinguishable. *DiPietro* did not involve a jury deadlock. Instead, the court declared a mistrial

after "the government asserted that the guilty pleas and convictions of" other alleged participants

in the defendant's criminal conduct "constituted evidence that all the elements of the accusations

against [the defendant] had been proved, thus using their convictions for purposes other than

credibility." *Id.* at 7. After a recess for lunch, the court "summoned counsel and the court

reporter, and took notes while the reporter read back the government's rebuttal argument," after

which the attorneys withdrew "with no further comment." *Id.* at 8.  Upon reconvening, "the court declared a mistrial and excused the jury." *Id.*

*DiPietro* is inapposite here for a number of reasons.   First, "the error occurred several hours before the declaration of a mistrial" and "[d]efense counsel was arguably on inquiry notice when the court summoned the attorneys for conference and reviewed the erroneous government argument to the jury." *Id.* at 11.  Here, by contrast, the trial court called in the jury immediately after informing counsel that the jury was at an impasse and before it even disclosed the contents of the note to counsel.  The jury arrived a mere 30 seconds later.  Counsel cannot reasonably be expected to have anticipated the *sua sponte* mistrial declaration given (a) the court's established practice of reviewing jury notes with them and providing an opportunity to respond – a continuing, predictable prior practice that counsel had every reason to believe would not be varied from at this pivotal moment of the trial and (b) 40 years of SJC precedent guaranteeing them a "full opportunity to be heard" before a mistrial was declared.  Dkt. 2 at 17 (citing cases).  Second, while the *DiPietro* Court found "ample opportunity to object when the mistrial decision was declared," such an opportunity to object in the presence of the jury is not sufficient where, as here, a mistrial is declared for a jury deadlock.  As one authority heavily relied upon by *DiPietro* observed, "[w]hen defense counsel objects in the jury's presence after a mistrial declaration due to jury deadlock, he endures the risk that the jury will hold him responsible for compelling them to continue deliberations contrary to the opinion of both judge and jury." *Camden v. Cir. Ct. of Second Jud. Cir.*, 892 F.2d 610, 615 n.6 (7th Cir. 1989).  Finally, while the *DiPietro* Court noted counsel's failure to object after the jury was dismissed in combination with the other prior opportunities to object, such an after-the-fact opportunity, standing alone, does not rise to the

level of consent.  *Cf. Candelario-Santana*, 977 F.3d at 162 (noting that district court "only

addressed counsel after reading and confirming the verdict in open court to ask if there was

'[a]nything else' before discharging the jury").  Moreover, the *post hoc* discussion in *DiPietro*,

unlike that at issue here, specifically related to the "explanation of the reason for a mistrial,"

substantially increasing the likelihood that counsel would have raised any objection they had

regarding that issue.

Finally, Respondent's characterization of *DiPietro* is contrary to the string of First Circuit

precedents relied on above.  If counsel's mere failure to object to a *sua sponte* declaration of

mistrial upon which counsel was not asked to comment amounted to consent, then the defendants

in *Brady*, *Ramirez*, and *Candelario-Santana* would have been found to have consented to the

mistrials, obviating the need for any manifest necessity analysis.  Clearly, that is not the law in

the First Circuit.

**IV.    The Jury's Unanimous Conclusion Following Trial that Ms. Read Is Not Guilty on
         Counts 1 and 3 Constitutes an Acquittal and Precludes Re-Prosecution**

As noted in Ms. Read's opening Memorandum, "***whether an acquittal has occurred for***

***purposes of the Double Jeopardy Clause is a question of federal, not state, law***."  Dkt. 2 at 25

(quoting *McElrath v. Georgia*, 601 U.S. 87, 96 (2024)).  This, in itself, is sufficient to reject

Respondent's argument that "[t]he SJC's instruction on what constitutes a valid jury verdict . . .

is definitive and binding in this habeas action."  Dkt. 18 at 20.  The operative question, under

federal law, is whether "there has been any ruling that the prosecution's proof is insufficient to

establish criminal liability for an offense."  *McElrath*, 601 U.S. at 96 (citation omitted).  While

"operation of state law" may inform whether the jury reached such a conclusion, *id.*, *i.e.*, by

defining what the jury was required to find, this Court may not defer to state procedural requirements regarding the form that any such finding must take.

In *McElrath*, for example, the Supreme Court of Georgia had vacated a verdict finding the defendant not guilty by reason of insanity under a state law "repugnancy" doctrine which, the state court held, rendered the not guilty verdict a "nullity" that "should not have been accepted by the trial court." *Id.* at 95-96 (citation omitted). The Supreme Court reversed, reaffirming that, "[b]ecause of" the Double Jeopardy caselaw's "focus on substance over labels, a State's characterization . . . of [a ruling] is not binding." *Id.* at 96 (citation omitted). In other words, "it is not dispositive whether a factfinder incanted the word acquit; instead, an acquittal has occurred if the factfinder acted on its view that the prosecution had failed to prove its case." *Id.* at 96 (citation omitted).

Respondent maintains that form must control over substance in the context of a jury acquittal, though it concededly does not for judicial acquittals. *See* Dkt. 18 at 22 n.11. This contention is inconsistent with *McElrath* itself (which refused to elevate form over substance in the context of a jury acquittal), as well as the Supreme Court's clear instruction that "[t]he Double Jeopardy clause . . . prohibits reexamination of a court-decreed acquittal to the same extent it prohibits reexamination of an acquittal by jury verdict." Dkt. 2 at 26 (quoting *Smith v. Massachusetts*, 543 U.S. 462, 467 (2005)); *see also Ball v. United States*, 163 U.S. 662, 671 (1896) ("However it may be in England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense."). Respondent also ignores the Supreme Court caselaw finding jury acquittals "***implied*** by a conviction on a lesser included offense." Dkt. 2 at 26 (quoting *Price v. Georgia*, 398 U.S. 323,

14

329 (1970)); *see also Green v. United States*, 355 U.S. 184, 191 (1957) ("[W]e believe this case can be treated no differently, for purposes of former jeopardy, than if the jury had returned a verdict which expressly read: 'We find the defendant not guilty of murder in the first degree but guilty of murder in the second degree.'"). In one such implied acquittal case, the Sixth Circuit relied upon the very same language from the Supreme Court's *Martin Linen* opinion that Respondent criticizes the Petitioner for citing here: "we must determine whether the ruling of the judge *(or jury)*, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charges." *Terry v. Peers*, 786 F.2d 1166, at *3 (6th Cir. 1986) (unpublished) (emphasis added). As Ms. Read's initial Memorandum noted, and Respondent fails to address, in the rare situation presented here, where the jury reached a final decision that the defendant is not guilty but failed to accurately announce that verdict, federal courts have acknowledged the substantive acquittal, notwithstanding the lack of form. *See* Dkt. 2 at 28 (citing *United States v. Dotson*, 817 F.2d 1127, 1129 (5th Cir. 1987); *United States v. Stauffer*, 922 F.2d 508, 511 (9th Cir. 1990)).

*Blueford v. Arkansas*, 566 U.S. 599 (2012), as previously explained, was decided based on a lack of finality, not form. *See* Dkt. 2 at 27-28; *Blueford*, 566 U.S. at 608 (finding that foreperson's report before jury was sent back to continue deliberations "lacked the finality necessary to amount to an acquittal . . . , quite apart from any requirement that a formal verdict be returned or judgment entered").[3] Respondent admits as much, but faults the Petitioner for making "a flawed assumption that the purported juror statements at issue here reflect the jury's

---

[3] It has been clear for more than 100 years that the formal entry of judgment is not required for a jury acquittal to prevent retrial under the Double Jeopardy Clause. *See Ball*, 163 U.S. at 671.

position 'at the end of deliberations.'" Dkt. 18 at 23. As an initial matter, the affidavits at issue were all executed post-trial, and none suggests that the agreement to acquit Ms. Read was tentative or changed at any point. In fact, one juror specifically recounted that, "after the jury was excused and aboard the bus, many of the jurors appeared uncomfortable with how things ended, wondering, *Is anyone going [to] know that we acquitted [Karen Read] on Count 1 and 3?* (R. 293). More fundamentally, to the extent there is any doubt regarding the finality of the jurors' agreement, the remedy is to conduct a *voir dire* as discussed *infra*.

**V.    Alternatively, the Defense Is Entitled to a Post-Verdict Judicial Inquiry to Determine Whether the Evidence Supports the Juror Representations as to Having Acquitted Ms. Read**

Ms. Read has clearly satisfied her burden of production to establish an entitlement to further inquiry regarding her acquittal. Contrary to Respondent's characterization, there is no indication in the affidavits submitted by Ms. Read that the jury's determination was "preliminary" or the result of a mere "straw poll." Dkt. 18 at 23; *see, e.g.*, (R. 287) ("Juror A told [counsel] that the **result** of the deliberations was that the jury unanimously agreed that Karen Read is NOT GUILTY of Count 1 (second degree murder)." (emphasis added)); (R. 293) ("Juror D explained that the jury reached NOT GUILTY **verdicts** on Count 1 and Count 3 . . . . Juror D, without hesitation, said in substance, *Every one of us will agree and acknowledge that we found [Karen Read] NOT GUILTY of Counts 1 and 3. Because that's what happened*." (emphasis added)). While Respondent now suggests doubt regarding the veracity of the juror statements, referring no fewer than 16 times to "purported" jurors or juror statements, the fact remains that it has presented no contrary evidence since the July 8, 2024 filing of Ms. Read's motion to dismiss. In fact, to the contrary, the Commonwealth was contacted by an individual who identified

him/herself "as a juror by full name and seat number," saying s/he could "confirm unanimous on charges one and three, as not guilty." (R. 325). In any event, both state courts assumed the truth of the juror statements, *see Read*, 495 Mass. at 327 n.14, which, on their face, entitle Ms. Read to further inquiry.

Ultimately, there is only one way to determine whether the jury in this case was, in fact, "unable to reach a verdict," Dkt. 18 at 11 (quoting *Renico*, 559 U.S. at 774), or by contrast had reached a partial verdict: through a *voir dire* conducted by this Court or the trial court.[4] Respondent, notably, does nothing to dispute the stunning implications of the SJC decision: "no defendant claiming that the jury acquitted her but failed to announce that verdict would be entitled to further inquiry, no matter how clear or well-supported her claim. . . . [E]ven if all 12 jurors submitted affidavits saying they unanimously and finally agreed to acquit the defendant, their failure to announce that verdict (and the trial court's failure to inquire) would take precedence over the defendant's fundamental constitutional protection against Double Jeopardy." Dkt. 2 at 28-29. Respondent cites no precedent or rationale convincingly supporting such a stark result.

Calling the jurors into Court and asking whether they had reached a final, unanimous verdict to acquit Ms. Read would be accompanied by the same "solemnity," if not more, that generally attends public announcement of verdicts. Dkt. 18 at 23. The answer to that question would, of necessity, dispel Respondent's concern that any such decision was merely preliminary,

---

[4] While Respondent suggests this Court should defer to the state court "in the interest of comity," Dkt. 18 at 28 n.15, it cites nothing that prohibits this Court from conducting a hearing to determine whether retrial would violate Ms. Read's rights under the United States Constitution.

as opposed to final.[5]  It would also confirm what the defense affidavits already expressly state: that all jurors, not just some, agreed Ms. Read is not guilty.  Those statements were widely publicized more than seven months ago and have not been contradicted in any respect by any of the seven other jurors.  Respondent's suggestion that the remaining jurors may have let the five juror statements go uncorrected for fear of drawing "further attention to themselves," Dkt. 18 at 27 n.13, might explain why any one or two jurors failed to come forward, but the defense respectfully submits it cannot convincingly explain the silence of all seven.  In any event, it is a matter readily discernable form the requested *voir dire*, which could be conducted anonymously. Respondent's focus on a few purported inconsistences among the juror statements overlooks the overarching consistency: that the jury unanimously acquitted Ms. Read of two of the three counts pending against her, including the count alleging second-degree murder.  The inconsistencies cited by Respondent simply pale in comparison and are irrelevant to the Double Jeopardy issue. *See* Dkt. 18 at 26 n.12 (noting one juror reported the final vote on Count 2 as 8-4, whereas another reported it was 9-3).

Asking the jury whether it reached a verdict does not infringe upon deliberations.  Rather, it is Respondent that seeks to inject issues regarding deliberations into the inquiry by raising peripheral, and constitutionally irrelevant, matters regarding the juror statements.  But Respondent fails to articulate how any such peripheral issues could change the inevitable constitutional effect of a statement by all 12 jurors that they reached a final, unanimous

---

[5] At present, Respondent's suggestion that one or more jurors may have changed their mind **is** "merely hypothetical."  Dkt. 18 at 21 n.10.  The juror statements reflected in the defense affidavits indicate no such change, nor has the Commonwealth presented any evidence of one in the last seven-plus months.

conclusion that Ms. Read is not guilty of murder.  *See McElrath*, 601 U.S. at 97 ("We simply cannot know why the jury in [this] case acted as it did, and the Double Jeopardy Clause forbids us to guess.").  Even assuming *arguendo* and contrary to the Petitioner's contention that the requested *voir dire* would violate Fed. R. Evid. 606, Respondent does not dispute that such "evidentiary rules cannot extinguish a criminal defendant's fundamental constitutional rights." Dkt. 2 at 32 (citing *United States v. Villar*, 586 F.3d 76, 87 (1st Cir. 2009)).

Ms. Read, who absent intervention of this Court will stand trial for murder beginning April 1, self-evidently has a powerful interest in determining whether she was, in fact, acquitted of that offense by a jury of her peers.  But that is not the only interest at stake here. "Democracies die behind closed doors."  *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002).  As the SJC observed in a case cited by Respondent, "an inflexible rule," like that imposed here, "excluding all juror testimony . . . achieves stability at the expense of doing justice between the parties a result not consistent with the ideal of trial by an impartial jury." *Commonwealth v. Fidler*, 377 Mass. 192, 197 (1979).  In a case that has generated enormous media attention, at a time when confidence in the judiciary is of the utmost importance, the public has a strong interest in a full and fair hearing of this matter, as well as in giving effect to any unanimous decisions reached by 12 of Ms. Read's fellow citizens.

<div style="margin-left:45%">

Respectfully Submitted,
KAREN READ
By Her Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
BBO #519480

</div>

20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Michael Pabian**
Michael Pabian, Esq.
BBO #684589
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

**/s/ Alan J. Jackson**
Alan J. Jackson, Esq.
Admitted *Pro Hac Vice*
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460
ajackson@werksmanjackson.com

**/s/ David R. Yannetti**
David R. Yannetti, Esq.
BBO #555713
44 School St., Suite 1000A
Boston, MA 02108
(617) 338-6006
law@davidyannetti.com

Dated: February 28, 2025

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, February 28, 2025, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.

20