**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| **KAREN READ,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **25-cv-10399-FDS** |
| ) | |
| **NORFOLK COUNTY SUPERIOR COURT** ) | |
| and **MASSACHUSETTS ATTORNEY** ) | |
| **GENERAL,** ) | |
| ) | |
| **Respondents.** ) | |
| _____ ) | |

**MEMORANDUM AND ORDER ON**
**PETITION FOR WRIT OF HABEAS CORPUS**

**SAYLOR, C.J.**

This is a petition for writ of habeas corpus under 28 U.S.C. § 2241.  Petitioner Karen Read is under indictment in the Massachusetts Superior Court for second-degree murder and two other charges.  She was tried on those charges beginning on April 16, 2024.  On July 1, 2024, after the jury reported that it was deadlocked, the trial judge declared a mistrial.

Petitioner moved in the Superior Court to dismiss two of the three charges on the ground that the Double Jeopardy Clause barred a retrial of those charges.  The Superior Court denied that motion, and petitioner appealed that ruling to the Massachusetts Supreme Judicial Court.  The SJC affirmed the Superior Court by a unanimous vote.  Petitioner then filed this habeas petition.  The retrial is scheduled to commence in the Superior Court on April 1, 2025.

The issues presented by the petition are limited to those arising under the federal Constitution—specifically, whether a retrial would constitute double jeopardy in violation of petitioner's rights under the Fifth and Fourteenth Amendments.  For the reasons set forth below,

the petition will be denied.

**I.    Background**

**A.    2024 Trial**

On June 9, 2022, the Commonwealth of Massachusetts charged petitioner Karen Read with second-degree murder, in violation of Mass. Gen. Laws ch. 265, § 1 (Count One); manslaughter while operating under the influence of alcohol, in violation of Mass. Gen. Laws ch. 265, § 13½ (Count Two); and leaving the scene of a collision resulting in death, in violation of Mass. Gen. Laws ch. 90, § 24(2)(a½)(2) (Count Three). *See Read v. Commonwealth*, 495 Mass. 312, 314 (2025).

A jury trial began in Norfolk County Superior Court on April 16, 2024, and lasted more than two months. *See id*. At the close of evidence, the jury received instructions concerning the three charged offenses, as well as two lesser-included offenses in Count Two: involuntary manslaughter and motor vehicle homicide. *See id*.

As part of its instructions, the trial judge indicated that the jury would receive separate verdict slips for each of the three charges. *See id*. The foreperson was directed to check the appropriate boxes as to each charge and to notify the court once the jury had reached a unanimous verdict. *See id*. The trial judge further instructed the jurors to "continue deliberating until [they] ha[d] reached a final verdict on each charge" and not to disclose their progress or standing as to any charge until they had reached a unanimous verdict. *See id*.

On the jury's third day of deliberations, the foreperson delivered a note to the court. *See id*. At that point, the jury had been deliberating for approximately 19 hours. In its entirety, the note said:

> I am writing to inform you, on behalf of the jury, that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict.

*See id.*

The court read the note into the record, and then invited argument from the parties as to whether it should issue a *Tuey-Rodriguez* charge (which is the Massachusetts equivalent of the federal *Allen* charge).  *See id.* at 315; *see also Commonwealth v. Rodriguez*, 364 Mass. 87, 101-02 (1973); *Commonwealth v. Tuey*, 8 Cush. 1, 2-3 (1851); *Allen v. United States*, 164 U.S. 492 (1896).  Such an instruction is designed to "urge the jury to reach a verdict by giving more serious consideration to opposing points of view" when the jury is deadlocked after "due and thorough deliberations."  *Commonwealth v. Carnes*, 457 Mass. 812, 827 (2010); Mass. Gen. Laws ch. 234A, § 68C.

The Commonwealth opposed issuing the instruction.  Counsel for petitioner, however, asserted that the jury's use of the terms "impasse" and "exhaustive" indicated that the jury's deliberations had been sufficiently "due and thorough," and thus warranted the instruction.  *See Read*, 495 Mass. at 315.  Given the length of the trial, the volume of evidence presented, and the complexity of the issues, the trial judge determined that "due and thorough" deliberations had not yet been completed, and thus the instruction was not appropriate at that time.  *See id.*

At around 10:45 a.m. on the following Monday, July 1, 2024, the foreperson submitted a second note to the court.  *See id.*  By that point, the jury had deliberated for approximately 25 hours.  The second note stated:

> Despite our commitment to the duty entrusted to us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind.
>
> The divergence in our views are not rooted in a lack of understanding or effort, but deeply held convictions that each of us carry ultimately leading to a point where consensus is unattainable.
>
> We recognize the weight of this admission and the implications it holds.

*See id.*  After soliciting further argument from the parties, the trial judge determined that a *Tuey-*

*Rodriguez* instruction was appropriate at that point.  The court noted that it had "never seen a note like this [from a jury] reporting to be at an impasse." *Id*. at 316.  The instruction was given to the jurors, who then returned to the jury room for further deliberations. *See id*.

Later that day, at around 2:30 p.m., the foreperson delivered a third note to the court. *See id*.  By that point, the jury had deliberated for nearly 30 hours in total.  The third note stated:

> Despite our rigorous efforts, we continue to find ourselves at an impasse.
>
> Our perspectives on the evidence are starkly divided.  Some members of the jury firmly believe that the evidence surpasses the burden of proof establishing the elements of the charges beyond a reasonable doubt.  Conversely, others find the evidence fails to meet this standard, and does not sufficiently establish the necessary elements of the charges.
>
> The deep division is not due to a lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions.
>
> To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs.

*See id*.

The court read the note into the record before the parties, directed that the jury be brought back into the courtroom, and declared a mistrial. *See id*.  The court then discharged the jury and discussed setting a future status conference with the parties. *See id*.  Petitioner's counsel did not object to the court's declaration of a mistrial at any time during that discussion or ask to be heard on that topic. *See id*.

## B.    Post-Trial Events

On July 2, 2024, one day after the trial concluded, "Juror A" contacted one of petitioner's counsel to inform him that the jury had agreed the defendant was not guilty of either Count One or Three. *See id*.  The following day, July 3, a person who was not a member of the jury sent petitioner's counsel screenshots of text messages from "Juror B" saying, among other things, "It

4

was not guilty on second degree.  And split in half for the second charge." *Id*. at 317.[1]  Another

person, not a member of the jury, sent petitioner's counsel screenshots of text messages

summarizing a conversation "Juror C" had with friends about deliberations.  *See id*.  According

to this intermediary, "manslaughter started polling at 6/6 then ended deadlock @4no8yes." *Id*.[2]

Several days later, "Juror D" contacted petitioner's counsel to explain that the jury's deadlock

related only to Count Two and its lesser included offenses.  *See id*.  "Juror E," similarly,

contacted petitioner's counsel to explain that the jury had been deadlocked only on the "lower

charges on count 2." *Id*.

Based on a subset of those statements, petitioner filed a motion to dismiss Counts One

and Three on July 8, 2024, one week after the declaration of a mistrial.  *See id*.  In substance,

petitioner argued that the jurors' post-trial statements demonstrated that the jury had effectively

acquitted her as to those counts, rendering a potential retrial unconstitutional.  *See id*.  She

further contended that the declaration of a mistrial was improper as to those two counts and that

the court, at a minimum, should conduct a post-verdict inquiry to verify the subsequent accounts

of the deliberations.  *See id*.

After petitioner's counsel attested to the juror communications as a part of petitioner's

motion to dismiss, the Commonwealth also received communications from several jurors.  *See

id*. at 318.  One juror left the prosecutor two voicemails stating that the jury had voted not guilty

---

[1] According to the affidavit of petitioner's counsel, the text read, "It was not guilty on second degree. And split in half for the second charge. When the judge sent us back with that Hernandez thing to look at the other side it turned into a bully match. I thought the prosecution didn't prove the case. No one thought she hit him on purpose or even thought she hit him on purpose [sic]." (Pet. Ex. A at 283). Juror B later affirmed the content of these messages directly to petitioner's counsel. (*Id.* at 330).

[2] According to the affidavit of petitioner's counsel, the summary also stated, "no consideration for murder 2." Upon questioning, the intermediary further stated, "the remaining charges were what they were hung on." (Pet. Ex. A at 285).

on Counts One and Three and had voted "9-3 guilty on the lower manslaughter charges." *Id.*[3]
Three other jurors e-mailed the prosecutor asking to speak about deliberations anonymously, but
declined to do so after they were informed that the Commonwealth might have to disclose what
they said to petitioner's counsel or the court. *See id.*

After hearing argument, the trial court denied the motion to dismiss Counts One and
Three. The court stated that there had been "no open and public verdict affirmed in the open
court" acquitting petitioner of any of the charges. *Id.* The court also rejected petitioner's
contention that declaration of a mistrial was inappropriate, noting that petitioner had herself
twice requested a *Tuey-Rodriguez* instruction—which is typically the last step before a mistrial—
and at no point objected to or sought to opine on the court's mistrial declaration. *See id.* In light
of the jury's multiple notes indicating a deadlock, the court concluded that a mistrial was
necessary and appropriate. *See id.*

C.    **SJC Appeal**

On September 11, 2024, petitioner filed a petition to the Supreme Judicial Court of
Massachusetts ("SJC"). On February 11, 2025, the SJC affirmed the trial court's denial of the
motion to dismiss. *See id.* at 314.

The SJC first held that the trial court properly acted within its discretion to determine that
the jury was at an impasse and that a mistrial was "manifestly necessary." *Id.* at 320. It based
that conclusion primarily on the jury's "increasingly emphatic notes," some of which "echo[ed]
language from other cases where [the SJC] ha[s] characterized a jury's report of deadlock as
'unambiguous.'" *Id.* It went on to reject petitioner's contention that no "manifest necessity" had
been established because the trial judge failed to adequately consider alternatives to mistrial. *See*

_____

[3] According to the Commonwealth, those messages came on August 1, one month after the jury was
discharged. (Pet. Ex. A at 325).

*id.* at 321.  According to the SJC, the judge "did consider and pursue such alternatives" by taking a measured and iterated approach to breaking the deadlock.  *Id.*

The SJC specifically rejected petitioner's other proposed alternatives, including inquiring about a partial verdict or polling the jury.  *See id.* at 321-25.  It found that while Mass. R. Crim. P. 27(d) allows a trial judge to inquire about a partial verdict, "a judge is not required to accept a partial verdict before declaring a mistrial, . . . and is prohibited from doing so on a single indictment that contains lesser included offenses," such as Count Two here.  *Id.* at 321.  The court gave great weight to the fact that "the record before the trial judge suggested complete deadlock" where "[t]he first and second notes provided no indication of a partial consensus, and the third note plainly implied the opposite."  *Id.* at 322.  It also emphasized that "these notes indicated that additional inquiry into the jury's deliberations risked producing a coerced verdict." *Id.* at 322-25.

The SJC also rejected petitioner's claim that the trial judge abused her discretion by declaring a mistrial without notifying defense counsel of the third note's contents and without allowing them to express their views.  *See id.* at 325-26.  It found that "there [was] no indication that inviting defense counsel to participate in a third round of consultation would have produced any fruitful alternatives" to mistrial.  *Id.* at 325.

The SJC then held that "because the jury did not publicly affirm that [petitioner] was not guilty of [Counts 1 and 3], there was no acquittal barring retrial under the double jeopardy clause."  *Id.* at 329-30.  It relied on the fact that, under Mass. R. Crim. P. 27(a), the jury had not returned a valid verdict; only "the actual return, receipt, and recording of a verdict . . . constitutes a final verdict[.]"  *Id.* at 327-28.  The court reasoned that absent these conditions, it "cannot conclude that the jury acted on their view that the prosecution had failed to prove its case," as required to establish acquittal under *McElrath v. Georgia*, 601 U.S. 87 (2024).  *Id.* at 328.  It

rejected petitioner's contention that the formalities of valid verdicts should not prevent the acquittal votes from taking effect. *See id.* at 329-30. According to the court, "requiring a jury to publicly affirm their verdict in open court . . . serves a vital purpose—it ensures that the verdict agreed upon in private truly reflects the unanimous and deliberate judgment of each juror." *Id.* at 329.

The SJC then went on to hold that the trial judge did not abuse her discretion in denying the petitioner's request for post-trial inquiry. *See id.* at 332. It found that because no verdict was announced as required, a post-trial *voir dire* "would not change the outcome of defendant's first trial." *Id.*. The court reasoned that petitioner was not entitled to this inquiry because the jurors' affidavits "do not indicate exposure to extraneous matters or juror bias," and because "there [was] no suggestion that jury's failure to return a verdict was the result of a clerical error." *Id.* at 330-31. The inquiry would therefore inappropriately require "probing the content of juror deliberations" and would do so "well after they became susceptible to outside influences." *Id.* at 331-32.

In the meantime, the trial judge set the matter for a retrial beginning on April 1, 2025. *See id.* at 332.

### D.    Procedural History

On February 18, 2025, petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 in this Court. That same day, the Court issued an expedited briefing and hearing schedule in light of the imminent retrial date. Defendants submitted an opposition brief on February 26, 2025, and the Court heard oral arguments on March 5, 2025.

For the following reasons, the petition will be denied.

## II.    Analysis

There are two threshold questions that the Court must address before turning to the merits

of the claim:  whether it has jurisdiction to consider the habeas petition and, if so, whether it must abstain from doing so.

## A.    **Jurisdiction and Ripeness**

A United States District Court may issue a writ of habeas corpus for a person "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(a), (c)(3).  A person on pretrial release is considered to be "in custody" and may petition for habeas relief if that custody violates federal law.  *See Justs. of Bos. Mun. Ct. v. Lydon*, 466 U.S. 294, 300 (1984).  Ordinarily, a person "in custody" is "in custody pursuant to the judgment of a State court" or "in custody under sentence of a court established by Act of Congress."  28 U.S.C. §§ 2254(a), 2255(a).  Because a person on pretrial release falls in neither category, any habeas petition filed by such a person must be brought under 28 U.S.C. § 2241.  The petition here is therefore filed under the correct statute.

A state defendant who is released pending trial "must still contend with the requirements of the exhaustion doctrine if [she] seeks habeas corpus relief in the federal courts."  *Lydon*, 466 U.S. at 301.  Nonetheless, a petitioner claiming a violation of the Double Jeopardy Clause need not stand trial a second time to exhaust her state remedies.  *See id.* at 302.  Instead, she must "take[ ] h[er] claim that [s]he should not be tried again as far as [s]he can in the state courts."  *Id.*

Here, petitioner moved to dismiss Counts One and Three of the indictment based on her double-jeopardy claim, and appealed the denial of that motion to the Massachusetts Supreme Judicial Court, which denied her claim.  Thus, she has exhausted her state-court remedies for the alleged constitutional violation, and the matter is ripe for review.

Accordingly, the Court may properly exercise jurisdiction over the habeas petition.  *See Lydon*, 466 U.S. at 302.

B.    __Abstention__

The primary relief petitioner seeks is release from state custody and a declaration that a retrial on Counts One and Three would violate the Double Jeopardy Clause.  (Pet. at 7).  In effect, she seeks a permanent stay of her state prosecution.  That request for relief potentially conflicts with the policy that, "except under extraordinary circumstances, where the danger of irreparable loss is both great and immediate," federal courts should abstain from enjoining state criminal prosecutions or issuing declaratory or other relief to similar practical effect.  *Younger v. Harris*, 401 U.S. 37, 45 (1971); *see Samuels v. Mackell*, 401 U.S. 66, 73 (1971).

By statute, a court considering a habeas petition may, "before final judgment or after final judgment of discharge . . . stay any proceeding against the person detained . . by or under the authority of any State for any matter involved in the habeas corpus proceeding."  28 U.S.C. § 2251.[4]  Nevertheless, the power to enjoin state prosecutions must be exercised sparingly, even when it is permitted.  *See Younger*, 401 U.S. at 54 (requiring abstention based on "the absence of the factors necessary under equitable principles to justify federal intervention," assuming such intervention was permitted).

A federal court generally must abstain from acting if "the requested relief would interfere . . . with (1) an ongoing state judicial proceeding; (2) that implicates an important state interest; and (3) that provides an adequate opportunity for the federal plaintiff to advance his federal constitutional challenge," such as a state criminal prosecution.  *Verizon New England, Inc. v. Rhode Island Dep't of Lab. & Training*, 723 F.3d 113, 116 (1st Cir. 2013).  But if there is a showing of "bad faith, harassment, or some other extraordinary circumstance that would make

---

[4] The Anti-Injunction Act, 28 U.S.C. § 2283, accordingly does not bar petitioner's requested relief.  *See id.* ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress.").

abstention inappropriate," a federal court may enjoin (or effectively enjoin) an ongoing state proceeding. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982).

A party can establish that extraordinary circumstances justify such an injunction by showing that she will suffer "great and immediate irreparable injury" if the state proceeding goes forward. *Doe v. Donovan*, 747 F.2d 42, 44 (1st Cir. 1984). In a typical case, a colorable double-jeopardy claim satisfies the irreparable-injury standard, because "a requirement that a defendant run the entire gamut of state procedures, including retrial, prior to consideration of his claim in federal court, would require him to sacrifice one of the protections of the Double Jeopardy Clause." *Lydon*, 466 U.S. at 303.[5]

Here, petitioner makes a colorable double-jeopardy claim. Even if she is ultimately acquitted of Counts One and Three, or if a conviction on those counts is ultimately overturned on double jeopardy grounds, she will have suffered irreparable injury from standing trial again for those charges. The Court therefore will not abstain, and will consider the merits of petitioner's claim.

## C.    **Double Jeopardy**

Under the Fifth and Fourteenth Amendments, no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see* U.S. Const.

---

[5] It is true that in one instance the First Circuit applied the abstention doctrine in a habeas petition alleging a double-jeopardy violation. *See Donovan*, 747 F.2d at 44. There, the alleged violation did not establish irreparable injury arising from a retrial because of "the unique jurisdictional posture" of that case. *Id.* at 45. The petitioner there was a minor less than a year shy of her eighteenth birthday, who was to stand trial for manslaughter even if the murder charge against her were dropped on double-jeopardy grounds, and who could not remain in state custody after she turned 18. *Id.* at 44-45. The Court of Appeals concluded that she "will suffer no significantly greater harm from a retrial on the murder count even if manslaughter is subsequently found to be the only permissible charge." *Id.* at 45. However, the court also affirmed the principle that, in ordinary circumstances, "the mere possibility of retrial prior to a determination of the federal constitutional claim would constitute irreparable harm justifying federal court intervention." *Id.* at 44.

amend. XIV, *Benton v. Maryland*, 395 U.S. 784, 794 (1969).  The right "protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense."  *See Lydon*, 466 U.S. at 306–07.

Here, petitioner contends that the Double Jeopardy Clause prevents her retrial on Counts One and Three for two reasons:  because the trial judge improperly declared a mistrial and because she was actually acquitted as to both counts.  Alternatively, she seeks an order providing for *voir dire* of the jurors in order to ascertain whether they did, in fact, vote to acquit her on both counts prior to the declaration of a mistrial.

### 1.    Whether the Trial Judge Improperly Declared a Mistrial

A trial judge may declare a mistrial in a criminal case without implicating the protections of the Double Jeopardy Clause whenever, "taking all the circumstances into consideration," there is a "manifest necessity" for doing so.  *United States v. Perez*, 9 Wheat. 579, 580 (1824); *Renico v. Lett*, 559 U.S. 766, 773 (2010).[6]  A "mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict [has been] long considered the classic basis for a proper mistrial."  *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *accord Renico*, 559 U.S. at 774; *Blueford v. Arkansas*, 566 U.S. 599, 609 (2012); *see also Downum v. United States*, 372 U.S. 734, 736 (1963) (a deadlocked jury is the "classic example" of when a state may try the same defendant twice).

The decision whether to grant a mistrial is reserved to the "broad discretion" of the trial judge.  *Illinois v. Somerville*, 410 U.S. 458, 462 (1973); *see also Perez*, 9 Wheat. at 580 (stating

---

[6] Subsequent to *Perez*, the Supreme Court clarified that the "manifest necessity" standard "cannot be interpreted literally," and that a mistrial is appropriate when there is a "'high degree'" of necessity.  *Washington*, 434 U.S. at 506.

that the decision to declare a mistrial is left to the "sound discretion" of the judge, but "the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes"). "The reasons for 'allowing the trial judge to exercise broad discretion' are 'especially compelling' in cases involving a potentially deadlocked jury." *Renico*, 559 U.S. at 775 (quoting *Washington*, 434 U.S. at 509).

Furthermore, "[t]he trial judge's decision to declare a mistrial when he considers the jury deadlocked is . . . accorded great deference by a reviewing court." *Washington*, 434 U.S. at 510. The justification for deference is that "the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Renico*, 559 U.S. at 775. In the absence of such deference, trial judges might otherwise "employ coercive means to break the apparent deadlock," thereby creating a "significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Id.* at 509-10.

The Supreme Court has "expressly declined to require the 'mechanical application' of any 'rigid formula' when trial judges decide whether jury deadlock warrants a mistrial." *Renico*, 559 U.S. at 775 (quoting *Wade v. Hunter*, 336 U.S. 684, 691, 690 (1949)).

> We have also explicitly held that a trial judge declaring a mistrial is not required to make explicit findings of "'manifest necessity'" nor to "articulate on the record all the factors which informed the deliberate exercise of his discretion." And we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse.

*Id.* (quoting *Washington*, 434 U.S. at 517); *see Blueford*, 566 U.S. at 609 (stating that "[w]e have never required a trial court, before declaring a mistrial because of a hung jury,

to consider any particular means of breaking the impasse—let alone to consider giving

the jury new options for a verdict").

Similarly, the First Circuit has held that trial judges are not required "to take

specific steps or make specific findings before concluding that a jury is deadlocked and

unlikely to reach a verdict." *United States v. Candelario-Santana*, 977 F.3d 146, 158 (1st

Cir. 2020). Rather, a judge exercises sound discretion to declare a mistrial based on

deadlock as long as she "take[s] *some* step to ensure that the jury truly is unable to reach

a verdict before discharging it." *Id.* [7]

Here, there was a "manifest necessity" for the declaration of a mistrial based on jury

deadlock, and the trial court did not abuse its broad discretion in reaching that conclusion.

In her memorandum of decision, the trial judge stated that she "had no doubt based on the

jury's notes to the Court that [the jury] was unable to reach a unanimous verdict." (Pet. Ex. A at

402-403). Nothing in the jury's three notes, she found, "indicated agreement on any of the

charges," or even an "inkling of an indication of agreement," notwithstanding the "care that went

into writing the notes and how articulately they expressed the jurors' disagreement." (Pet. Ex. A

at 403). Once the jury reported a deadlock for the third time, Massachusetts law prohibited the

judge from ordering the jury to continue deliberations without their consent. *See* Mass. Gen.

Laws ch. 234A, § 68C; *Read*, 495 Mass. at 321, 323. She concluded that it was "clear" that the

---

[7] In an opinion issued before *Renico*, the First Circuit held that although there is "no mechanical rule" that determines whether there is manifest necessity for a mistrial, three factors "inform[ ]" the inquiry: "(i) whether alternatives to a mistrial were explored and exhausted; (ii) whether counsel had an opportunity to be heard; and (iii) whether the judge's decision was made after sufficient reflection." *United States v. Toribio-Lugo*, 376 F.3d 33, 39 (1st Cir. 2004). To the extent, if any, that decision can be read to hold that a failure to consider any of those three factors is somehow dispositive, it has been superseded by subsequent Supreme Court decisions. *See Renico*, 559 U.S. at 779. In any event, the *Toribio-Lugo* court held that the inquiry "inevitably reduces to whether the district judge's declaration of a mistrial was reasonably necessary under all the circumstances." *Toribio-Lugo*, 376 F.3d at 39.

jurors "would not consent to continuing their deliberations" after it sent the third note.  (Pet. Ex. A at 400).

The SJC similarly concluded that "[t]he jury clearly stated during deliberations that they had not reached a unanimous verdict on any of the charges and could not do so."  *Read*, 495 Mass. at 313.  "The first and second notes provided no indication of a partial consensus, and the third note plainly implied the opposite."  *Id*. at 322.  "In short, the record before the trial judge suggested complete deadlock."  *Id*.

This Court sees no basis to conclude that the trial judge's decision to declare a mistrial was incorrect or improper.  To begin, the relevant inquiry is not confined to the brief interval of time between the receipt of the third note and the trial judge's declaration of a mistrial.  By that point, the jury had deliberated for nearly 30 hours, and had sent three notes to the court indicating that they were deadlocked—the latter two making that point with considerable emphasis.  The trial judge had held two conferences with counsel to discuss how to respond to the reported deadlock (during both of which counsel for defendant had argued that the jury was at an impasse).  After the second conference, the judge gave the *Tuey-Rodriguez* instruction.  In short, the decision to declare a mistrial was the product of a multi-day discussion between counsel and the court.  Under the circumstances, the judge cannot be said to have acted precipitately and without adequate time for reflection.

Nor did the trial judge fail to provide defense counsel an opportunity to be heard.  *See Read*, 495 Mass. at 325-26.  The judge solicited counsel's views after the first and second notes; by the time of the second note, if not earlier, it should have been obvious to all parties that a mistrial was highly likely.  As for counsel's opportunity to respond to the third note, it is true that the span of time was relatively brief between the point that the trial judge advised counsel that the jury was at an impasse and the point she declared a mistrial.  But it was not so brief that

counsel could not have objected or asked to be heard.  Furthermore, after the trial judge declared

a mistrial, there is no obvious reason why counsel could not have immediately asked to be heard

at sidebar in order to seek reconsideration of her decision before the jury was formally

discharged.[8]

Petitioner also contends that the trial judge improperly failed to consider alternatives

before declaring a mistrial.  The trial judge did, in fact, consider such alternatives in response to

the first and second note, and concluded after the second note to give a *Tuey-Rodriguez*

instruction.  After the third note—which, again, emphatically indicated that the jury was at a

deadlock—Massachusetts law required her to discharge the jury unless it consented to continue

deliberations.  *See* Mass. Gen. Laws ch. 234A § 68C.  The judge reasonably determined under

the circumstances that the jury would not consent to do so.  (Pet. Ex. A at 402-403).

Nothing more was required, as a matter of federal constitutional law, before the trial

judge could fairly conclude that the jury was genuinely deadlocked and should be discharged.  In

particular, the trial judge was not required to inquire about a possible partial verdict or poll the

jury before discharging it.  As the SJC noted, to make further inquiry would create a substantial

possibility of coercing a verdict.  *See Read*, 495 Mass. at 321-24, 26.

In summary, the trial judge took appropriate steps before determining that the jury was

"*genuinely* deadlocked."  *Candelario-Santana*, 977 F.3d at 158 (emphasis in original).  The

evidence that the jury was at an unresolvable impasse was substantial, and the trial judge, in the

exercise of her "broad discretion," made a well-grounded decision to declare a mistrial—a

---

[8] In *Toribio-Lugo*, 376 F.3d at 40-42, the trial judge ruled that defense counsel had consented to the declaration of a mistrial because she failed to make an objection.  The First Circuit reversed, noting that counsel had made "either two or three attempts to be heard during the district court's sua sponte consideration of whether or not to declare a mistrial," but that the judge "stopped counsel in her tracks, cutting her off" on each occasion, and it was "only after these three attempts to state her position had been firmly rebuffed that [she] lapsed into silence."  *Id.* at 41.  That is very far from the situation here, where defense counsel made no attempt to make an objection or ask to be heard.

decision that is entitled to "great deference" by this Court. *Somerville*, 410 U.S. at 462; *see Washington*, 434 U.S. at 510. Accordingly, because there was "manifest necessity" for the mistrial, petitioner may be tried again on the same charges without violating her rights under the Double Jeopardy Clause. *See Washington*, 434 U.S. at 509.[9]

### 2.    <u>Whether the Jury Acquitted Petitioner</u>

Petitioner further contends that she was actually acquitted by the jury as to Counts One and Three, and therefore cannot be tried again on those counts.

"[I]t has long been settled under the Fifth Amendment that a verdict of acquittal is final, ending a defendant's jeopardy, and . . . is a bar to a subsequent prosecution for the same offence." *McElrath*, 601 U.S. at 94 (quoting *Green v. United States*, 355 U.S. 184, 188 (1957)) (internal quotation marks omitted). "The Double Jeopardy Clause recognizes an event as an acquittal" when "there has been any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." *Id.* at 96.

It is also well-established that "whether an acquittal has occurred for purposes of the Double Jeopardy Clause is a question of federal, not state, law." *Id.* The analysis does not depend on state-law "labels," and a state's "characterization, as a matter of double jeopardy law, of [a ruling] is not binding." *Id.* (quoting *Smalis v. Pennsylvania*, 476 U.S. 140, 144, n.5 (1986)). Nonetheless, state law remains relevant.

> [T]he ultimate question is whether the Double Jeopardy Clause recognizes an event as an acquittal. In making that determination, we ask whether—given the operation of state law—there has been "any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense."

*Id.* (quoting *Evans v. Michigan*, 568 U.S. 313, 318 (2013)); *see also Smith v. Massachusetts*, 543

---

[9] The trial judge concluded that counsel's lack of objection to the declaration of a mistrial constituted implied consent. (Pet. Ex. A at 399-402). The SJC concluded that it did not need to reach the issue. *Read*, 495 Mass. at 326 n.13. This Court likewise concludes it need not do so.

U.S. 462, 474 (2005) (suggesting that a double-jeopardy ruling might be different if the state had

adopted different procedural rules).

A "ruling" of insufficient proof does not require a jury verdict; a judge may direct a

verdict of acquittal or overturn a conviction based on insufficient evidence.  *See, e.g.*, *Burks v.*

*United States*, 437 U.S. 1, 17–18 (1978).  The critical question is whether there was such a

"ruling."  *McElrath*, 601 U.S. at 96.

Here, the SJC summarized what constitutes a valid jury verdict under "the operation of"

Massachusetts law:

> [T]he fundamental requirements for a jury's issuance of a verdict in a criminal
> case are set forth in Mass. R. Crim. P. 27(a).  Pursuant to that rule, a valid jury
> verdict must be unanimous and returned by the jury to the judge in open court.
> Our case law confirms that a criminal verdict is effective only when affirmed by
> jurors in open court.  In other words, the distinction between informal agreement
> on a verdict and the actual return, receipt, and recording of a verdict in open court
> is central—only the latter constitutes a final verdict of the jury on a criminal
> charge.  We have consistently reaffirmed this longstanding distinction throughout
> our jurisprudence.

*Read*, 495 Mass. at 327-328 (quotations and citations omitted); *see also A Juvenile v.*

*Commonwealth*, 392 Mass. 52, 56-57 (1984) (quoting *Lawrence v. Stearns*, 11 Pick. 501, 502

(1831)) ("The only verdict which can be received and regarded, as a complete and valid verdict

of a jury, upon which a judgment can be rendered, is an open and public verdict, given in and

assented to, in open court, as the unanimous act of the jury, and affirmed and entered of record,

in the presence and under the sanction of the court.").

The SJC concluded that the jury here did not render a valid verdict under Massachusetts

law.  *See Read*, 495 Mass. at 328 ("Far from an affirmation in open court of unanimous

agreement on counts one and three, these notes clearly reflected a lack of consensus on 'the

charges.'  Even if the jury's deadlock pertained specifically to count two, their notes made no

such distinction, nor did they indicate any verdict would be returned to the judge in open court,

as required by Mass. R. Crim. P. 27(a).").  Petitioner appears to concede as much.  (Pet. Reply at 13-16).  Thus, in the absence of a valid verdict under state law, she must point to some other "*ruling* that the prosecution's proof is insufficient to establish criminal liability" to show that the jury acquitted her as a matter of federal constitutional law.  *McElrath*, 601 U.S. at 96 (emphasis added).

Petitioner has not done so.  Counsel have pointed to no case, from any jurisdiction, in which a private, unreported, and unrecorded vote of a jury was deemed to be a "ruling" capable of terminating jeopardy.  In fact, the Supreme Court has held that it is not sufficient for the foreperson of a jury to report—in open court, in the presence of the other jurors—that the jury had voted to acquit as to certain counts.  *See Blueford*, 566 U.S. at 608.

In *Blueford*, the defendant was tried in Arkansas state court for capital murder, which included the lesser included offenses of first-degree murder, manslaughter, and negligent homicide.  *Id.* at 602.  After a period of deliberation, the foreperson reported that the jury was "hopelessly deadlocked."  *Id.* at 603.  The court then "asked the foreperson to disclose the jury's votes on each offense."  *Id.*  The foreperson reported that the jury had voted unanimously against capital murder, had voted unanimously against first-degree murder, was deadlocked on manslaughter, and had not voted on negligent homicide.  *Id.* at 603-604.  The court gave the jury an *Allen* charge (its second) and instructed the jury to resume deliberations.  *Id.* at 604.  When the jury returned a half an hour later and reported that they were still deadlocked, the court declared a mistrial.  *Id*

The state then sought to retry the defendant on all charges.  *Id.*  He moved to dismiss the capital murder and first-degree murder charges on double-jeopardy grounds.  *Id.*  The trial court denied the motion, and the Arkansas Supreme Court affirmed.  *Id.*

The Supreme Court concluded that the defendant had not been acquitted, and that

therefore double jeopardy did not bar a new trial as to all charges.

> Blueford's primary submission is that he cannot be retried for capital and first-degree murder because the jury actually acquitted him of those offenses. The Arkansas Supreme Court noted—and Blueford acknowledges—that no formal judgment of acquittal was entered in his case. But none was necessary, Blueford maintains, because an acquittal is a matter of substance, not form. Blueford contends that despite the absence of a formal verdict, a jury's announcement constitutes an acquittal if it "'actually represents a resolution . . . of some or all of the factual elements of the offense charged.'" Here, according to Blueford, the foreperson's announcement of the jury's unanimous votes on capital and first-degree murder represented just that: a resolution of some or all of the elements of those offenses in Blueford's favor.

*Id.* at 605-06 (citations omitted).The court rejected that contention, concluding that "[t]he

foreperson's report was not a final resolution of anything." *Id.* at 606.

> When the foreperson told the court how the jury had voted on each offense, the jury's deliberations had not yet concluded. The jurors in fact went back to the jury room to deliberate further, even after the foreperson had delivered her report. When they emerged a half hour later, the foreperson stated only that they were unable to reach a verdict. She gave no indication whether it was still the case that all 12 jurors believed Blueford was not guilty of capital or first-degree murder, that 9 of them believed he was guilty of manslaughter, or that a vote had not been taken on negligent homicide. The fact that deliberations continued after the report deprives that report of the finality necessary to constitute an acquittal on the murder offenses.

*Id.* The court concluded that it "was therefore possible for Blueford's jury to revisit the offenses

of capital and first-degree murder, notwithstanding its earlier votes." *Id.* at 608. "And because

of that possibility, the foreperson's report prior to the end of deliberations lacked the finality

necessary to amount to an acquittal on those offenses, quite apart from any requirement that a

formal verdict be returned or judgment entered." *Id.*[10]

Here, even assuming that the jury did take a vote to acquit petitioner on Counts One and

---

[10] In a later portion of the opinion, where the Supreme Court concluded that the trial judge did not improperly declare a mistrial, it "reject[ed] the suggestion" that "the court . . . should have taken some action . . . to give effect to [the jury's] votes." *Id*. at 609.

Three, there is no basis to conclude that any such agreement was "final[ ]." *Id.* And unlike *Blueford*, any such agreement was not reported in open court in the presence of the other jurors, casting further doubt on the finality of any vote.

Petitioner seeks to distinguish *Blueford* on the ground that the post-trial juror statements here reflect the jury's position at "the end of deliberations," and that therefore there was no real possibility that a juror might change his or her mind. (Pet. Mem. at 27-28). But those post-trial statements do not actually indicate when the relevant votes were taken, or whether they actually reflect a final, conclusive verdict of acquittal by all twelve jurors. (Pet. Ex. A at 283-88, 292-94, 323-26, 330-31). And they certainly do not foreclose the possibility that the relevant votes were based on a preliminary discussion or a straw poll. *See Blueford*, 566 U.S. at 608 ("A single juror's change of mind is all it takes to require the jury to reconsider"); *see also Commonwealth v. Roth*, 437 Mass. 777, 793 (2002) (stating that even the "most recent 'vote' immediately prior to reporting deadlock may well be tentative, a failed experiment in compromise, and not a true expression of each juror's assessment of the case").

In short, any jury vote here was not final, as required by *Blueford*. It was not an "actual return, receipt, and recording of a verdict in open court," as required under Massachusetts law. *Read*, 495 Mass. at 327. And there is no other basis, in fact or law, to conclude that it is a "ruling" capable of terminating jeopardy. Accordingly, and as a matter of federal constitutional law, petitioner was not actually acquitted of any of the relevant offenses. *See McElrath*, 601 U.S. at 96.

### D.  Whether a Post-Trial *Voir Dire* of Jurors Is Appropriate

Finally, and alternatively, petitioner requests post-trial *voir dire* of the individual jurors in order to ascertain whether they voted to acquit her on any of the charges before the trial judge declared a mistrial. The SJC rejected that request, concluding that an inquiry would contravene

21

the Massachusetts "prohibition on probing the content of juror deliberations." *Read*, 495 Mass. at 330.

There is a threshold question as to whether this Court has the legal authority to conduct such a *voir dire*. As a general matter, the statutory framework for habeas proceedings contemplates the taking of evidence. Specifically, Section 2243 provides that a court "shall summarily hear and determine the facts" underlying a petition for habeas corpus. 28 U.S.C. § 2243. Section 2246 further provides that "[o]n application for a writ of habeas corpus, evidence may be taken orally or by deposition or, in the discretion of the judge, by affidavit." 28 U.S.C. § 2246. And when a federal prisoner files a habeas petition under Section 2255 challenging his or her federal confinement, the statute explicitly authorizes the court to "make findings of fact" to determine whether the claim has merit. 28 U.S.C. § 2255(b).

However, in a petition filed by a state prisoner under Section 2254 challenging his or her state confinement, a federal court has more limited authority. *See* 28 U.S.C. § 2254(e). In such a proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct," subject to rebuttal. 28 U.S.C. § 2254(e)(1). If there have been no state-court factual findings supporting the claim, the petitioner is entitled to an evidentiary hearing only if the claim relies on a retroactive rule of constitutional law or a factual predicate not discoverable through due diligence, and if the facts petitioner seeks to adduce would show that "no reasonable factfinder would have found the applicant guilty." 28 U.S.C. § 2254(e)(2).

Petitioner here is not challenging a federal sentence, nor a state court judgment, so her petition is not brought under either Section 2255 or Section 2254. Instead, she is challenging her state custody under Section 2241. In one respect, the ability of a federal court to conduct a factfinding inquiry in connection with a petition under Section 2241 is clearly limited; the federal court must give deference to any findings of fact made by the state courts. *See Marshall v.*

*Bristol Superior Ct.*, 753 F.3d 10, 16 (1st Cir. 2014).  But the extent of the authority of a federal court to take *additional* evidence concerning the underlying state-court proceeding is not clear.

The general grant of factfinding authority under Sections 2243 and 2246 would seem to permit the federal court to conduct an evidentiary hearing concerning a state-court proceeding under at least some circumstances.  Indeed, at least two federal courts appear to have held evidentiary hearings in matters involving state-prisoner petitions under Section 2241, although neither opinion cited any authority for doing so nor provided any relevant legal analysis.  *See Johnson v. Patton*, 580 F. App'x 646, 649 (10th Cir. 2014) (unpublished) (noting in passing that the federal court conducted an evidentiary hearing concerning "jail-time and street-time credits" for which a state prisoner would be eligible); *Hiratsuka v. Houser*, 2022 WL 348460, at *1 (D. Alaska Jan. 5, 2022) (noting in passing that the federal court held an evidentiary hearing concerning delays in pre-trial proceedings), report and recommendation adopted, 2022 WL 343772 (D. Alaska Feb. 4, 2022), aff'd, 2023 WL 5695995 (9th Cir. Sept. 5, 2023).

Counsel for petitioner has not, however, pointed to any case, from any court, where a federal court considering a Section 2241 petition has either undertaken its own *voir dire* of a state-court jury or ordered a state court to do the same.  Either approach is fraught with potential problems.

To begin, an injunction directing the state trial court to conduct a *voir dire* of the former jurors would implicate substantial concerns of federalism and comity.  *Cf. Younger*, 401 U.S. at 43-44.  While those concerns may be somewhat mitigated if this Court itself conducts the *voir dire*, such a process would nonetheless represent a substantial intrusion by a federal court into the functions and role of the state judiciary.  For example, and at a minimum, this Court would have to issue an order directing the state court to produce the impounded juror list.  Such a *voir dire* should be undertaken, if at all, only in extraordinary circumstances and even then with great

circumspection and care.

Furthermore, the *voir dire* petitioner proposes would inevitably require a detailed inquiry into the jury's deliberations. Petitioner contends that the inquiry could be limited to a simple yes-or-no question as to any votes the jury may have taken before the declaration of the mistrial. But surely more than that would be required. A *voir dire* would serve little or no purpose unless it established that the jury took a unanimous and conclusive vote of acquittal on one or more counts. To make such a finding, it would be necessary to ascertain when any votes were taken, and what each juror said and thought at the time of the vote. How many votes were taken? Were they straw votes, or otherwise preliminary or tentative? What was the timing of those votes in connection with the various notes to the trial judge? What, if anything, did jurors say to each other about the votes? Did the votes reflect any compromises? Was the possibility of compromise discussed? What were the mental processes of each juror? Did any jurors have private reservations about the vote they cast? How can any such votes be reconciled with the jury's public statements that they were deadlocked on the "charges"?[11] Why are the juror affidavits inconsistent?[12]

Nor would the inquiries be limited to the deliberations and votes inside the jury room. Because the events in question happened more than eight months ago, it would also be necessary to inquire into matters such as the potential pressures on jurors since the conclusion of the trial and the effect, if any, of such pressures on their testimony. *See Read*, 495 Mass. at 332 (noting

---

[11] The trial judge found that the post-trial statements by jurors "directly contradict[ed]" the jury's notes, particularly the third note, which stated they were "starkly divided" as to whether the elements of "the charges" had been proved. (Pet. Ex. A at 396 n.4). The SJC likewise concluded that the statements were "inconsistent with" and "contradict[ed]" their prior notes. *Read*, 495 Mass. at 313-14.

[12] The post-trial juror statements are inconsistent as to what charge (or charges) resulted in a unanimous verdict; what the vote count was as to the deadlocked charge; and whether the deliberations were respectful or had become a "bully match." (Pet. Ex. A at 283-85, 325-31).

that any inquiry of the jurors would necessarily "occur well after they became susceptible to outside influences").  Those are hardly hypothetical concerns, given the intense public focus on the jurors and their expressly voiced concerns for their privacy and even physical safety.  (Pet. Ex. A at, 293, 324, 325-26).

Any *voir dire* of that nature would, at a minimum, involve considerable complexities and lead to extended delays.  But even assuming that the many practical issues with a *voir dire* could be resolved—and even putting the federalism and comity issues to one side—there is a more substantial problem with petitioner's proposal:  it runs directly contrary to long-established principles that generally prohibit any examination of the content of juror deliberations.  *See Tanner v. United States*, 483 U.S. 107, 127 (1987).

The starting point for the analysis is Rule 606(b)(1) of the Federal Rules of Evidence. That rule provides as follows:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1).[13]  That rule codified long-standing common-law principles designed to protect the freedom of juror deliberations, the protection of jurors against harassment, and the finality of verdicts.  *See Tanner*, 483 U.S. at 119-21 (noting that "full and frank discussion in the jury room, juror's willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post-verdict scrutiny of juror conduct"); *Warger v. Shauers*, 574 U.S. 40, 47–48 (2014).  The

---

[13] Rule 606(b)(2) provides three narrow exceptions to the rule, none of which are applicable here:  inquiry is allowed only into extraneous prejudicial information, outside influence, or clerical errors made when entering the verdict on the verdict form.  *See* Fed. R. Evid. 606(b)(2).

Supreme Court in *Tanner* observed that the prohibitions set out in Rule 606(b)(1) derived from a long-standing common-law rule supported by "[s]ubstantial policy considerations":

> Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

*Id.*, 483 U.S. at 120 (quoting *McDonald v. Pless*, 238 U.S. 264, 267-68 (1915)); *see also Commonwealth v. Fidler*, 377 Mass. 192, 196 (1979) ("[I]t is essential to the freedom and independence of [jury] deliberations that their discussions in the jury room should be kept secret and inviolable; and to admit the testimony of jurors to what took place there would create distrust, embarrassment and uncertainty[.]") (quoting *Woodward v. Leavitt*, 107 Mass. 453, 460 (1871)).[14]

It is true that Rule 606 does not literally apply here, because the jury did not actually render a "verdict." Fed. R. Evid. 606(b)(1). Nonetheless, the same policy considerations concerning the freedom of juror deliberations and the protection of jurors against harassment are unquestionably implicated in the circumstances of this case. In fact, they apply with unusual force. This is a highly sensationalized prosecution that has been the subject of exceptional public scrutiny, not only locally but nationally. For a number of reasons, it has also proved to be unusually divisive. There is a strong likelihood that jurors would be subject to harassment, public pressure, and social coercion were the Court to order a post-trial *voir dire* that explores

---

[14] As noted, the SJC concluded that the *voir dire* requested by petitioner would contravene Massachusetts law and its "prohibition on probing the content of juror deliberations." *Read*, 495 Mass. at 330. It stated that "[m]aintaining the secrecy of those deliberations is a bedrock of our judicial system," which "not only prevents jury tampering but also upholds the finality of jury verdicts and fosters confidence in the judicial process." *Id.* at 330-31 (quotation omitted). "Probing secret deliberations to determine whether the jurors may have privately agreed on a verdict they never returned would undermine these fundamental principles." *Id.* at 331.

their viewpoints and votes at some length.[15]  More than eight months after the conclusion of the trial, the jurors' willingness to speak honestly about their deliberations would surely be compromised.[16]

Even the policy underlying Rule 606(b)(1) that favors finality is implicated, if only by analogy.  The jury notes reporting a deadlock—culminating in the note stating that the jury was "starkly divided" as to whether the Commonwealth had proved "the necessary elements of the charges"—led ineluctably to a substantial, if not final, legal consequence:  the declaration of a mistrial and the termination of the first trial.  (Pet. Ex. A at 268).

For all of those reasons, the Court concludes that a federal-court *voir dire* of the state-court jurors—a *voir dire* that would necessarily subject their private deliberations to intense public scrutiny—is probably unlawful and certainly ill-advised.  But in any event, under the circumstances presented here, the Court concludes that it is not necessary to reach the issue. Even assuming that a post-trial *voir dire* elicited evidence strongly favorable to petitioner—such as an attestation from each juror that the jury voted unanimously to acquit petitioner on Counts One and Three before being discharged—her claim would still fail.

As noted, an acquittal requires a "*ruling* that the prosecution's proof is insufficient to establish criminal liability for an offense."  *McElrath*, 601 U.S. at 96 (emphasis added).  A private, unreported, unrecorded jury vote is not a "ruling," and therefore not an acquittal.  *Id.*  At

---

[15] While the Court could of course order that the juror names be kept confidential, it is at least somewhat doubtful that their anonymity could be entirely and permanently protected.  More importantly, the jurors themselves would likely doubt the efficacy of any such order, and their willingness to speak freely concerning their deliberations would likely be inhibited.

[16] According to petitioner, "in the context of this highly publicized case, it strains credulity to suggest" that if the post-trial juror statements did not "represent the unanimous view of all 12, the remaining jurors would allow the inaccuracy to go uncorrected."  (Pet. Mem. at 27).  It is at least as likely that the remaining seven jurors are inhibited from coming forward in order to avoid continued media and social pressure, whether they agree with the post-trial statements or not.  (Pet. Ex. A at 331) (Juror B stating that he believes "other jurors have been reluctant to come forward because there is so much public and media attention focused on this case").  In any event, the actual views of those jurors could only be ascertained by a detailed *voir dire*.

the very least, such a "ruling" requires finality, and the public affirmation of a verdict is part of what makes it final, rather than provisional. The opportunity for "a single juror's change of mind" is enough to undermine its finality. *Blueford*, 566 U.S. at 608. And such a vote, in any event, does not constitute an acquittal under Massachusetts law. *Read*, 495 Mass. at 326-30. Therefore, there was no "ruling" that acquitted petitioner as to Counts One and Three. *McElrath*, 601 U.S. at 96.

Accordingly, the Court declines to order post-trial *voir dire* of the individual jurors in the initial trial of this matter.

## III.    Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

**So Ordered.**


                                                        /s/  F. Dennis Saylor IV
                                                        F. Dennis Saylor IV
Dated:  March 13, 2025                                  Chief Judge, United States District Court

28