# United States Court of Appeals
## For the First Circuit

No. 25-1257

KAREN READ,

Petitioner, Appellant,

v.

NORFOLK COUNTY SUPERIOR COURT; ANDREA J. CAMPBELL, Massachusetts
Attorney General,

Respondents, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Gelpí, Montecalvo, and Aframe, Circuit Judges.

Martin G. Weinberg and Michael Pabian on brief for appellant.

Caleb J. Schillinger, Special Assistant Attorney General,
Assistant Norfolk District Attorney, and Andrea Joy Campbell,
Attorney General of Massachusetts, on brief for appellees.

March 27, 2025

**MONTECALVO, Circuit Judge**.  On April 16, 2024, Karen Read's trial began in Norfolk County Superior Court in Massachusetts on charges of murder in the second degree, Mass. Gen. Laws ch. 265, § 1 (Count One); manslaughter while operating under the influence of alcohol, Mass. Gen. Laws ch. 265, § 13 1/2 (Count Two); and leaving the scene of personal injury resulting in death, Mass. Gen. Laws ch. 90, § 24(2)(a 1/2)(2) (Count Three). After thirty-seven days of trial, the charges were submitted to the jury for deliberation.  During approximately twenty-eight hours of deliberations, the jury sent three notes to the trial judge, informing the court that the jury was increasingly deadlocked.  On July 1, 2024, after receiving the third note, the trial judge declared a mistrial.  A retrial is scheduled to start on April 1, 2025.

After the mistrial, Read moved to dismiss Counts One and Three on the basis that the Double Jeopardy Clause barred retrial. The trial judge denied that motion, and the Massachusetts Supreme Judicial Court (SJC) affirmed.[1]  Read then filed a habeas petition

---

[1] Read filed her petition to the SJC under chapter 211, section 3 of the Massachusetts General Laws, which confers upon the SJC a "general superintendence" power that permits, among other things, review of "interlocutory matters in criminal cases only when substantial claims of irremediable error are presented . . . and only in exceptional circumstances, . . . where it becomes necessary to protect substantive rights." Garcia v. Commonwealth, 158 N.E.3d 452, 458 (Mass. 2020) (alterations in original) (citations omitted).

in federal court under 28 U.S.C. § 2241 to prevent the state court from retrying her on those counts, arguing that a retrial would violate her constitutional double jeopardy rights.  The United States District Court for the District of Massachusetts denied her habeas petition, and Read now appeals that decision.  For the reasons that follow, we affirm.

## I. Background

We focus here only on those facts relevant to the issues before us.

Following the close of evidence, the trial court instructed the jury to consider each of the three charges against Read listed above as well as two lesser offenses that were included in Count Two: involuntary manslaughter and motor vehicle homicide.

The jury began its deliberations on Tuesday, June 25, 2024, the thirty-seventh day of trial.  Three days later, on Friday, June 28, the jury sent a note to the trial judge stating that they were "unable to reach a unanimous verdict."[2]  The court discussed with the parties how to respond.  Read's counsel argued that the court should give what is called a <u>Tuey-Rodriguez</u> instruction under Massachusetts law -- a standard instruction encouraging the jury to reach agreement by seriously considering

---

[2] The first note reads: "I am writing to inform you, on behalf of the jury, that despite our exhaustive review of the evidence and our diligent consideration of all disputed evidence, we have been unable to reach a unanimous verdict."

other jurors' points of view.  Commonwealth v. Rodriquez, 300 N.E.2d 192, 202-03 (Mass. 1973).  The Commonwealth disagreed, arguing that it was too soon to give such an instruction.  The court agreed with the Commonwealth, finding that there had not yet been sufficient time for "due and thorough deliberations."  The court directed the jury to continue deliberating.

In the late morning of Monday, July 1, the jury sent a second note to the judge, explaining that they were "commit[ted] to the duty entrusted to [them]" but were "deeply divided by fundamental differences" and had reached "a point where consensus [was] unattainable."[3]  The court again discussed the jury note and potential responses with the parties.  As they had previously, Read's counsel argued that the court should give the Tuey-Rodriquez instruction, and the Commonwealth argued that it was still too soon.  This time, however, the court agreed with Read's counsel

---

[3] The second note reads:

> Despite our commitment to the duty entrusted to us, we find ourselves deeply divided by fundamental differences in our opinions and state of mind.
> The divergence in our views are [sic] not rooted in a lack of understanding or effort, but deeply held convictions that each of us carry ultimately leading to a point where consensus is unattainable.  We recognize the weight of this admission and the implications it holds.

and gave the instruction before directing the jury to continue deliberating.[4]

Later that day, the jury sent a third note, stating that they "continue[d] to find [them]selves at an impasse" despite "rigorous efforts" and that "continu[ing] to deliberate would be futile."[5] Upon receiving the note, the court told the parties that

_____

[4] In the Tuey-Rodriquez instruction, the court reminded jurors of their "duty to decide this case if [they] can do so conscientiously" and stated, in part:

> Where there is disagreement, those jurors who would find the defendant not guilty should consider whether the doubt in their own minds is a reasonable one if it makes no impression upon the minds of the other jurors . . . .
> At the same time, those jurors who would find the defendant guilty ought seriously to ask themselves whether they may not reasonably doubt the correctness of their judgment if it is not shared by other members of the jury.

[5] The third note reads:

> Despite our rigorous efforts, we continue to find ourselves at an impasse.
> Our perspectives on the evidence are starkly divided. Some members of the jury firmly believe that the evidence surpasses the burden of proof[,] establishing the elements of the charges beyond a reasonable doubt. Convers[e]ly, others find the evidence fails to meet this standard[] and does not sufficiently establish the necessary elements of the charges.
> The deep division is not due to a lack of effort or diligence, but rather a sincere adherence to our individual principles and moral convictions.
> To continue to deliberate would be futile and only serve to force us to compromise these deeply held beliefs.

"the jury is at an impasse," and then called the jury back into the courtroom.  The judge read the note out loud and immediately declared a mistrial, dismissing the jury.  Unlike with the prior two jury notes, the judge did not first read the note to counsel or ask them for input.

Read's counsel report that shortly after trial concluded, they were contacted by several people.  First, a juror told one of Read's attorneys that the jury had unanimously agreed that Read was not guilty of Counts One and Three.  A second juror called another of Read's attorneys and relayed the same information.  Then a third party reported to Read's counsel that a third juror had told a mutual friend that there was "no consideration for [second-degree] murder" -- Count One -- and that the jury was deadlocked on the manslaughter charge -- Count Two.

After Read filed a motion to dismiss based on these reports, a fourth juror contacted her counsel to express their view "that it was very troubling that the entire case ended without the jury being asked about each count, especially Count [One] and Count [Three]."  That juror added that "the jury actually discussed telling the judge that they had agreed unanimously on NOT GUILTY verdicts for Counts [One] and [Three], but they were not sure if they were allowed to say so."  Finally, a fifth juror contacted Read's counsel and informed them that the jury was "unanimous" that Read was not guilty on Counts One and Three and was

"deadlocked" only "in relation to the 'lower charges' on Count [Two]."

The Commonwealth likewise received communications from individuals identifying themselves as jurors after Read filed her motion to dismiss. One left a voicemail stating, "it is true what has come out recently about the jury being unanimous on [Counts One and Three]." Three individuals sent emails to the Commonwealth, expressing that they wished to speak anonymously. They later declined to communicate further once the Commonwealth informed them that it could not promise confidentiality.

The trial court denied Read's motion to dismiss, holding that double jeopardy did not bar Read's retrial on Counts One and Three and that conducting a post-trial inquiry with the jurors would impermissibly delve into the substance of jury deliberations. Read appealed but the SJC affirmed, holding that the trial court had acted within its discretion in declaring a mistrial and that no acquittal had occurred because the jury had not publicly affirmed that Read was not guilty of the charges. Read v. Commonwealth, 250 N.E.3d 551, 559, 565-66 (Mass. 2025). Read then petitioned for habeas relief before the district court, which also rejected her arguments that double jeopardy should preclude her retrial and declined to order or conduct a post-trial hearing. Read v. Norfolk Cnty. Super. Ct., No. 25-cv-10399, 2025

WL 815048, at *1, 15 (D. Mass. Mar. 13, 2025).  We now consider her arguments to this court.

## II. Standard of Review and Legal Issues

A federal court may grant a writ of habeas corpus to a person who is "in custody" in violation of the Constitution or federal laws.  28 U.S.C. § 2241(a), (c)(3); see also Justs. of Bos. Mun. Ct. v. Lydon, 466 U.S. 294, 300-01 (1984) (holding that a person on pretrial release is considered to be "in custody" for the purposes of habeas relief).  "[W]e, as a federal habeas court reviewing a petition under section 2241, must defer to the SJC's findings of fact but must undertake plenary review of that court's resolution of issues of law." Marshall v. Bristol Super. Ct., 753 F.3d 10, 16 (1st Cir. 2014) (alteration in original) (quoting Gonzalez v. Justs. of Mun. Ct. of Bos., 382 F.3d 1, 7 (1st Cir. 2004), judgment vacated on other grounds, 544 U.S. 918 (2005), and reinstated, 420 F.3d 5 (1st Cir. 2005)).  "We review a district court's disposition of a section 2241 petition de novo."  Id.

The issues before us all stem from Read's claim that the Constitution's Double Jeopardy Clause bars her retrial for Counts One and Three.  The Double Jeopardy Clause provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V; see also Benton v. Maryland, 395 U.S. 784, 794 (1969) (applying the Double Jeopardy Clause to the States through the Fourteenth Amendment).

To succeed on a double jeopardy challenge, the defendant must show that (1) jeopardy attached in the original state court proceeding and (2) "the state court terminated jeopardy in a way that prevents reprosecution." Gonzalez, 382 F.3d at 8.

In this case, there is no dispute that jeopardy attached when the jury was empaneled and sworn. See Martinez v. Illinois, 572 U.S. 833, 839 (2014) (per curiam). Rather, the question is whether the court terminated jeopardy (i.e., whether the trial ended) in a way that prevents a second trial. Read offers two alternative arguments: first, that the court erred because there was no "manifest necessity" to declare a mistrial on two counts and, second, that the jury effectively acquitted her on those two counts.

### III. Discussion

#### A. Manifest Necessity

We begin by summarizing the legal principles relevant to Read's "manifest necessity" claim. Under our constitutional framework, a defendant generally may not be retried for a charge if, after trial begins, the court discharges the jury without the defendant's consent. United States v. Ramirez, 884 F.2d 1524, 1528 (1st Cir. 1989). This stems from a defendant's "valued right to have [her] trial completed by a particular tribunal." Id. (quoting Wade v. Hunter, 336 U.S. 684, 689 (1949)). But this right "is not absolute; it is subject to the rule of 'manifest

necessity.'"  Id. (quoting United States v. Perez, 22 U.S. 579, 580 (1824)).

Under the doctrine of manifest necessity, trial judges may not foreclose the defendant's right to have that particular jury reach a verdict "until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings."  Id. (quoting United States v. Jorn, 400 U.S. 470, 485 (1971)).  The Supreme Court has defined "manifest necessity" as meaning a "high degree" of necessity.  Renico v. Lett, 559 U.S. 766, 774 (2010) (quoting Arizona v. Washington, 434 U.S. 497, 506 (1978)).  A deadlocked jury is the "classic example" of a situation where declaring a mistrial is manifestly necessary.  Id. (quoting Downum v. United States, 372 U.S. 734, 736 (1963)).  The government may then retry the defendant for the charge, or charges, on which the jury deadlocked.  Id.

Relatedly, while a trial court's decision to declare a mistrial based on "manifest necessity" is "accorded great deference," that deference does not "end the inquiry" and can be overcome.  Washington, 434 U.S. at 510, 514.  Because the decision affects a defendant's constitutionally protected interest "to conclude [her] confrontation with society through the verdict of a tribunal [she] might believe to be favorably disposed to [her] fate," id. at 514 (quoting Jorn, 400 U.S. at 486), "reviewing

courts have an obligation to satisfy themselves that . . . the trial judge exercised 'sound discretion' in declaring a mistrial," id. For example, a trial court has not exercised "sound discretion" if it "acts irrationally or irresponsibly," id., or "for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling," id. at 510 n.28.

Read argues that the trial judge made a "precipitous decision" in declaring a mistrial, emphasizing that only two minutes passed between the trial court announcing that it had received a third jury note -- by stating, "the jury is at an impasse" -- and discharging the jury. Read also argues that the record suggests that the court did not consider alternatives to declaring a mistrial or even discuss the possibility of a mistrial with the parties.

In response, the Commonwealth counsels that we take a broader view of the relevant timeline. It argues that the trial court took careful steps throughout deliberations in responding to the jury's notes and only declared a mistrial when it was clear, after the third such note, that the jury was truly deadlocked. The Commonwealth further argues that federal courts have never required a trial court to take any particular steps when confronted with a deadlocked jury and that the judge exercised sound discretion under these circumstances. In addition, the Commonwealth argues that, contrary to Read's suggestion, the trial

judge was not required to ask the jury about a partial verdict or poll individual jurors, as doing so may have improperly risked coercing a verdict.

In determining whether the declaration of a mistrial reflected a trial judge's sound discretion and was "reasonably necessary under all the circumstances," we consider "whether the district court explored other options, gave counsel the opportunity to object, and acted 'after sufficient reflection.'" United States v. Candelario-Santana, 977 F.3d 146, 158 (1st Cir. 2020) (quoting United States v. Toribio-Lugo, 376 F.3d 33, 39 (1st Cir. 2004)); see also Brady v. Samaha, 667 F.2d 224, 229 (1st Cir. 1981) (stating that whether the "record indicates [the judge] has considered alternatives to a mistrial is significant," as is "affording counsel an opportunity to be heard on the subject"). Among other factors, the amount of time that the judge takes with the mistrial decision is relevant: "A precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial, would tend to indicate insufficient concern for the defendant's constitutional protection." Brady, 667 F.2d at 229. But there is no "mechanical rule" or set of "specific steps" that a trial court must follow before declaring a mistrial due to deadlock. Candelario-Santana, 977 F.3d at 158. Rather, the court must only take "some step" to ensure the jury is actually deadlocked. Id.

We agree with the Commonwealth and the district court that we must consider the trial court's actions throughout jury deliberations and not limit our review solely to the court's response to the third jury note. See Read, 2025 WL 815048, at *8. Thus, we return to the judge's actions during that period.

Recall that the trial judge received the first jury note about its difficulty in reaching a unanimous verdict after the jury had been deliberating for around nineteen hours. See id. at *1. Upon receiving the note, the trial judge shared it with counsel and heard their arguments on how to respond. As discussed, Read's counsel urged the judge to give a Tuey-Rodriquez instruction, arguing that the jurors had "exhausted all manner of compromise" and were "at an impasse." In other words, Read's counsel encouraged the court to find that the jury had failed to reach a unanimous verdict following "due and thorough" deliberations. See Commonwealth v. Jenkins, 625 N.E.2d 1344, 1345 (Mass. 1994) (holding that "the giving of a [Tuey-Rodriquez] charge" generally reflects a conclusion by the court that "the jury's deliberations were 'due and thorough'" within the meaning of then-applicable Mass. Gen. Laws ch. 234, § 34). This is particularly relevant because, under Massachusetts law, once a "jury, after due and thorough deliberation, returns to court without having agreed on a verdict" and is sent back out for further deliberation, but then returns to once again report a

deadlock, the court cannot require them to continue deliberating unless the jury consents. Mass. Gen. Laws ch. 234A, § 68C. However, after the first note, the court declined to give the instruction and sent the jury back to keep deliberating because it concluded that there had not yet been sufficient time for the jury to have engaged in "due and thorough deliberations."

After the second jury note, Read's counsel pressed a second time for the Tuey-Rodriquez instruction, arguing that the jury was "hopelessly deadlocked." The Commonwealth again argued it was premature, but the judge found that enough time had elapsed to conclude that the jury's deliberations were "due and thorough," and thus proceeded to give the instruction. It was only after the jury's third report of deadlock, when the court was statutorily precluded from ordering the jury to continue deliberations without their consent, that the trial court declared a mistrial. Mass. Gen. Laws ch. 234A, § 68C; Read, 250 N.E.3d at 560.

Considering the court's actions throughout jury deliberations, we find that the record, read as a whole, reflects only that the court acted diligently to avoid a mistrial. After the first note, and after consulting with the parties, it declined to give the Tuey-Rodriquez instruction and sent the jury back to deliberate. After the second note, the judge again consulted with counsel before concluding that the jury had engaged in "due and thorough deliberations" such that it was appropriate to give the

instruction.  The court then received a note in which the jury made clear not only that unanimity remained unobtainable, but also implied that the jury would not consent to further deliberations because such deliberations "would be futile" and "only serve to force [the jurors] to compromise [their] deeply held beliefs." Without that consent, the court would have been bound by statute -- the constitutionality of which Read does not challenge -- from compelling the jury to continue deliberating. Mass. Gen. Laws ch. 234A, § 68C.  While we agree there is force to the SJC's view that "the more prudent course" may have been to read the third note to counsel and allow them to weigh in, as the judge had done upon receiving the prior two notes, the court's decision not to do so with the third note was within its discretion, particularly when faced with the circumstances described above.  Read, 250 N.E.3d at 563.

Read further argues, with the benefit of hindsight and the post-trial statements from some jurors, that the trial court should have considered, as an alternative to declaring a mistrial, asking the jury to specify on which charges it faced deadlock or if its final note related to some or all of the charges.  But our point of reference is the court's knowledge at the time it declared the mistrial.  See Washington, 434 U.S. at 506 (A reviewing court must consider "the particular problem confronting the trial judge."); see also United States v. Elliot, 463 F.3d 858, 864 (9th

Cir. 2006) ("A reviewing court must determine whether such a manifest necessity existed at the time a mistrial was declared by the district court."); United States v. Cameron, 953 F.2d 240, 244 (6th Cir. 1992) (same). We cannot say that a "clear alternative," Toribio-Lugo, 376 F.3d at 39, was available to the court at the time of its decision, for the following reasons.

At that time, the only juror statements that the court had were the jury notes in front of it. The notes stated that the jury was "unable to reach a unanimous verdict" (first note); that the jury was "deeply divided by fundamental differences in [their] opinions and state of mind" and that "consensus [was] unattainable" (second note); and that the jurors' perspectives were "starkly divided," with some believing the evidence "establish[ed] the elements of the charges beyond a reasonable doubt" and others finding the evidence "[did] not sufficiently establish the necessary elements of the charges" (third note). (Emphases added). The emphasized portions were the only time that the charges were mentioned, and the jury notes contained no indication that the jury might have reached unanimous agreement on any individual count.

Read now argues that the court should have considered that "charges" might refer only to the lesser-included offenses embedded within Count Two, and, accordingly, the court should have inquired into the possibility of a partial verdict pursuant to

Massachusetts Rule of Criminal Procedure 27(b). Mass. R. Crim. P. 27(b) (providing that the court "may first require the jury to return verdicts on . . . charges upon which the jury can agree" before "declar[ing] a mistrial as to any charges upon which the jury cannot agree"). But the interpretation of the notes that Read now advances only seems plausible in light of the post-trial statements that did not exist and were therefore unavailable to the court when it had to make its decision. On their face, the notes appear to make a series of definite assertions that the jury could not reach any unanimous verdict. Thus, while it would have been within the court's discretion under Massachusetts Rule of Criminal Procedure 27(b) to inquire into the existence of a partial verdict, there was no apparent need to do so here. Nor was this alternative proposed by Read's counsel during the two opportunities counsel was given to consult with the court regarding the jury's reported deadlock or upon learning that the jury had returned to report an impasse for the third time.[6] It follows that at the time of the court's decision, considering the information the court had before it, there was no readily apparent alternative to declaring a mistrial. For these reasons, we are satisfied that

---

[6] We note that there is nothing in the third note that changes the calculus. Indeed, the third note -- which says that the jury remained divided on the "charges" -- is the note that is most facially inconsistent with the possibility of there being a partial verdict.

the trial court exercised "sound discretion" in declaring a mistrial.[7]  See Washington, 434 U.S. at 514.

### B. Post-Trial Statements

Next, Read argues that several jurors' post-trial statements establish that the jury actually acquitted her on two counts, such that she may not be re-prosecuted on those counts. As an alternative remedy, she requests a hearing to ask the original jurors whether they acquitted her on Counts One and Three.

### 1. Whether an Acquittal Occurred

"[A] verdict of acquittal is final, ending a defendant's jeopardy, and . . . bar[ring] a subsequent prosecution for the same offence."  McElrath v. Georgia, 601 U.S. 87, 94 (2024) (quoting Green v. United States, 355 U.S. 184, 188 (1957)). "[W]hether an acquittal has occurred for purposes of the Double Jeopardy Clause is a question of federal, not state, law."  Id. at 96.

Under the Double Jeopardy Clause, an "acquittal . . . encompass[es] any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense."  Id. at 94 (quoting Evans v. Michigan, 568 U.S. 313, 318 (2013)).  "[A]n acquittal has occurred if the factfinder 'acted on

---

[7] Given our conclusion that the trial court exercised sound discretion in granting a mistrial, we need not address the Commonwealth's alternative argument that Read's counsel impliedly consented to a mistrial.

its view that the prosecution had failed to prove its case.'" Id. at 96 (quoting Evans, 568 U.S. at 325). In deciding whether a defendant was acquitted, we "focus on substance over labels," and "look to whether the ruling's substance relates to the ultimate question of guilt or innocence." Id. at 94, 96 (cleaned up) (quoting United States v. Scott, 437 U.S. 82, 98 n.11 (1978)). In addition to a jury's formal verdict, a ruling that precludes retrial can include, for example, a judge's order granting a motion of acquittal, even if that order is mistaken or based on legal error. See, e.g., Smith v. Massachusetts, 543 U.S. 462, 467-69 (2005); United States v. Martin Linen Supply Co., 430 U.S. 564, 571-72 (1977).

Read argues that there was an acquittal because "[t]he 'ruling' here was the jury's unanimous and final decision, reflected in the post-trial affidavits, that Read is not guilty." She offers no case law that directly supports her argument. Instead, she points to cases where the jury returned a verdict, and the verdict form was later amended to fix an error. See United States v. Dotson, 817 F.2d 1127, 1129 (5th Cir.), vacated in part on other grounds, 821 F.2d 1034 (5th Cir. 1987); United States v. Stauffer, 922 F.2d 508, 511 (9th Cir. 1990).

The Commonwealth counters that there was no valid jury verdict here under Massachusetts law. In particular, the Commonwealth emphasizes that under state law, "a criminal verdict

is effective only when affirmed by jurors in open court." (Quoting Read, 250 N.E.3d at 565). The Commonwealth also notes that federal law accords with this principle. See, e.g., Blueford v. Arkansas, 566 U.S. 599, 601 (2012).

Here, binding precedent is dispositive. In Blueford v. Arkansas, the Supreme Court considered whether an acquittal had occurred where, before a mistrial was declared, the jury foreperson reported in open court that the jury had voted unanimously against guilt on two of four charges but then returned to deliberating. 566 U.S. at 601, 610. The Court held that the defendant was not acquitted of those two charges based on the possibility that jurors could have changed their minds during the time they continued deliberating but before a mistrial was declared. Id. at 606-08. In other words, even where the jury foreperson had reported in court a unanimous vote to acquit on two charges, that was insufficient because deliberations were ongoing and the verdict was not final. See id.

Read's evidence is far weaker than the facts in Blueford. The statements here do not describe when any votes were taken or whether such votes were preliminary or formal. Like Blueford, there is no sign that a final vote was taken, meaning that if any deliberations continued after a vote, jurors could have changed their minds. See id. at 606, 608. Nor did the jury announce its verdict in open court. Cf. id. at 603-04. Instead, the only

communications the jury made were about its inability to reach a consensus.  Therefore, even if we assume that the jury unanimously voted in private that the prosecution had failed to prove its case on Counts One and Three, the jury did not "act[] on [that] view." McElrath, 601 U.S. at 96 (quoting Evans, 568 U.S. at 325).  There was simply no act here that could be considered a "ruling" or characterized as an acquittal.

### 2. Post-Trial Hearing

Read requests a post-trial hearing to question the original jurors as to whether they acquitted her on Counts One and Three during their deliberations.  But on the facts here, we agree with the district court that there was no final "ruling" of acquittal that would trigger double jeopardy concerns such that post-trial inquiry of the jurors would be appropriate.  See Read, 2025 WL 815048, at *11.  We also share the district court's concerns about conducting such a hearing.  Typically, the content of jury deliberations is kept secret to enable jurors to discuss their views freely and frankly and to protect them from harassment. See Tanner v. United States, 483 U.S. 107, 120 (1987).  The district court found that these concerns -- the "freedom of juror deliberations and the protection of jurors against harassment" -- were "unquestionably implicated" in this case. Read, 2025 WL 815048, at *15.  We agree with the district court that such a hearing would not be appropriate here.

### IV. Conclusion

The district court's decision is **<u>affirmed</u>**.   Read's motion to stay the state court proceedings pending appeal is **<u>denied</u>** as moot.